**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| ──────────────────── x | | |
| BUILDING TRADES PENSION FUND OF WESTERN PENNSYLVANIA, Individually and on Behalf of All Others Similarly Situated, | : : : | Case No. |
| | : | <u>CLASS ACTION</u> |
| Plaintiff, | : : | |
| | : | |
| v. | : : | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| | : | |
| INSPERITY, INC., PAUL J. SARVADI, and DOUGLAS S. SHARP, | : : | |
| | : | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | : : | |
| | : | |
| ──────────────────── x | | |

**INTRODUCTION**

Plaintiff Building Trades Pension Fund of Western Pennsylvania ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Insperity, Inc. ("Insperity" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**OVERVIEW OF THE ACTION**

1.      This is a securities class action brought on behalf of all persons or entities who purchased or otherwise acquired Insperity common stock from February 11, 2019 through February 11, 2020, inclusive (the "Class Period").  The action is brought against Insperity and certain of its officers and/or directors (collectively, "Defendants") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.      Insperity provides human resource ("HR") services and employee benefits to small and medium-sized business customers, including group health insurance plans.  A majority of these plans are provided by UnitedHealthcare Insurance Company ("UnitedHealthcare").  According to Insperity, it considers the UnitedHealthcare offering to be one of the "most significant elements of [its] employee benefits package."  Under its contract with UnitedHealthcare, Insperity is liable for plan costs (primarily medical claims from its customers' employees) that exceed the fixed premiums paid and owed to UnitedHealthcare.

Therefore, Insperity's ability to properly estimate and report its medical claims expense is important to its investors.

3.     On February 11, 2019, the start of the Class Period, Insperity reported its fourth quarter and full-year 2018 financial results, which results were up significantly year-over-year. Additionally the Company offered bullish full-year 2019 guidance.  Likewise, on April 29, 2019, Insperity reported "record" first quarter results, and raised its full-year 2019 guidance. Therefore, at least according to Defendants' narrative, Insperity was poised to deliver a record year of growth as a result of the Company's successful business model.  As a result, Insperity's stock price dramatically increased during the first half of 2019.

4.     Unknown to the market at this time, however, was that Defendants' statements were materially false and misleading.  Specifically, Defendants failed to disclose, and would continue to omit, the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by Defendants:

(a)     the Company had failed to negotiate appropriate rates with its customers for employee benefit plans and did not adequately disclose the risk of large medical claims from these plans;

(b)     Insperity was experiencing an adverse trend of large medical claims;

(c)     as a mitigating measure, the Company would be forced to increase the cost of its employee benefit plans, causing stunted customer growth and reduced customer retention; and

(d)     the foregoing issues were reasonably likely to, and would, materially impact Insperity's financial results.

5.      The truth about Insperity's deceptive business practices was revealed through a series of disclosures.  First, on July 29, 2019, Insperity released its second quarter 2019 financial results.  Despite delivering year-over-year growth and meeting analysts' estimates, the Company offered disappointing third quarter 2019 guidance and reduced its full-year 2019 guidance.  Further, Defendants revealed that in the second quarter 2019, Insperity had experienced an increase in large medical claim costs, which Defendants described as an anomaly which would not impact projected cost benefit trends.  On this news, Insperity shares fell $35.74 per share, or 25 percent.

6.      Second, on November 4, 2019, Insperity released its third quarter 2019 financial results, which substantially missed analysts' estimates and were materially down year-over-year.  In addition, Insperity materially reduced its full-year 2019 guidance.  Defendants attributed these results to continued large medical claim costs, which they again attempted to describe as a mere anomaly to assuage investor concern.  On this news, Insperity shares fell by $36.29 per share, or 34 percent.

7.      Finally, on February 11, 2020, after the close of trading, Insperity released its fourth quarter and full-year 2019 financial results.  While the Company's results were in line with its (repeatedly downgraded) financial forecasts, Insperity revealed that large medical claims had *again* impacted the Company by significantly increasing operational costs.  Further, the Company stated that it had restructured its contract with UnitedHealthcare to no longer have financial responsibility for any medical claims over $1 million.  Finally, Insperity offered disappointingly bearish guidance for the first quarter and full-year 2020.  Analysts immediately lowered their views on Insperity stock.  For example, analysts at Baird cut their rating from "Outperform" to "Neutral" stating that "after three quarters, rising jumbo claims appear to be a

trend, not aberrational." On this news, Insperity shares declined by $17.44 per share, or 20 percent.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) as Insperity maintains offices in this District, does a significant portion of its business in this District, and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.  In addition, Insperity common stock trades on the New York Stock Exchange ("NYSE").

11.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12.      Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased Insperity common stock during the Class Period and was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

13.      Defendant Insperity is a Delaware corporation headquartered in Kingwood, Texas.  The Company's stock is listed on the NYSE under the ticker symbol "NSP."

14. Defendant Paul J. Sarvadi ("Sarvadi") was, at all relevant times, Insperity's Chief Executive Officer ("CEO"), and the Chairman of the Company's Board of Directors.

15. Defendant Douglas S. Sharp ("Sharp") was, at all relevant times, Insperity's Chief Financial Officer ("CFO"), Treasurer, and Senior Vice President of Finance.

16. Defendants Sarvadi and Sharp are sometimes collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Insperity's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17. Insperity and the Individual Defendants are referred to herein, collectively, as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

18. Insperity provides its customers with an array of HR and business outsourcing solutions designed to help improve business performance. These solutions include, *inter alia*,

5

payroll and employment administration, employee benefits, workers' compensation, government compliance, performance management, and training and development services. The Company's customers are small to medium-sized businesses with 10 to 5000 employees that operate in a variety of sectors including medical, information technology, retail, manufacturing, finance, and real estate.  Insperity operates across the Unites States, with its most substantial business concentrated in New York, California, and Texas.

19.     Insperity enters into a service agreement with each of its customers whereby the Company and its customer act as co-employers of the employees who work at the customer's worksite ("WSEE"). Through these agreements, Insperity assumes responsibility for personnel administration and assists its customers in complying with employment-related governmental regulations, while the customer retains the employees' services for its business.

20.     In its suite of outsourced HR solutions, Insperity administers employee benefit plans to its WSEEs, including group health insurance plans for medical, dental, vision and prescription drug coverage.  All benefit plans are provided to eligible employees based on the specific eligibility provisions of each plan.  Insperity is the policyholder responsible for the costs and premiums associated with any group insurance policies that provide benefits under these plans, and the Company acts as plan sponsor and administrator of the plans to its WSEEs. Insperity is responsible for negotiating the terms and costs of the plans, maintaining the plans in accordance with applicable federal and state regulations and serves as liaison for the delivery of these benefits to its WSEEs.

21.     As of February 11, 2019, Insperity's contract with UnitedHealthcare provided approximately 86 percent of the Company's health insurance coverage.  According to Insperity,

its contract with UnitedHealthcare is one of "the most important elements of [its] employee benefits packages."

22.     Under Insperity's contract with UnitedHealthcare, if plan costs, including medical claims, exceed the premiums paid and owed to UnitedHealthcare, the Company would be required to accrue a liability for the excess costs on its balance sheet.

23.     Therefore, it is integral for Insperity to negotiate the appropriate pricing for its benefit plans to appropriately cover medical claims expenses while also remaining competitive in order to retain existing clients and attract new business.  Moreover, it is important that Insperity properly estimate and report its medical claims expense and the related liability to its investors.

## Materially False and Misleading Statements

24.     The Class Period begins on February 11, 2019.  On that date, Insperity reported positive financial results for its fourth quarter and full-year 2018.  For the year ended December 31, 2018, Insperity reported that its net income increased 60 percent over 2017 to $135.4 million, and that its diluted net income per share had increased 60 percent per share to $3.22. The Company also reported that its adjusted EPS increased 53 percent over 2017 to $3.75, and Adjusted EBITDA increased 35 percent to $239.6 million.

25.     Insperity's fourth quarter 2018 net income and diluted earnings per share of $24.7 million and $0.59, respectively, represented increases of 59 percent and 64 percent, respectively, compared to the fourth quarter of 2017.  The Company's adjusted EPS for its fourth quarter 2018 was $0.69, a 25 percent increase over the fourth quarter of 2017.  Finally, Insperity's adjusted EBITDA for the fourth quarter 2018 increased 24 percent over the fourth quarter of 2017 to $47.6 million.

26.     Insperity also issued a strong financial outlook.  The Company guided that for the full-year 2019, it would have an average of 238,400 to 242,600 WSEEs, a yearly increase of 14 to 16 percent, and an adjusted EPS of $4.37 to $4.69, a yearly increase of 17 to 25 percent. The Company also projected adjusted EBITDA of $268 to $285 million for the full-year 2019, a yearly increase of 12 to 19 percent.

27.     Defendants Sarvadi and Sharp were both quoted in the fourth quarter 2018 earnings release lauding the Company's financial results.  For example, Defendant Sarvadi was quoted stating that this was the "fourth year in a row with growth in adjusted EBITDA above 25%," and that "[a]s a result of [Insperity's] successful fall selling and retention campaign, [the Company was] starting 2019 with 15% worksite employee growth and [was] well positioned to continue [its] strong financial performance."  Defendant Sharp was quoted attributing the "significant improvement in our profitability over the past four years" to "[a]cceleration of worksite employee growth into the mid-teens, improved pricing and effective management of our direct costs and operating expenses."

28.     Additionally on February 11, 2019, Insperity filed its 2018 annual report with the SEC on Form 10-K, reporting the results outlined above.  Under Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303("Item 303"), Defendants Sarvadi and Sharp were required to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations," within Insperity's 2018 Form 10-K.

29.     Finally on February 11, 2019, Insperity hosted a conference call with analysts and investors to discuss the Company's results.  When discussing the strong momentum in the fourth quarter of 2018, Defendant Sharp stated that this momentum has carried over into 2019,

leaving the Company well-positioned, and that the strong quarter had more than offset higher than expected medical claims, stating in pertinent part:

> As for the fourth quarter details, average paid worksite employees increased by 17% over Q4 of 2017 at the high end of our forecasted range. Client retention remained strong, again averaging over 99% for the quarter. As for our sales efforts, worksite employees paid from new sales increased by 36% on a 13% increase in the average number of trained Business Performance Advisors on continued sales momentum in both our core and mid-market clients segments.
>
> As Paul will discuss in detail in a few minutes, **this momentum continued through year end with a successful fall sales campaign and client renewal period, leading to a strong starting point for 2019**. Our gross profit increased by 13% over Q4 of 2017, on continued pricing strength and favorable results in our workers' compensation and payroll tax direct cost areas. **Positive results in these areas was partially offset by slightly higher-than-expected Q4 medical claims**.

30.     On the February 11, 2019 earnings call, Defendant Sharp described how the Company arrived on its "conservative" 2019 financial forecasts, which included accounting for medical claim "trends," stating in pertinent part:

> Thanks, Paul. Now, let me provide our 2019 guidance beginning with the full-year. Paul just mentioned we are forecasting a 14% to 16% increase in average paid worksite employees over 2018 to a range of 238,400 to 242,600.
>
> Our forecast is based upon our successful year-end transition of new and renewing accounts, 15% growth in the average number of trained Business Performance Advisors, while maintaining recent sales efficiency levels, and continued success in our mid-market client segment.
>
> For the full-year of 2019, we are budgeting client retention consistent with 2018 and slightly less net hiring in our client base as we intend to take a more conservative approach to this metric at the outset of the year.
>
> **As for our gross profit area, we have gone through our usual budget process of analyzing client mix, pricing, and direct cost, including healthcare and workers' compensation claim trends**.

> *Similar to prior years, our budget process is intended to begin the year with a conservative forecast for direct cost trends and leave the upside to favorable developments as we manage pricing and direct cost over the course of the year*.

31.     Following Defendants' positive statements regarding Insperity's financial prospects for 2019, the price of the Company shares increased significantly.  Specifically, on February 11, 2019, Insperity shares *increased by $21.07, or 19 percent*, from the previous trading day's closing price of $110.90 per share, to close at $131.97 per share on February 11, 2019.

32.     On April 29, 2019, Insperity reported its financial results for the first quarter of 2019 on SEC Form 8-K.  In the earnings release, the Company reported year-over-year growth in all key financial metrics.  Specifically, compared to the Company's first quarter 2018 results, average WSEEs paid were up 15 percent, net income was up 53 percent, adjusted EPS was up 40 percent, and adjusted EBITDA was up 21 percent.  Furthermore, Insperity increased its full-year 2019 adjusted EPS and adjusted EBITDA guidance to ranges of $4.55 to $4.80, and $276 to $289 million, respectively.

33.     Both Defendants Sarvadi and Sharp were quoted in the first quarter 2019 earnings release lauding the Company's financial results.  For example, Defendant Sarvadi attributed Insperity's "*record first quarter results*," to "*the strength of [the Company'] business model and continued execution of [their] strategic plan*."  Defendant Sarvadi further stated that the "*results further demonstrate[d] the sustainability of [Insperity's] rapid growth and profitability experienced over the last several years into 2019*."  Defendant Sharp echoed this positive sentiment, stating that "*[w]orksite employee growth in the mid-teens, combined with effective management of pricing, direct cost programs and operating costs, produced adjusted EBITDA and cash flow at record levels*."

34.     Additionally on April 29, 2019, Insperity filed its first quarter 2019 quarterly report with the SEC on Form 10-Q, reporting the results outlined above.  Under Item 303, Defendants Sarvadi and Sharp were required to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations," in Insperity's first quarter 2019 Form 10-Q.

35.     Finally, on April 29, 2019, Defendants hosted a conference call with analysts and investors to discuss the Company's first quarter 2019 financial results.  On the call, Defendant Sarvadi attributed the sustainability of the Company's record EBITDA growth to "four pillars," one of which being the "management of price and costs," stating in pertinent part:

> **After four years in a row increasing our adjusted EBITDA by more than 25%, a natural question is how sustainable are these strong results**. **There are four pillars to our business model supporting the sustainability of our high performance**; **consistent predictable growth, management of price and costs, operating leverage and the share size of our market opportunity**.
>
> Our proven capability to generate consistent predictable double-digit unit growth is the platform for sustaining this level of performance. This competency comes from the combination of a professional, dedicated service organization, delivering on our promises and achieving exemplary retention results. And a high performance sales organization hiring, training and supporting BPAs to drive sales success at targeted levels.
>
> **We've also proven over many years our proficiency at managing employment costs and effectively matching pricing to clients to achieve targeted levels of profitability, while providing a more stable cost environment for clients. This is a central element to the sustainability of the high performance of our business model**. Our business model also has operating leverage built in as approximately 55% of our expenses are variable increasing along with our growth, while the other 45% are fixed or semi variable. Investments in growth, service, technology or compliance can be readily managed to balance growth and profitability.

> Our vast market opportunity is the fourth pillar, allowing for
> continuing exemplary high growth and profitability. Over 60% or
> 70 million people in the United States work for companies in our
> addressable market. Demand for our services has been growing in
> recent years, and Insperity is in a unique position to capitalize on
> this opportunity.

36.     The statements referenced in ¶¶ 26–35 above were materially false and/or

misleading when made because they failed to disclose the following adverse facts pertaining to

the Company's business, operations, and financial condition, which were known to or recklessly

disregarded by Defendants:

(a)     the Company had failed to negotiate appropriate rates with its customers

for employee benefit plans and did not adequately disclose the risk of large medical claims from

these plans;

(b)     Insperity was experiencing an adverse trend of large medical claims;

(c)     as a mitigating measure, the Company would be forced to increase the

cost of its employee benefit plans, causing stunted customer growth and reduced customer

retention; and

(d)     the foregoing issues were reasonably likely to, and would, materially

impact Insperity's financial results.

37.     Moreover, Defendant Sarvadi and Sharp's failure to disclose adverse material

trends in Insperity's annual and quarterly reporting with the SEC violated Item 303, because the

undisclosed facts listed above were known to Defendants, and would (and did) have an

unfavorable impact on the Company's financial results.

### Adverse Trends Begin to Manifest; Defendants Downplay as Aberrational

38.     Following the Company's release of favorable first quarter 2019 financial

results, as well as the upward revision to its full-year 2019 guidance, Insperity shares enjoyed

steady gains throughout the second quarter of 2019.  These gains accelerated in anticipation of the release of the Company's second quarter 2019 financial results, reaching Class Period highs of nearly $145 per share on July 26, 2019.

39.     Insperity released its second quarter 2019 results on July 29, 2019.  Despite delivering year-over-year growth and meeting analysts' estimates, the Company issued weak third quarter 2019 guidance, and lowered its full-year 2019 guidance.  Specifically, Insperity projected that its adjusted EPS for the third quarter 2019 would be between $1.00 and $1.04 per share, when analysts had forecasted the Company to deliver adjusted EPS of $1.09 per share.  Further, Insperity reduced its projected average WSEEs for full-year 2019 to a range of 237,350 to 239,500, down from guidance of 238,400 to 242,600.  Finally, Insperity altered its full-year 2019 adjusted EPS and adjusted EBITDA by increasing the low-end of the forecasted ranges, yet decreasing the high-end, to ranges of $4.59 to $4.74, and $278 to $286 million, respectively.

40.     In the earnings release, Defendants stated that WSEE growth had been favorable "in spite of lower than expected hiring in [the Company's] client base," which had resulted in "lower than expected" net gains in the Company's client base, and that profits had been impacted by "higher than expected benefit costs, driven by large claim activity."

41.     Additionally on July 29, 2019, Insperity filed its second quarter 2019 quarterly report with the SEC on Form 10-Q, reporting the results outlined above.  Under Item 303, Defendants Sarvadi and Sharp were required to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations," in Insperity's second quarter 2019 Form 10-Q.

42.     Finally, on July 29, 2019, Defendant held a conference call with analysts and investors to discuss Insperity's second quarter 2019 financial results.  On the call, Defendant Sharp attributed lower net gains in the Company's client base to lower hiring rates in June 2019, and that upon review, the increased large healthcare activity was abnormal, and not anticipated to impact expected benefit cost trends, stating in pertinent part:

> Net gains in our client base were lower than expected particularly during the month of June as a result of less hiring of fulltime and seasonal employees by our clients. During the second quarter, net gains in our client base were down by 15% from Q2 of 2018, even though the client base is significantly larger.

> Gross profit increased by over 12% over Q2 of 2018 and included higher than forecasted benefit costs, partially offset by favorable results in our workers' compensation program and higher pricing. ***The higher benefit costs resulted from large healthcare claim activity, in which these claims were approximately 22% of total healthcare claims during Q2 compared to normal and recent historical levels of 18% to 20%.***

> ***Now, while the higher than expected large claim activity may happen in the quarter from time-to-time with a plan our size, a detailed analysis of the underlying Q2 claims data, benefit plan participant data and plan migration still indicates a full-year 2019 expected benefit cost trend of only 2% to 2.5%.***

43.     Additionally on the July 29, 2019 call, Defendant Sarvadi attempted to explain the large claim activity as aberrational, in that it was the coincidental concentration of larger claims within the quarter, stating in pertinent part:

> ***A second issue that presented in the second quarter was an unusually high incident and severity rate of large healthcare claims.*** As we have discussed on many occasions, the predictability of the cost of our health plan is excellent on an annual basis which is how health plans are typically managed. ***However, somewhat random over the course of any given year, whether a concentration of large claims may occur within one particular quarter. This is what we believe happened in the second quarter this year.***

14

44.     On the call, Defendant Sarvadi also attributed lower hiring to a "tight labor market," which was an "overall positive," stating in pertinent part:

> Our recruiting team identified some trends -- recent trends resulting from the unusual combination of the unemployment rate at a 49 year low, and more job openings than people looking for work. Competition for employees is substantial and many candidates are receiving multiple offers and have their pick of opportunities.
>
> Companies have responded by accelerating the hiring process with many candidates receiving offers within 24 hours of an interview.
>
> In addition candidates are turning down offers because they've accepted counteroffers from their current employers. As a result, the ratio of recruiter interviews to hires is tracking at 14:1 which is much higher than previous year's at 7:1.
>
> ***Now even though a tight labor market can make the net hiring in our client base a bit choppy, it's an overall positive for our business***. Through Insperity, clients have the benefits and services they need to compete against big companies in hiring and retaining authorities. This is certainly the advantage our prospective clients are seeking today.

45.     Analysts pushed for more information regarding the unusually large claims on the July 29, 2019 earnings call.  In response, Defendant Sharp defined "large" claims as those that were greater than $50,000.  He then assured that these large claims were being offset by other favorable areas of the business, stating in pertinent part:

> So I talked about in my prepared remarks that we're at about 22% of total claims versus our normal 18% to 20% and that's under definition of claims over 50,000 and above is how we define that, and it equates to about $15 million over and above recent trends. Now, as Paul mentioned, the normal trend below that ran better than expected. So at the end of the day, the benefit costs were lower versus our expectations, being that $15 million number.
>
> Okay. Then when you offset the better pricing in the favorable areas -- other favorable areas that are direct costs and operating costs, that's helped to offset that entirely. That gives you a little of favors as to the dollar extent of a large claim activity. I think

obviously the bottom-line is that you have normal large claim activity, it would have been quite a quarter. And so, that definitely impacted us along with the net layoffs -- both lower net gains in the client base.

46.     Defendant Sharp was further pressed by analysts as to whether these large claims would continue into the third quarter of 2019, and whether this activity was embedded in the Company's guidance.  Defendant Sharp replied, stating in pertinent part:

> ***So, as we also mentioned, we look at all of the detailed claims data relative to those large claims. We also look at the demographics of the plan, age, gender, geographic, the members in the plan, plan migration et cetera. All those things are running favorably for the plan itself***. And so, I think we've started the year staying at about 2% to 3% medical claim cost trend for 2019. First quarter came out a little bit better than what we expected. So that was below 2% where we are today. And I mentioned now we're forecasting this to 2.5% range or so. ***And so, still a very favorable claim cost -- benefit cost trend that we're looking at***.

47.     Despite Defendants' attempt to assure the market that the large claims and lower hiring rates would not materially impact the Company's financial results, investors balked at the third quarter guidance, sparking a sell-off in Insperity shares.  Following the release of the Company's second quarter results and commentary from the related earnings call, ***Insperity shares fell $35.74, or 25 percent***, closing at $108.89 per share on July 29, 2019, down from the previous trading day's close of $144.63 per share.

48.     Certain analysts, however, did not share the market's sentiment.  For example, in a report titled "Buy the Dip" from SunTrust Robinson Humphrey, an analyst stated that while medical claims had impacted the Company, "[s]tatistically, a surge in large claims can occur in any given quarter but is unlikely to repeat in multiple consecutive quarters."  Additionally, in a report from Roth Capital Partners titled "2Q19 In-Line, Fundamentals Still Strong; Selloff Presents Opportunity," the analyst stated that Insperity had adequately "tempered" expectations

on WSEE growth, that the large claims had been "offset by other items," and "importantly, [Insperity] still sees benefits costs increases of just 2-2.5%."

49.     This positive analyst commentary continued during the start of the third quarter of 2019.  For example, a September 2019 analyst report from SunTrust Robinson Humphrey stated that they believed "3Q is likely to restore confidence in the attractive growth algorithm of mid-teens volume and 25%+ EBITDA," and "there has been a sharp disconnect between NSP's business trends and the stock post-2Q and look for shares to bounce as 2H19 demonstrates business momentum remains strong."

50.     On November 4, 2019, Insperity released exceptionally disappointing third quarter 2019 financial results.  The Company posted adjusted EPS of $0.75, down 22 percent year-over-year, and missing analysts' estimates by approximately 26 percent.  The Company also reported that net income and adjusted EBITDA had decreased 29 percent and 17 percent year-over-year to $26 million and $51 million, respectively, due to "elevated benefit costs." Insperity also reduced its full-year 2019 guidance, projecting average WSEEs between 235,700 to 236,300, and adjusted EPS and adjusted EBITDA at ranges of $4.08 to $4.20 and $247 to $253 million, respectively.  Insperity attributed these poor results and weak guidance to "*[h]igher healthcare costs*" which "***were driven primarily by large claim activity, which declined from the second quarter of 2019, but remained elevated from historical and expected levels.***"

51.     In spite of these subpar results, however, Defendant Sharp was quoted in the earnings release stating that Insperity's "long-term outlook for outlook for growth and profitability remain[ed] strong."  Defendant Sarvadi was also quoted stating that the Company's "fall campaign is off to an excellent start."

52.     Additionally on November 4, 2019, Insperity filed its third quarter 2019 quarterly report with the SEC on Form 10-Q, reporting the results outlined above.  Under Item 303, Defendants Sarvadi and Sharp were required to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations," in Insperity's third quarter 2019 Form 10-Q.

53.     Finally on November 4, 2019, Insperity hosted a conference call with analysts and investors to discuss the Company's third quarter 2019 financial results.  On the call, Defendants explained that Insperity's disappointing quarter was "***driven primarily by a second consecutive quarter with elevated large claims at our medical plan and to a small degree by lower growth than expected in paid worksite employees***."

54.     Defendant Sarvadi, in reference to the slowing WSEE growth, stated that it was not due to client retention issues  but instead due to "lower growth and net change of [the Company's client base," as well as missed budgets and forecasts, stating in pertinent part:

> We began 2019 with an expectation for growth in paid worksite employees of 15% based upon our starting point in January, and our budget for each of the three growth drivers including new sales, client retention and growth in the client base. We now expect to end the year at 13% growth in paid worksite employees.
>
> ***Approximately half of this shortfall is due to lower growth and the net change in our client base and the other half due to fewer worksite employees paid from new sales from what we budgeted and forecasted as the year played out***. ***Client retention has been and is expected to be substantially on plan, continuing near historic highs***.

55.     On the related earnings call, Defendant Sharp referred to the "spike" in large claims as an "anomaly," which would soon "normalize."  Defendant Sharp further stated that these claims were caused by a small number of participants, were not concentrated in new

business, and for the most part were new claims as opposed to a continuance of the large claims

in the prior quarter, stating in pertinent part:

> Based upon our review of the detailed data we have determined the following. ***First, it's clear that only a relatively small number of claimants rather than something pervasive over our entire participant face negatively impacted our healthcare costs in Q2 in Q3***.
>
> An analysis of large claims over the past two years indicated a recent spike in activity related to participant with claims exceeding $250,000 a year. These jumbo claims from a very small number of participants were the primary driver behind our claim dollars exceeding expectations by approximately $27 million over the past two quarters.
>
> ***As a second finding our insurance carrier confirm that there is an element of randomness in the recent elevated large claim activity, and there is an expectation that it will revert back to a normal level***. The recent increase in the frequency of claimants with jumbo claims is above the level of our insurance carriers fully insured book of business whereas prior to this activity, we have historically been in line or below their book.
>
> Thirdly, an analysis of claims over $100,000 over the course of the two quarters shows that the claims were largely from different participants, as opposed to ongoing claims from the same group of participants. ***The fact that the two consecutive quarters of large claim activity were driven by two largely different groups of participants, further points to the randomness of these two isolated events***.
>
> Fourthly, a review of the clients associated with these large claims did not indicate a concentration associated with new clients. And therefore would indicate that this was not driven by adverse client selection.
>
> And finally, our comprehensive review of overall plan participant demographics such as age, gender, geographic mix, overall inpatient hospital stays, and plan migration continues to point that to favorable trends of our health plan as a whole. ***Accordingly, based upon our detailed review, our best estimate is that the spike in large claim activity during 2019 is a historical anomaly and we expect the large claim activity to normalize***.

56.     When questioned by analysts whether the increased medical claims would impact client retention due to increased rates, Defendant Sarvadi answered the question in the negative, stating that the two were unrelated, stating in pertinent part:

> ***Really no connection there because our pricing strategy really didn't – this didn't call for any change in pricing***. Remember, the total cost trend of 3.7% that we even have in this year is really favorable against the market at large as it is. Our normal pricing strategy would actually have us pricing in a higher number than that in our normal pricing. However, that number gets offset by people making plan design changes, or choosing a lower cost plan or making other changes. Where it's not – we can't really determine today what percentage increase would we have in benefits pricing in January? But we know we've built in a higher number than the 3.7, it will come out something lower than that. ***But it'll be within the range and we don't have the cost price mismatch. We don't have to go back and hurry up and increase prices on customers. That's not what's going on from this situation***.

57.     Defendant Sarvadi was further pressed by analysts about whether Insperity had ever experienced this "trend" of increased medical claims in the past. In response, Defendant Sarvadi touted the strength of Insperity's "book," and that there was no explanation for the increased claims, stating in part:

> I would say without having the benefit of going back and looking every quarter historically, but certainly and – we don't know of a time. I mean, our whole book of business constantly runs better than the United's book. They tell us that on an ongoing basis. ***The comments in our script related to these large claims, which for this period, for the first time ran above their level and it's historically been below. We don't have any reason why we're sitting here today to think they're not going to turn back to at least the normalized levels. And, frankly, I don't have any reason to think we're – based on how we run the plan***. We did a complete deep dive on the demographics to see if there's anything driving this, any source of new business, any age, gender differences, any selection that could possibly be driving this and this is not there. ***In fact, the demographic review that's 50 something page analysis, actually shows our book of business measured out in terms of the health of the book and how***

> *changes actually was a little positive*. So that's not again
> confirmed nothing they're driving these two quarters we had.

58.     On news of the second consecutive quarter of increased large medical claims and slowing WSEE growth, which were contributing to continually disappointing results and downward guidance, the market reacted negatively.  Specifically, ***Insperity shares fell by $36.29 per share, or 34 percent***, closing at $71.38 on November 4, 2019, down from the previous trading day's closing price of $107.67 per share.

59.     The statements referenced in ¶¶ 39–57 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by Defendants:

(a)     the Company had failed to negotiate appropriate rates with its customers for employee benefit plans and did not adequately disclose the risk of large medical claims from these plans;

(b)     Insperity was experiencing an adverse trend of large medical claims;

(c)     as a mitigating measure, the Company would be forced to increase the cost of its employee benefit plans, causing stunted customer growth and reduced customer retention; and

(d)     the foregoing issues were reasonably likely to, and would, materially impact Insperity's financial results.

60.     Moreover, Defendant Sarvadi and Sharp's failure to disclose adverse material trends in Insperity's annual and quarterly reporting with the SEC violated Item 303, because the undisclosed facts listed above were known to Defendants, and would (and did) have an unfavorable impact on the Company's financial results.

## THE TRUTH IS FULLY REVEALED

61.     On February 11, 2020, after the close of trading, Insperity released its fourth

quarter and full-year 2019 financial results.  While the Company's financial results were in line

with its (repeatedly downgraded) financial forecasts, Insperity revealed that large medical

claims had *again* impacted the Company by increasing operational costs by 4 percent from the

prior year:

> Gross profit increased slightly compared to the fourth quarter of 2018 to $161.9 million. ***The number of large healthcare claims declined over the past two quarters after a significant increase in the second quarter of 2019; however, the frequency of large claims and related costs remained elevated when compared to levels in prior years***. Higher benefit costs were partially offset by continued improvements in pricing. ***Operating expenses increased 4% to $134.2 million over the 2018 period, largely reflecting reduced incentive compensation costs***.

The earnings release also revealed that for the full-year 2019 Insperity had "also experienced

9% fewer WSEEs added from [it's] client base due primarily to the tight labor market."

62.     In the earnings release, the Company disclosed that it had started to take

appropriate measures to restructure the contract with UnitedHealthcare in order to adequately

manage its exposure to large insurance claims:

> "We recently added a new feature in our health plan with our national health insurance carrier to limit our exposure on our largest claims. ***Beginning in 2020, we will not have financial responsibility for any amount of a participant's annual claim costs that exceed $1 million***," said Douglas S. Sharp, senior vice president of finance, chief financial officer and treasurer. "***Although this type of coverage does not address an increase in frequency of large claims below $1 million, it does provide a level of protection against significant large claims and helps to mitigate the overall risk in our health plan***."

63.     Finally, Insperity offered bearish guidance for the first quarter and full-year

2020.  For both the first quarter and full-year 2020, the Company projected that average WSEEs

would only grow approximately 6 percent, well below the double-digit growth rates in 2019. The Company projected that first quarter 2020 adjusted EPS would be in a range of $1.61 to $1.70 per share, down 18.7 to 14.1 percent year-over-year.  Full-year adjusted EPS was projected at $3.73 to $4.16 per share, with the low end down 10 percent year-over-year. Adjusted EBITDA projections fared a little better.  First quarter 2020 adjusted EBITDA was expected at range of $98 to $103 million, down 3.4 percent year-over-year on the low end. Full-year 2020 adjusted EBITDA was projected at a range of $250 to $274 million, which was only breakeven on the low end, and a year-over-year increase of 10 percent on the high end of the guidance.

64.     Additionally on February 11, 2020, Insperity hosted a conference call with analysts and investors to discuss the Company's fourth quarter and full-year 2019 results.  On the call, Defendant Sharp again stated that the large claims were primarily resulting from *new* claims, as opposed to the existing participants from previous quarters, stating in pertinent part:

> Similar to Q3, a detailed review of the Q4 claims continued to indicate that the large claims were associated with a very small number of participants. ***The claims were largely from different participants as opposed to ongoing claims from the same group of participants in prior periods***, and a review of the clients associated with these large claims did not indicate a concentration associated with new clients, COBRA participants or a particular region.

65.     Analysts immediately lowered their views on Insperity stock.  For example, analysts at Baird cut their rating from "Outperform" to "Neutral" stating that "after three quarters, rising jumbo claims appear to be a trend, not aberrational."  The analyst further noted that while many had considered Insperity's estimates to be conservative "with the expectation for a normalization in benefit costs and continuation of double-digit" WSEE growth, that "neither occurred."

66.     On this news, Insperity shares again declined for the third quarter in a row.  On February 12, 2020, Insperity shares declined by *$17.44 per share, or 20 percent*, closing at $71.64 per share, down from the February 11, 2020 closing price of $89.08 per share.

## UNDISCLOSED ADVERSE FACTS

67.     The market for Insperity stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Insperity common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Insperity shares relying upon the integrity of the market price of the Company's common stock and market information relating to Insperity, and have been damaged thereby.

68.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Insperity common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  These statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Insperity's business, operations, and prospects as alleged herein.

69.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made, or caused to be made a series of materially false and/or misleading statements about Insperity's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being

and prospects, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

70.     During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

71.     The Individual Defendants permitted Insperity to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's stock.

72.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Insperity, their control over, receipt, and/or modification of Insperity's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Insperity, participated in the fraudulent scheme alleged herein.

73.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Insperity stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding Insperity's business, operations, and

management and the intrinsic value of Insperity stock and caused Plaintiff and members of the Class to purchase Insperity shares at artificially inflated prices.

## LOSS CAUSATION/ECONOMIC LOSS

74.     During the Class Period, as detailed herein, Insperity and Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Insperity stock, and operated as a fraud or deceit on Class Period purchasers of Insperity shares by misrepresenting the value and prospects for the Company's business, growth prospects, and accounting compliance.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Insperity stock fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Insperity stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

75.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiff and other members of the Class purchased Insperity stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

76.     At all relevant times, the market for Insperity stock was efficient for the following reasons, among others:

(a)     as a regulated issuer, Insperity filed periodic public reports with the SEC;

(b)     Insperity regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     Insperity was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     Insperity common stock was actively traded in an efficient market, namely the NYSE, under the ticker symbol "NSP."

77.     As a result of the foregoing, the market for Insperity securities promptly digested current information regarding Insperity from all publicly available sources and reflected such information in Insperity's stock price.  Under these circumstances, all purchasers of Insperity common stock during the Class Period suffered similar injury through their purchase of Insperity common stock at artificially inflated prices and the presumption of reliance applies.

78.     Further, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## NO SAFE HARBOR

79.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Insperity who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

80.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all person or entities who purchased or otherwise acquired Insperity common stock during the Class Period, and were damaged thereby (the "Class"). Excluded from the Class are: Defendants (as defined herein); any officers or directors of Defendants during the Class Period (the "Excluded D&Os"); members of Defendants' and the

Excluded D&Os' immediate families; the subsidiaries and affiliates of the Partnership, including the Partnership's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); any entity in which Defendants or the Excluded D&Os have or had a controlling interest; and the legal representatives, heirs, successors or assigns of any excluded person or entity.

81.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the Exchange Act was violated by Defendants;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of Insperity stock was artificially inflated; and

(f)     The extent of the damage sustained by Class members and the appropriate measure of damages.

82.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

83.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in securities class action litigation.  Plaintiff has no interests that conflict with those of the Class.

84.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT  I

### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

85.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

86.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

87.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Insperity common stock during the Class Period.

88.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Insperity shares.  Plaintiff and the Class would not have purchased Insperity stock at the prices they paid, or at all, if they had been

aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

89.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Insperity stock during the Class Period.

## COUNT  II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

90.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

91.     The Individual Defendants acted as controlling persons of Insperity within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Insperity, the Individual Defendants had the power and ability to control the actions of Insperity and its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  July 21, 2020                          Respectfully submitted,

                                                               **LABATON SUCHAROW LLP**

                                                               */s/ Francis P. McConville*
                                                               Christopher J. Keller
                                                               Eric J. Belfi
                                                               Francis P. McConville
                                                               140 Broadway
                                                               New York, New York 10005
                                                               Telephone: (212) 907-0700
                                                               Facsimile: (212) 818-0477
                                                               ckeller@labaton.com
                                                               ebelfi@labaton.com
                                                               fmcconville@labaton.com

                                                               *Attorneys for Plaintiff*

## CERTIFICATION

I, William Greer, as Trustee of Building Trades Pension Fund of Western Pennsylvania ("Building Trades Western Pennsylvania"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Building Trades Western Pennsylvania.  I have reviewed a complaint prepared against Insperity, Inc. ("Insperity") alleging violations of the federal securities laws, and authorize the filing of this pleading;

2.      Building Trades Western Pennsylvania did not purchase common stock of Insperity at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Building Trades Western Pennsylvania is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary. Building Trades Western Pennsylvania fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.      Building Trades Western Pennsylvania's transactions in Insperity common stock during the Class Period are reflected in Exhibit A, attached hereto;

5.      Building Trades Western Pennsylvania sought to serve as a lead plaintiff in the following class action under the federal securities laws filed during the last three years:

*Building Trades Pension Fund of Western Pennsylvania v. Textron, Inc.*, No. 1:19-cv-7881 (S.D.N.Y.)

6.      Beyond its pro rata share of any recovery, Building Trades Western Pennsylvania will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _20th_ day of July, 2020.


_____
William Greer
*Trustee*
*Building Trades Pension Fund of*
*Western Pennsylvania*

2

**EXHIBIT A**

**TRANSACTIONS IN INSPERITY, INC.**

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 09/25/19 | 184.00 | $97.51 | ($17,941.84) |
| Purchase | 09/26/19 | 100.00 | $99.31 | ($9,931.00) |
| Purchase | 09/27/19 | 140.00 | $98.21 | ($13,749.40) |
| Purchase | 09/30/19 | 100.00 | $98.61 | ($9,861.00) |
| Purchase | 10/01/19 | 297.00 | $96.66 | ($28,708.02) |
| Purchase | 10/01/19 | 155.00 | $97.98 | ($15,186.90) |
| Purchase | 10/02/19 | 248.00 | $96.61 | ($23,959.28) |
| Purchase | 10/03/19 | 300.00 | $95.67 | ($28,701.00) |
| Purchase | 10/07/19 | 40.00 | $98.99 | ($3,959.60) |
| Purchase | 10/08/19 | 211.00 | $98.37 | ($20,756.07) |
| Sale | 10/24/19 | -50.00 | $106.00 | $5,300.00 |
| Sale | 11/05/19 | -210.00 | $71.92 | $15,103.20 |
| Sale | 11/05/19 | -310.00 | $71.61 | $22,199.10 |
| Sale | 11/06/19 | -200.00 | $68.83 | $13,766.00 |
| Sale | 11/06/19 | -300.00 | $68.31 | $20,493.00 |
| Sale | 11/07/19 | -217.00 | $68.52 | $14,868.84 |
| Sale | 11/07/19 | -336.00 | $68.95 | $23,167.20 |
| Sale | 11/08/19 | -152.00 | $69.33 | $10,538.16 |