UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

BUILDING TRADES PENSION FUND OF
WESTERN PENNSYLVANIA, Individually
and on Behalf of All Others Similarly Situated,

                Plaintiff,

    vs.

INSPERITY, INC., PAUL J. SARVADI and
DOUGLAS S. SHARP,

                Defendants.

———————————————————— x

Civil Action No. 1:20-cv-05635-NRB

CLASS ACTION

The Honorable Naomi Reice Buchwald

CORRECTED AMENDED COMPLAINT
FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE ACTION ....................................................................................1

INTRODUCTION AND BACKGROUND ....................................................................1

JURISDICTION AND VENUE ..................................................................................14

PARTIES .....................................................................................................................14

CONTROL PERSONS ...............................................................................................15

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED
DURING THE CLASS PERIOD ................................................................................17

    Insperity Announces FY18 Results, Forecasts Significant Growth
    in FY19 Based on Purported Full View of Medical Benefit Costs
    and Growing BPA Salesforce ..........................................................................17

    Insperity Announces Mixed 1Q19 Results, Missing Revenue
    Expectations but Raises FY19 EPS and EBITDA Guidance..........................23

    Insperity Announces 2Q19 Results Negatively Impacted by
    Increased Medical Claims Costs, Reduces FY19 Guidance but
    Falsely Reassures Investors Company Remains on Track ...............................28

    Insperity Announces Disastrous 3Q19 Results Due to Continued
    Increased Medical Claims Costs and Insufficient BPAs, but Falsely
    Assures Investors of Strong Ongoing Sales.....................................................34

    Insperity Announces Weak 4Q19 Results Due to Increased
    Healthcare Benefit Claims and Higher Client Attrition; Slashes
    Outlook in Full Reset of Growth Expectations................................................43

LOSS CAUSATION/ECONOMIC LOSS ..................................................................51

NO SAFE HARBOR ..................................................................................................56

APPLICABILITY OF THE FRAUD ON THE MARKET AND *AFFILIATED
UTE* PRESUMPTION OF RELIANCE ....................................................................56

CLASS ACTION ALLEGATIONS ...........................................................................57

    COUNT I For Violation of §10(b) of the Exchange Act and Rule
    10b-5 Against All Defendants ..........................................................................59

    COUNT II For Violation of §20(a) of the Exchange Act Against
    All Defendants ..................................................................................................60

**Page**

PRAYER FOR RELIEF ............................................................................................60

JURY DEMAND .....................................................................................................61

Lead Plaintiff Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association Trust ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Insperity, Inc. ("Insperity" or the "Company"), Company press releases and conference call transcripts, analyst reports and media about the Company.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.     This is a securities class action on behalf of all persons or entities who purchased the common stock of Insperity between February 11, 2019 and February 11, 2020, inclusive (the "Class Period").  The defendants are Insperity, the Company's Chairman, President and Chief Executive Officer ("CEO"), Paul J. Sarvadi, and its Chief Financial Officer ("CFO"), Treasurer and Senior Vice President of Finance, Douglas S. Sharp.  Lead Plaintiff, on behalf of all persons or entities who purchased Insperity common stock during the Class Period, seeks remedies for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10(b)-5, promulgated thereunder.

## INTRODUCTION AND BACKGROUND

2.     Founded in 1986, Insperity describes itself as a professional employer organization ("PEO") providing an array of human resources ("HR") and business solutions to small and medium-sized business clients, including payroll, administration, employee benefits, health

insurance, workers' compensation insurance, and government compliance.  Insperity's products and services allow its clients to effectively outsource their HR departments to Insperity.

3.     With each of its clients, Insperity enters into a Client Service Agreement ("CSA"), under which the Company and the client act as co-employers of the employees who work at the client's worksite ("worksite employees" or "WSEEs").  Insperity charges its clients a comprehensive service fee that includes WSEE payroll.  When WSEE payroll is deducted, the remainder is Insperity's revenue.  Insperity's growth is primarily driven by increasing WSEEs, either by signing up new clients or when existing clients add new employees. As of December 31, 2018, Insperity serviced an average of 209,123 WSEEs per month nationwide.

4.     The CSA is generally a one- or two-year contract, subject to pricing arrangements that are typically renewed annually.  Almost half of pricing arrangements begin in January, after the existing clients receive new pricing during the prior October.  Likewise, the Company experiences its largest concentration of new clients in the first quarter as clients seeking its services often do so at the beginning of a new calendar year.

5.     In FY18, 68% of all WSEEs received group health insurance coverage through Insperity's own group insurance plan, including medical, dental, vision and prescription drug coverage.  Insperity provides approximately 87% of its group health insurance coverage through the Company's contract with UnitedHealthcare ("UnitedHealth").   Insperity is the policyholder responsible for the premiums associated with these group insurance policies.  While the health insurance carrier (*e.g.*, UnitedHealth) initially pays healthcare claims made by WSEEs, Insperity is actually responsible for paying back the carrier for all healthcare benefits delivered.  Insperity's comprehensive service fee to its clients includes a pricing component associated with its healthcare benefit costs.

4852-7784-9301.v2

6.     Sales of Insperity's HR services to new clients are generated by the Company's Business Performance Advisors ("BPAs"), who are sales representatives paid on commission.  BPAs gather information about prospective clients, generate a bid, and pitch the prospective client on using Insperity to provide HR services and benefits.  The Company's selling process typically takes 90 days for clients with less than 150 employees, and 180 days for larger "mid-market" clients with more than 150 employees.  A sale does not produce revenue until after WSEEs are enrolled and paid by Insperity, which usually takes an additional 60 to 90 days.  The Company told investors that the more BPAs it hired, the more new clients sales (and thus WSEEs) it would generate.  During FY18, the Company increased the number of WSEEs from new client sales by 27.0% over 2017, while increasing the average number of BPAs by 16.2%.

7.     At the start of the Class Period, on February 11, 2019, the Company announced its financial results for 4Q18 and FY18 and provided financial guidance for FY19, including WSEE (14%-16% growth), adjusted EPS (17%-25% growth) and adjusted EBITDA (12%-19% growth). Defendants stated that the Company was well positioned to achieve these figures because of its successful 4Q18 performance and it already had "15% worksite employee growth" to begin 1Q19.

8.     The same day, defendants discussed the FY18 results and FY19 expectations on an earnings conference call.  Defendants Sarvadi and Sharp stated that during the most recent quarter the Company experienced "slightly higher-than-expected Q4 medical claims" but annual FY18 medical claims costs had been favorable.  Defendants assured investors that their FY19 budget and financial outlook accounted for potential increases in medical claims costs and that the Company's guidance for medical claims during FY19 was conservative and based on their review of "***healthcare . . . claim trends***."

9.      In addition, defendants claimed they already had visibility into the Company's

benefits costs – which included health insurance costs – for FY19:

> We are able to see the ***full picture*** of this change each year in the first week of
> February, and we can confirm we are in ***excellent shape*** for the starting point for
> 2019.  This view into pricing includes all the elements of our direct costs, ***including***
> ***benefits*** . . . .

10.     Defendants stated that growth of the Company's BPAs was critical to driving new

client sales, and the Company was seeking to grow BPAs by 14%.  Defendants claimed that the

Company was in position to grow WSEEs at an even faster rate than BPAs, due to their new focus

on larger mid-market clients.  Defendants also claimed that the retention rate for BPAs, a position

historically plagued with high turnover, was at an all-time high.

11.     The same day, February 11, 2019, the Company filed its SEC Form 10-K for FY18,

which discussed its healthcare benefit plans and costs, described its purportedly close relationship

with UnitedHealth, and discussed its ongoing evaluation of claims experience:

> ***On an ongoing basis***, we evaluate these [liability and expenses] estimates, including
> those related to health and workers' compensation insurance claims experience . . . .

12.     Investment analysts reacted positively to the FY18 results and FY19 outlook, with

one analyst noting that "The sales force remains a key strength" and "We are encouraged by 2019

expected BPA growth of 14%."  Another analyst noted "anticipate[d] WSE growth of 14-16%,

***driven by continued growth in the sales force*** . . . ." and advised investors to purchase the stock.

13.     In response to these false and misleading statements and omissions, the Company's

stock price increased dramatically from $110.90 on February 8, 2019 (the previous trading day), to

$131.97 on February 11, 2019, an increase of 19%.

14.     On April 29, 2019, the Company announced mixed 1Q19 financial results, missing

Wall Street expectations for net revenue but achieving the Company's own guidance for EPS and

WSEEs.  While much of the WSEE growth was attributable to deals completed in the prior quarter,

Defendant Savardi attributed the results to "continued excellent execution of our strategic plan" and *increased* the Company's FY19 EPS guidance up to 28% growth and EBITDA up to 21% growth.

15.     Although the Company had previously told investors that it would be BPA growth that would drive new sales, the Company *reduced* its target for BPA growth for FY19 to 13%, from 14%, while maintaining WSEE growth targets.  Defendants claimed that their purported success in the mid-market was allowing them to grow WSEEs faster and the Company was utilizing a more efficient sales model, placing them exactly where "they intend to be."

16.     Analysts questioned why net revenue missed Wall Street estimates – a potential sign the Company was underpricing benefits to attract new clients at unprofitable price points.  But defendants dismissed their concerns describing the metric as "not meaningful" and told investors on the earnings conference call that the healthcare claims cost trend remained low.

17.     While the stock price declined on the mixed results, investment analysts again recommended that investors purchase the stock, repeating defendants' earnings conference call statements and downplaying the significance of the net revenue miss.  One analyst issued an upgrade to a "buy" rating, brushing aside pricing concerns and repeating the Company's position that revenue was not a metric to focus on.

18.     Defendants statements concerning, among other things, the Company's hiring and retention of BPAs, their ability to generate WSEE growth via new sales, their evaluation of healthcare cost trends, and assertions that the Company was on track and positioned as intended were materially false and misleading when made because defendants knew or recklessly disregarded and failed to disclose the following facts:

4852-7784-9301.v2

(a)     The Company did not currently have, and was not hiring or retaining, a sufficient number of trained BPAs to make the sales required to support its WSEE and financial growth outlook for FY19;

(b)     The Company did not have timely ongoing access to current health insurance claims data from its primary health insurance carrier, UnitedHealth, at any point during the course of any quarter to analyze or estimate current or future healthcare costs or trends;

(c)     The Company was experiencing a material increase in large healthcare claims, beginning no later than April 1, 2019 (*i.e.*, the start of 2Q19), and continuing for the duration of FY19;

(d)     The Company's historical growth of WSEEs was the result of underpricing benefits – in particular health insurance – to compete for clients and, as a result, a material number of clients paid insufficient fees to cover their healthcare claims costs and were not sufficiently profitable;

(e)     The increase in pricing necessary to cover the cost of medical claims and support the Company's financial growth outlook made the Company not competitive with potential new clients and caused increased attrition with existing clients;

(f)     Defendants' positive assessment of the Company's current condition and outlook was predicated on the assumption that the mid-market segment would outperform the prior year and cover for the reduced sales caused by the lack of trained BPAs; and

(g)     As a result of the foregoing, defendants knew or recklessly disregarded that at no point during the Class Period was the Company on track or in position to achieve its financial guidance metrics.

- 6 -

19.     As a result of defendants' material misrepresentations and omissions during the Class Period, Insperity stock reached artificially inflated prices of more than $144.00 per share.

20.     On July 29, 2019, the Company reported 2Q19 results that missed guidance for paid WSEE growth and disclosed that it experienced "higher than expected benefits costs," driven by an increase in large medical claims.  The Company cut full-year guidance for EPS growth from a high of 28% to 25%, EBITDA growth from a high of 20% to 19%, and WSEE growth from a high of 16% to 14.5%.

21.     Despite reducing the top end of annual financial guidance across the board, Defendant Sarvadi told investors not to worry about the reduction and that the Company's "earnings outlook for 2019 is *in line* with our previous forecast" and the Company remained "*on track*" to achieve its FY19 guidance.  Defendant Sarvadi directed investors to focus on the "13% increase year-over-year in [BPAs]," reported in the quarter, which was the "key metric" from which investors could measure the Company's financial prospects.   And, according to Defendant Sarvadi, because new sales "progressed on plan" this demonstrated the Company's success in hiring and training BPAs.  When asked by a skeptical analyst if the Company's sales were actually in line with the Company's expectations or if they had seen a recession or slowdown, Defendant Sarvadi falsely retorted, "*No, sir, we haven't seen any sign of a slowdown*" adding that the mid-market sales pipeline was "the biggest we've had, and we are above last year in sales for the year."

22.     Defendant Sarvadi also falsely reassured investors that, regardless of the increase in medical claims the Company experienced in 2Q19, the Company maintained the ability to reliably estimate annual medical claims costs and determined that they would remain low over the remainder of the year:

*[T]he predictability of the cost of our health plan is excellent on an annual basis*. . . . Based on that analysis, we expect large claims to normalize and overall benefit cost trend to remain relatively low for the remainder of 2019.

23.     As a result of these disclosures, including the guidance miss for WSEE growth, elevated healthcare claims costs, and the guidance reduction going forward, Insperity's stock price declined more than 24%, from a close of $144.63 per share on July 26, 2019 to a close of $108.89 per share on July 29, 2019 (the next trading day).  However, while these disclosures began to reveal the Company's true financial condition, Insperity's stock price continued to trade at artificially inflated prices due to defendants' ongoing misrepresentations and omissions.  Defendants' statements concerning, among other things, the Company's sales opportunities and execution, its growth of BPAs, its assessment of healthcare claims and trends and representations that the Company was currently on track or in line with expectations were materially false and misleading when made because defendants knew, or recklessly disregarded and failed to disclose, those facts as described in ¶18(a)-(g), above.

24.     On November 4, 2019, the Company announced disastrous 3Q19 financial results, missing every quarterly guidance metric: The Company reported adjusted EPS of $0.75, missing its 3Q19 guidance by up to $0.29 or 28%; the Company reported adjusted EBITDA of $51 million, missing its guidance by as much as $18 million or 26%; and the Company reported 240,939 average WSEEs paid, missing its guidance by as much as 3,161 WSEEs.

25.     Defendants placed the blame for its results on two factors they had previously assured investors, just one quarter prior, would not interfere with the Company's performance.  First, despite claims that medical costs were reliably predictable on an annual basis and the 2Q19 spike was an aberration that would not be repeated, defendants blamed the miss on another quarter of increased healthcare claims costs.  Second, in contradiction to what they had been telling investors the prior

- 8 -

two quarters, defendants admitted that they failed to employ enough trained BPAs in the first half of

the year and this lead to decreased sales and slower WSEE growth:

> The **primary cause** leading to fewer paid worksite employees from sales in Q3 is we
> simply had **too few trained BPAs** early this year . . . .

26.    And – unbeknownst to investors – defendants admitted that they were "too

optimistic" in counting on the mid-market segment to cover up for the known shortfall in BPAs, or

as Sarvadi conceded:

> In retrospect, I believe **I was too optimistic** in expecting mid-market sales to offset a
> lower growth rate in BPAs at this stage.

27.    Accordingly, the Company had to slash FY19 EPS and EBITDA guidance to levels

below those announced at the outset of the Class Period on February 11, 2019 – and well below the

increased levels announced on April 29, 2019:

| FY19 Guidance (date issued) | Feb. 11, 2019 | Apr. 29, 2019 | Nov. 4 2019 |
|---|---|---|---|
| Avg. WSEEs paid growth | 14%-16% | 14%-16% | 12.7%-13.0% |
| Adjusted EPS growth | 17%-25% | 21%-28% | *9%-12%* |
| Adjusted EBITDA growth | 12%-19% | 15%-21% | *3%-6%* |

28.    During an earnings conference call with analysts, defendants were asked about when

they knew of the increased medical claims costs and their ability to obtain current medical claims

data.  Defendant Sharp admitted that the Company simply did not have the visibility into current

claims costs and development because defendants did not have access to current claims data.  In fact,

defendants did not receive claims data until after the quarter had ended:

> So you don't know your health care claims data on an incurred basis until **after the
> quarter is over with**.

29.    Despite their earlier claims that healthcare claims costs would normalize to lower

levels, defendants changed tune and told investors they were now assuming medical claims costs

would continue at an elevated rate for the fourth quarter:

4852-7784-9301.v2

[W]e believe it is prudent to take a more conservative approach to estimating benefit costs for the fourth quarter by ***not assuming a further reduction*** in large claim levels for the remainder of 2019.

30.     Despite increased medical claims costs in 4Q18 and two consecutive quarters, defendants reassured investors that pricing for new and renewing clients would not be impacted and that the renewal period was off to a strong start, if not ahead of expectations.  Defendants also told investors that renewal pricing for 2020 reflected a normalization of healthcare claims costs to pre-2019 levels – *i.e.*, a reduction in costs.

31.     Negative analyst and media coverage promptly followed: On November 6, 2019, The Street published an article titled "Insperity Stock Tanks After HR Provider's Earnings Fall Short, Guidance Pared" noting that "***Insperity lost nearly a third of its market value***."  However, some analysts were more upbeat, reducing price targets but encouraging investors to buy on the price reduction and echoing defendants' false and misleading statements.

32.     As a result of these disclosures, including the 3Q19 earnings miss on elevated healthcare claims costs, and the guidance reduction going forward, Insperity's stock price plummeted close to 34%, from a close of $107.67 per share on November 1, 2019 to a close of $71.38 per share on November 4, 2019.

33.     While these disclosures partially revealed the Company's true financial condition, Insperity's stock continued to trade at artificially inflated prices due to defendants' ongoing misrepresentations and omissions.  Defendants' statements concerning, among other things, the effect of increased medical claims on pricing, the purported success of the Company's renewal campaign and that health claims would normalize were each materially false and misleading when made because defendants knew or recklessly disregarded and failed to disclose those facts set forth in ¶¶18(c)-(f), above.

34.     On November 26, 2019, an analyst report described defendants' continued positive misrepresentations to investors, including that the Company was in the midst of strong sales during 4Q19 and it was not suffering from systemic issues in its healthcare plan:

> The company reiterated that two consecutive quarters of elevated HC claims appear to be a ***statistical anomaly*** and are ***not representative of a systemic issue*** in the benefits plan.

35.     The report stated that defendants also rejected the possibility that they should purchase a form of insurance to limit their medical claims risk as such a mechanism would limit growth and profitability.   Defendants were also reportedly questioned about whether they had underpriced healthcare benefits to attract new customers at the expense of profitability, but defendants pushed back insisting that their growth was sustainable:

> Management believes ***double-digit WSEE growth is achievable*** while still keeping a firm handle on the associated risk.

36.     As a result of these false and misleading statements, which were made with just five weeks left in FY19, the Company's stock continued to trade at artificially inflated prices.

37.     On February 11, 2020, the Company announced its 4Q19 and FY19 results, ***missing every metric*** of its original and upwardly revised guidance issued on April 29, 2019.   The Company reported adjusted EPS of $4.15 per share, missing by up to $0.65.   Annual growth for adjusted EPS was 10.67%, far short of the 21% to 28% upwardly revised guidance.   Annual growth for adjusted EBITDA was 4.3%, far short of the 15% to 21% upwardly revised guidance.   The Company also reported 235,547 average WSEEs, or annual growth of 12.6% missing the lower end of both its upwardly revised guidance and recently lowered guidance from just one quarter earlier.

38.     In contrast to its prior statements, the Company also reported that it, in fact, had been increasing pricing to offset elevated healthcare costs.   Defendant Sarvadi discussed the significantly

higher attrition among its clients experienced in 4Q19, admitting that it was due to raising prices on unprofitable clients – *i.e.*, the very mismatch defendants claimed was not an issue:

> This group of terminating clients had a gross profit contribution ***12% below the average*** of our client base due to a combination of lower pricing allocations compared to their direct costs, including benefits.

39.     While defendants were claiming into late November 2019 that they could continue growing WSEEs by double digits, they conceded that double-digit growth would not be possible ***until 2021***.  Defendants also admitted their business model was not resilient and growth would take a massive slide backwards: "an interruption in growth and profitability unfortunately ***resets the starting point***."  Going forward, WSEE growth would drop as low as 5.5% for 1Q20 or less than half the FY19 growth rate.

40.     The Company also finally admitted that they had to increase their healthcare claims cost estimates going forward and that the Company's FY19 claims experience represented the new baseline and ***continued growth*** in large claims on top of FY19 levels was possible.  When pressed for further details, defendants acknowledged the truth: They had "***no basis***" to predict that claims would return to pre-2019 levels, despite previously assurances:

> [Healthcare claims] didn't snap back in line with the pre-Q2 levels. . . .  And we felt like though it was important for us for budgeting purposes to ***not assume*** that was just going to keep happening ***with no basis for it***.  So instead, we've assumed kind of in our worst case that the number of these claims goes up with our unit growth. . . . in the best case, the [elevated amount that we experienced in 2019].

41.     And, in a complete reversal from defendants' prior statements, the Company announced that it had recently renegotiated its agreement with UnitedHealth to add a stop loss limiting its exposure to claims above $1 million going forward.

42.     As a result, analysts lowered their price targets, stating that they expected shares to bottom out on the negative year-end disclosures.  Both Roth Capital Management and SunTrust Robinson Humphry called out the new health cost baseline at 2019's elevated levels and agreed that

they did not expect sales to return to double-digit growth until 2021.  SunTrust stated that the reduced expectations for WSEEs were from lower BPAs, higher attrition and slow mid-market sales, and as a result was lowering revenue in its valuation model.

43.    As a result of these disclosures, including the third consecutive quarter of elevated healthcare claims, the Company's WSEE guidance miss, the higher attrition in existing clients and the slashed outlook, Insperity's stock price declined 19.58%, from a close of $89.08 per share on February 11, 2020 to a close of $71.64 per share on February 12, 2020 (the next trading day).

44.    The chart below illustrates the impact of defendants' misrepresentations and omissions and their subsequent disclosures of the truth on the Company's stock price and resulting investor losses:



## JURISDICTION AND VENUE

45.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. Jurisdiction is conferred by §27 of the Exchange Act.  Venue is proper pursuant to §27 of the Exchange Act because the acts alleged herein giving rise to the violations complained of occurred in this District, Insperity maintains three sales offices in this District, does significant business in this District, co-employs a significant number of WSEEs in this District, and is traded on New York Stock Exchange ("NYSE").

## PARTIES

46.     Lead Plaintiff, Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association Trust, purchased Insperity common stock during the Class Period, as set forth in its previously-filed certification, which is incorporated herein by reference, and was damaged thereby.

47.     Plaintiff Automotive Industries Pension Trust Fund purchased Insperity common stock during the Class Period, as set forth in its previously-filed certification, which is incorporated herein by reference, and was damaged thereby.

48.     Plaintiff Michigan Carpenters' Pension Fund purchased Insperity common stock during the Class Period, as set forth in its previously-filed certification, which is incorporated herein by reference, and was damaged thereby.

49.     Defendant Insperity describes itself as a PEO that provides a wide range of HR services to small- and medium-sized businesses in the United States via a co-employment model. Insperity is a Delaware corporation headquartered in Kingwood, Texas.  It maintains five sales offices in the state of New York (including three in this District) and approximately ten percent of its

approximately 221,000 co-employed WSEEs are within the state of New York.  Insperity trades on the NYSE under the ticker symbol "NSP."

50.     Defendant Paul J. Sarvadi is and was at all relevant times the CEO and Chairman of the Board of Directors, positions he has held since 1989.  The Company states that he frequently meets with clients and has extensive knowledge and insight into the Company's operations and issues affecting it, as well as the broader PEO industry.  Sarvadi participated in earnings conference calls and presentations, is quoted in the Company's relevant press releases, and signed the Form 10-K filed with the SEC on February 11, 2019.  During the Class Period, defendant Sarvadi sold 89,800 shares of Insperity common stock for proceeds of nearly $10.73 million.

51.     Defendant, Douglas S. Sharp is and was at all relevant times the CFO, Treasurer, and Senior VP of Finance, positions he has held since 2008.  Sharp joined Insperity in 2000, was an audit manager with Ernst & Young LLP, and is a certified public accountant.  Sharp participated in earnings conference calls and presentations, is quoted in the Company's relevant press releases, and signed the Form 10-K filed with the SEC on February 11, 2019, as well as the Forms 10-Q filed with the SEC on April 29, July 29 and November 4, 2019.  During the Class Period, defendant Sharp sold more than 16,427 shares of Insperity common stock for proceeds of approximately $2.07 million.

52.     Defendants Sarvadi and Sharp are collectively referred to herein as the "Individual Defendants."

## CONTROL PERSONS

53.     As officers and/or directors and controlling persons of a publicly held company whose common stock is traded on the NYSE and governed by the provisions of the federal securities laws, the defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct

- 15 -

any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

54.     Defendants participated in the drafting, preparation, and/or approval of the various public shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom and their materially false and misleading nature. Because of their Board memberships and/or executive and managerial positions with Insperity, the Individual Defendants had access to the adverse undisclosed information about the Company's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Insperity and its business or adopted by the Company materially false and misleading.

55.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

56.     Throughout the Class Period, the Individual Defendants held themselves out to the market as knowledgeable about the Company's business operations, financial results, growth and

trends.  The Individual Defendants routinely communicated with analysts and investors during the Class Period and represented that they were informed of, and experienced with, issues affecting these areas.  This is reflected in their statements issued both before and during the Class Period in relevant press releases, SEC filings and earnings conference calls.

57.     The Company and the Individual Defendants, by disseminating materially false and misleading statements and/or concealing material adverse facts, are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Insperity common stock.  The scheme: (i) deceived the investing public regarding Insperity's business, operations, management, and the intrinsic value of Insperity common stock; and (ii) caused Lead Plaintiff and other members of the Class (as defined below) to purchase Insperity common stock at artificially inflated prices.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

**Insperity Announces FY18 Results, Forecasts Significant Growth in FY19 Based on Purported Full View of Medical Benefit Costs and Growing BPA Salesforce**

58.     On February 11, 2019, the Company issued a press release announcing its financial results for FY18 and provided financial guidance for FY19.  Each earnings press release issued during the Class Period was also filed with the SEC on Form 8-K.  The press release issued on February 11, 2019 stated that the Company's growth was based on its increase in BPAs, higher pricing and effective management:

### Insperity Announces Record Fourth Quarter and Full Year 2018 Results

\*     \*     \*

For the year ended Dec. 31, 2018 . . . .  Adjusted EPS increased 53% over 2017 to $3.75.  Adjusted EBITDA increased 35% to $239.6 million.

\*     \*     \*

- 17 -

This growth was primarily driven by an increase in WSEEs paid from new sales on a 16% increase in the average number of trained Business Performance Advisors.

\*       \*       \*

"Acceleration of worksite employee growth into the mid-teens, improved pricing and effective management of our direct costs and operating expenses has resulted in significant improvement in our profitability over the past four years," said Douglas S. Sharp . . . .

59.    The press release contained the Company's financial guidance for FY19 forecasting strong year-over-year growth across WSEEs, adjusted EPS and adjusted EBITDA:

| FY19 Outlook | |
|---|---|
| Y-o-Y WSEE growth: | 14%-16% |
| Adjusted EPS: Y-o-Y growth: | $4.37-$4.69 17%-25% |
| Adjusted EBITDA: Y-o-Y growth: | $268M-$285M 12%-19% |

60.    The press release falsely stated that based on the Company's strong 4Q18 performance the Company was already experiencing 15% growth in WSEEs and was well positioned for continued growth:

"As a result of our successful fall selling and retention campaign, we are starting 2019 with 15% worksite employee growth and ***are well positioned to continue our strong financial performance***."

61.    Following the February 11, 2019 press release of the Company's 4Q18 and FY18 financial results, the Company held an earnings conference call for analysts and investors hosted by defendants Sarvadi and Sharp.  Defendants stated they expected growth in WSEEs to be faster than growth in trained BPAs and Sarvadi misleadingly claimed that BPA retention rates were at historically all-time highs:

This year, we expect to open 9 new offices to support 14% growth in trained BPAs. . . .  ***Success in mid-market sales allows us to grow worksite employees at a faster rate than we grow the BPA team***.

\*       \*       \*

- 18 -

[Analyst:] And then with the expanded client solution side as well as the enhanced training, are you actually seeing an increase in BPA retention rates?

[Sarvadi] Yes.  ***We've seen what I'd call a kind of a step-up improvement in retaining our BPAs for a long time***.  First 30 years in business or 28 maybe years in business, we were north of 30%, around the 30% to 35% mid, sometimes even as high as that.  And we're more in the 26%, 27% [turnover rate].

62.     In support of the Company's outlook, the Company stated its expected growth in

WSEEs to be 14%-16%, driven by 15% growth in trained BPAs.  Defendants claimed they were

always conservative in their budget process, representing that the likelihood that they were

underestimating the Company's expenses, or overestimating its revenue and earnings potential, was

low:

> We are always conservative in our routine budget process. . . .  ***So when you put the entire picture together, our starting point in paid worksite employees supports our expectation for 14% to 16% unit growth for 2019***.  We expect continuing strong sales and retention, our controllable factors, and we have incorporated a slightly lower contribution from new hires and layoffs just to be conservative.
>
> *       *       *
>
> Our [WSEE] forecast is based upon our successful year-end transition of new and renewing accounts, ***15% growth in the average number of trained Business Performance Advisors while maintaining recent sales efficiency levels, and continued success in our mid-market client segment***.

63.     During the earnings conference call, defendants revealed that 4Q18 healthcare claims

costs had been "slightly higher-than-expected" but falsely assured investors that they had reviewed

current healthcare claims cost trends, their estimates for FY19 were conservative, and that guidance

already incorporated an expected increase in severity of healthcare claims in FY19:

> Positive results in these areas was partially offset by slightly higher-than-expected Q4 medical claims.
>
> *       *       *
>
> [Analyst:] [A]ssuming that the health-care costs on a per employee basis are probably going to be a little bit . . . higher than they were last year, that . . .

- 19 -

[Sarvadi:] Yes.  We look at the trend on that.  That's with **underlying claims in there and kind of build it on a year-over-year basis.  So yes, we would expect that to be down a little bit because it was so exaggerated last year**.

\*       \*       \*

[Analyst:] You had a 2% growth in health benefits trend last year, what are you kind of thinking this year?

[Sarvadi:] We're kind of looking at – again, being conservative at the beginning of the year around 3%.  So look at a range of around 2.5% to 3.5% . . .

\*       \*       \*

[Sharp:] As for our gross profit area, **we have gone through our usual budget process of analyzing client mix, pricing and direct cost, including healthcare and workers compensation claim trends**.

Similar to prior years, our **budget process is intended to begin the year with a conservative forecast for direct cost trends** and leave the upside to favorable developments as we manage pricing and direct cost over the course of the year.

64.     Defendants also falsely reassured investors that, as of the first week of February 2019 (*i.e.*, the week prior), they had full visibility into the Company's pricing and annual healthcare benefit costs, indicating that the Company both had access to current claims data and could accurately forecast from such information:

**We are able to see the full picture of this change each year in the first week of February, and we can confirm we are in excellent shape for the starting point for 2019.  This view into pricing includes all the elements of our direct costs, including benefits**, payroll tax and workers compensation allocation in addition to HR service fees and other smaller items.

65.     On February 11, 2019, the Company filed with the SEC its annual report on Form 10-K for the period ending December 31, 2018.  The Form 10-K was signed by defendants Sarvadi and Sharp.  The Form 10-K repeated the Company's 4Q18 and FY18 financial results and contained other financial disclosures.  In Management's Discussion and Analysis, the 10-K also falsely stated that Company evaluated its current health insurance claims experience on an ongoing basis:

*On an ongoing basis, we evaluate these [liability and expense] estimates, including those related to health and workers' compensation insurance claims experience* . . . .

66.     Each of the misrepresentations set forth above in ¶¶60-65 concerning the Company's hiring and retention of BPAs, its ability to grow WSEEs, and its ongoing evaluation of healthcare claims costs and trends was materially false and misleading when made because defendants knew or recklessly disregarded and failed to disclose the following facts:

(a)     The Company did not currently have, and was not hiring or retaining, a sufficient number of trained BPAs to make the sales required to support its WSEE and financial growth outlook for FY19;

(b)     The Company did not have timely ongoing access to current health insurance claims data from its primary health insurance carrier, UnitedHealth, at any point during the course of any quarter to analyze or estimate current or future healthcare costs or trends;

(c)     The Company's historical growth of WSEEs was the result of underpricing benefits – in particular health insurance – to compete for clients, and as a result, a material number of clients paid insufficient fees to cover their healthcare claims costs and were not sufficiently profitable;

(d)     The increase in pricing necessary to cover the cost of medical claims and support the Company's financial growth outlook made the Company not competitive with potential new clients and caused increased attrition within existing clients;

(e)     Defendants' positive assessment of the Company's current condition and outlook was predicated on the assumption that the mid-market segment would outperform the prior year and make up for the reduced sales cause by the lack of trained BPAs; and

(f)     As a result of the foregoing, defendants knew or recklessly disregarded that at no point during the Class Period was the Company on track or in position to achieve its financial guidance metrics.

67.     Investment and industry analysts reacted positively to the FY18 results and the Company's outlook for FY19.  On February 11, 2019, SunTrust Robinson Humphrey issued an analyst report titled "Middle-Market a Highlight in Record-Setting Quarter" raising 2019 financial estimates for the Company.  The analyst paid particular attention to the defendants' statements regarding its BPAs and sales force translating to WSEE growth, as well as the Company's purported strength in the "mid-market":

> *We see strength in the mid-market as a highlight of the call*.  NSP increased mid-market proposals by +24% YoY in 4Q18 and increased WSEE sold by +100% to this segment. . . .

> *The sales force remains a key strength for NSP, in our view*.  With experience a key component in landing clients, in our view, *we find it a positive indicator of continued execution that NSP has decreased the turnover rate of sales to 26%-27%* from the 30%-35% a few years ago.

> *We are encouraged by 2019 expected BPA growth* of 14%, which is in-line with our previously-stated expectations of 13%-15% growth.

> \*     \*     \*

> Guidance indicates a continuation of 2H18's strong WSEE growth, in our view, with NSP expecting 14%-16% during 2019 to 238,400-242,600.

68.     On February 19, 2019, Roth Capital Partners issued an analyst report titled "NSP: Model Update Post 4Q18 Results" recommending that investors purchase the stock based on managements' conservative estimates and highly attractive WSEE growth guidance.  In particular, the analyst also stressed that growth in the sales force meant growth and retention of WSEEs and created increased visibility, just as defendants had asserted:

> NSP beat 4Q18 expectations, driven by stronger-than-anticipated WSE growth and operating leverage.  Sales efficiency and *continued growth in the sales force are*

*primary contributors*.  Management established 2019 guidance above our model estimate for adjusted EPS and in line for adjusted EBITDA.  It anticipates WSE growth of 14-16%, ***driven by continued growth in the sales force*** . . . .

We note that NSP typically guides conservatively at the start of the year . . . . .  We view 2019 guidance with encouragement, emphasizing WSE growth in the 14-16% range, adjusted EPS growth of 17-25%, and adjusted EBITDA growth of 12-19%.  ***We find the WSE growth highly attractive, which combined with the elevated level of client retention, drives increased visibility to the recurring nature of the business model***.

69.    Following the publication of the 4Q18 and FY18 results, the Company's stock price increased from $110.90 on February 8, 2019 (the previous trading day), to $131.97 on February 11, 2019, an increase of 19%, on an increased volume of 1.1 million shares traded:

**Insperity Announces Mixed 1Q19 Results, Missing Revenue Expectations but Raises FY19 EPS and EBITDA Guidance**

70.    On April 29, 2019, the Company issued a press release announcing its financial results for 1Q19.  The Company beat its quarterly financial guidance for adjusted EPS and paid WSEEs, but missed consensus expectations for net revenue and reduced BPA growth estimates. Defendants attributed the positive results to their own execution and downplayed the missed metrics.

**Insperity Announces Record First Quarter Results**

\*       \*       \*

Revenues increased 14% over the first quarter of 2018 to $1,153.0 million on a 15% increase in the average number of worksite employees ("WSEEs") paid per month.

\*       \*       \*

"Worksite employee growth in the mid-teens, combined with effective management of pricing, direct cost programs and operating costs, produced adjusted EBITDA and cash flow at record levels," said Douglas S. Sharp . . . .

71.    The press release also included new financial guidance for FY19, which increased adjusted EPS and adjusted EBITDA.  Specifically, FY19 year-over-year growth for adjusted EPS was increased from 17%-25% to 21%-28%, and adjusted EBITDA from 12%-19% to 21%.

- 23 -

| **FY19 Guidance (date issued)** | Feb. 11, 2019 | Apr. 29, 2019 |
|---|---|---|
| Y-o-Y WSEE growth: | 14%-16% | 14%-16% |
| Adjusted EPS: Y-o-Y growth: | $4.37-$4.69 17%-25% | $4.55-$4.80 21%-28% |
| Adjusted EBITDA: Y-o-Y growth: | $268M-$285M 12%-19% | $276M-$289M 15%-21% |

72.     Defendants falsely told investors in the press release that their mixed 1Q19 financial results demonstrated that their rapid growth and purported business execution was sustainable despite the reduction in BPA guidance:

> "***Our record first quarter results reflect the strength of our business model and continued excellent execution of our strategic plan***," said Paul J. Sarvadi, Insperity chairman and chief executive officer. "***These results further demonstrate the sustainability of our rapid growth and profitability experienced over the last several years into 2019***."

73.     On April 29, 2019, defendants Sarvadi and Sharp participated in an earnings conference call to discuss the Company's 1Q19 financial results.  During the call, defendants reiterated the increased financial guidance for 2Q19 and FY19 and falsely claimed the Company's current performance success was directly attributable to their strong business execution, in particular selling to larger mid-market clients.  Defendants also stated that they were ***reducing*** estimated growth for trained BPAs, but assured analysts and investors that the overall size of the sales organization was allowing it to grow the Company's WSEE numbers at a sufficient rate and the Company was positioned exactly as defendants intended:

> ***The size and maturity of our sales organization, combined with our mid-market sales success, is now allowing us to grow the number of worksite employees at a faster rate than the growth rate of the number of BPAs***.  This more efficient growth model . . . as we continue to get leverage in the sales side of our business.  ***We expect to continue to ramp up the number of BPAs as we open up 9 new offices this year, targeting an average increase in trained BPAs of 13% for the full year***.

*     *     *

[Analyst:] Okay.  And on the BPAs, could you kind of give us an update of where we are now in terms of trained BPAs and total BPAs and kind of where you're going? . . .

[Sarvadi:] *But in the first quarter, we're basically where we intend to be*. . . .  We will ramp up over the course of the year to where our average for the year, *we're expecting around 13% increase [in trained BPAs] year-over-year*.

74.     On the call, an analyst noted that the Company's net revenue growth lagged its WSEE growth, a potential indicator that the Company was reducing prices to grow its WSEEs (*i.e.*, achieving growth at the expense of profitability).  Sarvadi promptly rejected the premise, stating that that the metrics were not meaningful – and thus there was no concern about unprofitable clients – because the comparison to the prior year was difficult and their growth was on target:

[Analyst:] And then one thing that perhaps is confusing to some is your net revenue increased 13.7% on a 15.3% increase in WSEEs.  Can you talk a little bit about the dynamics around that?

[Sarvadi:] Well, last year we . . . had a very strong quarter from a benefits perspective.  *And so you've got kind of a comparison going on in there at that net revenue line that is really not meaningful in the big picture.  So if you look at where we're targeting for the full year, I'm at measure*.

75.     On the call, defendant Sharp reiterated that the Company continued to forecast minimal growth in healthcare benefits costs in the 2%-3% range, implying to investors that defendants had ongoing access to current claims data, as well as visibility into medical claims development over the remainder of 2Q19 and FY19:

But when we look over the course of the year, we're still looking at a benefit cost trend.  I think we said initially, maybe 2% to 3%, *but where we look today is more towards the low end of that*.

76.     On April 29, 2019, the Company filed its 1Q19 SEC Form 10-Q detailing its financial results disclosed in its earnings press release and providing other financial disclosures.  The 1Q19 Form 10-Q, as well as the Forms 10-Q filed in connection with 2Q19 and 3Q19, all of which were signed by Defendant Sharp, incorporated the Company's Risk Factors set forth in its 2018 SEC

- 25 -

Form 10-K (filed on February 11, 2019).  The Company's Forms 10-Q purported to warn investors of various potential risks which could arise in the future, including the potential risk that the Company "*could*" experience increased healthcare costs "*if*" the severity of claims increased, without disclosing that the Company was unable at any time to timely obtain healthcare claims cost data to measure this risk and, no later than April 1, 2019, this purported "risk" had already materialized, rendering the warnings false and misleading:

> Health insurance costs are in part determined by our claims experience and comprise a significant portion of our direct costs.  *If* we experience an increase in the number or severity of claims, our health insurance costs *could* increase.  Claim activity levels and costs are impacted by a number of factors, including, but not limited to, macro-economic changes, proposed and enacted regulatory changes and medical outbreaks.

77.     Each of the misrepresentations set forth in ¶¶72-76, above, concerning the Company's mid-market sales execution, its stability and size of its sales organizations, including BPAs, its ability to grow WSEEs, and its risk of increased healthcare claims was materially false and misleading when made because defendants knew or severely recklessly disregarded and failed to disclose the facts set forth in ¶66(a)-(f), above, as well as, that the Company was already experiencing a material increase in large healthcare claims, beginning no later than April 1, 2019 (*i.e.*, the start of 2Q19), and continuing for the duration of FY19.

78.     On the announcement of mixed 1Q19 results, including the beat and raise of Company guidance on WSEEs and EPS, but a miss of consensus revenue guidance, Insperity's stock price declined to $112.96 on April 29, 2019, from $118.95 on April 28, 2019, or 5%, on elevated volume of 1 million shares.

79.     On April 29, 2019, after market close, Roth Capital Partners issued an analyst report titled "NSP: 1Q19 Results Yield Beat and Raise, Raising PT to $147" recommending that investors

purchase the stock and downplaying the net revenue miss on the basis that the Company was facing a difficult year-over-year comparison – just as defendants stated on the earnings conference call:

> ***We recommend accumulating NSP shares*** on the negative reaction to strong 1Q19 results and higher guidance. . . .

> Revenue grew 14% to $1.153 billion, driven by 15.3% higher average WSEEs, partially offset by a 1.4% decline in revenue / WSEE / month to $1,704. Gross profit / WSEE / month of $335 marks a $5 decline y/y, yielding a 13.5% increase in gross profit y/y. ***Recall in 1Q18, gross profit benefited from a negative trend in benefit costs, making for a challenging 1Q19 comparison***.

80. On April 30, 2019, Suntrust Robinson Humphrey issued an analyst report titled "Upgrade – Crackerjack SMB Growth Story; Buy" in which it upgraded Insperity to a "Buy" rating and repeated defendants' characterizations of the revenue miss as not an important metric:

> We recommend capitalizing on Apr. 29's 5% share decline (S&P +0.11%). . . . The stock declined on a slight consensus revenue miss in 1Q, concern around cadence of quarterly WSEE growth in 19, slightly slower net hiring in the customer base, and GP pressure.

> \*      \*      \*

> Recall, ***revenue is not a metric we focus on*** since there are vast pass-throughs included in this number, including insurance premiums, payroll taxes and workers' compensation premiums.

81. On April 30, 2019 Zacks issued an analyst report titled "Insperity (NSP) Beats on Q1 Earnings, Raises 2019 EPS View" which highlighted the mixed results, noting the Company's miss of consensus revenue expectations:

> Insperity reported mixed first-quarter 2019 results wherein earnings surpassed the Zacks Consensus Estimate but revenues lagged the same.

> \*      \*      \*

> Total revenues of $1.15 billion however lagged the consensus estimate by $11.7 million . . . .

82. Following these analyst reports, some of which repeated and endorsed Defendants' false and misleading statements, the Company's stock price rose to $119.56 on April 30, 2019, from

- 27 -

$116.27 on April 29, 2019, or 2.83%, on elevated volume of 0.8 million shares, and continued to

trade at artificially inflated prices as high as $144.00 per share.

**Insperity Announces 2Q19 Results Negatively Impacted by Increased Medical Claims Costs, Reduces FY19 Guidance but Falsely Reassures Investors Company Remains on Track**

83.     On July 29, 2019, the Company issued a press release announcing its financial results

for 2Q19.  While the Company's results met quarterly EPS guidance, it missed its quarterly guidance

for WSEEs growth and reported a significant increase in benefit costs attributable to large medical

claims:

<strong>Insperity Announces Second Quarter Results</strong>

*        *        *

Adjusted EPS was $0.83, a 22% increase over the second quarter of 2018.  Adjusted EBITDA increased 22% over the second quarter of 2018 to $56.7 million.

*        *        *

***Net gains in our client base were lower than expected***, particularly during the last month of the quarter, due primarily to less hiring of full-time and seasonal employees.

*        *        *

Gross profit increased 12% over the second quarter of 2018 to $173.7 million, ***and included higher than expected benefits costs, driven by large claim activity***.

84.     The press release also included new guidance for FY19, sharply reducing WSEE

growth and reducing the midpoint for adjusted EPS to 24%, from 24.5%, and adjusted EBITDA to

17.5% from 18%:

| FY19 Guidance (date issued) | Feb. 11, 2019 | Apr. 29, 2019 | Jul. 29, 2019 |
|---|---|---|---|
| Y-o-Y WSEE growth: | 14%-16% | 14%-16% | 13.5%-14.5% |
| Adjusted EPS:<br>Y-o-Y growth: | $4.37-$4.69<br>17%-25% | $4.55-$4.80<br>21%-28% | $4.59-$4.74<br>22%-26% |
| Adjusted EBITDA:<br>Y-o-Y growth: | $268M-$285M<br>12%-19% | $276M-$289M<br>15%-21% | $278M-$286M<br>16%-19% |

85.    Having increased FY19 guidance just one quarter prior, defendants shocked investors

cutting top-end FY19 guidance on all metrics, but still falsely claimed that their performance was in-

line with expectations for the first half of the year:

> "***Our earnings outlook for 2019 is in line with our previous forecast as we
> come off a strong performance in the first half of the year and effectively manage
> our business in response to emerging trends***," said Douglas S. Sharp, "We expect to
> continue to generate over 20% growth in adjusted EPS, as we effectively execute our
> long-term strategic plan."

86.    On July 29, 2019, defendants Sarvadi and Sharp participated in an earnings

conference call to discuss the Company's 2Q19 financial results with analysts.  Defendants blamed

lower reported WSEEs on lower client hiring, and assured investors that despite the ongoing increase

in large claims, the Company was "on track" to achieve its new full year earnings guidance –

purportedly due to the Company's demonstrated resiliency.  Defendants revealed that growth in

average number of BPA growth in 2Q19 was just 11% but falsely claimed that new sales were above

expectations and demonstrated the Company's purported success in hiring and training new BPAs

which would by the key driver for future growth:

> [Sarvadi:] ***New sales, client retention, expansion and product development all
> progressed on plan***, while lower net hiring in our client base and frequency and
> severity of large health care claims presented impediments.  ***Despite these
> challenges, our business model demonstrated substantial resiliency, and our
> earnings outlook is on track for the year***.
>
> ***New sales were 101% of forecast over the first half of the year*** as sales
> efficiency stayed the same despite an 11% increase in the average number of
> Business Performance Advisors.  ***This demonstrates our success in hiring and
> training new Business Performance Advisors, which is the key driver for future
> growth***.
>
> *        *        *
>
> Now for the balance of the year, we are full steam ahead executing our
> growth and expansion plan to continue the strong momentum we have experienced
> several years in a row.  ***The key metric to follow to continue our strong growth
> momentum is the number of Business Performance Advisors we have in the***

- 29 -

*marketplace.  We ended Q2 with a 13% increase year-over-year in this metric*, and we expect to continue hiring and training BPAs over the last half of 2019.  We expect to have approximately 620 BPAs in Q4, a 14% increase . . . .

87.    Defendants assured investors that, while the estimation of quarterly healthcare costs and expenses exceeded estimates during 2Q19, the predictability of healthcare costs remained "*excellent on an annual basis*" and that costs were expected to normalize and remain low throughout the remainder of the year, indicating to investors that defendants had meaningful insight into future claims costs:

> [Sharp:] The higher benefit costs resulted from large health care claim activity . . . . Now while the higher-than-expected large claim activity may happen in a quarter from time to time with a plan of our size, *a detailed analysis of the underlying Q2 claims data, benefit plan participant data and plan migration still indicates a full year 2019 expected benefit cost trend of only 2% to 2.5%*.

> \*       \*       \*

> [Sarvadi:] As we have discussed on many occasions, *the predictability of the cost of our health plan is excellent on an annual basis* . . . .   We've analyzed our underlying plan trends, including large claim activity, plan utilization and plan demographics.  *Based on that analysis, we expect large claims to normalize and overall benefit cost trend to remain relatively low for the remainder of 2019*.

88.    Analysts sought additional details about the large medical claims that caused the earnings miss in 2Q19, and defendant Sharp falsely assured analysts and investors that medical claims costs growth would be limited to 2.5% and that there were no pricing issues which would indicate an unfavorable benefit/cost trend:

> [Sharp:] I mentioned now we're forecasting [medical claims cost trend] to 2.5% range or so.  *And so still a very favorable claim cost – benefit/cost trend that we're looking at*.

89.    Analysts also sought further information concerning the Company's outlook in light of the WSEE guidance miss and whether the Company was currently poised for the necessary acceleration in the second half of the year.  In response, defendant Savardi falsely assured analysts that the Company had not seen any sign of a slowdown, and characterized the sales pipeline as the

biggest the Company had ever had, adding that the Company was purportedly ahead of FY18 in mid-market sales:

> [Analyst:] So question was the sales result in the second quarter.  You said it was 101% for the first half.  *But was the second quarter in line with your expectations?  Are you seeing any impact of any recession or slowdown or beginnings of such?*
>
> [Sarvadi:] *No, sir, we haven't seen any sign of a slowdown*, Jim. . . .
>
> [Analyst:] Anything you can say about mid-market versus the core business?
>
> [Sarvadi:] Sure.  The mid-market, it's a little newer, of course, a little choppier just because it's fewer salespeople out there and – *but the channel is really strong right now.  We've got the biggest pipeline we've had, and we are above last year in sales for the year*.

90.     Analysts also sought answers from defendants about the basis for their optimism that the Company was currently positioned to accelerate and achieve guidance despite lowering BPA guidance earlier in the year.  Defendants expressed confidence that the current number of BPAs would translate into their predicted growth over the balance of the year and asserted that they were right where they wanted to be with respect to BPA growth:

> [Analyst:] And then in terms of the acceleration of worksite employee growth from Q3 to Q4 of this year . . . is there anything in particular that gives you a basis for seeing that acceleration?
>
> [Sarvadi:] *Well, certainly . . . it's just our normal sales plan in terms of the sales per salesperson per month, number of BPAs and how that rolls in over the balance of the year*.  So you're going to see that acceleration just as we hit our sales numbers as the year progresses. . . .
>
> [Analyst:] And then in terms of talent acquisition on the BPA side, are you seeing challenges there given the tight labor market?  And how are you fighting that?
>
> [Sarvadi:] This is a tremendous opportunity for people. . . . *and we're capable of growing that base of Business Performance Advisors at the targeted levels*.  So like I said, we were at about 13% at the end of the quarter, for June, year-over-year, and we'll continue to ramp that up to around 14% over the balance of the year, *and that's right where we want to be going into 2020*.

91.     On July 29, 2019, The Street published a report on the Company's 2Q earnings results titled "Insperity Falls as Tight Labor Market Hits Customers' Hirings" stating that investors were reacting to the reduction in guidance for the remainder of the year, causing the stock price to plummet:

> ***Shares of human resources and business management systems provider Insperity plunged on Monday*** after the company reported second-quarter earnings that matched analysts' forecasts, but ***tweaked its full-year earnings forecast downward*** amid an anticipated slowdown in hiring among its customers.
>
> *                *                *
>
> ***[T]he company said that its third-quarter and full-year results will be lower than analysts' forecasts***.  Insperity now expects third-quarter net income of between $36.5 million and $38.5 million, and adjusted per-share earnings of between $1 and $1.04.

92.     On July 29, 2019, Roth Capital Partners issued an analyst report titled "NSP: 2Q19 In-Line, Fundamentals Still Strong; Selloff Presents Opportunity."  The report lowered the price target from $147.00 to $138.00 on the Company's mixed results, but the analyst remained upbeat on the Company's outlook and its ability to grow WSEEs at 15% annually while parroting defendants' baseless assertion that healthcare costs would normalize:

> Our investment thesis on NSP ***centers around the company's ability to grow the WSEE base at double-digit rates***, while exhibiting attractive operating leverage, enabling ~20% growth in profit metrics.  Continued growth in the sales force and enhances features and flexibility of the service offering are significant contributors to the growth engine.  We maintain our Buy rating and reset our price target to $138 from $147.
>
> [Insperity] tempered the expectation for WSEE growth to a midpoint of 14% from 15%, ***primarily due to net hiring trends within the client base***.  Healthcare benefits costs impacted the quarter, but were offset by numerous other items; ***importantly, NSP still sees benefits costs increases of just 2-2.5% this year***.
>
> ***We maintain a high level of conviction in NSP's ability to grow the WSEE base at a double-digit pace*** . . . .

93.     On July 29, 2019, SunTrust Robinson Humphrey issued an analyst report titled "Buy The Dip" commenting on the "disappointing 2019 guidance" issued by the Company but claimed it

- 32 -

was partially attributable to a single delayed customer merger. The analyst repeated defendants' position that the negative effects of increased healthcare costs were transitory and were unlikely to be repeated in consecutive quarters:

> We highly recommend growth investors take advantage of share weakness on inline 2Q results and disappointing 2019 guidance to accumulate NSP shares *as we believe issues impacting guidance should prove transitory*. Elevated large medical claims, slowing job growth by customers in 2Q and a delayed customer merger impacted results/guidance.

> \* \* \*

> We believe that 2Q profit would have been materially higher and exceeded consensus if not for an unexpected pickup in large healthcare claims. . . . We think the larger claims may have shaved >$0.20 off of the $0.83 in adjusted EPS reported in 2Q. Statistically, a surge in large claims can occur in any given quarter *but it is unlikely to repeat in multiple consecutive quarters*.

94.     Each of the statements set forth in ¶¶85-90, above, concerning the Company's mid-market sales opportunity and execution, the number and growth of its BPAs, its ability to generate new sales and renewals to grow WSEEs, its assessment of health claims and benefit costs/benefit trends, and its claims of currently being on track or in line with expectations was materially false and misleading when made because defendants knew or recklessly disregarded and failed to disclose the facts set forth in ¶77.

95.     As a result of the disclosures on July 29, 2019, including the guidance miss for WSEE growth, elevated healthcare claims costs, and the guidance reduction going forward, Insperity's stock price declined more than 24%, from a close of $144.63 per share on July 26, 2019 to a close of $108.89 per share on July 29, 2019 (the next trading day), on volume of 2.7 million shares traded. While the disclosures on July 29, 2019 partially disclosed the Company's true financial condition, Insperity's stock price continued to trade at artificially inflated prices above $100.00 per share due to defendants' ongoing misrepresentations and omissions.

96.     On September 10, 2019, SunTrust Robinson Humphrey published an analyst report stating that the Company appeared at roadshows in both New York and Boston during which defendants Sarvadi and Sharp addressed analysts and investors.  According to the analyst report describing defendants' comments, despite 3Q19 being just three weeks from completion, defendants were reported to have falsely represented that business momentum continued to be strong and indicated that the spike in healthcare costs was an unusual event limited to 2Q19.

**Insperity Announces Disastrous 3Q19 Results Due to Continued Increased Medical Claims Costs and Insufficient BPAs, but Falsely Assures Investors of Strong Ongoing Sales**

97.     On November 4, 2019, the Company issued a press release announcing its financial results for 3Q19.  The Company missed *every financial guidance metric*: it reported adjusted EPS of $0.75, missing its 3Q19 guidance by up to $0.29 per share; adjusted EBITDA of $51M, missing its guidance by as much as $18 million; and, average WSEEs paid of 240,939, missing guidance by as much as 3,161 WSEEs.  Defendants also announced *another quarter of increased health benefit costs* – making it three out of the prior four quarters in which the Company experienced increased healthcare costs:

<strong>Insperity Announces Third Quarter Results</strong>

*     *     *

"*Q3 large medical claim activity in our plan was disappointing* . . ." said Paul J. Sarvadi . . . .

98.     The press release also included new guidance for FY19, including sharp reductions across the board for WSEEs, adjusted EPS and adjusted EBITDA – to figures well below the initial and raised guidance announced earlier in the Class Period:

| FY19 Guidance (date issued) | Feb. 11, 2019 | Apr. 29, 2019 | Jul. 29, 2019 | Nov. 4, 2019 |
|---|---|---|---|---|
| Y-o-Y WSEE growth: | 14%-16% | 14%-16% | 13.5%-14.5% | 12.7%-13.0% |
| Adjusted EPS: Y-o-Y growth: | $4.37-$4.69 17%-25% | $4.55-$4.80 21%-28% | $4.59-$4.74 22%-26% | $4.08-$4.20 9%-12% |

| Adjusted EBITDA: | $268M-$285M | $276M-$289M | $278M-$286M | $247M-$253M |
| Y-o-Y growth: | 12%-19% | 15%-21% | 16%-19% | 3%-6% |

99.     In addition to the significant reduction in annual guidance, the Company's quarterly guidance for 4Q19 was sharply negative as compared to 4Q18.  Adjusted EPS was forecast to **decline** quarter-over-quarter by as much as 28% and adjusted EBITDA was expected to **decline** quarter-over-quarter as much as 20%.

100.     On November 4, 2019, defendants Sarvadi and Sharp participated in an earnings conference call to discuss the Company's 3Q19 earnings miss and guidance reduction with analysts, and to reassure investors about the Company's current position and outlook.  During the call, defendants stated that large medical claims and lower growth in paid WSEEs had negatively impacted the Company's 3Q19 results.

> [Sarvadi:] These results include third quarter performance below our expectations, ***driven primarily by a second consecutive quarter with elevated large claims in our medical plan and to a small degree by lower growth than expected in paid worksite employees***.

101.     In a shocking contradiction of their prior assurances, defendants admitted that the "primary cause" of disappointing WSEE growth was their failure to hire and retain BPAs during the first half of the year.  And, unbeknownst to investors, while defendants' knew of this BPA shortage, they had (by their own characterization) taken the overly optimistic view that the Company's newest sales segment – mid-market business clients – would over-perform and cover up the expected shortfall created by the lack of BPAs.  Defendants also stated that only now (*i.e.*, during 4Q19) was the Company finally increasing BPAs sufficient to grow sales, but given the time it takes to generate new sales, defendants were already expecting poor 4Q19 sales:

> ***The primary cause leading to fewer paid worksite employees from sales in Q3 is we simply had too few trained BPAs early this year and did not offset that with mid-market sales***.

*     *     *

*In retrospect, I believe I was too optimistic in expecting mid-market sales to offset a lower growth rate in BPAs at this stage*.

            \*         \*         \*

[Sarvadi:] And at this point, ***frankly, that fourth quarter doesn't really matter***. We're all focused on the January starting point for the year. And so what we're really focused on is our fall campaign activity. ***And we've got our nice increase in trained rep count back up where it belongs, 13%***. . . . So we're in that period where you have this year-over-year growth on top of this significant increase in the – with the large customer we had last year. And with that comparable, ***along with having a lower-trained BPA count early in the year, that's just the way it's come out at this point, and we're focused on turning that around***.

102.     Defendants acknowledged that mid-market sales not only would not make up for the insufficient number of BPAs but also that their prior claims about mid-market sales being above FY18 was false. Mid-market sales were actually down from FY18 because the Company had fewer and smaller mid-market deals. Furthermore, the FY18 mid-market results were driven by an outlier sale to a large-enterprise client which would not recur in FY19:[1]

This year, we have ***nearly the same number of accounts sold*** year-to-date in our mid-market segment and a substantially larger pipeline for 2020. However, ***the biggest difference from last year in mid-market sales is the lower average size of accounts sold*** and the fact that we did not close a large enterprise account like we did last year.

103.     During the earnings conference call, defendants contradicted their prior assurances that they had visibility into annual healthcare claims costs and that claims would normalize, instead stating that the Company now predicted elevated healthcare costs would continue through 4Q19. Defendants also revealed that the spike in health claims was actually from participants who had large claims of over $250,000 throughout the whole year – indicating that the increases were part of a longer-running trend:

---

[1]     During the November 4, 2019 earnings conference call, defendants disclosed that the large mid-market client in 2018, which was the Company's largest ever sale (approximately 3,000 WSEEs), was enrolled on July 1, 2018 and that this one client alone added 160 basis points to its WSEE growth that year.

[Sharp:] ***An analysis of large claims over the past 2 years indicated a recent spike in activity related to participant[s] with claims exceeding $250,000 a year***.  These jumbo claims from a very small number of participants were the primary driver behind our claim dollars exceeding expectations by approximately $27 million over the past 2 quarters.

*        *        *

[W]e believe it is prudent to take a more conservative approach to estimating benefit costs for the fourth quarter by ***not assuming a further reduction in large claim levels for the remainder of 2019***.

104.    Defendants also revealed that at no point in the Class Period did they did have ongoing access to current medical claims data during the quarter to assess the status of claims or claim trends, as previously represented, but rather had to wait until after quarter-end to obtain claims data – and this delay was "typical."  Defendants also conceded that they were unable to get more current information and were not in fact able to project medical costs as they had previously represented:

> [Analyst:] And when did you discover that the health care costs were running at an elevated level?

> [Sharp:] [W]e get the claims . . . data from United Healthcare and that's not following the end of the quarter.  And so it was – in October, first, we get the initial claims data from them and then – which further – takes time to further analyze that data, and particularly in a quarter like this where you can keep going into a deeper analysis of that.  But that's . . . ***typical with every quarter*** over the course of our history.  ***So you don't know your health care claims data on an incurred basis until after the quarter is over with***.

> [Analyst:] Is there the possibility of getting more frequent updates?

> [Sarvadi:] It's actually not a matter of frequent updates.  We meet with United every month.  ***And even through the September meeting, there wasn't an indication because you don't have the quarterly report, which has the fully – full claims as on an incurred basis***, put back to where they initiated and things were looking reasonable through the 2 months.  It went until the claim reports for the quarter that came in after that we were faced with some numbers that were quite disappointing.

*        *        *

[Analyst:] [I]s there a way to get an earlier warning system?  Any sort of rolling system or anything like that?

[Sarvadi:] At this point, we have some things that we will probably work with them on to try to get better insight, but now that it's kind of new information, *it's not something we're going to be able to say right away this will help us project that*.

105.    Despite admitting to their lack of visibility into claims activity, defendants falsely stated that their analysis indicated that healthcare claims would not continue to grow during 2020 and would normalize to pre-2019 levels and that pricing on new and renewing business was proceeding according to these projections:

> As we look forward to 2020 and enter a new plan year, our detailed claims data does not indicate the level of large claim activity will compound by increasing over the recent elevated rate.  Under this scenario, *we would expect 2020 to return to a more normalized benefit cost trend over 2019 costs, and we are pricing our new and renewing business accordingly*.

106.    Concerned investors sought information from defendants about the long-term impact of increased healthcare benefits costs.  Defendants falsely reassured them that pricing going into the 4Q19 renewal period would not be significantly impacted and that they had not previously underpriced their plans (*i.e.*, did not have a price-cost mismatch).  Defendants told investors that throughout the first three quarters of 2019 renewals and pricing were strong – if not ahead of expectations – and that the Company was well into the year-end renewal period and was seeing positive results:

> [Analyst:] I was wondering if you could elaborate on those changes to your health care pricing after seeing those outsized claims in the past 2 quarters?

> [Sarvadi:] But we feel very good.  *Pricing has been strong throughout the year and has even come in ahead of our expectations as the year went along*.  So we feel good about how we have things price going forward even in spite of this anomaly, we've had on these large claims.

*     *     *

> [Analyst:] I wanted to get a sense on how you feel that the higher benefits cost could affect your year-end transition in terms of retention?

- 38 -

[Sarvadi:] ***Really, no connection there because our pricing strategy really didn't – this didn't call for any change in pricing***.  Remember, the total cost trend of 3.7% that we even have in this year is really favorable against the market at large as it is.  Our normal pricing strategy would actually have us pricing at a higher number than that in our normal pricing. . . .  ***And we don't have . . . a cost price mismatch, we don't have to go back and hurry up and increase prices on customers.  That's not what's going on from this situation***.

\*       \*       \*

[Sarvadi:] Now the year-end, we have . . . a little over 40% of our book of business renews in this January to February time period.  ***And those – we're well into renewing those accounts already and – or actually a little ahead on that***.  But those – those – the pricing on those accounts goes out in October, typically, the bulk of it.  And so we're already out there renewing those accounts.[2]

\*       \*       \*

***So all in, like I say, our pricing compared to our all-in cost is still well intact, not an issue there that has driven a big change in pricing strategy***.

107.    On November 4, 2019, Suntrust Robinson Humphrey issued an analyst report titled "HC Anomaly Presents Buying Opportunity; 2020 Drivers Solid" and lowered its price target from $150.00 to $128.00.  The report echoed defendants' statements on the earnings conference call that the two-quarter increase in healthcare claims was not indicative of systemic issues and would not affect healthcare insurance pricing going into the renewal period:

In our view, ***two consecutive quarters of large HC claims are not reflective of systemic issues in the benefits program*** and forward indicators suggest more favorable conditions for NSP's small-business clients in 2020. . . .

Management reiterated that they believe the spike in claims is a statistical anomaly and does not reflect an ongoing issue in their benefits program. . . .  This is the first time NSP has recognized large HC claims twice in a year (including only 4 quarters in the past decade).  NSP recognizes claims when they close and ***management is not anticipating an associated change in their HC pricing strategy***.

\*       \*       \*

---

[2]      On the 2Q19 earnings conference call Defendants stated that "[w]e expect to kick off our fall sales and retention campaign for our core business in early September."

Revised guidance for 4Q adj. EBITDA of $42M and adj. EPS of $0.56 at the midpoint were downside to street estimates to $56M and $0.81, respectively. Projected WSE growth of 10%-11% fell short of our prior 13.6% estimate.

108.    On November 5, 2019, Roth Capital Partners issued an analyst report titled "NSP: HC Benefit Costs Strike Again, Expectation Reset Creates Opportunity" slashing their target price for the Company's stock to $100.00, from $138.00 and noting that the Company's share price had been cut in half over the prior four months:

NSP reported 3Q19 results materially below expectations driven by a second consecutive spike in healthcare benefit costs to the tune of $27mm over the past six months. Shares have been cut in half over the past four months in reaction. . . . *We expect management to guide for 2020 at the elevated benefit cost level*, leaving a return to normalized cost levels as upside.

109.    On November 6, 2019, The Street published an article titled "*Insperity Stock Tanks After HR Provider's Earnings Fall Short, Guidance Pared*" which stated that "*Insperity lost nearly a third of its market value* after the human-resources provider dashed analyst expectations, reporting subpar quarterly earnings and lowering its guidance for the fourth quarter as well."

110.    As a result of these disclosures, including the earnings miss on elevated healthcare claims costs, and the guidance reduction going forward, Insperity's stock price declined close to 34%, from a close of $107.67 per share on November 1, 2019 to a close of $71.38 per share on November 4, 2019 (the next trading day), on volume of more than 4.8 million shares traded.

111.    While the disclosures on November 4, 2019, partially disclosed the Company's true financial condition, Insperity's stock price continued to trade at artificially inflated prices due to defendants' ongoing misrepresentations and omissions set forth in ¶¶105-106 concerning the Company's assessment that health claims would normalize to pre-FY19 levels, its pricing, and its renewal campaign success. Each of these misrepresentations and omissions was knowingly false and misleading when made because defendants knew or recklessly disregarded and failed to disclose, the following facts:

(a)     The Company's historical growth of WSEEs was the result of underpricing benefits – in particular health insurance – to compete for clients and as a result, a material number of clients paid insufficient fees to cover their healthcare claims costs and were not sufficiently profitable;

(b)     The increased pricing necessary to cover the cost of increased medical claims and support the Company's financial growth outlook made the Company not competitive with new potential new clients and caused increased attrition within existing clients;

(c)     The Company was continuing to experience a material increase in large healthcare claims, beginning no later than April 1, 2019 (*i.e.*, the start of 2Q19), which would continue for the duration of FY19; and

(d)     Defendants were unable to analyze or estimate current or future healthcare costs or trends for any period, including any determination as to when or whether claims costs would return to pre-FY19 levels.

112.    On November 12, 2019, Zacks issued an analyst report downgrading Insperity from "Neutral" to "Underperform," slashing its price target from $76.00 to $61.00 and stating that "[t]he company's operation in a highly fragmented and competitive PEO industry remains a concern."

113.    On November 26, 2019, Suntrust Robinson Humphrey published an analyst report titled "Investor Call Highlights: HC Claims at Forefront, Selling Season Upbeat" which stated that Suntrust had hosted a call with defendants Savardi and Sharp during which defendants falsely reiterated that there were no systemic problems in the Company's healthcare portfolio and the prior large medical claims were anomalous.  Defendants made false and misleading statements and omissions and intentionally fostered mistaken beliefs concerning material facts, which were incorporated into the analyst's report summarizing the call:

We hosted an investor conference call yesterday with Insperity's CEO Paul Savardi and CFO Douglas Sharp.  *The company reiterated that two consecutive quarters of elevated HC claims appear to be a statistical anomaly and are not representative of a systemic issue in the benefits plan*.  Positive early momentum in the 4Q selling season was encouraging with both core and midmarket accounts performing well.  We reiterate our Buy rating and $128 PT.

114.     The analyst report described the questions put to defendants Sharp and Savardi and summarized their responses, including whether defendants had considered implementing mechanisms to limit their exposure to large medical claims.  Defendants reportedly rejected this option as not economically feasible and too limiting on growth and profitability:

**Discussion Highlights From Our Investor Conference Call**

\*     \*     \*

**Have you looked at ways to mitigate HC claims through layers of insurance, whether stop-loss insurance or some other mechanism and the tradeoffs that would entail?**

- With another quarter of heightened claims, the company has spent more time digging into potential options.  *The current orientation provides two distinct advantages in the marketplace (1) growing faster; and (2) being more profitable*. . . .

- An aggregate limit/overall cap on claim liability is possible, but *unlikely to be doable in such a way that would make economic sense for NSP*.

115.     Defendants were also reportedly questioned whether they had underpriced their products and services – like healthcare benefits – to attract new customers at the expense of profitability, and whether they would be facing pressure to reprice consistent with the medical claims costs they had incurred.  Defendants pushed back on these questions, falsely insisting that their track record evidenced successful pricing and the Company could achieve 10%+ WSEE growth:

**With the argument NSP grew too fast and took on customers that are not the best match – what is the counterpoint?**

- The history of the business should dispel that argument very readily; have grown double-digit for a long time and ramped up faster last year onboarding the largest account ever at 2,800+ employees.

- 42 -

- ***NSP remains fully confident in existing customer selection processes at this rate of growth***.

- Underlying claims below the larger ($250k+) level are tracking with expectations.

*   *   *

**A PEO competitor previously had an issue with outsized HC claims.  Cost trends went up, the company was forced to reprice and saw heightened churn as a result.  How is your situation different?**

- NSP's situation is unique with respect to recent issues experienced by competitors. ***Management believes double-digit WSEE growth is achievable while still keeping a firm handle on the associated risk***.

116.    Defendants statements, as summarized in the Suntrust analyst report, set forth in ¶¶113-115, above, concerning the Company's assessment that the increased health claims was not representative of a systemic issue, its consideration of stop-loss insurance, and its ability to grow WSEEs were each knowingly false and misleading because defendants failed to disclose the true facts, which were known to them or recklessly disregarded and failed to disclose the facts as set forth in ¶111(a)-(d), above, as well as that the Company had already put in place, or was in the process of putting in place, stop loss on large claims which would limit the Company's exposure to claims greater than $1 million.

117.    As a result of these false and misleading statements and omissions, which were made with just five weeks left in FY19, the Company's stock continued to trade at artificially inflated prices above $90.00.

**Insperity Announces Weak 4Q19 Results Due to Increased Healthcare Benefit Claims and Higher Client Attrition; Slashes Outlook in Full Reset of Growth Expectations**

118.    On February 11, 2020, after the market closed, the Company issued a press release announcing its abysmal financial results for 4Q19 and FY19 and, for the third quarter in a row, elevated healthcare costs.  For 4Q19, the Company reported adjusted EPS of $0.57 per share, ***a***

*decrease of -17.4%* year-over-year; adjusted EBITDA of $20.4 million, *a decrease of -14.4%* year-over-year; and 243,715 average WSEEs paid, missing even its recently-lowered guidance.

**Insperity Announces Full Year and Fourth Quarter 2019 Results**

\*       \*       \*

### Fourth Quarter Results

Fourth quarter 2019 net income and diluted earnings per share of $20.4 million and $0.51 represented decreases of 17% and 14%, respectively, compared to the fourth quarter of 2018. ***Adjusted EPS was $0.57, a 17% decrease over the fourth quarter of 2018. Adjusted EBITDA decreased 14% over the fourth quarter of 2018 to $40.7 million***.

\*       \*       \*

*[T]he frequency of large claims and related costs remained elevated when compared to levels in prior years*.

119.     For the FY19 results, the Company ***missed every metric*** of its upwardly revised guidance issued on April 29, 2019.  The Company reported adjusted EPS of $4.15 per share, missing by up to $0.65.  Annual growth for adjusted EPS was 10.67%, far short of the 21% to 28% upwardly revised guidance.  The Company reported adjusted EBITDA of $250 million, missing guidance by up to $39 million.  Annual growth for adjusted EBITDA was 4.3%, far short of the 15% to 21% upwardly revised guidance.  The Company also reported 235,547 average WSEEs, missing its upwardly revised guidance as much as 7,053 WSEEs.  Annual growth for WSEEs was 12.6%, missing both its upwardly revised and its lowered guidance from just one quarter prior.  And, guidance for 2020 WSEE growth was reduced to just 6%-8% as momentum was halted and growth expectations reset.  The Company also reported that due the benefit cost trend, average gross profit per WSEE per month declined.

### Full Year Results

Adjusted EPS increased 11% over 2018 to $4.15.  Adjusted EBITDA increased 4% to $250.0 million.

- 44 -

*     *     *

Revenues in 2019 increased 13% to $4.3 billion, on a 13% increase in the average number of worksite employees ("WSEEs") paid per month over 2018.  This growth was driven by WSEEs paid from new sales on a 12% increase in the average number of trained Business Performance Advisors and client retention of 85%.[3]

120.    The Company's annual guidance, revisions and final results are summarized as follows:

| FY19 Guidance (date issued) | Feb. 11, 2019 | Apr. 29, 2019 | Jul. 29, 2019 | Nov. 4, 2019 | Feb 11, 2020 FY Results |
|---|---|---|---|---|---|
| WSEE growth (Y-o-Y): | 14%-16% | 14%-16% | 13.5%-14.5% | 12.7%-13.0% | 12.6% |
| Adjusted EPS: Growth (Y-o-Y): | $4.37-$4.69 17%-25% | $4.55-$4.80 21%-28% | $4.59-$4.74 22%-26% | $4.08-$4.20 9%-12% | $4.15 10.7% |
| Adjusted EBITDA: Growth (Y-o-Y): | $268M-$285M 12%-19% | $276M-$289M 15%-21% | $278M-$286M 16%-19% | $247M-$253M 3%-6% | $250M 4% |

121.    In a reversal from defendants' statements to investors on November 26, the Company announced that it renegotiated its agreement with UnitedHealth to add a stop loss mechanism to limit its exposure going forward – the exact protection the Company previously dismissed as too limiting on growth and profitability:

"We recently added a new feature in our health plan with our national health insurance carrier to limit our exposure on our largest claims.  Beginning in 2020, we will not have financial responsibility for any amount of a participant's annual claim costs that exceed $1 million,"

122.    And, in contrast to defendants' prior statements that increased healthcare costs were not affecting the Company's pricing for new and renewing customers, the Company acknowledged that it had been increasing pricing to offset elevated healthcare costs, which placed downward pressure on WSEE growth:

"***Higher benefit costs were partially offset by continued improvements in pricing***."

---

[3]    By reporting 85% client retention, or 15% client attrition, Insperity disclosed that its 4Q19 attrition was at least 5.1% based on its prior reported attrition rates in 1Q19 (7.9%), 2Q19 (less than 1%) and 3Q19 (less than 1%).

123.     On February 11, 2020, after the market closed, defendants Sarvadi and Sharp also participated in an earnings conference call to discuss the Company's 4Q19 and FY19 results. Defendant Sarvadi stated that client attrition was significantly higher during 4Q19 as compared to 4Q18, and confirmed that new sales during the quarter did not offset the loss in existing clients.  In contrast to their statements in the prior quarter that pricing was not an issue, Sarvadi stated that 42% of the attrition was caused by increasing a client's renewal price:

> *This January, worksite employees lost from client attrition came in at 7.3%, 180 basis points above January 2019*, which was 5.5%.  This was a primary driver to the lower-than-expected starting point in paid worksite employees for 2020.  *In addition, new sales were not enough to offset the attrition* . . . .

> The client attrition difference of 180 basis points was *the result of an increase in client terminations* in our larger account segments, including emerging growth and mid-market clients.  The 2 primary reasons given for these terminations were mergers and acquisitions and cost or value considerations. . . . *Cost or value considerations comprised . . . 42%* . . . .  So our emphasis going forward will focus on what we can do to improve results in our emerging growth in mid-market segments.

124.     While Sarvadi attempted to spin this attrition as a positive, indicating that these clients were less profitable, it was an acknowledgement that the Company's prior WSEE growth was driven by underpricing services and left the Company facing losses on healthcare claims.  And, when pricing was raised to account for increased health insurance costs, so the Company could reach the profitability necessary to make its guidance, its clients were no longer interested in doing business with Insperity:

> *This group of terminating clients had a gross profit contribution 12% below the average of our client base due to a combination of lower pricing allocations compared to their direct costs, including benefits*.  This is particularly important when considering the second challenge we faced in Q4 . . . .although the number of large health care claims declined each of the subsequent quarters since the sudden spike in Q2, we continued to see an elevated number of large claims compared to previous levels.

125.    Defendants' explanations of the FY19 results also acknowledged that the Company did suffer from a cost-price mismatch, contrary to their prior claims.  Indeed, Sarvadi explained that the Company's new higher pricing allowed the Company to be in position to "match the expected direct cost trend," however these increased prices resulted in clients not renewing and crushed the Company's outlook:

> When you weigh in the positive effects from the lower-priced clients terminating at year-end to ***our enhanced overall pricing***, ***we are starting this year in a position to be able to match the expected direct cost trend***, including benefits, with just a modest level of targeted increases over the course of the year.

126.    While defendants had claimed as late as November 26, 2019 that they could continue growing WSEEs at greater than 10% during 4Q19, on the call they conceded that fundamental changes were required and the Company did not anticipate reaching double-digit growth ***until 2021***. Defendants also disclosed that they knew that FY18 was actually the year mid-market sales outperformed, in part because of a single jumbo client, and that going forward the lower FY19 execution was the realistic expectation:

> [Sarvadi] [W]e'll focus on the fundamentals necessary to accelerate our growth, recover our profitability and ***lay the groundwork to reach our goal to return to double-digit growth in 2021***.
>
> *       *       *
>
> [Sarvadi:] [2020 guidance] would be more in line with what we had last year as opposed to ***the year before when mid-market really outperformed***.  We sold the same number of accounts in mid-market last year as we did the year before, but the average size was smaller.  We didn't have a super jumbo in there.  ***So we've incorporated something more in line with what we had last year***.

127.    Defendants also conceded that their business model was not resilient, as previously claimed, and the Company would go through a painful reset in which WSEE growth would drop as low as 5.5% for the quarter and 6%-8% for FY2020.

> In our residual income business model, ***an interruption in growth and profitability unfortunately resets the starting point***, which is what we're facing this year.  As a

- 47 -

result, *we're expecting 6% to 8% unit growth for the year in paid worksite employees*, more in line with the industry growth rate.  We expect to start the first quarter at the low end of this range and anticipate growth acceleration as the year progresses.

128.     In explaining why health costs remained elevated during 4Q19, defendants attempted to state that claims were largely not from ongoing claims (*i.e.*, unpredictable), but in doing so admitted that the cost increase was, in fact, partially attributable to *known* ongoing claims from the prior quarters.  Further, defendants admitted that the new claims were not the product of new clients (*i.e.*, unknown risks), but existing clients of the Company and they still lacked any visibility into claim trends:

> During Q4, the number of large claims continued to decline from the high point in Q2 however *remained elevated when compared to the periods prior to Q2 of 2019*. . . .   The claims were largely from different participants as opposed to ongoing claims from the same group of participants in prior periods, and a review of the clients associated with these large claims *did not indicate a concentration associated with new clients*, COBRA participants or a particular region.

> \*        \*        \*

> This claim activity largely *drove a 4% benefit cost trend in 2019* compared to the 2% to 3% forecasted trend at the outset of the year.  In fact, for the full year 2019, the proportion of our cost related to individual claimants exceeding $250,000 increased 26% over the 2018 period.  This included 27 claimants over $1 million at a total cost of approximately $37 million, more than double the amount experienced in 2018.

129.     The Company also finally admitted that they had to increase their cost estimates going forward.  The Company disclosed that it raised its estimate for healthcare cost to 3.5% to 4.5% per WSEE.  Defendant Sharp admitted that the FY19 claims experience was in fact the new baseline risk and represented the low-end end of the guidance range, while the high end assumed *continued growth* in large claims on top of FY19 levels:

> As for our forecast for large claim activity, while it is possible that the frequency of these claims revert back to levels prior to Q2 of 2019, we have taken a more conservative approach in our 2020 forecast . . . . *the upper end of our benefit cost range assumes an increase in the number of large claimants in line with our projected worksite employee growth.  The lower end of our forecasted benefit costs*

*assumes the number of large claimants generally in line with the elevated levels experienced in 2019*.

130.    When pressed for further details on why the Company was assuming that healthcare claims rates would remain at FY19 levels, defendants acknowledged the truth:  They had "***no basis***" to predict that claims would return to pre-FY19 levels, despite previously assuring investors that exactly such a change would occur:

> [Analyst:] And what kind of comfort level do you have that [large benefit claims] could find some stability here in the next quarter or 2 and then maybe improve from there?

>         *       *       *

> [Savardi] Well, like we said, it didn't snap back in line with the pre-Q2 levels, but it's come down in frequency, those 2 quarters in a row.  ***And we felt like though it was important for us for budgeting purposes to not assume that was just going to keep happening with no basis for it*.**  So instead, we've assumed kind of in our worst case that the number of these claims goes up with our unit growth. . . .

> [Sarvadi] Yes.  We really don't have it trending lower, much less falling off. I mean if it did either of those things, we – you'll see some outperformance on that front but ***just not appropriate at this point to build any of that in***.

131.    On February 11, 2020, Roth Capital Partners issued an analyst report reducing the stock price target and stating that it expected that based on the new disclosures the stock would bottom out, that the new health cost guidance was above the FY19 levels, and that it did not expect double digit growth again until 2021:

> [A]s we've seen in the past, a 20% downside move in shares on a negative year-end transition ($74 in this case), as is the case this year, is usually where the stock begins to recover. . . .

> Management guided 2020 below consensus on lower WSE growth of 6-8% and guided HC benefits costs 2.5% to 3.5% ***above the elevated level in 2019***.

>         *       *       *

> As a result, management sees a quick rebound and acceleration of unit growth, ***albeit we likely won't see a return to double-digit growth until 2021***.

132.     On February 11, 2020, SunTrust Robinson Humphrey lowered its price target, stating that the reduced expectations for WSEEs were from lower BPAs, higher attrition and slow mid-market sales, and as a result was lowering revenue in its model.  The analyst also similarly stated that expected the stock would bottom out, that the new health costs in FY19 were the baseline, and that it did not expect double digit growth again until 2021:

> *We view the FY20 WSEE outlook as disappointing*.  NSP guided for 6-8% WSEE growth in FY20 versus our prior 9.5% estimate.  We note the company has a long history of being able to estimate WSEE volume within a narrow band.  In our view, *the softer guide was driven by: (1) a modest pace of net hiring in the core small business account base; (2) increased customer attrition y/y; and (3) a steady pace of mid-market account sales*.  On the call, management affirmed their confidence in returning to a *double-digit WSEE growth rate in FY21*.

> The 3.5-4.5% cost trend embedded in FY20 guidance (versus the ~4% overall cost trend in FY19) *assumes the historically high healthcare claims experienced in this past year as a baseline*.

> *In-line F4Q19 selling season was offset by increased attrition. The company noted some deceleration in November sales* . . . .

> \*       \*       \*

> *We reduce our FY20 revenue to $4.6B from $4.7B (based on 6.8% WSEE growth)* and our FY20 adj. EPS to $3.95 from $4.62.

133.     As a result of these disclosures, including three consecutive quarters of elevated healthcare claims, the Company's WSEE guidance miss, the higher attrition in existing clients and the slashed outlook going forward, Insperity's stock price declined 19.58%, from a close of $89.08 per share on February 11, 2020 to a close of $71.64 per share on February 12, 2020 (the next trading day), on volume of more than 3.7 million shares traded.

134.     On February 12, 2020, the Company filed its SEC Form 10-K for FY19.  The Company disclosed that "[d]uring 2019, the number of WSEEs paid from new client sales decreased over 2018 [, and] . . . the net change in existing clients and client retention also decreased compared to 2018."

135.    The Company also disclosed that its benefits cost had increase *by approximately $200 million in 2019, or approximately 11.76%*, over FY18.  Further, the reported 4% increase in benefits cost it discussed on the February 11, 2020 earnings call worked out to be $12.00 per month per WSEE, compared to $6.00 increase in FY18, *a 200% increase*.

136.    The Company also made changes to its risk disclosures, no longer stating that health insurance costs "could" increase if there was an increase in health claims, but revealing that if claims increased it is "anticipated" that costs would and that its pricing would now be dependent on its own health cost forecasts:

> The profitability of our PEO HR Outsourcing solutions is affected by the overall expenses associated with the cost of delivering our services, one of the largest of which is the cost of our health insurance.  *Our ability to accurately anticipate the expenses associated with the plans, including claims costs on a quarterly or annual basis, can impact our results of operations*.  If the plans experience an increase in the number or severity of claims, our associated health insurance costs could increase *beyond anticipated levels, as we experienced in 2019*. . . .  Further, *if the overall pricing of our services includes cost assumptions based on inaccurate forecasts of plan expenses, our profitability or our ability to attract and retain clients may be adversely impacted*.

137.    Lastly, the Company also disclosed that, in contrast to its press release just issued the day before, WSEEs had not grown faster than BPAs.  The Company reported that there was "a 12.8% increase in total BPAs in 2019" and the "[a]verage number of WSEEs paid per month increased 12.6%."  While in the press release the Company rounded WSEE growth up from 12.6% to 13%, it rounded down BPA growth from 12.8% to 12%.

## LOSS CAUSATION/ECONOMIC LOSS

138.    During the Class Period, as detailed herein, defendants made knowingly false and misleading statements about Insperity's current and historical business operations, financial condition, access to information, visibility into trends, and its current outlook and prospects.  These material misrepresentations and omissions operated as a fraud or deceit on Lead Plaintiff and the

- 51 -

Class, and artificially inflated Insperity's stock price, including to a Class Period high of $144.92 on July 26, 2019. Defendants' false and misleading statements and omissions were revealed to the market through a series of partial disclosures – some mitigated by further false or misleading statements or omissions that caused the price to remain artificially inflated. As defendants' prior misrepresentations and fraudulent conduct became apparent to the market, Insperity's stock price fell precipitously, as the prior artificial inflation came out of the stock's price with each partial disclosure. As a result of their purchases of Insperity common stock during the Class period, Lead Plaintiff and other members of the Class suffered economic loss (*i.e.*, damages), under the federal securities laws.

139.   The true financial condition of the Company began to emerge on July 29, 2019, when the Company announced disappointing 2Q19 financial results, including that it missed its quarterly guidance for WSEE growth and reported a significant increase in benefit costs attributable to large medical claims, as well as reduced annual guidance for the remainder of the year. ¶¶83-90. These disclosures began to reveal the true financial condition of the Company and were contrary to defendants' prior representations concerning, among other things, the ability to grow WSEEs and the risk of increased healthcare claims. However, in conjunction with these disclosures, defendants made additional false and misleading statements and omissions, concerning, among other things, the sufficiency of BPAs, the Company's assessment of ongoing medical claims costs, and the Company's current ability to generate increased growth. ¶¶85-90.

140.   On July 29, 2019, The Street published an analyst report on the Company's 2Q earnings results titled "Insperity Falls as Tight Labor Market Hits Customers' Hirings" stating that the price of shares "plunged" after the Company "tweaked its full-year earnings forecast downward" below analysts' previous forecasts. ¶91.

141. On July 29, 2020, Suntrust Robinson Humphrey issued an analyst report titled "Buy the Dip" and stated that the "[e]levated large medical claims, slowing job growth by customers in 2Q and a delayed customer merger impacted results/guidance." ¶93. It, however, "highly recommend growth investors take advantage of share weakness" as the analyst "belive[d] issues impacting guidance should prove transitory."

142. As a result of these July 29, 2019 disclosures, accompanied by additional false statements and omissions, the Company's stock price declined from a close of $144.63 per share on July 26, 2019, to a close of $108.89 per share on July 29, 2019, more than 24.71%, on a massive trading volume of more than 2.6 million shares but continued to trade at inflated prices due to defendants' ongoing false statements and omissions.

143. The true condition of the Company was further revealed on November 4, 2019, when the Company made additional disclosures in conjunction with its 3Q19 financial results, which missed every financial guidance metric. ¶¶97-106. The Company disclosed that it experienced another quarter of elevated medical claims and admitted it did have access to current medical claims data. Defendants also revealed that the Company had too few BPAs during the first half of the year to generate WSEE growth and were overly optimistic in their assumptions concerning mid-market sales. These disclosures were contrary to defendants' prior statements concerning, among other things, the sufficiency of the Company's BPAs and their ability to grow WSEEs, the Company's assessment of healthcare claims data and trends, and sales momentum. However, defendants continued to make additional false and misleading statements and omissions concerning, among other things, the pricing of the Company's benefits, expectations for healthcare claims trends, and the status of the Company's renewals. ¶¶105-106.

144.    On November 4, 2019, Suntrust Robinson Humphrey issued an analyst report lowing its price target from $150.00 to $128.00 per share "after a disappointing quarter" noting that Insperity's adjusted EBITDA and adjusted EPS guidance for 4Q19 "at the midpoint were downside to street estimates" and that "[p]rojected WSE[E] growth of 10%-11% fell short of our prior 13.6% estimate." ¶107.

145.    On November 5, 2019, Roth Capital Partners issued an analyst report slashing its price target from $138.00 to $100.00 but remained "optimistic [that] elevated healthcare benefit cost spikes the past two quarters will prove anomalous." ¶108.

146.    On November 6, 2019, The Street published an article titled "Insperity Stock Tanks After HR Provider's Earnings Fall Short, Guidance Pared" which stated that "***Insperity lost nearly a third of its market value*** after the human-resources provider dashed analyst expectations, reporting subpar quarterly earnings and lowering its guidance for the fourth quarter as well." ¶109.

147.    As a result of these November 4, 2019 disclosures, the Company's stock price declined from a close of $107.67 per share on November 1, 2019, to a close of $71.38 per share on November 4, 2019, more than 33.70%, on a massive average volume of more than 4.8 million shares traded but continued to trade at inflated prices due to defendants' ongoing false statements and omissions.

148.    The true condition of the Company was further revealed on February 11, 2020, when the Company announced its FY19 financial results, including that it missed every metric of its original and upwardly revised guidance issued on April 29, 2019, had another quarter of elevated medical claims, which would not normalize, had high client attrition and slow sales because of its pricing increases, and overstated its sales opportunities. ¶¶118-130.  Defendants also slashed the Company's 2020 outlook, including WSEE growth as low as 6%.  These disclosures were contrary

to defendants' prior assertions and positive statements concerning, among other things, the Company's WSEE and BPA growth trends, review of healthcare claims data and trends, pricing strategy and success, and sales momentum.

149.    As a result of Insperity's aftermarket disclosures, its stock price declined from a close of $89.08 per share on February 11, 2020, to a close of $71.64 per share on February 12, 2020, or 19.87%, on a massive average volume of more than 3.8 million shares traded.

150.    On February 11, 2020, Roth Capital Partners issued an analyst report stating that they believed the stock price had hit its bottom because of the disclosures – "20% downside move in shares on a negative year-end transition ($74 in this case), as is the case this year, is usually where the stock begins to recover." ¶131.  It further lowered its price target to $97.

151.    On February 11, 2020, SunTrust Robinson Humphrey also lowered its price target to $112.00, with the analyst echoing that the reduced expectations for WSEEs were from lower BPAs, higher attrition and flat mid-market sales, and as a result was lowering revenue in its valuation model. ¶132.  The analyst report called the outlook "disappointing" and noted that the 4Q19 selling season was "offset by increased attrition."

152.    Like other members of the Class who purchased Insperity stock at artificially inflated prices during the Class Period, Lead Plaintiff suffered an economic loss (*i.e.*, damages), when Insperity's stock prices declined upon the disclosures correcting the alleged misrepresentations.

153.    The timing and magnitude of Insperity's stock price declines negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.

**NO SAFE HARBOR**

154.    To the extent that any alleged false or misleading statement is, in part, a forward looking statement ("FLS"), the portion of the alleged false statement that is current or backward-looking and not a FLS is not subject to safe harbor protection and is actionable for the reasons set forth above.

155.    To the extent that any alleged false statement is, in part or in whole, a FLS, the portion of such statement that is forward looking is not subject to safe harbor protection and defendants are not shielded from liability because they failed to disclose known current material negative facts and trends which caused the FLS to be false or misleading or without reasonable basis and rendered any purportedly cautionary language to be not meaningful, false or misleading, on account of material omissions of the same known information.

156.    None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

157.    To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

**APPLICABILITY OF THE FRAUD ON THE MARKET AND**
***AFFILIATED UTE* PRESUMPTION OF RELIANCE**

158.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   The Company's common stock traded in an efficient market;

(d)   The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)   Lead Plaintiff and other members of the Class purchased Insperity common stock between the time defendants misrepresented or failed to disclose material facts and the time true facts were disclosed, without knowledge of the misrepresented or omitted facts.

159.   At all relevant times, the market for Insperity common stock was efficient for the following reasons, among others:

(a)   As a regulated issuer, Insperity filed periodic public reports with the SEC; and

(b)   Insperity regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

160.   Lead Plaintiff will also rely upon the presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

## CLASS ACTION ALLEGATIONS

161.   Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased Insperity common stock during the Class Period (the "Class").   Excluded from the Class are defendants and their families, directors and officers of Insperity, at all relevant times, and their immediate families, and their legal

representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

162.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Insperity has more than 40 million shares of common stock outstanding, owned by thousands of persons.

163.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)    whether the Exchange Act was violated by defendants;

(b)    whether defendants omitted and/or misrepresented material facts;

(c)    whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    whether the price of Insperity common stock was artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

164.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from defendants' wrongful conduct.

165.     Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Lead Plaintiff has no interests which conflict with those of the Class.

166.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**
**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

167.     Lead Plaintiff incorporates ¶¶1-166 by reference.

168.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

169.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Insperity common stock during the Class Period.

170.     Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Insperity common stock.  Lead Plaintiff and the Class would not have purchased Insperity common stock at the prices they paid, or at all, had

they been aware that the market prices were artificially and falsely inflated by defendants' misleading statements.

171.     As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Insperity common stock during the Class Period.

## COUNT II
### For Violation of §20(a) of the Exchange Act
### Against All Defendants

172.     Lead Plaintiff incorporates ¶¶1-171 by reference.

173.     The Individual Defendants acted as controlling persons of Insperity within the meaning of §20 of the Exchange Act.  By virtue of their positions and their power to control public statements about Insperity, the Individual Defendants had the power and ability to control the actions of Insperity and its employees.  Insperity controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding Lead Plaintiff and the members of the Class damages and interest;

C.     Awarding Lead Plaintiff reasonable costs, including attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED: December 24, 2020                ROBBINS GELLER RUDMAN & DOWD LLP
                                        SHAWN A. WILLIAMS
                                        DANIEL J. PFEFFERBAUM


                                        s/ SHAWN A. WILLIAMS
                                        SHAWN A. WILLIAMS

                                        Post Montgomery Center
                                        One Montgomery Street, Suite 1800
                                        San Francisco, CA  94104
                                        Telephone:  415/288-4545
                                        415/288-4534 (fax)
                                        shawnw@rgrdlaw.com
                                        dpfefferbaum@rgrdlaw.com

                                        ROBBINS GELLER RUDMAN & DOWD LLP
                                        PATTON L. JOHNSON
                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)
                                        pjohnson@rgrdlaw.com

                                        ROBBINS GELLER RUDMAN & DOWD LLP
                                        SAMUEL H. RUDMAN
                                        DAVID A. ROSENFELD
                                        58 South Service Road, Suite 200
                                        Melville, NY  11747
                                        Telephone:  631/367-7100
                                        631/367-1173 (fax)
                                        srudman@rgrdlaw.com
                                        drosenfeld@rgrdlaw.com

                                        *Lead Counsel for Lead Plaintiff*

- 61 -

VANOVERBEKE, MICHAUD & TIMMONY, P.C.
AARON L. CASTLE
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
acastle@vmtlaw.com

WATKINS, PAWLICK, CALATI & PRIFTI, PC
DEREK L. WATKINS
1423 E. Twelve Mile Road
Madison Heights, MI  48071
Telephone:  248/658-0797
248/658-0801 (fax)
dwatkins@wpcplaw.com

*Additional Counsel for Lead Plaintiff*

- 62 -

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on December 24, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ SHAWN A. WILLIAMS
SHAWN A. WILLIAMS

ROBBINS GELLER RUDMAN & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail:  shawnw@rgrdlaw.com

## Mailing Information for a Case 1:20-cv-05635-NRB Building Trades Pension Fund of Western Pennsylvania v. Insperity, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Amy P. Hefley**
  amy.hefley@bakerbotts.com

- **Patton Johnson**
  pjohnson@rgrdlaw.com

- **Brian C. Kerr**
  brian.kerr@bakerbotts.com,john.mitchell@bakerbotts.com,brian-kerr-3602@ecf.pacerpro.com

- **Francis Paul McConville**
  fmcconville@labaton.com,HChang@labaton.com,lpina@labaton.com,drogers@labaton.com,9849246420@filings.docketbird.com,electroniccasefiling@labaton.com

- **Daniel J. Pfefferbaum**
  dpfefferbaum@rgrdlaw.com,dpfefferbaumRGRD@ecf.courtdrive.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@ecf.courtdrive.com

- **David D. Sterling**
  david.sterling@bakerbotts.com,john.mitchell@bakerbotts.com,leslie.buenzow@bakerbotts.com,leigh-ann-bunker-8737@ecf.pacerpro.com,leigh.ann.bunker@bakerbotts.com,leslie-buenzow-9672@ecf.pacerpro.com

- **Shawn Anthony Williams**
  swilliams@rgrdlaw.com,aelishb@rgrdlaw.com,ShawnW@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,sbloyd@rgrdlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)