UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BUILDING TRADES PENSION FUND OF WESTERN PENNSYLVANIA, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>     vs.<br><br>INSPERITY, INC., PAUL J. SARVADI and DOUGLAS S. SHARP,<br><br>                Defendants. | Case No. 1:20-cv-05635-NRB |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CORRECTED AMENDED COMPLAINT**

TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... iv

TABLE OF DEFINITIONS ................................................................................................... viii

I.     INTRODUCTION ............................................................................................... 1

II.    BACKGROUND ................................................................................................. 2

       A.    Insperity's business model and financial guidance for FY 2019. .......................... 2

       B.    Insperity experiences a historically anomalous rise in large healthcare claims and misses its FY 2019 guidance. ....................................................... 3

       C.    Plaintiff files the CAC, alleging various false and misleading statements. ............. 5

III.   LEGAL STANDARD ........................................................................................... 5

IV.    ARGUMENT & AUTHORITIES ........................................................................... 6

       A.    The CAC fails to state a Section 10(b) claim. ......................................... 6

             1.    The CAC fails to plead an actionable false or misleading statement. ................................................................................. 7

                   a.    For many Challenged Statements, the CAC fails to plead falsity with particularity. ........................................ 7

                   b.    The CAC challenges PSLRA-protected, forward-looking statements. ....................................................... 10

                   c.    The CAC challenges numerous opinion statements but fails to satisfy the Supreme Court's *Omnicare* test. .......................... 12

                   d.    Other Challenged Statements are non-actionable puffery. ........... 16

             2.    The CAC pleads no facts giving rise to a strong inference of scienter. ...................................................................... 18

                   a.    The CAC does not allege a "motive and opportunity" to defraud. ...................................................... 19

                   b.    The CAC fails to allege "strong circumstantial evidence of conscious misbehavior or recklessness." ....................... 20

i.      The CAC fails to identify contradictory reports or information to which the Individual Defendants had access. ............................................................................... 20

ii.     Defendants' retrospective analysis of their forecasts are not "admissions" of past contrary knowledge............. 22

c.     The CAC's poorly disguised "fraud by hindsight" theory is outweighed by the more compelling non-culpable inferences. .................................................................... 24

B.     The CAC fails to state a Section 20(a) claim.......................................................... 25

V.     CONCLUSION.................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................5, 6

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)...........................................................................................3

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................................5, 6

*Born v. Quad/Graphics, Inc.*,
2021 WL 736839 (S.D.N.Y. Feb. 25, 2021)...............................................................25

*Campo v. Sears Holdings Corp.*,
371 F. App'x 212 (2d Cir. 2010) ...............................................................................21

*City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*,
2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011)............................................................13

*City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*,
679 F.3d 64 (2d Cir. 2012)..........................................................................................14

*Davidoff v. Farina*,
2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005).............................................................20

*ECA & Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)..............................................................6, 16, 18, 19, 20

*Emps.' Ret. Sys. of Gov't of Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015).........................................................................................22

*Francisco v. Abengoa, S.A.*,
481 F. Supp. 3d 179 (S.D.N.Y. 2020)..........................................................................17

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018)...........................................................13, 14, 20, 24

*GE Inv'rs v. Gen. Elec. Co.*,
447 F. App'x 229 (2d Cir. 2011) ..................................................................................6

*Gissin v. Endres*,
739 F. Supp. 2d 488 (S.D.N.Y. 2010)...........................................................................11

*In re Adient plc Sec. Litig.*,
  2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)....................................................8, 17, 18, 23

*In re Avon Sec. Litig.*,
  2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)..........................................................22

*In re Biogen Inc. Sec. Litig.*,
  857 F.3d 34 (1st Cir. 2017)......................................................................................24

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
  2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015).........................................................11

*In re Gildan Activewear, Inc. Sec. Litig.*,
  636 F. Supp. 2d 261 (S.D.N.Y. 2009)................................................................21, 25

*In re HEXO Corp. Sec. Litig.*,
  2021 WL 878589 (S.D.N.Y. Mar. 8, 2021) ............................................................21

*In re IAC/InterActiveCorp Sec. Litig.*,
  478 F. Supp. 2d 574 (S.D.N.Y. 2007)......................................................................12

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
  251 F. Supp. 3d 596 (S.D.N.Y. 2017)......................................................................15

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014).....................................................................9, 16

*In re Nielsen Holdings PLC Sec. Litig.*,
  2021 WL 22722 (S.D.N.Y. Jan. 4, 2021) ...............................................................24

*In re Philip Morris Int'l Inc. Sec. Litig.*,
  437 F. Supp. 3d 329 (S.D.N.Y. 2020).................................................................11, 12

*In re Pretium Res. Inc. Sec. Litig.*,
  2020 WL 953609 (S.D.N.Y. Feb. 27, 2020)...........................................................14

*In re PXRE Grp., Ltd., Sec. Litig.*,
  600 F. Supp. 2d 510 (S.D.N.Y. 2009)......................................................................21

*In re Seadrill Ltd. Sec. Litig.*,
  2016 WL 3461311 (S.D.N.Y. June 20, 2016) .........................................................10

*In re Skechers USA, Inc. Sec. Litig.*,
  444 F. Supp. 3d 498 (S.D.N.Y. 2020).............................................................19, 21, 22

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)....................................................................................18

v

*Lasker v. N.Y. State Elec. & Gas Corp.*,
  85 F.3d 55 (2d Cir. 1996) ....................................................................................17

*Martin v. Quartermain*,
  732 F. App'x 37 (2d Cir. 2018) .....................................................................13, 14

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016)..................................................................17

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)........................................................................6, 16, 17

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)...................................................................................13, 15, 16

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
  432 F. Supp. 3d 131 (D. Conn. 2019)...................................................................22

*Pa. Ave. Funds v. Inyx Inc.*,
  2010 WL 743562 (S.D.N.Y. Mar. 1, 2010) ...........................................................9

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) .........................................................22

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004), and (2) ........................................................6, 7, 25

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000)...................................................................................22

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009)...................................................................................19

*Shemian v. Research In Motion Ltd.*,
  2013 WL 1285779 (S.D.N.Y. 2013)......................................................................17

*Singh v. Schikan*,
  2015 WL 4111344 (S.D.N.Y. June 25, 2015) ........................................................7

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)...........................................................................10, 12

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
  96 F. Supp. 3d 325 (S.D.N.Y. 2015).....................................................................14

*Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*,
  412 F. Supp. 3d 353 (S.D.N.Y. 2019)...................................................................11

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
531 F.3d 190 (2d Cir. 2008)............................................................................................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...........................................................................................2, 6, 18, 25

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)......................................................................................13, 16

*Turner v. MagicJack VocalTec, Ltd.*,
2014 WL 406917 (S.D.N.Y. Feb. 3, 2014)......................................................................20

## STATUTES

15 U.S.C. § 78u-4(b)(1) .....................................................................................................12

15 U.S.C. § 78u-4(b)(2) ..................................................................................................1, 18

15 U.S.C. § 78u-4(b)(3) .......................................................................................................6

15 U.S.C. § 78u-5(i)(1) ......................................................................................................10

### TABLE OF DEFINITIONS

1.  "CAC" refers to Plaintiff's Corrected Amended Complaint.

2.  "Defendants" means Insperity, together with the Individual Defendants.

3.  "Individual Defendants" means Insperity's CEO Paul Sarvadi and its CFO Douglas Sharp.

4.  "Insperity" and the "Company" mean Insperity, Inc.

5.  "Plaintiff" means Building Trades Pension Fund of Western Pennsylvania, individually and on behalf of all others similarly situated.

6.  "PSLRA" refers to the Private Securities Litigation Reform Act.

## I.    INTRODUCTION

Insperity provides a service that allows businesses to effectively outsource to Insperity various human resource functions, including employee health benefits. Like most public companies, Insperity provides earnings guidance. Following a successful 2018, Insperity, through the Individual Defendants, provided earnings guidance predicting growth for FY 2019. But because Insperity failed to predict certain large healthcare claims in 2019—an event an analyst later described as a historical "anomaly" and for which Insperity expressly cautioned its investors—Insperity missed its guidance, and its stock price declined.

The CAC alleges that Defendants committed securities fraud by issuing, revising, and explaining FY 2019 projections that did not come to fruition. In many ways, the CAC is plagued by defects that derail similar garden-variety guidance-miss cases. It labels as false a handful of arguably factual statements, but only by mischaracterizing them, omitting context, or failing to explain how or why they are false. It challenges forward-looking statements cloaked in cautionary language, offering no way around the PSLRA's safe harbor. It challenges a host of subjective opinion statements without pleading a cognizable liability theory under the Supreme Court's *Omnicare* test. And it tops that off by roping in classic corporate puffery statements.

Those shortcomings are bad enough, but they pale in comparison to the CAC's abject failure to plead facts giving rise to the requisite "strong inference" of scienter—something akin to an intent to defraud. 15 U.S.C. § 78u-4(b)(2)(A).[1] *The CAC does not even mention the word "scienter" once in its 60 pages*, let alone plead particularized facts demonstrating the Individual Defendants' contemporaneous knowledge of specific contrary information or, really, *anything* resembling even one indicium of scienter. At its core, the CAC's scienter theory is of the tired "fraud by hindsight" variety that courts in this Circuit routinely dismiss. And it is one that does

---

[1] Unless otherwise noted, all internal quotation marks, citations, and footnotes from quoted material are omitted.

1

not make sense—especially when juxtaposed with Insperity's decision to *repurchase* millions of dollars of its stock during the height of the purported fraud. Indeed, from 2018 to 2019, Insperity nearly doubled its stock repurchases.

The PSLRA requires dismissal where the inference that the defendants acted with scienter is not "cogent and at least as compelling" as the inference that they did not. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). This is not a case of finely weighing culpable and nonculpable inferences; the nonculpable inferences here break the scienter scale. With Plaintiff's having already repleaded once and declined the Court's invitation to do so again, the Court should dismiss the CAC with prejudice.

## II.    BACKGROUND

### A.    Insperity's business model and financial guidance for FY 2019.

Since 1986, Insperity has provided a broad range of human-resources services to small- and medium-sized businesses across the United States. Dkt. 37, CAC ¶ 2. Insperity's platform essentially allows those businesses to outsource various HR functions through Insperity, including services like payroll and employment administration, employee benefits, and workers' compensation insurance. *Id.* Insperity provides these functions by entering into a Client Service Agreement with the client company. *Id.* ¶ 3. Under that agreement, Insperity becomes a co-employer of the employees who work at the client company's site ("WSEEs"). *Id.*

In simplified terms, Insperity's revenue is primarily derived from a per-WSEE service fee that accounts for WSEE payroll and other anticipated direct costs, including those associated with Insperity's financial obligations for claims with UnitedHealthcare (which covers the vast majority of Insperity's WSEEs). *Id.* ¶¶ 4–5. Insperity is the premium-paying policyholder on that insurance plan, and it is ultimately responsible for paying UnitedHealthcare back for the healthcare claims made by WSEEs. *Id.* ¶ 5. Thus, Insperity's revenue and costs necessarily

2

fluctuate based on, among other things, (1) the number of WSEEs serviced (more WSEEs equals higher service revenue), and (2) the frequency and size of incurred healthcare claims (more claims and larger claims equals higher cost). *Id.* ¶¶ 3, 5. Insperity employs sales representatives known as Business Performance Advisors ("BPAs"). *Id.* ¶ 6.

In February 2019, Insperity issued FY18 financial results and FY19 guidance, estimating year-over-year growth in the following categories: WSEE (14–16%); adjusted earnings per share ("EPS") (17–25%); and adjusted EBITDA (12–19%). *Id.* ¶ 59. Insperity also projected year-over-year growth in BPA hiring at 15% and its annual healthcare cost increase at 2.5–3.5%. *Id.* ¶¶ 62–63. For the latter figure, Insperity's 2018 10-K detailed how Insperity relies "on historical experience and on various other assumptions" to estimate its annual healthcare cost trend. Ex. 1, 2018 10-K, 37.[2] To revise its estimates on an ongoing basis after each quarter, Insperity considers: "(1) the level of claims processed during the quarter; (2) estimated completion rates based upon recent claim development patterns under the plan; and (3) the number of participants in the plan." *Id.* Insperity advised about the "variability" of these quarterly estimates and the "unpredictable nature of large claims." *Id.* at 54. Insperity further cautioned that such estimates "involve[] a significant level of judgment," and an "increase in the number or severity of claims ... could have a material adverse effect on [its] financial condition or results of operations." *Id.* at 20, 37.

**B.    Insperity experiences a historically anomalous rise in large healthcare claims and misses its FY 2019 guidance.**

*Q1 2019.* In April 2019, Insperity updated its FY 2019 guidance, increasing adjusted EPS and EBITDA growth but leaving estimated WSEE growth unchanged. CAC ¶ 71. Insperity also

---

[2] A court reviewing a Rule 12(b)(6) motion to dismiss "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

slightly reduced its estimated BPA growth, but projected that strong mid-market sales would preserve WSEE growth despite that decrease in BPA numbers. *Id.* ¶ 73. Insperity predicted the annual healthcare cost trend would remain at the low end of the originally projected range. *Id.* ¶ 75.

**Q2 2019.** In July 2019, Insperity updated its FY 2019 guidance again, decreasing its midpoint growth estimates for WSEEs, EPS, and EBITDA. *Id.* ¶ 84. This update came on the heels of "***higher than expected benefit costs, driven by larger claim activity***" during Q2, along with "***[n]et gains in [Insperity's] client base [that] were lower than expected*** … due primarily to less hiring of full-time and seasonal employees" by those existing clients. *Id.* ¶ 83. Insperity continued to project the annual healthcare cost trend to be around the 2.5% range. *Id.* ¶ 88.

**Q3 2019.** In November 2019, Insperity announced that its performance fell below growth expectations for WSEEs, EPS, and EBITDA, causing it to revise those projections downwards for the remainder of FY 2019. *Id.* ¶ 98. This guidance miss, Insperity explained, was "***driven primarily by a second consecutive quarter with elevated large claims in our medical plan and to a small degree by lower growth than expected in paid worksite employees***." *Id.* ¶ 100. As one analyst noted, confirming the statistical anomaly that was afoot, "[t]his [wa]s the first time [Insperity] ha[d] recognized large [healthcare] claims twice in a year (including only 4 quarters in the past decade)." CAC ¶ 107; Ex. 2, 11/4/19 SunTrust Report, 1. Given the higher-than-expected large claims in two consecutive quarters, Insperity did not assume a further reduction in large claim levels for the remainder of 2019. CAC ¶ 103.

**Q4 2019.** In February 2020, Insperity announced its financial results for Q4 and FY 2019, missing its April 2019 annual guidance in all three categories, but largely meeting its downwardly revised guidance from November 2019. *Id.* ¶ 120. Insperity again experienced, for

the third consecutive quarter, historically elevated levels of large healthcare claims, resulting in a 4% annual benefit cost trend (as opposed to the 2.5–3.5% originally predicted). *Id.* ¶ 128. Insperity announced that it had renegotiated its agreement with UnitedHealthcare to add a "stop loss" provision that limited exposure on large claims going forward. *Id.* ¶ 121. And in January 2020, Insperity experienced increased client attrition, including client terminations—42% of which were attributed to "[c]ost or value considerations." *Id.* ¶ 123.

**C.      Plaintiff files the CAC, alleging various false and misleading statements.**

Seizing on Insperity's stock drops over the course of FY 2019, Plaintiff filed this suit for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. Dkt. 1. On December 22, 23, and 24, 2020, respectively, Plaintiff filed its Consolidated Complaint, Amended Complaint, and, finally, the CAC. Dkts. 35–37. Broadly speaking, the CAC challenges statements regarding  Insperity's (1) healthcare cost projections and its access to the large claims data; (2) outlook on WSEE growth in conjunction with BPA growth and mid-market sales; (3) pricing increases in relation to client attrition; and (4) decision to renegotiate its UnitedHealthcare agreement to cap losses on large claims (collectively, the "Challenged Statements").

After the parties filed their pre-motion letters, Dkts. 38–39, the Court issued a February 26, 2020 order authorizing Defendants to file this motion to dismiss. Dkt. 40 at 1. The Court expressly invited Plaintiff to "assert additional allegations to cure any alleged deficiencies raised by defendants' letter." *Id.* Plaintiff opted to forgo any amendment and rest on the CAC.

### III.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard requires "[f]actual

allegations … [that] raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

To state a claim under Section 10(b) of the Exchange Act, "a plaintiff must adequately plead: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GE Inv'rs v. Gen. Elec. Co.*, 447 F. App'x 229, 231 (2d Cir. 2011). "Rule 9(b) requires that averments of fraud be stated with particularity," meaning a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* at 231–32. The plaintiff also must meet the "[e]xacting pleading requirements" of the PSLRA, *Tellabs*, 551 U.S. at 313, which requires (1) specific allegations of "why and how" each statement was false or misleading, *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004), and (2) "particular allegations giving rise to a strong inference of scienter" for each statement. *ECA & Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). A complaint that fails to satisfy the PSLRA "shall" be dismissed. 15 U.S.C. § 78u-4(b)(3)(A); *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) ("PSLRA *requires* courts to dismiss complaints that fail to meet [its] pleading requirements ....") (emphasis added).

## IV.   ARGUMENT & AUTHORITIES

### A.   The CAC fails to state a Section 10(b) claim.

The CAC alleges no false or misleading statement actionable under Section 10(b) and compounds that error with no factual allegations of scienter. The Court should dismiss the CAC for either reason. And the Court need not give Plaintiff a chance to replead. The CAC's defects

6

are unsalvageable, and Plaintiff already amended once and declined the Court's invitation to try to address the defects by repleading. *See Singh v. Schikan*, 2015 WL 4111344, at *2 (S.D.N.Y. June 25, 2015) (Buchwald, J.) (dismissing with prejudice where plaintiff already amended and failed to "request further leave to amend at numerous points before the Court entered its decision ... apart from a cursory one-sentence request at the close of their opposition brief").

       1.       **The CAC fails to plead an actionable false or misleading statement.[3]**

       a.       **For many Challenged Statements, the CAC fails to plead falsity with particularity.**

The CAC repeatedly plays fast and loose with the statements it challenges. For some, the CAC either selectively quotes or mischaracterizes what Defendants said. For others, the CAC fails to allege any falsity whatsoever, much less the requisite "why and how" each such statement was false.[4] *Rombach*, 355 F.3d at 174.

*Real-time access to large healthcare claims data.* One of the CAC's principal allegations is that Defendants "falsely reassured investors" that "they had full visibility" into the size of Insperity's health care claims, including real-time "access to current claims data," CAC ¶ 64, only to later reveal they did not "have ongoing access to current medical claims data during the quarter ... but rather had to await until after quarter-end to obtain claims data," *id.* ¶ 104. Not so. Insperity explained that its estimate of healthcare cost trends on an "ongoing basis," *id.* ¶ 65, was a quarter-by-quarter analysis of the annual trend, with Insperity factoring in (among other things) "the level of claims *processed* during the quarter" as part of its forward-looking estimate of "incurred *but not reported* claims." Ex. 1, 2018 10-K, 37 (emphases added). Insperity also explicitly advised about the "*unpredictable nature of large claims*," which could lead to

---

[3] The Challenged Statements discussed in this section are representative of the laundry list of similar statements challenged in the CAC. For the Court's convenience, Defendants have attached as Appendix A a detailed chart quoting every Challenged Statement in the CAC and listing the reasons each is non-actionable.

[4] App'x A (identifying missing false statements of fact in the following: CAC ¶¶ 61, 63–65, 73, 86, 89, 106, 113–14).

"variability [of medical claims costs] on a *quarterly basis*." *Id.* (emphasis added). Indeed, the CAC tellingly does not take issue with the 10-K's detailed explanation of how the Company estimated its healthcare cost trends—an explanation that (1) makes no mention of purported real-time access to large claims data from the following quarter and (2) meshes seamlessly with how Defendants discussed access to claims data on later earnings calls. *Compare id.* (stating "estimated incurred claims are based upon," among other things, the "level of claims processed during the quarter"), *with* CAC ¶ 104 (explaining not having claims data "***on an incurred basis until after the quarter is over with***"). Instead, the CAC derives its "full visibility" hypothesis from the below earnings-call statement, conspicuously omitting the bolded context:

> ***Another important measure of a successful fall campaign for Insperity is the effect on pricing of the book of business after accounting for the volume of new sales, client renewals and client terminations occurring at year end.*** We are able to see the full picture of this change each year in the first week of February, and we can confirm we are in excellent shape for the starting point for 2019. This view into pricing includes all the elements of our direct costs, including benefits, payroll tax and workers compensation allocation in addition to HR service fees and other smaller items.

CAC ¶ 9; Ex. 3, 2/11/19 Q4 Tr., 6 (emphasis added). Thus, the "full picture" phrase from which the CAC apparently intuits real-time access was decidedly not referring to intra-quarter data on large healthcare claims. The CAC's theory is flatly contradicted by the filings it quotes and, as a result, fails as a matter of law. *See, e.g.*, *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *13–15 (S.D.N.Y. Apr. 2, 2020) (rejecting securities fraud claims that mangled context and "mischaracterize[d] Defendants' actual statements").

***All-time high BPA retention.*** The CAC also lumps into the Challenged Statements a statement that as of February 11, 2019, the Company had "***seen ... a step-up improvement in retaining our BPAs for a long time***." CAC ¶ 61. The CAC never alleges how or why that statement was false, nor does it refute that Insperity's BPA retention was then at an all-time high.

8

*See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("The Second Circuit has repeatedly stated that plaintiffs must do more than simply assert that a statement is false— they must demonstrate with specificity why that is so."), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

***Strong mid-market start to 2019.*** The same is true regarding Defendants' July 29, 2019 statements concerning the strong start to mid-market sales in the first two quarters of FY 2019. *See, e.g.*, CAC ¶ 89 (explaining that the mid-market "***channel is really strong right now. We've got the biggest pipeline we've had, and we are above last year in sales for the year***"). The CAC never alleges that Insperity was not at that point ahead of the prior year in mid-market sales. Again, mere "conclusory allegations of falsity do not satisfy Rule 9(b)'s particularity requirement," and the absence of "facts showing why or how the[se] statements were false" means that they cannot support a Section 10(b) claim. *Pa. Ave. Funds v. Inyx Inc.*, 2010 WL 743562, at *7 (S.D.N.Y. Mar. 1, 2010).

***Customer attrition due to increased pricing.*** Next is the CAC's misleading narrative that Defendants "falsely reassured" investors that Insperity had not "previously underpriced [its] plans," such that the "truth" was purportedly revealed when Defendants later acknowledged "increasing pricing to offset elevated healthcare costs" and client attrition due in part to "cost or value considerations." CAC ¶ 106, 122–23. What Defendants really said was that the anomalous large claim activity in Q2 and Q3 2019, in particular, "***didn't call for any change in pricing***" or the need to retroactively "***go back and hurry up and increase prices on customers***." *Id.* ¶ 106. Indeed, Defendants clarified—and the CAC omits—that Insperity "actually *[was] building in price increases* that would be greater than that 3.7%" revised annual healthcare cost trend. Ex. 4, 11/4/19 Earnings Call Tr., 13 (emphasis added). That is why Defendants accurately characterized Insperity's "pricing compared to [its] all-in-cost [a]s still well intact" and its large claims activity

as having not "driven a big change in pricing strategy." *Id.* This critical context negates the CAC's theory that Insperity misled investors about its pricing.

***Amendment to Insperity's UnitedHealthcare plan.*** The CAC's final sleight of hand relates to Insperity's decision to add a stop-loss provision to its benefits plan. Citing an analyst report discussing highlights from an investor conference call (and not Defendants' actual statements), the CAC claims Insperity falsely "rejected th[at] option" in November 2019, only to double-back and renegotiate with UnitedHealthcare. CAC ¶¶ 114, 121. The analyst report, however, characterized Insperity as "*exploring* coverage plans that could mitigate recent volatility" and as expressing doubt about—not rejecting—the viability of "[a]n aggregate limit/overall cap on claim liability." Ex. 5, 11/26/19 SunTrust Report, 1–2 (emphasis added) (noting that such an aggregate limit was "possible"). More importantly, the actual transcript of the investor call distinguished an "aggregate limit" and "stop loss coverage" (also known as a "pooling limit") as two *different* options and stated that, for the latter, Insperity would "make a determination as we go on to the next plan year of whether or not we want to add a pooling limit." Ex. 6, 11/25/19 Investor Call, 5. Insperity's decision to add the stop-loss coverage it said it was contemplating was anything but false or misleading.

> **b.     The CAC challenges PSLRA-protected, forward-looking statements.**

The PSLRA immunizes forward-looking statements, such as "plans and objectives of management for future operations" and "future economic performance," 15 U.S.C. § 78u-5(i)(1), if (1) the statement is "identified and accompanied by meaningful cautionary language or is immaterial" or (2) "the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *In re Seadrill Ltd. Sec. Litig.*, 2016 WL 3461311, at *8 (S.D.N.Y. June 20, 2016) (quoting *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010)). Many of the

Challenged Statements fall squarely within this safe harbor.[5]

First, these statements were indisputably forward looking:

- Defendants' earnings projections are plainly forward looking. *Compare, e.g.*, CAC ¶ 85 ("***Our earnings outlook for 2019 is in line with our previous forecast as we come off a strong performance in the first half of the year and effectively manage our business in response to emerging trend[s].***"), *with Gissin v. Endres*, 739 F. Supp. 2d 488, 507 n.108 (S.D.N.Y. 2010) (characterizing as forward-looking statement that "[b]ased on our current expectation of cash flows from operations and ... investments ... we feel we will be in a position to fund [anticipated] capital investments for the year"), *and In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 356 (S.D.N.Y. 2020) (same as to statement that "there's nothing in the horizon that would affect—that would cause any change in what happened in the previous years").

- The same is true of Defendants' predictions about prospects for operational growth. *Compare, e.g.*, CAC ¶ 73 ("***We expect to continue to ramp up the number of BPAs as we open up 9 new offices this year, targeting an average increase in trained BPAs of 13% for the full year***" and "***we're expecting around 13% increase [in trained BPAs] year-over-year.***"), *with In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *14 (S.D.N.Y. Aug. 19, 2015) (characterizing as forward-looking statement that company would open approximately 300 stores nationally, including "3 stores in FY 2015" and "3–4 stores annually thereafter"), *R&R adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015); *Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 365 (S.D.N.Y. 2019) (characterizing as forward-looking statement that "[w]ith increased year-over-year backlogs at the end of June, strong incoming order rates and July sales, as well as the positive sell-through reports from wholesale … we believe that we will continue to achieve new sales and profit records through 2015"), *aff'd sub nom. Cavalier Fundamental Growth Fund v. Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020).

Second, each forward-looking statement was accompanied by meaningful cautionary language addressing the allegedly materialized risks, cautioning investors concerning:

- "increases in health insurance costs ... and underlying claims trends," Ex. 7, 7/29/19 8-K, 6;

- "variability on a quarterly basis in medical claims costs based on the unpredictable nature of large claims," Ex. 1, 2018 10-K, 54;

- "failure to manage growth of our operations and the effectiveness of our sales and marketing effort," Ex. 8, 4/29/19 8-K, 6;

---

[5] App'x A (identifying statements protected by the safe harbor in the following: CAC ¶¶ 62–63, 73, 75–76, 85–88, 90, 105, 115).

- "the inability to renew client contracts or attract new clients," Ex. 7, 7/29/19 8-K, 6;

- there being "no assurance that the number of contract cancellations will continue at these [projected] levels and such cancellations may increase in the future due to various factors, including economic conditions in the markets we operate," Ex. 1, 2018 10-K, 22.

Because these risks map neatly onto the CAC's allegations concerning Insperity's missed guidance, they are "meaningful" under the PSLRA's safe harbor. *See, e.g.*, *Philip Morris*, 437 F. Supp. 3d at 356 (company's predictions for growth in a certain market were inactionable because they were accompanied by meaningful warnings about risks that materialized and affected the predictions' accuracy, including adult smoking behaviors and potentially unsuccessful attempts to commercialize smoke-free products in Japan).

Moreover, for reasons discussed more fully in connection with scienter, *infra* Section IV.A.2, the CAC fails to allege with particularity that Defendants had "actual knowledge" that these statements were false when made—a higher scienter bar than the one for statements of current fact. *Slayton*, 604 F.3d at 773. Nor were these forward-looking statements misrepresentations of current facts. *Supra* Section IV.A.1.a; *see In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 586 (S.D.N.Y. 2007) (forward-looking earnings guidance protected under the PSLRA where "Plaintiffs ha[d] not alleged that ... the [earnings] guidance itself misrepresented present facts"). Because neither exception applies, the statements are immunized from liability. *Id.* at 587 (holding company's reconfirmation of its earning guidance fell within the safe harbor because statements were accompanied by meaningful cautionary language and plaintiffs had not alleged that either exception applied).

      c.    **The CAC challenges numerous opinion statements but fails to satisfy the Supreme Court's *Omnicare* test.**

Because Section 10(b) liability follows only from an "untrue statement" or "omi[ssion]" of "material fact," 15 U.S.C. § 78u-4(b)(1)(A)–(B), statements of *opinion* are not actionable

simply because they "turned out to be wrong." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). The CAC challenges a host of statements involving Insperity's FY 2019 financial guidance, including statements (1) forecasting WSEE growth, including Insperity's predicted ability to offset slower-than-expected BPA growth with mid-market sales; (2) forecasting BPA growth; (3) forecasting healthcare cost trends, including large claims and their predictability on an annual basis; and (4) discussing Defendants' perception of the strength of Insperity's pricing and whether it would result in a cost-price mismatch. The subjective, predictive nature of those statements brings them squarely within the *Omnicare* framework.[6] *See, e.g.*, *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 226 (S.D.N.Y. 2018) (applying *Omnicare* to financial projections and "statements reaffirming those estimates"), *aff'd sub nom. Kapitalforeningen Lægernes Invest v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019); *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, 2011 WL 4357368, at *19 n.54 (S.D.N.Y. Sept. 19, 2011) (Buchwald, J.) (holding that growth projections are statements of opinion).

For these statements, the CAC must plead one of the "three ways in which a statement of opinion can be false or misleading" under *Omnicare*: "(1) the speaker d[oes] not hold the belief … professed; (2) the fact[s] [ ] supplied in support of the belief professed are untrue; or (3) the speaker omits information that makes the statement misleading to a reasonable investor." *Martin v. Quartermain*, 732 F. App'x 37, 40 (2d Cir. 2018). "[M]eeting the standard under *Omnicare* is no small task for an investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016). And the CAC comes nowhere close.

***No subjective disbelief.*** The CAC makes zero effort to plead that Defendants subjectively disbelieved their opinions. That is, it fails to allege that Defendants "did not [subjectively]

---

[6] App'x A (identifying the following non-actionable opinions: CAC ¶¶ 60–63, 72–76, 85–90, 105–06, 113–15).

believe" their predictions would pan out "at the time they made them" (*e.g.*, that Defendants did not believe large healthcare claims would return to historical levels or they could achieve certain growth targets). *City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67 (2d Cir. 2012) (per curiam). Even if the CAC had so alleged, those allegations would collapse into the scienter analysis, *infra* Section IV.A.2, and fail for the same reasons. *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 96 F. Supp. 3d 325, 344 (S.D.N.Y. 2015) (explaining that when "allegations are insufficient to establish scienter" "[t]hey likewise do not establish that [the defendant] subjectively knew its [] opinions to be false"), *aff'd*, 645 F. App'x 72 (2d Cir. 2016); *Frankfurt-Tr.*, 336 F. Supp. 3d at 227 (similar).

***No false embedded facts.*** Plaintiff finds no solace in *Omnicare*'s second prong, also known as "objective falsity," which asks whether "any of the facts supplied by [Defendants] in support of its estimates were untrue." *Martin*, 732 F. App'x at 41. The only purportedly false "facts" upon which these opinions conceivably rest are the allegations—debunked above—that relate to Insperity's real-time access to large claims data, BPA retention in early FY 2019, and strong mid-market start to FY 2019. *Supra* Section IV.A.1.a. Having failed to plausibly allege falsity as to those statements, the CAC cannot identify a false predicate fact or embedded input supplied by Defendants. That failure defeats *Omnicare*'s second prong. *See, e.g.*, *Martin*, 732 F. App'x at 41 (holding *Omnicare* prong did not apply where "plaintiffs d[id] not plausibly allege that any of the facts supplied by [Defendant] in support of its estimates were untrue").

***No omission of actionable contrary facts.*** All that remains is a theory that Defendants omitted facts that cut against their projections—a "theory of misleading omission" that "is only amenable to analysis under the third *Omnicare* test." *In re Pretium Res. Inc. Sec. Litig.*, 2020 WL 953609, at *4 (S.D.N.Y. Feb. 27, 2020). *Omnicare*'s omission prong requires the plaintiff to

14

"identify *particular* (and material) facts going to the basis for the [defendant's] opinion" and in its "possession at the time." 575 U.S. at 189, 194. The CAC appears to assert such a theory,[7] but it focuses almost entirely on contrary *conclusions* that Insperity allegedly should have drawn from otherwise unidentified information. *E.g.*, CAC ¶ 66 (alleging Insperity did not have enough trained BPAs to sustain growth projections; its WSEE growth was the result of underpricing; pricing increases would make it uncompetitive; and its optimistic growth was predicated on an incorrect assumption concerning the mid-market segment). The CAC identifies not a single *fact* concerning Insperity's BPA growth, pricing, or mid-market sales that Defendants possessed but omitted at the time of their predictions. *See, e.g.*, *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 619 (S.D.N.Y. 2017) (rejecting *Omnicare* omission theory where "Plaintiff fail[ed] to allege particular facts regarding the knowledge Defendants did (or did not) possess at the time the opinion statements were made, whose omission made those statements misleading"). The CAC's real gripe is that Defendants' projections "turned out to be wrong"—a theory on which *Omnicare* liability may not rest. 575 U.S. at 186.

The only allegedly omitted "fact" the CAC identifies is Insperity's lack of real-time access to large healthcare claims data. *E.g.*, CAC ¶ 66(b). Defendants have already explained why the Challenged Statements did not, as the CAC alleges, give the *contrary* impression that Insperity had real-time access. *Supra* Section IV.A.1.a. But even when couched as a pure omission theory, the CAC's allegation fails. An opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way" because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts." *Omnicare*, 575 U.S. at 189–90. Separating actionable omissions from the non-actionable thus depends on

---

[7] The CAC does not even hint at *Omnicare*'s alternative omission theory—involving the speaker's "inquiry into" the opinion. 575 U.S. at 189.

15

the "full context" of a statement, including "the customs and practices of the relevant industry" and the specificity of the statement, along with the presence of "hedges, disclaimers, and apparently conflicting information." *Id.* at 190.

Those contextual factors defeat any omission liability here. Insperity cautioned about "variability on a quarterly basis in medical claims costs based on the *unpredictable nature of large* claims." Ex. 1, 2018 10-K, at 54 (emphasis added). And Insperity made clear that its annual healthcare claims trend estimate was based on the thesis that "*historical* experience" and "recent claims activity" were "representative of incurred and paid trends during the reporting period," and that its prospective trend analysis "involve[d] a significant level of judgment." *Id.* at 37. These "hedges" and "disclaimers" concerning the inherently unpredictable, historical-trend-based modeling of healthcare claims conveyed that if anything, Insperity *lacked* the sort of real-time information that would have purportedly rendered large claims something other than "unpredictable." *Omnicare*, 575 U.S. at 190; *see Tongue*, 816 F.3d at 211 (rejecting *Omnicare* omission claim where defendants made "numerous caveats to the reliability of the projections"). Thus, the allegedly omitted  fact of (non)access cannot be the basis for liability because it is not at odds with any of Defendants' opinions. *Omnicare*, 575 U.S. at 191 (explaining that omission liability only rests on omitted facts which "cannot be squared" with a defendant's opinions and therefore render them misleading).

### d.    Other Challenged Statements are non-actionable puffery.

The CAC also challenges statements that amount to classic corporate puffery.[8] "Rosy predictions, or statements that are loosely optimistic regarding a company's well-being ... are not actionable because they are 'too general to cause a reasonable investor to rely upon them.'" *Lululemon*, 14 F. Supp. 3d at 572–73 (quoting *ECA*, 553 F.3d at 206); *see also Novak*, 216 F.3d

---

[8] App'x A (identifying puffery in the following: CAC ¶¶ 60, 64, 72, 86, 90, 115).

at 315 ("[S]tatements containing simple economic projections, expressions of optimism, and other puffery are insufficient" to create 10b-5 liability.). Courts routinely dismiss claims challenging such puffery. *See, e.g.*, *Adient*, 2020 WL 1644018, at \*21 ("Although the parties do not focus on whether the challenged statements constitute inactionable puffery, the Court nonetheless finds that many of them do.").

For example, the CAC challenges statements like, "we … *are well positioned to continue our strong financial performance*," CAC ¶ 60; "*we can confirm we are in excellent shape for the starting point for 2019*," ¶ 64; "*[o]ur record first quarter results reflect the strength of our business model and continued excellent execution of our strategic plan*," ¶ 72; and "*[t]hese results further demonstrate the sustainability of our rapid growth and profitability experienced over the last several years into 2019*," *id*. Courts routinely deem similar statements to be non-actionable puffery. *See, e.g.*, *Shemian v. Research In Motion Ltd.*, 2013 WL 1285779, at \*4 (S.D.N.Y. 2013) ("we are setting the stage for continuing success"); *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 211 (S.D.N.Y. 2020) (company was in "excellent position"); *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 580 (S.D.N.Y. 2016) (company's "competitive strength").

The CAC also challenges statements like "*[t]his demonstrates our success in hiring and training new Business Performance Advisors, which is the key driver for future growth*," CAC ¶ 86, and "[t]his is a tremendous opportunity for people. And so we get -- we certainly get our fair share, *and we're capable of growing that base of Business Performance Advisors at the targeted levels*." CAC ¶ 90; Ex. 9, 7/29/19 Q2 Tr., 9. Such statements are puffery as well. *See Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (per curiam) (statements touting company's "commitment to create earnings opportunities" and that "[w]e are convinced

17

our business strategies will lead to continued prosperity" "consist of precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable"); *Adient*, 2020 WL 1644018, at \*22 (that company had seen "a big improvement in Metals" business segment and Metals was "on the upwards trajectory" were "broad statements of corporate optimism"). The Court should reject the CAC's attempt to base a fraud claim on these statements.

### 2.   The CAC pleads no facts giving rise to a strong inference of scienter.

The CAC's failure to plead scienter provides an alternative, independent basis for dismissal. Under the PSLRA, a plaintiff must plead "with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). To qualify as a "strong inference," the inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

"The requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. To raise a strong inference of scienter through "motive and opportunity" to defraud, "plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). "[I]f Plaintiffs cannot make the 'motive' showing, then they could raise a strong inference of scienter under the 'strong circumstantial evidence' prong, 'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive." *ECA*, 553 F.3d at 198–99. A plaintiff pleading the "conscious misbehavior or recklessness" theory of scienter must allege, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant

18

must have been aware of it." *Id.* at 202–03. The recklessness required for scienter is "conscious recklessness—i.e., a state of mind *approximating actual intent*, and *not merely a heightened form of negligence.*" *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).

"At least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *ECA*, 553 F.3d at 199. The CAC pleads none of these, and it asserts no other basis for a strong inference of scienter.

### a.      The CAC does not allege a "motive and opportunity" to defraud.

The CAC all but concedes a lack of "motive and opportunity." Its only motive-related allegation is an unadorned assertion that Sarvadi and Sharp sold stock during the class period. CAC ¶¶ 50–51. "[T]he mere fact that insider stock sales occurred," however, "does not suffice to establish scienter. Rather, plaintiffs must establish that the sales at issue were 'unusual' or suspicious." *E.g.*, *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 523 (S.D.N.Y. 2020) (Buchwald, J.). The CAC does not even attempt to show the sales were unusual or suspicious, nor does it allege any other "concrete and personal benefit to the individual defendants" from the alleged scheme. The CAC thus pleads no "motive and opportunity" whatsoever.

Looming large over this failure to plead a fraudulent motive is the nonculpable inference that Defendants believed their guidance, but the Company simply came up short. That inference is even more compelling here, given Insperity's repurchase of stock *during the height of the purported fraud*. *See* Ex. 10, 2/11/20 8-K, 5–6 (explaining Insperity repurchased "approximately 2,125,000 shares of stock at a cost of $203.0 million" in FY 2019, including fourth-quarter repurchases "total[ing] 643,000 shares at a cost of $49.4 million"). Indeed, from 2018 to 2019,

19

Insperity nearly doubled its stock repurchases, from $113.3 million in repurchased shares in 2018 to $203.0 million in 2019. Ex. 1, 2018 10-K, 53; Ex. 11, 2019 10-K, 36. Courts routinely hold that such behavior negates scienter because it is economically irrational for a company to repurchase its own stock at artificially inflated prices. *E.g.*, *Turner v. MagicJack VocalTec, Ltd.*, 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014) ("[D]uring the Class Period, magicJack was engaged in a massive, $100 million stock buyback," so "[i]t [wa]s unreasonable to assume that magicJack would artificially inflate its stock price when it was repurchasing a significant amount of its own shares on the open market.").[9]

### b.    The CAC fails to allege "strong circumstantial evidence of conscious misbehavior or recklessness."

Because the CAC "cannot make the 'motive' showing," "the strength of the circumstantial allegations" of conscious misbehavior or recklessness "must be correspondingly greater." *ECA*, 553 F.3d at 198–99. But the CAC never alleges that Defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Id.* at 199.

### i.    The CAC fails to identify contradictory reports or information to which the Individual Defendants had access.

The closest the CAC gets to alleging that Sarvadi or Sharp knew facts or had access to information suggesting that their public statements were not accurate is a boilerplate allegation in the "Control Persons" section that "[b]ecause of their Board memberships and/or executive and managerial positions with Insperity, the Individual Defendants had access to the adverse

---

[9] *See also, e.g.*, *Davidoff v. Farina*, 2005 WL 2030501, at *11 n.19 (S.D.N.Y. Aug. 22, 2005) (Buchwald, J.) (no strong inference of scienter where "it would have made no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail"); *Frankfurt-Tr.*, 336 F. Supp. 3d at 225 (argument that defendants "initiated billions of dollars of stock buyback during the Class Period to 'prop up'" reported earnings negated, rather than supported, scienter, as "it would make no economic sense for a company to buy back its stock at a price it knows to be inflated").

undisclosed information about the Company's financial condition and performance as particularized herein ...." CAC ¶ 54. That does not move the scienter needle, for "[a]lthough their high-level positions should presumably have provided the Individual Defendants access to" the allegedly adverse undisclosed information, "the issue is whether there *really were* clearly contrary predictions." *Skechers*, 444 F. Supp. 3d at 528 (emphasis added).

On that critical question, the CAC cites nothing (no confidential witnesses, no reports, nothing) suggesting the Individual Defendants had specific, contradictory information. And even that is being charitable—the CAC does not allege *any contradictory information at all* that would help identify "exactly what contemporaneous data Defendants had, even to be able to suggest such knowledge." *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 273 (S.D.N.Y. 2009). This failure is fatal because, "where plaintiffs contend defendants had access to contrary facts, they must *specifically identify* the reports or statements containing this information." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (emphasis added); *see also In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) ("Second Circuit cases uniformly rely on allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements."), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009). Courts routinely find no strong inference of scienter when complaints are similarly deficient. *See In re HEXO Corp. Sec. Litig.*, 2021 WL 878589, at *20 (S.D.N.Y. Mar. 8, 2021) (Buchwald, J.) ("Given the nature of plaintiffs' theory of scienter, their abject failure to identify any reports or statements containing adverse facts to which defendants had access at the time the statements at issue were made is itself fatal to plaintiffs' Section 10(b) claims.").[10]

---

[10] *See also, e.g., Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010) ("[A]lthough CW1 confirmed that a Kmart officer or board member could obtain access to any company information," including certain

The cases cited in Plaintiff's pre-motion letter, Dkt. 39, serve only to highlight what facts and circumstances are *missing* here. In those cases, defendants conceded knowledge of contrary facts, plaintiffs identified specific reports containing contrary information, or both:

- *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016): The company represented it was "substantially in compliance with the relevant global regulatory requirements," despite having received several contrary letters from federal regulators and "appear[ing] to concede" that defendants "were aware" of three deficient recalls. *Id.* at *2, *5, *7. For plaintiffs' other, more analogous claim—that the company had falsely estimated its warranty-and-recall reserves—there was no such concession, and the court found *no scienter* based on the lack of "internal analyses, confidential witnesses, or other particularized allegations" and dismissed the claim. *Id.* at *9.

- *In re Avon Sec. Litig.*, 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019): Plaintiffs alleged defendants were "in charge" of an undisclosed strategy to slash credit qualifications for new company sales representatives in Brazil to the extent that "[s]uddenly the Company was approving 8 of 10 applicants in Brazil, rather than 2 of 10." *Id.* at *5, 19. And "the CWs [did] identify particular reports containing non-public information reviewed by the Defendants." *Id.* at *21.

- *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131 (D. Conn. 2019): Plaintiffs alleged that defendants *led* a price-fixing and price-hike scheme, corroborated by allegations of contrary reports and analysis that defendants themselves created, circulated, and approved. *Id.* at 170–71.

Plaintiff's other scienter cases involve similarly particularized factual allegations of contrary knowledge and fraudulent motives,[11] further confirming that the CAC bears no resemblance to a cognizable scienter pleading.

### ii.    Defendants' retrospective analysis of their forecasts are not "admissions" of past contrary knowledge.

Unable to identify any specific contradictory information to which the Individual

---

reports on Kmart's real estate holdings, "he admitted that he had no knowledge of whether [Defendants] Lampert or Day actually accessed or reviewed the reports."); *Skechers*, 444 F. Supp. 3d at 528 ("The CAC simply does not contain any support for existence of contrary predictions.").

[11] *See Emps.' Ret. Sys. of Gov't of Virgin Islands v. Blanford*, 794 F.3d 297, 308–09 (2d Cir. 2015) (CWs alleged particular facts showing excess inventory was "stuffed to the rafters" but concealed from visiting auditors while defendants sold stock at "opportune moments" for "significant personal gain"); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (holding allegation company "suddenly realized" it would need to expense 84% of its total royalty advances to software developers, "together" with other allegations, including that company filed lawsuits against developers in apparent recognition that such royalty advances would never be recouped, established scienter).

22

Defendants had access, the CAC blithely suggests that Sarvadi "admitted" Defendants had some sort of contrary knowledge at the time of the Challenged Statements, quoting two of his statements during the November 4, 2019 Q3 earnings call:

- "Our paid worksite employee number from new sales explains the other half of the shortfall. Although we were substantially on plan in this metric through two quarters, the last two months of Q3 fell behind. ***The primary cause leading to fewer paid worksite employees from sales in Q3 is we simply had too few trained BPAs early this year and did not offset that with mid-market sales.*** Both of these issues have rebounded and now point toward strong performance in the fall campaign and as we look ahead to 2020."

- "As we look ahead to 2020, the number of trained BPAs will drive our unit growth and mid-market sales will supplement that growth. ***In retrospect, I believe I was too optimistic in expecting mid-market sales to offset a lower growth rate in BPAs at this stage.*** With this plan in place, we should see quarterly growth acceleration over 2020, especially as we move past the difficult comparisons related to the large mid-market account."

CAC ¶¶ 25–26, 101; Ex. 4, 11/4/19 Earnings Call Tr., 5 (adding context). But as the statements themselves make readily apparent, they are not "admissions" that when he spoke about Insperity's FY 2019 forecasts, Sarvadi knew "[t]he Company did not currently have, and was not hiring or retaining, a sufficient number of trained BPAs to make the sales required to support its WSEE and financial growth outlook for FY19," as Plaintiff claims. CAC ¶ 18(a). The CAC never explains how or why these statements could support a reasonable inference of past scienter, which is fatal. *See, e.g.*, *Adient*, 2020 WL 1644018, at *30 ("Plaintiffs claim that statements that the Company had not been 'exactly spot-on with guidance' and that 'some of the expectations' they had in Metals were 'a bit optimistic or proved to be a bit optimistic' amount to an 'admission that Defendants knew or were reckless in setting guidance for the Company.' Those statements simply do not constitute an admission, and the SAC fails to explain how or

23

why such an inference can be drawn.").[12]

Sarvadi's comments were retrospective analysis of the Company's forecasts, the reasons for its slower-than-expected growth, and the implications for the upcoming fiscal year. Such "retrospective observations" do not create past scienter. *See, e.g.*, *Frankfurt-Tr.*, 336 F. Supp. 3d at 210, 220 (CEO's post-guidance-miss statements—"I think we just assumed that we were going to continue to see" strong growth, the company was "looking at trends, but I don't think we delved deep enough into – or we didn't question enough the assumptions underlying how they were going to get there," and "we didn't dig deep enough last year when these plans were getting put together"—were not admissions "that when he spoke" previously "he knew at that time that [the company] had not 'delv[ed] deep enough,' nor is it reasonable to infer he meant to say that"); *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 44 (1st Cir. 2017) ("[T]he various 'evidentiary admissions' [plaintiff] points to as indicative of scienter all involve statements made by the defendants, well after the end of the Class Period, that do not provide particularized insight into the defendants' knowledge at the time of the alleged misstatements. The use of these statements amounts to little more than pleading fraud by hindsight."). !

### c.  The CAC's poorly disguised "fraud by hindsight" theory is outweighed by the more compelling non-culpable inferences.

The CAC's scienter theory boils down to the bare fact that Insperity's performance fell short of guidance. The Court can swiftly reject that paradigmatic attempt at pleading "fraud by hindsight," as courts in this Circuit routinely do in cases involving supposedly "aggressive," "overly optimistic," and "ambitious" financial guidance. *Frankfurt-Tr.*, 336 F. Supp. 3d at 210,

---

[12] Plaintiff's pre-motion letter cited *In re Nielsen Holdings PLC Securities Litigation*, 2021 WL 22722 (S.D.N.Y. Jan. 4, 2021) for its finding that a "later admission supported 'an inference that Defendants knew facts or had access to information suggesting that these statements were materially misleading.'" Dkt. 39 at 2 (quoting *Nielsen*, 2021 WL 22722, at *12). But that case involved later admissions *of contemporaneous knowledge*—a critical distinction. *Nielsen*, 2021 WL 22722, at *5–6 (statement that "[e]arlier this year, as we saw these more challenging trends unfolding …" was admission "that Defendants had seen the trend unfold '[e]arlier this year'").

217 (rejecting "'fraud by hindsight' theory of liability that the Second Circuit has repeatedly rejected" where company lowered its earnings guidance after missing financial targets and CEO stated he had been "way too aggressive" with projections); *Born v. Quad/Graphics, Inc.*, 2021 WL 736839, at *9 (S.D.N.Y. Feb. 25, 2021) (guidance miss "may support the suspicion that … management team had been overly optimistic when it set the company's financial guidance for 2019" but did not support inference that defendants' past statements, including that company was "on track" to meet its financial targets, were false or misleading); *Gildan Activewear*, 636 F. Supp. 2d at 274 ("[S]cienter may not be established by hindsight, and these allegations do nothing to illustrate that Defendants knew or should have known at the time that the costs associated with the integration were inconsistent with their ambitious earnings guidance.").

In sum, the CAC fails to allege—much less with particularity—that the Individual Defendants *knew* when they issued the challenged guidance that Insperity had too few BPAs; that it was allegedly underpricing services; or that the large healthcare claims anomaly would occur and repeat. The CAC identifies no motive, no reason to infer the Individual Defendants knew contrary facts at the time, no specific contrary information to which they had access, and no confidential witnesses claiming the statements were fraudulent. The nonculpable inference—Defendants' optimistic projections did not come to pass (though the Company still grew)—is decidedly more compelling than the baseless inference of fraud. *Tellabs*, 551 U.S. at 314.

## B.    The CAC fails to state a Section 20(a) claim.

Because the CAC has not pleaded a primary violation, the court must also dismiss the Section 20(a) claim against Sarvadi and Sharp. *Rombach*, 355 F.3d at 177–78.

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion and dismiss the CAC with prejudice.

25

Dated:  April 26, 2021

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By:  /s/ *David D. Sterling*

Brian C. Kerr
NY Bar No. 2806123
30 Rockefeller Plaza
New York, NY 10112-4498
Tel: (212) 408-2543
Fax: (212) 259-2543
brian.kerr@bakerbotts.com

David D. Sterling (*pro hac vice*)
Texas Bar No. 19170000
Amy Pharr Hefley (*pro hac vice*)
Texas Bar No. 24046046
Anthony J. Lucisano (*pro hac vice*)
Texas Bar No. 24102118
Elizabeth P. Furlow (*pro hac vice*)
Texas Bar No. 24109899
Frank Mace (*pro hac vice*)
Texas Bar No. 24110609
910 Louisiana St.
Houston, Texas 77002
Tel: (713) 229-1946
Fax: (713) 229-7946
david.sterling@bakerbotts.com
amy.hefley@bakerbotts.com
anthony.lucisano@bakerbotts.com
elizabeth.furlow@bakerbotts.com
frank.mace@bakerbotts.com

**COUNSEL FOR DEFENDANTS INSPERITY, INC.,
PAUL J. SARVADI, AND DOUGLAS S. SHARP**

26