# Exhibit 11

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

For the fiscal year ended December 31, 2019

or

Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

For the transition period from _____ to _____

Commission File No. 1-13998

## 🌀 **Insperity**®

## **Insperity, Inc.**

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **76-0479645** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

| | |
|---|---|
| **19001 Crescent Springs Drive** | |
| **Kingwood, Texas** | **77339** |
| **(Address of principal executive offices)** | **(Zip Code)** |

(Registrant's Telephone Number, Including Area Code):  (281) 358-8986

Securities Registered Pursuant to Section 12(b) of the Act:

| | | |
|---|---|---|
| Common Stock, Par value $0.01 per share | NSP | New York Stock Exchange |
| (Title of class) | (Trading symbol) | (Name of exchange on which registered) |

Securities Registered Pursuant to Section 12(g) of the Act: NONE

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes   No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes     No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes   No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data file required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes   No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definition of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer | Accelerated filer |
| Non-accelerated filer | Emerging growth company |
| Smaller reporting company | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes   No

As of February 4, 2020, 39,380,068 shares of the registrant's common stock, par value $0.01 per share, were outstanding. As of the last business day of the registrant's most recently completed second quarter, the aggregate market value of the common stock held by non-affiliates (based upon the June 30, 2019 closing price of the common stock as reported by the New York Stock Exchange) was approximately  $4.7 billion.

**DOCUMENTS INCORPORATED BY REFERENCE**

Part III information is incorporated by reference from the proxy statement for the  2020 annual meeting of stockholders, which the registrant intends to file within 120 days of the end of the fiscal year.

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **Part I** | | |
| Item 1. | Business | 2 |
| Item 1A. | Risk Factors | 19 |
| Item 1B. | Unresolved Staff Comments | 26 |
| Item 2. | Properties | 27 |
| Item 3. | Legal Proceedings | 28 |
| Item 4. | Mine Safety Disclosures | 29 |
| Item S-K 401(b). | Executive Officers of the Registrant | 30 |
| **Part II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 31 |
| Item 6. | Selected Financial Data | 33 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 35 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 55 |
| Item 8. | Financial Statements and Supplementary Data | 55 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 56 |
| Item 9A. | Controls and Procedures | 56 |
| Item 9B. | Other Information | 56 |
| **Part III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 57 |
| Item 11. | Executive Compensation | 57 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 57 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 57 |
| Item 14. | Principal Accounting Fees and Services | 57 |
| **Part IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 58 |
| Item 16. | Form 10-K Summary | 61 |

## BUSINESS

### PART I

Unless otherwise indicated, "Insperity," "we," "our" and "us" are used in this annual report to refer to Insperity, Inc. and its consolidated subsidiaries. This annual report contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. You can identify such forward-looking statements by the words "expects," "intends," "plans," "projects," "believes," "estimates," "likely," "possibly," "probably," "goal," "opportunity," "objective," "target," "assume," "outlook," "guidance," "predicts," "appears," "indicator" and similar expressions. In the normal course of business, in an effort to help keep our stockholders and the public informed about our operations, from time to time, we may issue such forward-looking statements, either orally or in writing. Generally, these statements relate to business plans or strategies, projected or anticipated benefits or other consequences of such plans or strategies, or projections involving anticipated revenues, earnings or other operating results. We base the forward-looking statements on our current expectations, estimates and projections. We caution you that these statements are not guarantees of future performance and involve risks, uncertainties and assumptions that we cannot predict. In addition, we have based many of these forward-looking statements on assumptions about future events that may prove to be inaccurate. Therefore, the actual results of the future events described in such forward-looking statements in this annual report, or elsewhere, could differ materially from those stated in such forward-looking statements. Among the factors that could cause actual results to differ materially are the risks and uncertainties discussed in this annual report, including, without limitation, factors discussed in Item 1, "Business," Item 1A, "Risk Factors," and Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

### Item 1.   Business.

### General

We provide an array of human resources ("HR") and business solutions designed to help improve business performance. Since our formation in 1986, we have evolved from being solely a professional employer organization ("PEO"), an industry we pioneered, to our current position as a comprehensive business performance solutions provider.

Our long-term strategy is to provide the best small and medium-sized businesses in the United States with our specialized human resources service offering and to leverage our buying power and expertise to provide additional valuable services to clients. Our most comprehensive HR services offerings are provided through our Workforce Optimization® and Workforce Synchronization™ offerings (together, our "PEO HR Outsourcing solutions"), which encompass a broad range of human resources functions, including payroll and employment administration, employee benefits, workers' compensation, government compliance, performance management, and training and development services, along with our cloud-based human capital management platform, Insperity Premier™. Workforce Optimization is our most comprehensive HR outsourcing solution and is our primary offering. Workforce Synchronization, which generally is offered only to our middle market client segment, is a lower cost offering with a typically longer commitment that includes the same compliance and administrative services as Workforce Optimization and allows those clients to select, for an additional fee, from the strategic HR products and services that are included with Workforce Optimization.

In addition to our PEO HR Outsourcing solutions, we offer Workforce Acceleration ™, a comprehensive traditional payroll and human capital management solution. We also offer a number of other business performance solutions, including Time and Attendance, Performance Management, Organizational Planning, Recruiting Services, Employment Screening, Expense Management Services, Retirement Services and Insurance Services, many of which are offered as a cloud-based software solution. These other products and services are offered separately or along with our PEO HR Outsourcing solutions or with Workforce Acceleration.

Our PEO HR Outsourcing solutions are designed to improve the productivity and profitability of small and medium-sized businesses. These solutions relieve business owners and key executives of many employer-related administrative and regulatory burdens, which enable them to focus on the core competencies of their businesses. Our PEO HR Outsourcing solutions also promote employee performance through human resources management techniques designed to improve employee satisfaction. We enter into a Client Service Agreement ("CSA") with each of our PEO HR Outsourcing solutions clients under which we and our client act as co-employers of the employees who work at the client's worksite, or worksite employees ("WSEEs"). Under the CSA, we assume responsibility for personnel administration and assist our clients in complying with employment-related governmental regulations, while the client retains the employees' services in its business and remains the employer for other purposes. We charge a comprehensive service fee ("comprehensive service fee" or "gross billing"), which is invoiced concurrently with the processing of payroll for the WSEEs of the client. The

## BUSINESS

comprehensive service fee consists of the payroll of our WSEEs plus an additional amount reflected as a percentage of the payroll cost of the WSEEs.

We accomplish the objectives of our PEO HR Outsourcing solutions through a "high-touch/high-tech" approach to service delivery. In advisory areas, such as recruiting, employee performance management and employee training, we employ a high-touch approach designed to ensure that our clients receive the personal attention and expertise needed to create a customized human resources solution. We utilize a variety of information technology capabilities to deliver our PEO HR Outsourcing solutions, including Insperity Premier™, our cloud-based human capital management platform through which we, along with our clients and WSEEs, manage payroll, benefits, retirement solutions and other HR-related information, creating efficiencies for all parties.

As of December 31, 2019, we had 81 offices, including 75 sales offices in 38 markets. In addition, we had four regional service centers along with human resources and client service personnel located in a majority of our 38 sales markets, which serviced an average of 243,715 WSEEs per month in the fourth quarter of 2019. Our service centers coordinate PEO HR Outsourcing solutions for clients on a regional basis and localized face-to-face human resources services.

We were organized as a corporation in 1986. Our principal executive offices are located at 19001 Crescent Springs Drive, Kingwood, Texas 77339. Our telephone number at that address is (281) 358-8986, and our website address is www.insperity.com. Our stock is traded on the New York Stock Exchange under the symbol "NSP." We file or furnish periodic reports with the Securities and Exchange Commission ("SEC"), including our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and if applicable, amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934. Through the investor relations section of our website, we make available electronic copies of the documents that we file or furnish to the SEC, the charters of the standing committees of our Board of Directors and other documents related to our corporate governance, including our Code of Conduct. Access to these electronic filings is available free of charge as soon as reasonably practicable after filing or furnishing them to the SEC. Printed copies of our committee charters and other governance documents and filings can be requested by writing to our corporate secretary at the address above.

### PEO Industry

The PEO industry began to evolve in the early 1980s largely in response to the burdens placed on small and medium-sized employers by an increasingly complex legal and regulatory environment. While various service providers were available to assist these businesses with specific tasks, PEOs emerged as providers of a more comprehensive range of services relating to the employer/employee relationship. In a PEO arrangement, the PEO assumes certain aspects of the employer/employee relationship as defined in the contract between the PEO and its client. Because PEOs provide employer-related services to a large number of employees, they can achieve economies of scale that allow them to perform employment-related functions more efficiently, provide a greater variety of employee benefits, and devote more attention to human resources management than a client can individually.

We believe the key factors driving demand for PEO services include:

- the focus on growth and productivity of the small and medium-sized business community in the United States, utilizing outsourcing to concentrate on core competencies

- the need to provide competitive health care and related benefits to attract and retain employees

- the increasing costs associated with health and workers' compensation insurance coverage, workplace safety programs, employee-related complaints and litigation

- complex regulation of employment issues and the related costs of compliance, including the allocation of time and effort to such functions by owners and key executives

- the significant costs, time and specialized knowledge required to purchase or develop the technology infrastructure to administer benefits, HR and payroll processing on an integrated basis

A significant factor in the development of the PEO industry has been increasing recognition and acceptance of PEOs and the co-employer relationship by federal and state governmental authorities. Insperity and other industry leaders, in concert with the National Association of Professional Employer Organizations ("NAPEO"), have worked with the relevant governmental entities for the establishment of a regulatory framework that protects clients and employees, discourages

## BUSINESS

unscrupulous and financially unsound PEOs, and promotes further development of the industry. Currently,  42 states have enacted legislation either recognizing PEOs or requiring licensing, registration, or certification, and several others are considering such regulation. Such laws vary from state to state but generally provide for monitoring the fiscal responsibility of PEOs. State regulation assists in screening insufficiently capitalized PEO operations and helps to resolve interpretive issues concerning employer/employee status for specific purposes under applicable state law. We have actively supported such regulatory efforts and are currently recognized, licensed, registered, certified or pursuing registration in all of these states. The cost of compliance with these regulations is not material to our financial position or results of operations.

The Small Business Efficiency Act ("SBEA") created a federal regulatory framework for the payment of wages to WSEEs and the reporting and remittance of federal payroll taxes on those wages paid by PEOs certified under the statute ("CPEOs"). We actively supported the enactment of this law. The SBEA clarified that a CPEO, rather than the client, is treated as the employer for purposes of reporting and remitting payroll taxes. It also clarified that a CPEO is treated as a successor employer for purposes of the wage base of WSEEs on which federal payroll taxes are applied. In addition, the law clarified that clients of a CPEO remain eligible for specified tax credits for which they would have been eligible absent the CPEO relationship. Following the establishment of the certification program by the Internal Revenue Service of the United States ("IRS") and Treasury Department, our PEO subsidiary, Insperity PEO Services, L.P., received its designation as a CPEO from the IRS.

### Service Offerings

#### *PEO HR Outsourcing Solutions*

We serve small and medium-sized businesses by providing our PEO HR Outsourcing solutions, which encompass a broad range of services. Both of our PEO HR Outsourcing solutions offer the following:

- benefits and payroll administration

- health and workers' compensation insurance programs

- personnel records management

- employer liability management

- assistance with government compliance

- general HR advice

- access to Insperity Premier for employees, managers and client owners

- 401(k) retirement plan sponsored by us

Our Workforce Optimization solution also provides additional services that our Workforce Synchronization clients can purchase for an additional fee, including the following:

- employee recruiting and support

- employee performance management

- training and development services

Our PEO HR Outsourcing solutions are designed to attract and retain high-quality employees, while relieving client owners and key executives of many employer-related administrative and regulatory burdens. Among the employment-related laws and regulations that may affect a client are the following:

## BUSINESS

- Internal Revenue Code (the "Code")
- Federal Income Contribution Act (FICA)
- Federal Unemployment Tax Act (FUTA)
- Fair Labor Standards Act (FLSA)
- Employee Retirement Income Security Act, as amended (ERISA)
- Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA)
- Immigration Reform and Control Act (IRCA)
- Title VII (Civil Rights Act of 1964)
- Health Insurance Portability and Accountability Act (HIPAA)
- Age Discrimination in Employment Act (ADEA)
- Americans with Disabilities Act (ADA)

- The Family and Medical Leave Act (FMLA)
- Genetic Information Nondiscrimination Act of 2008
- Drug-Free Workplace Act
- Occupational Safety and Health Act (OSHA)
- Worker Adjustment and Retraining Notification Act (WARN)
- Uniformed Services Employment and Reemployment Rights Act (USERRA)
- State unemployment and employment security laws
- State workers' compensation laws
- Health Care and Education Reconciliation Act of 2010 (the "Reconciliation Act")
- Patient Protection and Affordable Care Act (PPACA)
- State and local law equivalents of the foregoing

These laws and regulations are complex, and in some instances overlapping. We assist our PEO HR Outsourcing solutions clients in complying with these laws and regulations by providing services in the categories set forth below:

*Administrative Functions*. Administrative functions encompass a wide variety of processing and recordkeeping tasks, mostly related to payroll administration and regulatory compliance. Specific examples include:

- payroll processing
- payroll tax deposits
- payroll tax reporting
- employee file maintenance
- unemployment claims processing
- workers' compensation claims reporting and monitoring

*Benefit Plans Administration*. We maintain several benefit plans for eligible WSEEs including the following:

- a group health plan
- a health savings account program
- a health care flexible spending account plan
- a 401(k) retirement plan
- cafeteria plans for group health and health savings account contributions
- short-term and long-term disability insurance
- an educational assistance program
- an adoption assistance program
- group term life insurance
- group universal life insurance
- accidental death and dismemberment insurance
- paid family leave, where required by law

## BUSINESS

The group health plan includes medical, dental, vision and prescription drug coverage, as well as a work-life program. All benefit plans are provided to eligible employees based on the specific eligibility provisions of each plan. We are the policyholder responsible for the costs and premiums associated with any group insurance policies that provide benefits under these plans, and we act as plan sponsor and administrator of the plans. We negotiate the terms and costs of the plans, maintain the plans in accordance with applicable federal and state regulations and serve as liaison for the delivery of these benefits to WSEEs and corporate employees. COBRA coverage is extended to eligible terminated WSEEs and other eligible individuals in accordance with applicable law. We believe that the variety and comprehensive nature of our benefit plan offerings are generally not available to employees in our small and medium-sized business target market and are usually offered only by larger companies that can spread program costs over a much larger group of employees. As a result, we believe the availability of these benefit plans provides our clients with a competitive advantage that small and medium-sized businesses are typically unable to attain on their own.

*Insperity Premier.* Insperity Premier is our cloud-based human capital management platform for our PEO HR Outsourcing solutions and is available to our clients with minimal implementation effort or cost. It is designed to provide our service providers with insight into client and WSEE HR information to better support their needs. Insperity Premier provides role-based access to a wide range of human capital management functions, along with personalized content to the managers, owners and WSEEs of our PEO HR Outsourcing solutions clients, including:

For managers and client owners:

- WebPayroll for the submission, approval and reporting of payroll data

- mobile access to review and approve payroll transactions and employee time entry

- tools to manage the onboarding of new employees

- employee administration functions such as viewing or changing information about employees

- access to client-specific compliance-related information relevant to many HR areas

- reporting and analytics tools to create, view, save and export reports and data about employees and, for our mid-market customers, to do more complex analysis and visualization of their workforce data with the Insperity People Analytics solution

- ability to manage employee time and attendance information, absences and paid time off

- access to talent management tools in the areas of recruiting, performance management and learning management

- access to a library of online human resources forms

- access to a wide range of best-practices human resources management content

For WSEEs:

- access to view, edit and change a range of employee profile information

- online check stubs, pay history, W-2s, update W-4 forms and other state forms

- employee-specific benefits content, including summary plan descriptions, enrollment status and tools to assist with benefits selection

- access to 401(k) retirement plan information, if offered by client

- e-Learning web-based training

- links to benefits providers and other key vendors

- performance management tools including self-reviews and review history, if offered by client

- ability to submit time and attendance information, absences and paid time off requests

## BUSINESS

- mobile access to perform a wide range of employee-specific activities such as reporting time and attendance and paid time off, view pay stubs, insurance coverage and ID cards, view 401(k) balances and other commonly accessed data

*Personnel Management*. In addition to the services that we deliver through Insperity Premier, we provide a wide variety of personnel management services that give our clients access to HR advisors and additional resources normally found only in the human resources departments of large companies. All PEO HR Outsourcing solutions clients have access to our advice concerning personnel policies and practices, including recruiting, discipline and termination procedures. Other personnel management services we provide include:

- drafting and reviewing personnel policies and employee handbooks

- designing job descriptions

- performing prospective employee screening and background investigations

- designing performance appraisal processes and forms

- professional development and issues-oriented training

- employee counseling

- substance abuse awareness training

- outplacement services

- compensation guidance

*Employer Liability Management*. Under the CSA, we assume many of the employment-related responsibilities associated with the administrative functions, benefit plans administration and personnel management services we provide. For many of those employment-related responsibilities that are the responsibility of the client or of both the client and us, we may assist our clients in managing and limiting liability. This assistance may include safety-related risk management reviews as well as the implementation by our clients of safety programs designed to reduce workplace accidents and, consequently, workers' compensation claims. We also provide guidance to clients for avoiding discrimination, sexual harassment and civil rights violations, and we assist with termination decisions when consulted to attempt to minimize liability on those grounds. While we do not provide legal services to our clients, we employ in-house and external counsel who specialize in several areas of employment law, have broad experience in disputes concerning the employer/employee relationship and provide support to our internal human resources professionals. As part of our comprehensive service, we also maintain employment practice liability insurance coverage for ourselves and our clients, monitor developments in HR-related laws and regulations, and notify clients of the potential effect of such changes on employer liability.

*MarketPlace<sup>SM</sup> provided by Insperity®*. Through our many alliances with best-of-class providers, Insperity's MarketPlace is an e-commerce portal that brings a wide range of products and services to our clients, WSEEs and their families. Through MarketPlace, which is provided through Insperity Premier, our clients also have the opportunity to offer their products and services to other clients and WSEEs.

*Middle Market Solutions.* We believe the middle market sector, which we generally define as those companies with employees ranging from approximately 150 to 5,000 WSEEs, has historically been under-served by the PEO industry. Currently, we have a dedicated sales management, service personnel and consulting staff who concentrate solely on the middle market sector. Our average number of WSEEs per month in our middle market sector increased 18.0% over 2018, representing approximately 25.7% of our total paid WSEEs during 2019.

### Other Product and Services Offerings

We offer other product and services offerings on a stand-alone basis and to our PEO HR Outsourcing solutions clients. We also strive to leverage our relationships with our customers to enable cross-selling of our various products and services.

During 2019 and 2018, revenues from our other products and services offerings as a percentage of our total revenues were 1.0% and 1.1%, respectively.

---

## BUSINESS

Following are the key components of our other products and services, which are offered separately or as a bundle:

*Traditional Payroll and Human Capital Management.* Our Insperity Workforce Acceleration solution is a comprehensive human capital management and payroll services solution for clients that do not choose our PEO HR Outsourcing solutions. This solution combines a cloud-based human resources software suite that provides integrated payroll, HR administration and employee onboarding, benefits administration, performance management, and time and attendance functionality with HR guidance and tools, as well as reporting and analytics. In addition, through a strategic partner, Workforce Acceleration clients have access to a national, licensed insurance brokerage that specializes in the insurance needs of small businesses.

*Time and Attendance.* Our Time and Attendance products and services provide small to medium-sized businesses with software, hardware and services to track, allocate, and analyze employee resources and provide inputs into clients' payroll processing and accounting systems. The service is primarily delivered as a cloud-based solution or an an on-premise installation. For customers utilizing Time and Attendance in conjunction with our PEO HR Outsourcing solutions, we provide access through Insperity Premier.

*Performance Management.* Our Performance Management products and services provide human resources software offerings including Insperity ® PerformSmart® a performance management cloud-based offering. Insperity PerformSmart is available to both our Workforce Optimization and Workforce Synchronization clients. For customers utilizing PerformSmart in conjunction with our PEO HR Outsourcing solutions, we provide access through Insperity Premier. Performance Management products are sold through online subscription arrangements and through various reseller arrangements.

*Organizational Planning.* Organizational Planning offers cloud-based software used by companies to facilitate the creation, management and communication of detailed organizational management charts. For customers utilizing OrgPlus RealTime in conjunction with our PEO HR Outsourcing solutions, we provide access through Insperity Premier.

*Recruiting Services.* Our Recruiting Services offer direct hire placement on an as-needed basis and provides outsourced support for individual requisitions or large-scale hiring projects. In addition, we provide consulting services to assist in the creation and maintenance of consistent hiring practices and retention strategies. We also provide compensation services, behavior-based interview training and talent assessment.

*Employment Screening.* Our Employment Screening services offer a customized approach to background-check reporting for companies. Services include criminal records checks; verification of employment history or education; driving record, civil record and credit history checks; and confirmation of extraordinary credentials.

*Expense Management.* Our Expense Management product delivers employee expense management solutions that automate employee expense reporting, enforce travel and expense policies, and provide management reporting and analysis. The service is delivered as a cloud-based solution.

*Retirement Services.* Our Retirement Services solutions deliver comprehensive 401(k) retirement plan recordkeeping and administrative services to small and medium-sized businesses, primarily in connection with a 401(k) retirement plan we sponsor for our PEO HR Outsourcing solutions clients. Services include employee education and enrollment, participant communications, elective deferral withholding and transmission, matching contribution calculation, loan and distribution processing, regulatory filing preparation and nondiscrimination testing.

*Insurance Services.* Our Insurance Services solutions offer assistance through our licensed insurance agency to small and medium-sized businesses throughout the United States to secure affordable, customizable business insurance packages and life, health and disability insurance policies. Insurance Services also assists individuals in obtaining insurance coverages.

### Client Service Agreement

All PEO HR Outsourcing solutions clients execute a CSA with us. The CSA provides for an ongoing relationship between Insperity and the PEO HR Outsourcing solutions client. For most clients, the CSA generally is an annual contract subject to earlier termination by Insperity or the client upon 30 days' written notice or upon shorter notice in the event of default. CSAs for our middle market clients are generally two-year contracts, subject to earlier termination by clients upon payment of a termination fee or otherwise by the parties upon an event of default. The CSA establishes our comprehensive service fee, which is subject to periodic adjustments to account for changes in the composition of the client's workforce, employee benefit election changes, and statutory changes that affect our costs. Under the CSA, clients active in January of any year

## BUSINESS

are obligated to pay the estimated payroll tax component of the comprehensive service fee in a manner that reflects the pattern of incurred payroll tax costs. This practice aligns clients' payments to us with our obligations to make payments to tax authorities, which are higher in the earlier part of the year and decrease as limits on wages subject to payroll tax are reached.

The CSA also establishes the division of responsibilities between us and the client as co-employers. Pursuant to the CSA, we are responsible for personnel administration and for compliance with certain employment-related government regulations. In addition, we assume liability for payment of salaries and wages (as well as related payroll taxes) of our WSEEs and responsibility for providing specified employee benefits to such persons. These liabilities are not contingent on the prepayment by the client of the associated comprehensive service fee. Instead, as a result of our employment relationship with each of our WSEEs, we are liable for payment of salary and wages to the WSEEs as reported by the client and are responsible for providing specified employee benefits to such persons regardless of whether the client pays the associated comprehensive service fee. The client retains the employees' services and remains liable for complying with certain government regulations that require control of the worksite or daily supervisory responsibility or is otherwise beyond our ability to assume. A third group of responsibilities and liabilities are assumed by both Insperity and the client where such concurrent responsibility is appropriate. The specific division of applicable responsibilities under our CSAs generally is as follows:

### *Insperity Responsibilities*

- Payment of wages and salaries as reported by the client and related tax reporting and remittance (local, state and federal withholding, FICA, FUTA, state unemployment)

- Workers' compensation compliance, procurement, management and reporting

- Compliance with the Code, COBRA, HIPAA and ERISA for Insperity-sponsored employee benefit plans , as well as monitoring changes in other governmental laws and regulations governing the employer/employee relationship and updating the client when necessary

- Offering benefits under Insperity-sponsored employee benefit plans that comply with PPACA requirements

- Employee benefits administration of plans sponsored solely by Insperity

### *Client Responsibilities*

- Payment, through Insperity, of commissions, bonuses, vacations, paid time off, sick pay, paid leaves of absence, and severance payments

- Payment and related tax reporting and remittance of non-qualified deferred compensation and equity-based compensation

- Products produced and/or services provided

- Compliance with OSHA regulations, EPA regulations, FLSA, FMLA, WARN, USERRA, and state and local equivalents and compliance with government contracting provisions

- Compliance with federal, state, and local pay or play health care mandates and all such other similar federal, state and local legislation

- Compliance with the National Labor Relations Act ("NLRA"), including all organizing efforts and expenses related to a collective bargaining agreement and related benefits

- Professional licensing requirements, fidelity bonding, and professional liability insurance

- Ownership and protection of all client intellectual property rights

- COBRA, HIPAA, PPACA, the Code and ERISA compliance for client-sponsored employee benefit plans

## BUSINESS

*Concurrent Responsibilities*

- Implementation of policies and practices relating to the employee/employer relationship

- Internal compliance with all federal, state and local employment laws, including Title VII of the Civil Rights Act of 1964, ADEA, Title I of ADA, the Consumer Credit Protection Act and immigration laws and regulations

We maintain employment practice liability insurance coverages (including coverages for our clients) to manage our exposure for various employee-related claims. Our incurred costs in excess of annual premiums with respect to this exposure have historically been insignificant to our operating results.

Because we are a co-employer with the client for some purposes, it is possible that we could incur liability for violations of such laws, even if we are not responsible for the conduct giving rise to such liability. Our CSA ordinarily addresses this issue by providing that the client will indemnify us for liability incurred to the extent the liability is attributable to conduct by the client. Notwithstanding this contractual right to indemnification, it is possible that we could be unable to collect on a claim for indemnification and may therefore be ultimately responsible for satisfying the liability in question.

In most instances, clients are required to remit their comprehensive service fees no later than one day prior to the applicable payroll date by wire transfer or automated clearinghouse transaction. Although we are ultimately liable, as the employer for payroll purposes, to pay employees for work previously performed, we retain the ability to terminate immediately the CSA and associated WSEEs or to require prepayment, letters of credit, or other collateral upon deterioration in a client's financial condition or upon non-payment by a client. These rights, the periodic nature of payroll, and the overall quality of our client base have resulted in an excellent overall collections history.

### PEO HR Outsourcing Solutions Clients

Insperity's PEO HR Outsourcing solutions provide value-added, full-service human resources solutions we believe are most suitable to a specific segment of the small and medium-sized business community. We target successful businesses with approximately 10 to 5,000 employees that recognize the advantage in the strategic use of high-performance human resources practices. We have set a long-term goal to serve approximately 10% of the overall small and medium-sized business community in terms of WSEEs. We serve clients and WSEEs located throughout the United States.

By region, our revenue distribution for the year ended  December 31, 2019, was as follows:



**Percent of Total Revenues**

West 20.6%
Northeast 26.7%
Southeast 11.7%
Central 17.5%
Southwest 23.5%

Please read  Note 1 "Accounting Policies," to the Consolidated Financial Statements for additional information related to the change in revenues by region.

## BUSINESS

All prospective PEO HR Outsourcing solutions clients are evaluated on the basis of a comprehensive analysis of employer-related risks entailing many factors, including industry and operations, workplace safety and workers' compensation, unemployment history, operating stability, group medical information, human resources practices and other employer risks. As part of our client selection strategy, we strive to minimize offering our PEO HR Outsourcing solutions to businesses falling within certain specified NAICS (North American Industry Classification System) codes for those industries that we believe present a higher employer risk such as employee injury, high turnover or litigation.

Our PEO HR Outsourcing solutions client base is broadly distributed throughout a wide variety of industries as follows:



**Percent of Client Base by Industry**

This diverse client base lowers our exposure to downturns or volatility in any particular industry. However, our performance could be affected by a downturn in one of these industries or by general economic conditions within the small and medium-sized business community.

We focus heavily on client retention. During 2019 and 2018, our retention rate was approximately 85% and 86%, respectively. For all PEO HR Outsourcing solutions clients, the average annual retention rate over the last five years was approximately 85%. Client attrition is attributable to a variety of factors, including: (1) client non-renewal due to price or service factors; (2) client business failure, sale, merger or disposition; (3) our termination of the CSA resulting from the client's non-compliance or inability to make timely payments; and (4) competition from other PEOs or business services firms.

## BUSINESS

### Marketing and Sales

As of December 31, 2019, we had 75 sales offices located in 38 markets. Our sales offices typically consist of six to eight Business Performance Advisors ("BPAs"), a district sales manager, and an office administrator. To take advantage of economic efficiencies, multiple sales offices may share a physical location. Insperity's markets and their respective year of entry are as follows:

| Market | Sales Offices | Initial Entry Date | Market | Sales Offices | Initial Entry Date |
|---|---|---|---|---|---|
| Houston | 6 | 1986 | Raleigh | 1 | 2006 |
| San Antonio | 1 | 1989 | Kansas City | 1 | 2007 |
| Austin | 2 | 1989 | Columbus | 1 | 2010 |
| Orlando | 1 | 1989 | Nashville | 1 | 2011 |
| Dallas/Fort Worth | 5 | 1993 | Philadelphia | 2 | 2012 |
| Atlanta | 3 | 1994 | Seattle | 1 | 2015 |
| Phoenix | 1 | 1995 | Indianapolis | 1 | 2016 |
| Chicago | 5 | 1995 | Fort Lauderdale | 1 | 2017 |
| Washington D.C. | 2 | 1995 | Milwaukee | 1 | 2017 |
| Denver | 2 | 1996 | Oklahoma City | 1 | 2018 |
| Los Angeles | 6 | 1997 | Pittsburgh | 1 | 2018 |
| Charlotte | 1 | 1997 | San Jose | 1 | 2018 |
| St. Louis | 1 | 1998 | Stamford | 1 | 2018 |
| San Francisco | 3 | 1998 | Portland | 1 | 2019 |
| New York | 5 | 1999 | Tampa | 1 | 2019 |
| Baltimore | 2 | 2000 | Las Vegas | 1 | 2019 |
| Newark | 3 | 2000 | Sacramento | 1 | 2019 |
| San Diego | 2 | 2001 | Providence | 1 | 2019 |
| Boston | 3 | 2001 | | | |
| Minneapolis | 2 | 2002 | | | |

We identify markets using a systematic market evaluation and selection process. We continue to evaluate a broad range of factors in the selection process, using a market selection model that weighs various criteria that, based on our experience, we believe are reliable predictors of successful penetration. Among the factors we consider are:

- market size, in terms of small and medium-sized businesses engaged in selected industries that meet our risk profile

- market receptivity to PEO services, including the regulatory environment and relevant history with other PEO providers

- existing relationships within a given market, such as vendor or client relationships

- expansion cost issues, such as advertising and overhead costs

- direct cost issues that bear on our effectiveness in controlling and managing the cost of our services, such as workers' compensation and health insurance costs, unemployment risks, and various legal and other factors

- a comparison of the services we offer to alternatives available to small and medium-sized businesses in the relevant market, such as the cost to the target clients of procuring services directly or through other PEOs

- long-term strategy issues, such as the general perception of markets and our estimate of the long-term revenue growth potential of the market

# BUSINESS

We develop a mix of national and local advertising media and a placement strategy tailored to each individual market. After selecting a market and developing our marketing mix, but prior to entering the market, we engage in an organized media and public relations campaign to prepare the market for our entry and to begin the process of generating sales leads. We market our services through various business promotions and a broad range of media outlets, including the Internet, television, radio, newspapers, periodicals and direct mail. We employ public relations firms for most of our markets as well as advertising consultants to coordinate and implement our marketing campaigns. We have developed an inventory of television, radio and newsprint advertisements, which are utilized in this effort.

We routinely seek to develop new marketing approaches and campaigns to capitalize on changes in the competitive landscape for our human resources services and to more successfully reach our target market. We have an agreement with the Professional Golf Association Champions Tour to be the title sponsor of the annual Insperity Invitational™ presented by UnitedHealthcare® professional golf tournament held annually in The Woodlands, Texas (a suburb of Houston). In addition, we have an arrangement with Jim Nantz, a sports commentator, to serve as our national spokesperson. Our marketing campaigns use this event and the relationship with Mr. Nantz as a focal point of our brand marketing efforts.

Our organic growth model generates sales leads from five primary sources: direct sales efforts, advertising, third-party channel programs, referrals, marketing alliances, and the Internet. These leads result in initial presentations to prospective PEO HR Outsourcing solutions clients, and ultimately, prospective PEO HR Outsourcing solutions client business profiles. A prospective PEO HR Outsourcing solutions client's business profile reflects information gathered by the BPA about the prospect's employees, including base compensation, level of benefits coverage options, job classification, state of employment and workers' compensation classification. This information is used to generate a bid from our customized bid system, which applies Insperity's proprietary pricing model to the census data. Concurrent with this process, we evaluate prospective clients through the previously described comprehensive employer risk analysis. Upon completion of a favorable employer risk evaluation, the BPA presents the bid and attempts to complete the sale and enroll the prospect. Our selling process typically takes approximately 90 days for clients with less than 150 employees, and 180 days or longer for middle market clients. The process can be extended during economic downturns.

We have implemented cross-selling channels between our PEO HR Outsourcing solutions business and our other products and services. This cross-selling strategy focuses on using our PEO HR Outsourcing solutions to increase market penetration in each of our other products and services and using our other product and service offerings as a source of leads for our PEO HR Outsourcing solutions. The cross-selling channels attempt to reduce barriers to selling our products and services and allow us to tailor service packages to better meet the specific needs of the business.

## Competition

We provide a value-added, full-service human resources solution through our PEO HR Outsourcing solutions, which we believe is most suitable to a specific segment of the small and medium-sized business community. This full-service approach is exemplified by our commitment to provide a high level of service and technology personnel, which has produced a ratio of corporate staff to WSEEs (the "staff support ratio") that is higher than average for the PEO industry. Based on an analysis of the 2016 through 2018 annual NAPEO surveys of the PEO industry, we have successfully leveraged our full-service approach into significantly higher returns for Insperity on a per WSEE per month basis. During the three-year period from 2016 through 2018, our staff support ratio averaged 52% higher than the PEO industry average. During the same three-year period, our gross profit per WSEE and operating income per WSEE exceeded industry averages by 141% and 227%, respectively.

Competition in the PEO industry revolves primarily around quality of services, scope of services, choice and quality of benefits packages, reputation, and price. We believe reputation, national presence, regulatory expertise, financial resources, risk management, and information technology capabilities distinguish leading PEOs from the rest of the industry. We also believe we compete favorably in these areas; however, other PEOs may offer their PEO services at lower prices than we offer.

Due to the differing geographic regions and market segments in which most PEOs operate, and the relatively low level of market penetration by the industry, we consider our primary competition for our PEO HR Outsourcing solutions to be the traditional in-house provision of human resources services. The PEO industry is highly fragmented, and we believe Insperity is one of the largest PEO service providers in the United States. Our largest national competitors include the PEO divisions of large business services companies such as Automatic Data Processing, Inc. and Paychex, Inc., and other national PEOs, such as TriNet Group, Inc. In addition, we also face competition from: (1) fee-for-service providers such as payroll processors and human resources consultants; (2) human resources technology solution companies; and (3) large regional

**13**

## BUSINESS

PEOs in certain areas of the country. As Insperity and other large PEOs expand nationally, we expect that competition may intensify.

### Vendor Relationships

Insperity provides benefits to its WSEEs under arrangements with a variety of vendors. We consider our contracts with UnitedHealthcare ("United") and the Chubb Group of Insurance Companies ("Chubb") to be the most significant elements of our employee benefits package, as they would be the most difficult to replace.

We provide group health insurance coverage to our WSEEs through a national network of carriers including United, UnitedHealthcare of California, Kaiser Permanente, Blue Shield of California, HMSA BlueCross BlueShield of Hawaii and Tufts, all of which provide fully insured policies or service contracts. The health insurance contract with United provides approximately 87% of our health insurance coverage and expires on December 31, 2022, subject to cancellation by either party upon 180 days' notice. For a discussion of our contract with United, which is accounted for using a partially self-funded insurance accounting model, please read Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates—Benefits Costs."

Our workers' compensation coverage (the "Chubb Program") has been provided through an arrangement with Chubb (formerly ACE American Insurance Company) since 2007. The Chubb Program is a fully insured program whereby Chubb has the responsibility to pay all claims incurred under the policies regardless of whether we satisfy our responsibilities. For additional discussion of the Chubb Program, which includes terms shifting some of the financial responsibility for claims to us, please read Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates—Workers' Compensation Costs."

### Information Technology

Insperity utilizes a variety of information technology capabilities to provide its PEO HR Outsourcing solutions and business performance improvement services to its clients and WSEEs and for its own administrative and management information requirements.

Insperity's PEO HR Outsourcing solutions information systems, which include Insperity Premier, are a proprietary mix of applications that includes both internally developed software, licensed software applications and cloud-based services. These systems manage a wide range of transactions and information specific to our PEO HR Outsourcing solutions, to Insperity and to our clients and WSEEs, including:

- WSEE enrollment

- human resources management and employee administration

- benefits and defined contribution plan administration

- time and attendance collection and administration

- payroll processing

- client invoicing and collection

- management information and reporting

- sales bid calculations

Central to these systems are transaction processing capabilities that allow us to process a high volume of employee enrollment, employee administration, payroll, invoice and bid transactions that meet the specific needs of our clients and prospects. We administer our employee benefits through a proprietary application designed to process employee eligibility and enrollments, manage carrier relationships and maintain a variety of plan offerings. Our retirement services operations are conducted utilizing an industry-leading retirement plan administration application in a third-party hosted environment. Aspects of all of these components are delivered to our PEO HR Outsourcing solutions clients and WSEEs through Insperity Premier. We utilize commercially available software for other business functions such as finance and accounting, sales force activity management and customer relationship management.

## BUSINESS

Insperity has hosting facilities located at two separate leased facilities, located in Bryan, Texas and The Woodlands, Texas. These facilities host the majority of our business applications, telecommunications equipment, information security infrastructure and network equipment. Each hosting facility houses a mix of primary production applications, disaster recovery, replication and back-up applications, and pre-production environments, with the Bryan facility acting as our primary data center for all mission-critical applications. Both hosting facilities have the capacity to run all of our critical business applications and have sufficient capacity to handle all of our operations on a stand-alone basis, if required. We have an active Business Continuity Plan, which includes information technology capabilities and we utilize a variety of measures to ensure our Business Continuity Plan remains effective and available.

Our network infrastructure is designed to ensure appropriate connectivity exists among all of our facilities and employees and provides appropriate Internet connectivity to conduct business with our clients and WSEEs. The network infrastructure is provided through industry standard core network hardware and via high-speed network services provided by multiple vendors.

We have incorporated a variety of measures designed to maintain the security and privacy of the information managed through our systems and applications. These measures include industry standard technologies designed to protect, monitor and assess our data centers and network environment; best practice security policies and procedures; and a variety of measures designed to control access to sensitive and private information.

### Industry Regulations

The operations for our PEO HR Outsourcing solutions are affected by numerous federal and state laws relating to tax, insurance and employment matters. By entering into a co-employer relationship with our WSEEs, we assume certain obligations and responsibilities of an employer under these federal and state laws. Because many of these federal and state laws were enacted prior to the development of nontraditional employment relationships, such as PEOs, temporary employment and outsourcing arrangements, many of these laws do not specifically address the obligations and responsibilities of nontraditional employers. Currently, the federal government and 42 states have passed laws that recognize PEOs or require licensing, registration or certification requirements for PEOs, and several others are considering such regulation. The SBEA established a certification program and created a federal regulatory framework for the payment of wages to WSEEs and for the reporting and remittance of federal payroll taxes on those wages paid by CPEOs. Our PEO subsidiary, Insperity PEO Services, L.P., is a CPEO. Please read Item 1. "Business—PEO Industry" for further information.

As an employer, we are subject to federal statutes and regulations governing the employer/employee relationship. Subject to the issues discussed below, we believe that our operations are in compliance, in all material respects, with all applicable federal statutes and regulations.

### Employee Benefit Plans

We offer various employee benefits plans to eligible employees, including our WSEEs. These plans include:

- a group health plan, which includes medical, dental, vision and prescription drug coverage, as well as a work-life program

- a 401(k) retirement plan

- cafeteria plans under Code Section 125

- a health savings account program

- a welfare benefits plan, which includes life, disability, and accidental death and dismemberment coverage

- a health care flexible spending account plan

- an educational assistance program

- an adoption assistance program

- a commuter benefits program

## BUSINESS

Generally, employee benefit plans are subject to provisions of the Code, ERISA, and COBRA. The number and complex nature of federal and state regulations relating to employer-sponsored health plans has continued to increase over time. We believe that additional regulatory burdens placed on employers can increase the demand for our services because small and medium-sized businesses are especially challenged in their efforts to comply with governmental regulations due to limited resources and a lack of expertise. As a co-employer in the PEO relationship, we assume or share many of the employer-related responsibilities and assist our clients in complying with many employment-related governmental laws and regulations. Historically, we believe that we have successfully marketed the compliance component of our service offering and that our compliance-related services have increased the value proposition of our service offering.

*Employer Status*. In order to qualify for favorable tax treatment under the Code, employee benefit plans must be established and maintained by an employer for the exclusive benefit of its employees. Generally, an entity is an "employer" of individuals for federal employment tax purposes if an employment relationship exists between the entity and the individuals under the common law test of employment. In addition, the officers of a corporation are deemed to be employees of that corporation for federal employment tax purposes. The common law test of employment, as applied by the IRS, involves an examination of approximately 20 factors to ascertain whether an employment relationship exists between a worker and a purported employer. Generally, the test is applied to determine whether an individual is an independent contractor or an employee for federal employment tax purposes and not to determine whether each of two or more companies is a "co-employer." Substantial weight is typically given to the question of whether the purported employer has the right to direct and control the details of an individual's work. Among the factors that appear to have been considered more important by the IRS are:

- the employer's degree of behavioral control (the extent of instructions, training and the nature of the work)

- the financial control or the economic aspects of the relationship

- the intended relationship of the parties (whether employee benefits are provided, whether any contracts exist, whether services are ongoing or for a project, whether there are any penalties for discharge/termination, and the frequency of the business activity)

*ERISA Requirements*. Employee pension and welfare benefit plans are also governed by ERISA. ERISA defines "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan." ERISA defines the term "employee" as "any individual employed by an employer." The United States Supreme Court has held that the common law test of employment must be applied to determine whether an individual is an employee or an independent contractor under ERISA. A definitive judicial interpretation of "employer" in the context of a PEO or employee leasing arrangement has not been established.

If Insperity were found not to be an employer with respect to WSEEs for ERISA purposes, its plans would not comply with ERISA. Further, as a result of such finding, Insperity and its plans would not enjoy, with respect to WSEEs, the preemption of state laws provided by ERISA and could be subject to varying state laws and regulations as well as to claims based upon state common laws. Even if such a finding were made, we believe we would not be materially adversely affected because we would endeavor to make available similar benefits at comparable costs.

In addition to ERISA and the Code, issues related to the relationship between Insperity and its WSEEs may also arise under other federal laws, including other federal income tax laws.

*Patient Protection and Affordable Care Act.* The PPACA was signed into law on March 23, 2010. The PPACA was subsequently amended on March 30, 2010, by the Reconciliation Act. The PPACA and the Reconciliation Act (collectively the "Act") entail sweeping health care reforms with original staggered effective dates from 2010 through 2018, some of which were subsequently extended until as late as 2020. While the Act did not have a material adverse impact on our results of operations in 2019, the future impact of the following provisions or changes to the provisions, including any changes or a repeal that may be proposed by this Congressional session, is unknown at this time.

Beginning in 2014, the Act provided for the establishment of state insurance exchanges ("Exchanges") to make health insurance available to individuals and small employers (initially defined as 100 employees or less). States had the option of building a state-based exchange, entering into a state-federal partnership exchange or accepting the federally-facilitated exchange. States that accept the federally-facilitated exchange can transition to a state-based exchange at a later date. The Exchanges provide consumers with educational services and information on available options and offer a variety of health plans. Small business tax credits and subsidies are available to qualifying businesses and individuals who purchase health insurance through the Exchanges. As part of the Tax Cuts and Jobs Act enacted in December 2017, the requirements that

**16**

## BUSINESS

individuals maintain health insurance coverage or pay a penalty, which was known as the individual mandate, was effectively eliminated beginning in 2019. At this time, the Exchanges, tax credits, and subsidies have not had a material impact on our operations, but the impact of future changes to these provisions is unknown.

Additionally in 2014, the Act ushered in a number of insurance market reforms for the small group and individual markets. The reforms required guaranteed issue and renewability of coverage, eliminated certain underwriting practices by issuers, consolidated the number of risk pools in each state and restricted the permissible factors and variable ranges of those factors that can be considered in determining health insurance premiums. Transition relief permitted states to delay the effective date of some of these reforms. At this time, we are unable to determine whether the insurance market reforms will have an adverse impact on our business operations, our ability to attract and retain clients, or our ability to increase service fees to offset any increased costs.

The health insurance industry became subject to additional excise taxes in 2014, and reinsurance taxes were imposed on insurers and third-party administrators for the purpose of helping to offset the cost for insurance covering high-risk individuals. As the policyholder, all or a portion of these increased costs were passed on to us by our carriers. At this time, these taxes have not had a material impact on our operations, but the impact of future changes to these provisions is unknown.

Effective January 1, 2015, "pay or play" requirements applied to large employers with at least 50 full-time and full-time equivalent employees in the prior calendar year ("Applicable Large Employers" or "ALEs"). ALEs who fail to offer "minimum essential coverage" satisfying minimum value and affordability requirements may be subject to a penalty if a full-time employee obtains coverage from an Exchange and receives a subsidy or tax credit for such coverage. While clients are responsible for employer pay or play health care mandates under the CSA, the Insperity-sponsored group health plan qualifies as minimum essential coverage and is designed to satisfy the minimum value and affordability requirements. Clients are not required to use the affordability safe harbor utilized by us.

Information contained in the Congressional Record, which specifically references PEOs, indicates that any pay or play penalties should apply separately to clients of a PEO and not at the PEO level. However, the Act and subsequently issued IRS guidance do not expressly address the issue of whether the pay or play penalties apply only at the client level or whether the penalties can be applied at the PEO level. At this time, we are unable to determine if pay or play penalties may be assessed against a PEO for coverage provided to WSEEs under a PEO sponsored plan.

As part of the Tax Extenders Act passed in 2019, the rules imposing excise taxes commencing in 2022 on employers and insurers who offer excessive health benefits under so-called "Cadillac plans" have been repealed. At this time, we are unable to determine the effect that the repeal of these pending excise taxes will have on our business.

*401(k) Retirement Plans.* Our 401(k) Retirement Plan for WSEEs are operated pursuant to guidance provided by the IRS under Revenue Procedure 2002-21 and Revenue Procedure 2003-86, each of which provides guidance for the operation of defined contribution plans maintained by PEOs that benefit WSEEs. This guidance provides qualification standards for PEO plans that, if met, negate the inquiry of common law employer status for purposes of the exclusive benefit rule. All of Insperity's 401(k) Retirement Plans have received determination letters from the IRS confirming the qualified status of the plans.

### Employment Taxes

As a co-employer, Insperity assumes responsibility and liability for the payment of federal and state employment taxes with respect to wages and salaries paid to our WSEEs. There are essentially three types of federal employment tax obligations included in Subtitle C - Employment Taxes of the Code:

- withholding of income tax requirements governed by Code Section 3401, et seq.

- obligations under FICA, governed by Code Section 3101, et seq.

- obligations under FUTA, governed by Code Section 3301, et seq.

Under these Code sections, employers have the obligation to withhold and remit the employer portion and, where applicable, the employee portion of these taxes.

## BUSINESS

The SBEA provides that a CPEO shall be treated as the employer under Subtitle C – Employment Taxes of the Code, and shall be responsible for reporting federal employment taxes rather than the CPEO clients.

For any client CSA that is not a CPEO contract, Code Section 3401, which applies to federal income tax withholding requirements, contains an exception to the general common law test applied to determine whether an entity is an "employer" for purposes of federal income tax withholding. Code Section 3401(d)(1) states that if the person for whom services are rendered does not have control of the payment of wages, the "employer" for this purpose is the person having control of the payment of wages. The Treasury regulations issued under Code Section 3401(d)(1) state that a third party can be deemed to be the employer of workers under this section for income tax withholding purposes where the person for whom services are rendered does not have legal control of the payment of wages. While several courts have examined Code Section 3401(d)(1), its ultimate scope has not been delineated. Moreover, the IRS has to date relied extensively on the common law test of employment in determining liability for failure to comply with federal income tax withholding requirements.

Accordingly, while we believe that we can assume the withholding obligations for WSEEs, in the event we fail to meet these obligations, the client may be held ultimately liable for those obligations. While this interpretive issue has not to our knowledge discouraged clients from enrolling with Insperity, there can be no assurance that a definitive adverse resolution of this issue would not do so in the future. These interpretive uncertainties may also impact our ability to report employment taxes on our own account rather than the accounts of our clients.

### Unemployment Taxes

We record our state unemployment ("SUI") tax expense based on taxable wages and tax rates assigned by each state. State unemployment tax rates vary by state and are determined, in part, based on Insperity's prior years' compensation experience in each state. Certain rates are determined, in part, by each client's own compensation experience. In addition, states have the ability under law to increase unemployment tax rates, including retroactively, to cover deficiencies in the unemployment tax funds. Rate notices are typically provided by the states during, or prior to, the first quarter of each year; however, some notices are received later. Until we receive the final tax rate notices, we estimate our expected SUI rate in those particular states.

### State Regulation

While some states do not explicitly regulate PEOs,  42 states have adopted provisions for licensing, registration, certification or recognition of PEOs, and several others are considering such regulation. Such laws vary from state to state but generally provide for monitoring the fiscal responsibility of PEOs, and in some cases codify and clarify the co-employment relationship for unemployment, workers' compensation and other purposes under state law. We believe that we are in compliance with the material requirements in all 42 states that have such laws. Regardless of whether a state has licensing, registration or certification requirements for PEOs, we must comply with a number of other state and local regulations that could impact our operations.

### Corporate Office Employees

We had approximately 3,500 corporate employees as of  December 31, 2019. We believe our relations with our corporate employees are good. None of our corporate employees are covered by a collective bargaining agreement.

### Intellectual Property

Insperity currently has registered trademarks, copyrights and other intellectual property. We believe that our trademarks as a whole are of considerable importance to our business.

## RISK FACTORS

### Item 1A.  Risk Factors.

The statements in this section describe the known material risks to our business and should be considered carefully.

*Adverse economic conditions could negatively affect our industry, business, and results of operations.*

The small and medium-sized business market is sensitive to changes in economic activity levels as well as the credit markets. As a result, the demand for the outsourced HR services we provide clients could be adversely impacted by weak economic conditions or difficulty obtaining credit. Current and prospective clients may respond to such conditions by reducing employment levels, compensation levels, employee benefit levels and outsourced HR services. In addition, during periods of weak economic conditions, current clients may have difficulty meeting their financial obligations to us and may select alternative HR services at more competitive rates than we offer. Further, our growth is partially dependent on hiring of new employees by our existing clients, which growth may be restricted during periods of tight labor markets, such as the current period of historically low level of unemployment and resulting reduced hiring within our existing client base. Such developments could adversely impact our financial condition, results of operations and future growth rates.

*We assume liability for WSEE payroll, payroll taxes, and benefits costs and are responsible for their payment regardless of the amount billed to or paid by our clients.*

Under the CSA, we become a co-employer of WSEEs and assume the obligations to pay the salaries, wages and related benefits costs and payroll taxes of such WSEEs. We assume such obligations as a principal, not as an agent of the client. Our obligations include responsibility for:

- payment of the salaries and wages for work performed by WSEEs, regardless of whether the client timely pays us the associated service fee

- withholding and payment of federal and state payroll taxes with respect to wages and salaries reported by Insperity

- providing benefits to WSEEs even if our costs to provide such benefits exceed the fees the client pays us

If a client does not pay us, or if the costs of benefits we provide to WSEEs exceed the fees a client pays us, our ultimate liability for WSEE payroll and benefits costs could have a material adverse effect on our financial condition or results of operations.

*Increases in health insurance costs or our inability to secure replacement health insurance coverage on competitive terms could have a material adverse effect on our business, financial condition or results of operations.*

Maintaining health insurance plans that cover WSEEs is a significant part of our business. Our primary health insurance contract expires on December 31, 2022, subject to cancellation by either party upon 180 days' notice. In the event we are unable to secure replacement contracts on competitive terms, significant disruption to our business could occur.

Health insurance costs are in part determined by our plans' claims experience and comprise a significant portion of our direct costs. Our health insurance coverage is provided under policies or service contracts that are fully-insured. United is the carrier that insures the majority of our coverage. Although all of our carriers remain responsible to pay all covered claims, under our health insurance contract with United, we retain an obligation to United to fund the cost of the plan. The profitability of our PEO HR Outsourcing solutions is affected by the overall expenses associated with the cost of delivering our services, one of the largest of which is the cost of our health insurance. Our ability to accurately anticipate the expenses associated with the plans, including claims costs on a quarterly or annual basis, can impact our results of operations. If the plans experience an increase in the number or severity of claims, our associated health insurance costs could increase beyond anticipated levels, as we experienced in 2019. These costs are further impacted by a number of factors, including coverage options elected by employees, macro-economic changes, proposed and enacted regulatory changes and wide-spread health-related outbreaks. Contractual arrangements with our clients limit or delay our ability to reflect in our service fees any increases in the overall expense associated with the plans, which could substantially impair our financial condition or results of operations. Further, if the overall pricing of our services includes cost assumptions based on inaccurate forecasts of plan expenses, our profitability or our ability to attract and retain clients may be adversely impacted. As a result, if we do not accurately forecast the costs of our plans, our business, financial condition or results of operations may be materially adversely affected. For additional information related to our health insurance costs, please read Item 7.

## RISK FACTORS

"Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates—Benefits Costs."

### *Geographic market concentration makes our results of operations vulnerable to regional economic factors.*

Our New York, California and Texas markets accounted for approximately  10%, 16% and 21% (including 9% in Houston), respectively, of our WSEEs for the year ended December 31, 2019. Accordingly, while we have a goal of expanding in our current markets and into new markets, for the foreseeable future, a significant portion of our revenues may be subject to economic, statutory, and regulatory factors specific to New York, California and Texas.

### *Health care reform could affect our health insurance plan and could lead to a significant disruption in our business.*

The PPACA was signed into law on March 23, 2010. The PPACA was subsequently amended on March 30, 2010 by the Reconciliation Act. The Act entails sweeping health care reforms with original staggered effective dates from 2010 through 2018, some of which were subsequently extended out as far as 2022. Some provisions in the Act still require the issuance of additional guidance from the U.S. Department of Health and Human Services ("HHS") and the states.

Beginning in 2014, a number of key provisions of the Act took effect, including the Exchanges, insurance market reforms and the imposition of excise taxes on the health insurance industry and reinsurance taxes on insurers and third-party administrators. Additionally, the pay or play penalties on Applicable Large Employers were fully phased-in by 2016. As part of the Tax Cuts and Jobs Act enacted in December 2017, the requirements that individuals maintain health insurance coverage or pay a penalty, which was known as the individual mandate, was effectively eliminated beginning in 2019. In addition, supporters in various states are advocating for adoption of healthcare-related reforms at the state level. Collectively, these items have the potential to significantly change the insurance marketplace for small and medium sized businesses and how employers provide insurance to employees. In addition, as a co-employer in the PEO relationship, we assume or share many of the employer-related responsibilities and assist our clients in complying with many employment-related governmental regulations. Generally, the Act and subsequently issued guidance by the IRS and HHS have not addressed or in some instances are unclear as to their application in the PEO relationship or whether such provisions should be applied at the PEO or client level.

Although we do not believe that the Act has had a material adverse effect on our benefit plans, business model, or operations to date, the elimination of the penalty associated with the individual mandate and subsequent changes resulting from action that may be taken at the federal or state level, including repeal or repeal and replacement of the Act as has been advocated by Congressional leaders and the administration of President Trump, may impact our benefit plans, business model and future results of operations. In future periods, changes may result in increased costs to us and could affect our ability to attract and retain clients. Additionally, contractual arrangements and competitive market conditions may limit or delay our ability to increase service fees to offset any associated potential increased costs. For additional information related to the Act, please read Item 1. "Business—Industry Regulations—Patient Protection and Affordable Care Act." We are currently unable to determine whether potential future changes to the Act or other regulatory action, including at the state level, may adversely affect our business or market conditions.

### *Increases in workers' compensation costs or inability to secure replacement coverage on competitive terms could lead to a significant disruption to our business.*

Our workers' compensation coverage has been provided through an arrangement with Chubb (formerly ACE American Insurance Company) since 2007. Under our current arrangement with Chubb for claims incurred on or before September 30, 2019, we have a financial responsibility to Chubb for the first $1 million layer of claims per occurrence and for claims over $1 million, up to a maximum aggregate amount of $6 million per policy year for claims that exceed the first $1 million. Effective for claims incurred on or after October 1, 2019, our financial responsibility increased as we have financial responsibility to Chubb for the first $1.5 million layer of claims per occurrence and for claims over $1.5 million, up to a maximum aggregate amount of $6 million per policy year for claims that exceed $1.5 million. Chubb bears the financial responsibility for all claims in excess of these levels. The Chubb Program is a fully insured program whereby Chubb has the responsibility to pay all claims incurred under the policies regardless of whether we satisfy our responsibilities. For additional discussion of our policy with Chubb, please read Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates—Workers' Compensation Costs."

## RISK FACTORS

Workers' compensation costs are a significant portion of our direct costs. If we were to experience an unexpected large increase in the number or severity of claims, our workers' compensation costs could increase, which could have a material adverse effect on our results of operations or financial condition.

The current workers' compensation coverage with Chubb expires on September 30, 2020. In the event we are unable to secure replacement coverage on competitive terms, significant disruption to our business could occur.

### *Our ability to adjust and collect service fees for increases in unemployment tax rates may be limited.*

We record our SUI tax expense based on taxable wages and tax rates assigned by each state. SUI tax rates vary by state and are determined, in part, based on prior years' compensation experience in each state. Prior to the receipt of final tax rate notices, we estimate our expected SUI tax rate in those states for which tax rate notices have not yet been received for purposes of pricing. In a period of adverse economic conditions, state unemployment funds may experience a significant increase in the number of unemployment claims. Accordingly, SUI tax rates would likely increase substantially. Some states have the ability under law to increase SUI tax rates retroactively to cover deficiencies in the unemployment fund. In addition, FUTA may be retroactively increased in certain states in the event the state fails to timely repay federal unemployment loans.

Generally, our contractual agreements allow us to incorporate such statutory tax increases into our service fees upon the effective date of the rate change. However, our ability to fully adjust service fees in our billing systems and collect such increases over the remaining term of the clients' contracts could be limited, resulting in a potential tax increase not being fully recovered. As a result, such increases could have a material adverse effect on our financial condition or results of operations.

### *Many of our contracts for our PEO HR Outsourcing solutions may be canceled on short notice. Our inability to renew client contracts or attract new clients could materially and adversely affect our financial conditions or results of operations.*

Our standard CSA can generally be canceled by us or the client with 30 days' notice. Accordingly, the short-term nature of the CSA makes us vulnerable to potential cancellations by existing PEO HR Outsourcing Solution clients, which could materially and adversely affect our financial condition or results of operations. In addition, in the event we have a high proportion of terminating clients from our middle market client base (which are generally subject to CSAs with two-year terms), the financial impact of such an event could be significant due to the number of WSEEs involved and the longer time it takes to replace middle market clients. Also, our results of operations are dependent in part upon our ability to retain or replace our clients upon the termination or cancellation of the CSA. Our client attrition rate was approximately 15% in 2019. There can be no assurance that the number of contract cancellations will continue at these levels and such cancellations may increase in the future due to various factors, including economic conditions in the markets we operate. Clients electing to purchase our services or electing an alternative solution often do so at the beginning of the calendar year. As a result, we typically experience our largest concentration of new client additions and attrition in the first quarter of each year.

### *We may be subject to liabilities for client and employee actions.*

A number of legal issues remain unresolved with respect to the co-employment arrangement between a PEO and its WSEEs, including questions concerning the ultimate liability for violations of employment, payroll, discrimination, and workplace safety laws. Our CSA establishes the contractual division of responsibilities between Insperity and our clients for various personnel management matters, including compliance with and liability under various governmental regulations.

Because we act as a co-employer, we may be subject to liability for violations of various employment, payroll, discrimination, and workplace safety laws despite these contractual provisions, even if we do not participate in such violations. Although the CSA generally requires the client to indemnify us for certain liabilities attributable to the client's conduct, we may not be able to collect on such a contractual indemnification claim and thus may be responsible for satisfying such liabilities to the extent that such liabilities are not covered or insured against under our insurance policies. In addition, WSEEs may be deemed to be our agents, which may subject us to liability for the actions of such WSEEs.

### *Changes in federal, state and local regulation or our inability to obtain licenses under new regulatory frameworks could have a material adverse effect on our results of operations or financial condition.*

As a major employer, our operations are affected by numerous federal, state and local laws and regulations relating to labor, tax, benefit, insurance and employment matters. By entering into a co-employer relationship with employees assigned to

## RISK FACTORS

work at client locations, we assume certain obligations and responsibilities of an employer under these laws. However, many of these current laws (such as the Act, ERISA and federal and state employment tax laws) do not specifically address the obligations and responsibilities of non-traditional employers such as PEOs, and the definition of "employer" under these laws is not uniform despite the SBEA having provided clarification under federal employment tax laws for CPEOs. In addition, many of the states in which we operate have not addressed the PEO relationship for purposes of compliance with applicable state laws governing the employer/employee relationship or PEO health insurance plans. Any adverse application of, or adverse legislative/regulatory response to, new or existing federal or state laws to the PEO relationship with our WSEEs and client companies could have a material adverse effect on our results of operations or financial condition.

While some states do not explicitly regulate PEOs,  42 states have passed laws that have recognition, licensing, certification or registration requirements for PEOs and several other states are considering such regulation. Such laws vary from state to state, but generally provide for monitoring the fiscal responsibility of PEOs, and in some cases codify and clarify the co-employment relationship for unemployment, workers' compensation and other purposes under state law. In addition, the SBEA provides certain benefits for companies that qualify as a CPEO. While we generally support licensing regulation because it serves to validate the PEO relationship, we may not be able to satisfy licensing requirements or other applicable regulations for all states. In addition, there can be no assurance that we will be able to renew our licenses in all states or that we will be able to maintain our CPEO designation.

Certain state and federal regulators are more closely evaluating the existing regulatory framework governing money services businesses and money transmitters in their jurisdictions, particularly following the high-profile failures in 2019 of several national payroll companies. While we maintain that we are not a money services business or money transmitter, the adoption of new, or changes in interpretations of existing, state and federal money transmitter or money services business statutes, or disagreements by regulatory authorities with our interpretation of such statutes or regulations, could subject us to registration or licensing or result in limitations on our business activities until we are appropriately licensed, and such additional regulation and the actions of the regulatory authorities could have a material adverse effect on our results of operations or financial condition. These occurrences could also require changes to the manner in which we conduct some aspects of our business. In addition, should any state or federal regulators make a determination that we have operated as an unlicensed money services business or money transmitter, we could be subject to civil and criminal fines, penalties, costs, legal fees, reputational damage or other negative consequences, which could be material.

### *Competition and other developments in the HR services industry may impact our growth and/or profitability.*

The human resources services industry, including the PEO industry, is highly fragmented. Many PEOs have limited operations and fewer than 1,000 WSEEs, but there are several industry participants that are comparable to our size or larger. We also encounter competition from "fee for service" companies such as payroll processing firms, insurance companies, human resources consultants and human resources technology solutions as well as cloud-based self-service bundled human resources offerings. Our competitors include the PEO divisions of large business services companies, such as Automatic Data Processing, Inc. and Paychex, Inc., and other national PEOs such as TriNet Group, Inc. In many cases, these competitors offer a reduced service PEO offering at a lower price than our PEO HR Outsourcing solutions. We expect that as the PEO industry grows and its regulatory framework becomes better established, well organized competition with greater resources than we have may enter the PEO market, possibly including large "fee for service" companies currently providing a more limited range of services. In addition, competitors may be able to offer or develop new technology-based lower service models that may require us to make substantial investments in order to effectively compete.

We offer a lower priced reduced service level PEO offering referred to as Workforce Synchronization in response to certain middle market client needs and the evolving PEO marketplace. As of December 2019, approximately 15% of our WSEEs were co-employed by Workforce Synchronization clients. In the event we were to experience a significant increase in the number of clients using the Workforce Synchronization offering or increased pricing pressures in the PEO marketplace without corresponding reductions in operating costs, our operating margins may decline, which could have a material adverse impact on our financial condition or results of operations.

### *Evolving regulations, market trends and client expectations require us to constantly enhance and expand our service and technology offerings.*

The HR services industry is experiencing rapid technological advances to meet client expectations and expanding regulations. In order to effectively compete in this environment, we must identify and predict trends, and adapt our technology and service offerings accordingly. In addition, as a larger portion of our client base falls within the middle market

## RISK FACTORS

segment, we must also develop different technology and services to meet the more complex needs and demands of this key group. These efforts require us to devote substantial resources to develop new solutions, or to integrate third-party solutions, into our offerings. If we fail to respond successfully to these developments or we may make investments in enhancements that are not accepted by the market, then the demand for our solutions and services may diminish. Further, as new regulations are adopted, we must modify our systems to address these changes in the law, such as our recent efforts to transition our reporting and payroll tax processing methods for self-employed owners to those described in an Internal Revenue Service advice memorandum from the Office of Chief Counsel released in April 2019. In order to make these types of modifications, we may be required to reallocate resources, potentially resulting in delays to planned competitive improvements to our systems. In addition, if we do not successfully or timely deploy these types of modifications, we may be unable to comply with regulations, which could subject us to penalties, damage our reputation or result in decreased sales.

### *Disruptions of our information technology systems could damage our reputation and materially disrupt our business operations.*

Many of the HR services offerings we provide to clients are conducted through a technology infrastructure using both internally developed and purchased commercial software, a wide variety of hardware infrastructure technologies, and a multi-carrier wide area network. The processing of payroll, benefits and other transactions is dependent upon this complex infrastructure, some of which is provided by third-party vendors. We must manage all of these systems, including any upgrades or enhancements, to ensure that they continue to support our services. Any delays or failures caused by network outages, software or hardware failures, or other data processing disruptions, even for a brief period of time, could result in our inability to timely process transactions. If such failures cause us to not meet client service expectations or to breach our obligations to our clients, we may lose existing clients, have difficulty attracting new clients, incur regulatory penalties or liability to our clients, or suffer other financial losses, which may have a material adverse effect on our business and financial condition.

### *We could be subject to reduced revenues, increased costs, liability claims, or harm to our competitive position as a result of data theft, cyberattacks or other security vulnerabilities.*

In connection with our HR services offerings, we collect, use, transmit and store large amounts of personal and business information about our WSEEs and clients, including payroll information, personal and business financial data, social security numbers, bank account numbers, tax information and other sensitive personal and business information. Attacks on information technology systems continue to grow in frequency and sophistication, and we and our third-party vendors are targeted by unauthorized parties using malicious tactics, code and viruses. Hardware or applications we develop or procure from third-party vendors may contain defects in design or other problems that could unexpectedly compromise the confidentiality, integrity or availability of data or our systems. Because the techniques used to obtain unauthorized access and disable or sabotage systems change frequently and may be difficult to detect for long periods of time, we and our third-party vendors may be unable to anticipate these techniques or implement adequate preventive measures. As these threats continue to evolve, we may be required to invest significant additional resources to modify and enhance our information security and controls or to investigate and remediate any security vulnerabilities. While our technology infrastructure is designed to safeguard and protect personal and business information, we have limited ability to monitor the implementation of similar safeguards by our vendors and do not have the ability to monitor such implementation by our clients or WSEEs.

In addition, our services also involve the use and disclosure of personal and business information to us that could be used by a malicious party to commit identity theft or otherwise gain access to the data or funds of our clients or WSEEs. If any person, including any corporate employee, misappropriates or misuses such funds, documents or data, we may have liability for damages, and our reputation could be substantially harmed and we may have other liabilities that could have a material adverse effect on our business.

Any cyberattack, unauthorized intrusion, malicious software infiltration, network disruption, corruption of data, or theft of private or other sensitive information, or inadvertent acts by our own employees, could result in the disclosure or misuse of confidential or proprietary information, and could have a material adverse effect on our business operations or that of our clients, result in liability or regulatory sanction, or cause a loss of confidence in our ability to serve clients. We may not have adequate insurance coverage to compensate us for losses from a security incident. Accordingly, the impact of a data security incident could have a material adverse effect on our business, results of operations and financial condition.

## RISK FACTORS

*Failure to comply with privacy, data protection and cybersecurity laws and regulations could have a material adverse effect on our reputation, results of operations or financial condition, or have other adverse consequences.*

We are subject to various federal and state laws, rules and regulations relating to the collection, use, transmission and security and privacy of personal and business information. Most states and the District of Columbia have enacted notification rules that may require notification to regulators, clients or employees in the event of a privacy breach. In addition, new laws and regulations governing data privacy and the unauthorized disclosure of confidential information pose increasingly complex compliance challenges and potentially elevate our costs. It is possible that these federal and states laws may be interpreted and applied in a manner that is inconsistent with our data practices. If so, in addition to the possibility of fines, this could result in an order requiring that we change our data practices, which could have a material adverse effect on our business. Complying with these various laws could cause us to incur substantial costs or require us to change our business practices in a manner adverse to our business. For example, we incurred additional costs and reallocated internal resources in order to comply with the requirements of the California Consumer Privacy Act of 2018 (CCPA), which became effective on January 1, 2020, and we expect to incur additional costs and reallocate additional resources when the final regulations under the CCPA are released. Other states are currently contemplating additional privacy requirements. The future enactment of more restrictive laws, rules or regulations could have a material adverse impact on us through increased costs or restrictions on our businesses and noncompliance could result in regulatory penalties and significant liability. Additionally, any failure by us to comply with these laws and regulations, including as a result of a security or privacy breach, could result in significant penalties and liabilities for us.

*Our loss of insurance coverage or the failure of our insurance carriers could have a material adverse effect on us.*

As part of our PEO HR Outsourcing solutions, in addition to our health insurance carriers, we contract with other insurance carriers to provide workers' compensation insurance and employment practices liability insurance. In addition, we obtain insurance coverage for various commercial risks in our business such as property insurance, errors and omissions insurance, cyber liability insurance, general liability insurance, fiduciary liability insurance, automobile liability insurance, and directors' and officers' liability insurance. The failure of any insurance carrier, such as occurred in 2001 with respect to a previous workers' compensation insurance provider, providing such coverage could leave us exposed to uninsured risk and could have a material adverse effect on our business. In addition, in the event that our primary health carriers in any key market make material changes to their network of healthcare providers or facilities, such as the recent discontinuation of a prominent hospital network in Houston, Texas, by UnitedHealthcare in connection with their ongoing negotiations, then our ability to attract and retain clients in that market may be adversely affected, which could have a material adverse effect on our business and results of operations.

*The failure of third-party providers, such as financial institutions, data centers or cloud-service providers, could have a material adverse effect on us.*

In conjunction with providing services to clients, we rely on financial institutions to electronically transfer funds for the collection of our comprehensive service fee as well as the payment of wages and associated payroll tax withholdings. Failure by these financial institutions, for any reason, to deliver their services in a timely manner could result in material interruptions to our operations, impact client relations, and result in significant penalties or liabilities to us.

We lease hosting facilities for our data centers at two separate facilities, located in Bryan, Texas and The Woodlands, Texas, with the Bryan facility acting as our primary data center. These facilities host the majority of our business applications, telecommunications equipment, information security infrastructure and network equipment. If our data centers experience any interruptions or outages, and our business continuity plan fails, then our operations may be materially impacted, which could result in our failure to meet our obligations to our clients, WSEEs and tax authorities, and could damage our reputation, subject us to liability and have a material adverse effect on our business and financial condition.

In addition, some of our systems and services rely upon third-party technology, such as the human capital management system on which our Workforce Acceleration solution is based, the data analytics solution on which our Insperity People Analytics solution is based, and the payroll tax calculation tool that provides the rates used to calculate payroll taxes for our PEO HR Outsourcing solutions. Any failure by these service providers to deliver their services in a timely manner and in compliance with applicable laws could result in material interruptions to our operations, damage our reputation, and result in a loss of clients.

## RISK FACTORS

*A determination that a client is liable for employment taxes not paid by a PEO may discourage clients from contracting with us in the future.*

Under the CSA, we assume sole responsibility and liability for paying federal employment taxes imposed under the Code with respect to wages and salaries we pay our WSEEs. There are essentially three types of federal employment tax obligations:

- income tax withholding requirements

- FICA

- FUTA

Under the Code, employers have the obligation to withhold and remit the employer portion and, where applicable, the employee portion of these taxes. The SBEA clarifies that a CPEO is treated as the employer for purposes of federal payroll taxes on wages it pays to WSEEs. Most states impose similar employment tax obligations on the employer. While the CSA provides that we have sole legal responsibility for making these tax contributions, the applicable state taxing authority could conclude that such liability cannot be completely transferred to us. Accordingly, in the event that we fail to meet our tax withholding and payment obligations, the client may be held jointly and severally liable for those obligations. While this interpretive issue has not, to our knowledge, discouraged clients from enrolling with Insperity, a definitive adverse resolution of this issue may discourage clients from enrolling in the future.

*New and higher federal, state and local taxes could have a material adverse impact on our financial condition and results of operations.*

In times of economic slowdowns, states and municipalities in which we operate may experience reductions in tax revenues and corresponding budget deficits. In response to budget shortfalls, many states and municipalities have in the past and may in the future increase or enact new taxes on businesses operating within their tax jurisdiction, including business activity taxes and income taxes. In addition, federal, state and local taxing agencies may increase their audit activity in an effort to identify additional tax revenues. New tax assessments on our operations could result in increased costs. Our ability to adjust our service fees and incorporate additional tax assessments into our billing system could be limited. As a result, such higher taxes could have a material adverse impact on our financial condition or results of operations.

*Failure to integrate or realize the expected return on our acquisitions and investments could have a material adverse impact on our financial condition or results of operations.*

We have adopted a strategy to market and sell additional products and services within and outside of traditional PEO HR Outsourcing solutions. As part of this strategy, periodically we make strategic long-term decisions to invest in and/or acquire new companies, business units or assets. Acquiring new businesses involves a number of risks such as over-valuation of the acquired companies, entering markets or businesses in which we have no prior experience, integrating the technology, operations, and personnel, diversion of management's attention from other business concerns and litigation resulting from the activities of the acquired company. The occurrence of one or more of these events could result in the loss of existing or prospective clients or employees, not achieving anticipated revenues or profitability, or impairment of acquired assets. Such developments could have a material impact to our financial condition, results of operations and future growth rates. Based on market conditions or changes in operating plans, the fair value of our other acquired businesses or investments could decline, requiring us to record impairment charges for all or portions of the investments.

*Our business could be disrupted as a result of actions of certain stockholders.*

If any of our stockholders commence a proxy contest, advocate for change, make public statements critical of our performance or business, or engage in other similar activities, then our business could be adversely affected because we may have difficulty attracting and retaining clients due to perceived uncertainties as to our future direction and negative public statements about our business; responding to proxy contests and other similar actions by stockholders is likely to result in us incurring substantial additional costs and significantly divert the attention of management and our employees; and, if individuals are elected to our Board with a specific agenda, the execution of our strategic plan may be disrupted or a new strategic plan altogether may be implemented, which could have a material adverse impact on our business, financial condition or results of operations. Further, any of these matters or any such actions by stockholders may impact and result in volatility of the price of our common stock.

## OTHER INFORMATION

### Item 1B.  Unresolved Staff Comments.

None.

## PROPERTIES

### Item 2.  Properties.

We believe our current real estate and facilities are adequate for the purposes for which they are intended and provide for further expansion to accommodate our long-term growth and expansion goals. We believe that short-term leased facilities are readily available if needed to accommodate near-term needs if they arise. We will continue to evaluate the need for additional facilities based on the extent of our product and service offerings, the rate of client growth, the geographic distribution of our client base and our long-term service delivery requirements.

### Corporate Facilities

Our corporate headquarters is located in Kingwood, Texas, in a campus-style facility. This 33-acre company-owned office campus includes 430,000 square feet of office space and approximately 9 acres of undeveloped land for future expansion. Development and support operations are located in the Kingwood facility. In February 2019, we executed a contract to construct a 270,000 square foot office facility to be located on our corporate campus, which is expected to be completed in 2020.

We have hosting facilities, totaling approximately 2,000 square feet, located at two separate leased facilities. The hosting facilities house the majority of our business applications, telecommunications equipment and network equipment. The facilities, located in Bryan, Texas and The Woodlands, Texas, are under lease until 2024 and 2023, respectively.

### Service Centers

We currently have four regional service centers located in  Atlanta, Dallas, Houston and Los Angeles.

The Atlanta service center, which currently services approximately  34% of our WSEE base, is located in a  40,500 square foot facility under lease until 2023.

The Dallas service center, which currently services approximately  22% of our WSEE base, is located in a  42,500 square foot facility under lease until 2023. In addition to the service center operations, the facility also contains sales operations.

The Houston service center, which currently services approximately  23% of our WSEE base, is located on our corporate campus.

The Los Angeles service center, which currently services approximately  21% of our WSEE base, is located in a  39,000 square foot facility under lease until 2029.

### Sales and Service Offices

As of December 31, 2019, we had sales and service personnel in  63 facilities located in  38 sales markets throughout the United States. All of the facilities are leased and some are shared by multiple sales offices and/or client service personnel. As of December 31, 2019, we had  75 sales offices in these 38 markets. To take advantage of economic efficiencies, multiple sales offices may share a physical location. Each sales office is typically staffed by six to eight BPAs, a district sales manager and an office administrator. In addition, we have placed certain client service personnel in a majority of our sales markets to provide high-quality, localized service to our clients in those major markets. We expect to continue placing client service personnel in sales markets as a critical mass of clients is attained in each market.

## LEGAL PROCEEDINGS

### Item 3.  Legal Proceedings.

We are not a party to any material pending legal proceedings other than ordinary routine litigation incidental to our business that we believe would not have a material adverse effect on our financial condition or results of operations, except as discussed in Note 12 to the Consolidated Financial Statements, "Commitments and Contingencies," which is incorporated herein by reference.

## MINE SAFETY DISCLOSURES

### Item 4.  Mine Safety Disclosures.

Not applicable.

---

## EXECUTIVE OFFICERS

### Item S-K 401 (b).  Executive Officers of the Registrant.

The following table sets forth the names, ages (as of  February 4, 2020) and positions of Insperity's executive officers:

| Name | Age | Position |
| --- | --- | --- |
| Paul J. Sarvadi | 63 | Chairman of the Board and Chief Executive Officer |
| A. Steve Arizpe | 62 | President and Chief Operating Officer |
| Jay E. Mincks | 66 | Executive Vice President of Sales and Marketing |
| Douglas S. Sharp | 58 | Senior Vice President of Finance, Chief Financial Officer and Treasurer |
| Daniel D. Herink | 53 | Senior Vice President of Legal, General Counsel and Secretary |
| James D. Allison | 51 | Senior Vice President of Gross Profit Operations |

Paul J. Sarvadi has served as Chairman of the Board and Chief Executive Officer since August 2003. Mr. Sarvadi co-founded Insperity in 1986 and served as Vice President and Treasurer of Insperity from its inception in 1986 through April 1987, as Vice President from April 1987 through 1989 and as President and Chief Executive Officer from 1989 to August 2003. Prior to founding Insperity, Mr. Sarvadi started and operated several small businesses. Mr. Sarvadi has served as President of NAPEO and was a member of its Board of Directors for five years. Mr. Sarvadi was selected as the 2001 National Ernst & Young Entrepreneur Of The Year® for service industries. In 2004, he received the Conn Family Distinguished New Venture Leader Award from Mays Business School at Texas A&M University. In 2007, he was inducted into the Texas Business Hall of Fame.

A. Steve Arizpe was promoted to President and Chief Operating Officer in May 2019 from the position of Executive Vice President of Client Services and Chief Operating Officer, which he had held since August 2003. He joined Insperity in 1989 and has served in a variety of roles prior to those positions, including Houston Sales Manager, Regional Sales Manager and Vice President of Sales. Prior to joining Insperity, Mr. Arizpe served in sales and sales management roles for NCR Corporation and Clarke-American. He has also served as a director of the Texas Chapter of NAPEO. Mr. Arizpe graduated from Texas A&M University in 1979, earning his degree in Business Management.

Jay E. Mincks has served as Executive Vice President of Sales and Marketing since January 1999. Mr. Mincks served as Vice President of Sales and Marketing from February 1997 through January 1999. He joined Insperity in 1990 and has served in a variety of other roles, including Houston Sales Manager and Regional Sales Manager for the Western United States. Prior to joining Insperity, Mr. Mincks served in a variety of positions, including management positions, in the sales and sales training fields with various large companies. He holds a business degree from the University of Houston.

Douglas S. Sharp has served as Senior Vice President of Finance, Chief Financial Officer and Treasurer since May 2008. He served as Vice President of Finance, Chief Financial Officer and Treasurer from August 2003 until May 2008. Mr. Sharp joined Insperity in January 2000 as Vice President of Finance and Controller. From July 1994 until he joined Insperity, he served as Chief Financial Officer for Rimkus Consulting Group, Inc. Prior to that, he served as Controller for a small publicly held company; as Controller for a software company; and as an Audit Manager for Ernst & Young LLP. Mr. Sharp has served as a member of the Accounting Practices Committee of NAPEO. Mr. Sharp is also a certified public accountant.

Daniel D. Herink has served as Senior Vice President of Legal, General Counsel and Secretary since May 2008. Mr. Herink joined Insperity in 2000 as Assistant General Counsel and was promoted to Associate General Counsel in 2002. He was promoted and elected to Vice President of Legal, General Counsel and Secretary in May 2007. Mr. Herink previously served as an attorney at Rodriguez, Colvin & Chaney, L.L.P. and McGinnis, Lochridge & Kilgore, L.L.P. He earned his Bachelor of Science degree in business administration from the University of Nebraska and a Doctorate of Jurisprudence from The University of Texas School of Law, where he was a member of the Texas Law Review and The Order of the Coif. Mr. Herink is also a certified public accountant.

James D. Allison has served as Senior Vice President of Gross Profit Operations since May 2018. Mr. Allison   joined Insperity in 1997 and has held positions of increased responsibility, including Manager of Financial Reporting, Director of Accounting, Managing Director of Planning and Analysis, Managing Director of Finance, and Senior Vice President of Pricing and Cost Analysis. Mr. Allison has served on the Accounting Practices Committee of NAPEO and, prior to joining Insperity, he worked in the audit practice of Ernst & Young LLP. Mr. Allison earned his Bachelor of Business Administration and Master in Professional Accounting degrees from the University of Texas and is a certified public accountant.

**STOCK ACTIVITIES**

## PART II

### Item 5.  Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.

#### Common Stock

Our common stock is traded on the New York Stock Exchange under the symbol "NSP." As of  February 4, 2020, there were  465 holders of record of our common stock. This number does not include stockholders for whom shares were held in "nominee" or "street name."

#### Dividend Policy

The payment of dividends is made at the discretion of our Board and depends upon our operating results, financial condition, capital requirements, general business conditions and such other factors as our Board deems relevant.

#### Issuer Purchases of Equity Securities

The following table provides information about our purchases of Insperity common stock during the three months ended  December 31, 2019:

| Period | Total Number of Shares Purchased[1][2] | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Program[1] | Maximum Number of Shares that may yet be Purchased under the Program[1] |
|---|---|---|---|---|
| 10/01/2019 – 10/31/2019 | 24,000 | $      95.73 | 24,000 | 1,032,945 |
| 11/01/2019 – 11/30/2019 | 361,412 | 74.66 | 361,412 | 671,533 |
| 12/01/2019 – 12/31/2019 | 257,749 | 77.96 | 257,700 | 413,833 |
| Total | 643,161 | $      76.77 | 643,112 | |

[1]    Our Board has approved a program to repurchase shares of our outstanding common stock, including an additional 700,000 shares authorized for repurchase in August 2019. During the three months ended December 31, 2019, 643,112 shares were repurchased under the program. As of December 31, 2019, we were authorized to repurchase an additional 413,833 shares under the program. Unless terminated earlier by resolution of the Board, the repurchase program will expire when we have repurchased all the shares authorized for repurchase under the repurchase program.

[2]    During the three months ended December 31, 2019, 49 shares of restricted stock were withheld to satisfy tax-withholding obligations arising in conjunction with the vesting of restricted stock. The required withholding is calculated using the closing sales price reported by the New York Stock Exchange on the date prior to the applicable vesting date. These shares are not subject to the repurchase program described above.

**Insperity**                                                                                                    **2019 Form 10-K**

## STOCK ACTIVITIES

*Performance Graph*

The following graph compares our cumulative total stockholder return since December 31, 2014, with the S&P Smallcap 600 Index, the S&P Midcap 400 Index and the S&P 1500 Composite Human Resources and Employment Services Index. The graph assumes that the value of the investment in our common stock and each index (including reinvestment of dividends) was $100 on December 31, 2014.

**COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN\***
**Among Insperity, Inc., the S&P Smallcap 600 Index, the S&P Midcap 400 Index,**
**and S&P 1500 Composite Human Resource and Employment Services Index**



\*$100 invested on 12/31/14 in Insperity stock or in the specified index, including reinvestment of dividends.
Fiscal year ending December 31.

Copyright© 2019 Standard & Poor's, a division of S&P Global. All rights reserved.

|  | 12/14 | 12/15 | 12/16 | 12/17 | 12/18 | 12/19 |
|---|---|---|---|---|---|---|
| Insperity, Inc. | 100.00 | 144.62 | 216.28 | 360.36 | 591.74 | 551.78 |
| S&P Smallcap 600 | 100.00 | 98.03 | 124.06 | 140.48 | 128.56 | 157.85 |
| S&P Midcap 400 | 100.00 | 97.82 | 118.11 | 137.30 | 122.08 | 154.07 |
| S&P 1500 Composite Human Resource and Employment Services | 100.00 | 107.33 | 114.70 | 153.24 | 135.54 | 160.06 |

This graph shall not be deemed "filed" for purposes of Section 18 of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933 or the Exchange Act, regardless of any general incorporation language in such filing.

## SELECTED FINANCIAL DATA

### Item 6.  Selected Financial Data.

The selected consolidated financial data set forth below should be read in conjunction with the Consolidated Financial Statements and accompanying Notes and Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations."

| (in thousands, except per share and statistical data) | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2019** | **2018** | **2017** | **2016** | **2015** |
| **Income Statement Data:** | | | | | |
| Revenues[1] | $ 4,314,804 | $ 3,828,549 | $ 3,300,223 | $ 2,941,347 | $ 2,603,614 |
| Gross profit | 732,934 | 681,909 | 572,731 | 491,610 | 437,867 |
| Operating income | 186,633 | 179,036 | 129,941 | 106,306 | 65,699 [2] |
| Net income | 151,099 | 135,413 | 84,402 | 65,991 | 39,390 |
| Diluted EPS | 3.70 | 3.22 | 2.01 [3] | 1.54 [3] | 0.79 [3] |
| | | | | | |
| **Non-GAAP Financial Measures[4]:** | | | | | |
| Adjusted net income | $ 169,449 | $ 157,536 | $ 103,005 | $ 76,718 | $ 54,519 |
| Adjusted EPS | 4.15 | 3.75 | 2.45 [3] | 1.79 [3] | 1.10 [3] |
| Adjusted EBITDA | 250,006 | 239,601 | 177,681 | 141,183 | 110,014 |
| | | | | | |
| **Balance Sheet Data:** | | | | | |
| Working capital | $ 105,701 | $ 94,204 | $ 54,206 | $ 39,364 | $ 54,337 |
| Total assets | 1,394,996 | 1,191,816 | 1,063,695 | 907,174 | 784,912 |
| Total debt | 269,400 | 144,400 | 104,400 | 104,400 | — |
| Total stockholders' equity | 4,079 | 77,676 | 66,321 | 60,525 | 172,455 |
| Cash dividends per share | 1.20 | 0.80 | 1.58 [3][5] | 0.49 [3] | 0.43 [3] |
| | | | | | |
| **Average WSEEs paid** | 235,547 | 209,123 | 182,696 | 165,850 | 145,830 |
| | | | | | |
| **Statistical Data** (per WSEE per month): | | | | | |
| Revenues[6] | $ 1,527 | $ 1,526 | $ 1,505 | $ 1,478 | $ 1,488 |
| Gross profit | 259 | 272 | 261 | 247 | 250 |
| Operating income | 66 | 71 | 59 | 53 | 38 |
| Adjusted EBITDA[4] | 88 | 95 | 81 | 71 | 63 |

[1]    Revenues are comprised of gross billings less WSEE payroll costs as follows:

| (in thousands) | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2019** | **2018** | **2017** | **2016** | **2015** |
| Gross billings | $ 27,212,010 | $ 23,830,731 | $ 20,173,812 | $ 17,932,857 | $ 15,806,178 |
| Less: WSEE payroll cost | 22,897,206 | 20,002,182 | 16,873,589 | 14,991,510 | 13,202,564 |
| **Revenues** | $ 4,314,804 | $ 3,828,549 | $ 3,300,223 | $ 2,941,347 | $ 2,603,614 |

[2]    Includes non-cash impairment and other charges of $9.8 million and $1.3 million, respectively, partially offset by a reduction of $0.6 million in 2015.

[3]    Adjusted to reflect the two-for-one split of our common stock effected on December 18, 2017 as a stock dividend.

[4]    These are non-GAAP measures used by management to analyze Insperity's performance. Please read Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations—Non-GAAP Financial Measures" for a reconciliation of the non-GAAP financial measures to the most directly comparable financial measures calculated and presented in accordance with GAAP.

[5]    Includes a $1.00 per share special dividend paid in 2017.

## SELECTED FINANCIAL DATA

[6]    Revenues per WSEE per month are comprised of gross billings per WSEE per month less WSEE payroll costs per WSEE per month as follows:

| (per WSEE per month) | | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2019 | | 2018 | | 2017 | | 2016 | | 2015 |
| Gross billings | $ | 9,627 | $ | 9,496 | $ | 9,202 | $ | 9,011 | $ | 9,032 |
| Less: WSEE payroll cost | | 8,100 | | 7,970 | | 7,697 | | 7,533 | | 7,544 |
| **Revenues** | $ | **1,527** | $ | **1,526** | $ | **1,505** | $ | **1,478** | $ | **1,488** |

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

### Item 7.  Management's Discussion and Analysis of Financial Condition and Results of Operations.

You should read the following discussion in conjunction with our Consolidated Financial Statements and related Notes included elsewhere in this annual report. Historical results are not necessarily indicative of trends in operating results for any future period.

The statements contained in this annual report that are not historical facts are forward-looking statements that involve a number of risks and uncertainties. The actual results of the future events described in such forward-looking statements in this annual report could differ materially from those stated in such forward-looking statements. Among the factors that could cause actual results to differ materially are the risks and uncertainties discussed in Item 1A. Risk Factors and the uncertainties set forth from time to time in our other public reports and filings and public statements.

### Executive Summary

#### Overview

Our long-term strategy is to provide the best small and medium-sized businesses in the United States with our specialized human resources service offering and to leverage our buying power and expertise to provide additional valuable services to clients. Our most comprehensive HR services offerings are provided through our Workforce Optimization® and Workforce Synchronization™ solutions (together, our PEO HR Outsourcing solutions), which encompass a broad range of human resources functions, including payroll and employment administration, employee benefits, workers' compensation, government compliance, performance management and training and development services. Our overall operating results can be measured in terms of revenues, gross profit or adjusted EBITDA per WSEE per month. We often use the average number of WSEEs paid during a period as our unit of measurement in analyzing and discussing our results of operations.

In addition to our PEO HR Outsourcing solutions, we offer a comprehensive traditional payroll and human capital management solution, known as Workforce Acceleration™. We also offer a number of other business performance solutions, including Time and Attendance, Performance Management, Organizational Planning, Recruiting Services, Employment Screening, Expense Management Services, Retirement Services, and Insurance Services, many of which are offered as a cloud-based software solution. These other products or services are offered separately or with our other solutions.

#### 2019 Highlights

We ended 2019 averaging 243,715 paid WSEEs, which represents a 9.9% increase over fourth quarter 2018. We expect the average number of paid WSEEs per month to be between 238,000 and 240,200 in the first quarter 2020.

#### 2019 Compared to 2018

- Average number of WSEEs paid per month  increased 12.6% to 235,547, driving a 7.5% gross profit increase

- Net income and diluted earnings per share ("Diluted EPS") increased  11.6% and 14.9% to $151.1 million and $3.70, respectively

- Adjusted EBITDA  increased 4.3% to $250.0 million

- Adjusted net income increased  7.6% to $169.4 million

- Adjusted EPS  increased 10.7% to $4.15

- Approximately 25.7% and 24.6% of our average paid WSEEs were in our middle market sector for the years ended December 31,  2019 and 2018, respectively, which is generally defined as companies with 150 to 5,000 WSEEs.

- Our average gross profit per WSEE per month was  $259 in 2019 and $272 in 2018, due in part to an increase in the number of large individual healthcare claimants.

- Operating expenses increased 8.6% in 2019 to $546.3 million. On a per WSEE per month basis, operating expenses  decreased from $201 in 2018 to $193 in 2019.

---

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

- Adjusted operating expenses increased 10.7% in 2019 to $546.3 million. On a per WSEE per month basis, adjusted operating expenses decreased from $197 in 2018 to $193 in 2019.

- Our adjusted EBITDA per WSEE per month decreased 7.4% from $95 in 2018 to $88 in 2019.

- We ended 2019 with working capital of $105.7 million.

- During 2019, we paid $48.6 million in dividends, repurchased 2.1 million shares of our common stock at a cost of $203.0 million, paid $56.3 million on capital expenditures partially offset by borrowings of $125.0 million under our credit facility.

Please read "Non-GAAP Financial Measures" for a reconciliation of adjusted EBITDA, adjusted net income, adjusted EPS and adjusted operating expenses to their most directly comparable financial measures calculated and presented in accordance with GAAP.

### Revenues

We account for our revenues in accordance with Accounting Standards Update ("ASU") No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*. Our PEO HR Outsourcing solutions gross billings to clients include the payroll cost of each WSEE at the client location and a markup computed as a percentage of each WSEEs payroll cost. We invoice the gross billings concurrently with each periodic payroll of our WSEEs. Revenues, which exclude the payroll cost component of gross billings, and therefore, consist solely of the markup, are recognized ratably over the payroll period as WSEEs perform their service at the client worksite. This markup includes pricing components associated with our estimates of payroll taxes, benefits and workers' compensation costs, plus a separate component related to our HR services. We include revenues that have been recognized but not invoiced in unbilled accounts receivable on our Consolidated Balance Sheets.

Our revenues are primarily dependent on the number of clients enrolled, the resulting number of WSEEs paid each period and the number of WSEEs enrolled in our benefit plans. Because our total markup is computed as a percentage of payroll cost, certain revenues are also affected by the payroll cost of WSEEs, which may fluctuate based on the composition of the WSEE base, inflationary effects on wage levels and differences in the local economies of our markets.

### Direct Costs

The primary direct costs associated with revenue-generating activities for our PEO HR Outsourcing solutions are:

- employment-related taxes ("payroll taxes")

- costs of employee benefit plans

- workers' compensation costs

Payroll taxes consist of the employer's portion of Social Security and Medicare taxes under FICA, federal unemployment taxes and state unemployment taxes. Payroll taxes are generally paid as a percentage of payroll cost. The federal unemployment tax rates are defined by federal regulations. State unemployment tax rates are subject to claim histories and vary from state to state.

Employee benefits costs are comprised primarily of health insurance premiums and claims costs (including dental and pharmacy costs), but also include costs of other employee benefits such as life insurance, vision care, disability insurance, education assistance, adoption assistance, a flexible spending account program and a work-life program.

Workers' compensation costs include administrative and risk charges paid to the insurance carrier, and claims costs, which are driven primarily by the frequency and severity of claims.

### Gross Profit

Our gross profit per WSEE is primarily determined by our ability to accurately estimate and control direct costs and our ability to incorporate changes in these costs into the gross billings charged to PEO HR Outsourcing solutions clients, which are subject to pricing arrangements that are typically renewed annually. We use gross profit per WSEE per month as our principal measurement of relative performance at the gross profit level.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### *Operating Expenses*

- *Salaries, wages and payroll taxes* – Salaries, wages and payroll taxes ("Salaries") are primarily a function of the number of corporate employees, their associated average pay and any additional incentive compensation. Our corporate employees include client services, sales and marketing, benefits, legal, finance, information technology, administrative support personnel and those associated with our other products and services.

- *Stock-based compensation* – Our stock-based compensation relates to the recognition of non-cash compensation expense over the vesting period of restricted stock and long-term incentive plan awards.

- *Commissions* – Commissions expense consists primarily of amounts paid to sales managers and BPAs as well as channel referral fees. Commissions are based on new accounts sold and a percentage of revenue generated by such personnel.

- *Advertising* – Advertising expense primarily consists of media advertising and other business promotions in our current and anticipated sales markets, including the Insperity Invitational™ presented by UnitedHealthcare® sponsorship.

- *General and administrative expenses* –  Our general and administrative expenses primarily include:

  - rent expenses related to our service centers and sales offices

  - outside professional service fees related to legal, consulting, and accounting services

  - administrative costs, such as postage, printing, and supplies

  - employee travel and training expenses

  - technology expenses

  - facility repairs and maintenance costs

- *Depreciation and amortization* – Depreciation and amortization expense is primarily a function of our capital investments in corporate facilities, service centers, sales offices, software development and technology infrastructure.

- *Impairment charges and other* –  Impairment charges and other consist of non-cash expense associated with the decline in fair value of long-lived and intangible assets, including goodwill. Please read Note 1 "Accounting Policies," to the Consolidated Financial Statements for additional information.

### *Other Income (Expense)*

Other income (expense) includes interest charges incurred in connection with borrowings under our credit facility and interest income earned on our cash, cash equivalents, marketable securities, restricted cash and deposits. Please read "—Liquidity and Capital Resources" for additional information.

### *Income Taxes*

On December 22, 2017, the Tax Cuts and Jobs Act (the "2017 Tax Reform Act") was signed into law. The 2017 Tax Reform Act significantly changes U.S. corporate income tax laws by, among other things, reducing the U.S. corporate income tax rate from 35% to 21% beginning in 2018. As a result, we remeasured our deferred tax assets at the new lower corporate income tax rate and recorded a non-cash tax charge of $2.5 million in 2017. Our provision for income taxes typically differs from the U.S. statutory rate of 21%, due primarily to state income taxes, non-deductible expenses, vesting of equity awards and various tax credits. Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities used for financial reporting purposes and the amounts used for income tax purposes. Significant items resulting in deferred income taxes include prepaid assets, accruals for workers' compensation expenses, stock-based compensation, software development costs, accrued incentive compensation, operating lease assets and liabilities and depreciation. Changes in these items are reflected in our financial statements through a deferred income tax provision. Please read Note 7 to the Consolidated Financial statements, " Income Taxes," for additional information.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### Critical Accounting Policies and Estimates

The discussion and analysis of our financial condition and results of operations is based upon our Consolidated Financial Statements, which have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP"). The preparation of these financial statements requires our management to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities. On an ongoing basis, we evaluate these estimates, including those related to health and workers' compensation insurance claims experience, client bad debts, income taxes, property and equipment, goodwill and other intangibles, and contingent liabilities. We base these estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates.

We believe the following accounting policies are critical and/or require significant judgments and estimates used in the preparation of our Consolidated Financial Statements:

- *Benefits costs* – We provide group health insurance coverage to our WSEEs through a national network of carriers including United, UnitedHealthcare of California, Kaiser Permanente, Blue Shield of California, HMSA BlueCross BlueShield of Hawaii and Tufts, all of which provide fully insured policies or service contracts.

  The health insurance contract with United provides the majority of our health insurance coverage. As a result of certain contractual terms, we have accounted for this plan since its inception using a partially self-funded insurance accounting model. Accordingly, we record the costs of the United plan, including an estimate of the incurred claims, taxes and administrative fees (collectively the "Plan Costs"), as benefits expense in the Consolidated Statements of Operations. The estimated incurred claims are based upon: (1) the level of claims processed during the quarter; (2) estimated completion rates based upon recent claim development patterns under the plan; and (3) the number of participants in the plan, including both active and COBRA enrollees. Each reporting period, changes in the estimated ultimate costs resulting from claim trends, plan design and migration, participant demographics and other factors are incorporated into the benefits costs.

  Effective January 1, 2020, we entered into an arrangement whereby our financial responsibility is limited to the first $1 million of paid claims per claimant per year. Additionally, since the plan's inception, under the terms of the contract, United establishes cash funding rates 90 days in advance of the beginning of a reporting quarter. If the Plan Costs for a reporting quarter are greater than the premiums paid and owed to United, a deficit in the plan would be incurred and we would accrue a liability for the excess costs on our Consolidated Balance Sheets. On the other hand, if the Plan Costs for the reporting quarter are less than the premiums paid and owed to United, a surplus in the plan would be incurred and we would record an asset for the excess premiums in our Consolidated Balance Sheets. The terms of the arrangement with United require us to maintain an accumulated cash surplus in the plan of $9.0 million, which is reported as long-term prepaid insurance. As of December 31, 2019, Plan Costs were less than the net premiums paid and owed to United by $2.6 million. As this amount is less than the agreed-upon $9.0 million surplus maintenance level, the $6.4 million difference is included in accrued health insurance costs, a current liability, in our Consolidated Balance Sheets. In addition, the premiums owed to United at December 31, 2019, were $9.3 million, which is also included in accrued health insurance costs, a current liability, on our Consolidated Balance Sheets.

  We believe that recent claim development patterns are representative of incurred but not reported claims costs during the reporting period. The estimated completion rate and annual trend used to compute incurred but not reported claims involves a significant level of judgment. Accordingly, an increase (or decrease) in the completion rate or annual trend used to estimate the incurred claims would result in an increase (or decrease) in benefits costs and net income would decrease (or increase) accordingly.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following table illustrates the sensitivity of changes in the completion rate and annual trend on our estimate of total benefits costs of $1.9 billion in 2019:

| Change in Completion Rate and Annual Trend | Change in Benefits Costs (in thousands) | | Change in Net Income (in thousands) | |
|---|---|---|---|---|
| (2.5)% | $ | (24,133) | $ | 19,234 |
| (1.0)% | | (9,653) | | 7,694 |
| 1.0% | | 9,653 | | (7,694) |
| 2.5% | | 24,133 | | (19,234) |

- *Workers' compensation costs* – Since 2007, our workers' compensation coverage has been provided through an arrangement with Chubb. The Chubb Program is fully insured in that Chubb has the responsibility to pay all claims incurred under the policy regardless of whether we satisfy our responsibilities. Under the Chubb Program for claims incurred on or before September 30, 2019, we have financial responsibility to Chubb for the first $1 million layer of claims per occurrence and, for claims over $1 million, up to a maximum aggregate amount of $6 million per policy year for claims that exceed $1 million. Effective for claims incurred on or after October 1, 2019, we have financial responsibility to Chubb for the first $1.5 million layer of claims per occurrence and, for claims over $1.5 million, up to a maximum aggregate amount of $6 million per policy year for claims that exceed $1.5 million.

Because we bear the financial responsibility for claims up to the levels noted above, such claims, which are the primary component of our workers' compensation costs, are recorded in the period incurred. Workers' compensation insurance includes ongoing health care and indemnity coverage whereby claims are paid over numerous years following the date of injury. Accordingly, the accrual of related incurred costs in each reporting period includes estimates, which take into account the ongoing development of claims and therefore requires a significant level of judgment.

We utilize a third-party actuary to estimate our loss development rate, which is primarily based upon the nature of WSEEs' job responsibilities, the location of WSEEs, the historical frequency and severity of workers' compensation claims, and an estimate of future cost trends. Each reporting period, changes in the actuarial assumptions resulting from changes in actual claims experience and other trends are incorporated into our workers' compensation claims cost estimates. During the years ended December 31, 2019 and 2018, we reduced accrued workers' compensation costs by $31.7 million and $18.8 million, respectively, for changes in estimated losses related to prior reporting periods. Workers' compensation cost estimates are discounted to present value at a rate based upon the U.S. Treasury rates that correspond with the weighted average estimated claim payout period (the average discount rate was 1.9% in 2019 and 2.6% in 2018) and are accreted over the estimated claim payment period and included as a component of direct costs in our Consolidated Statements of Operations.

Our claim trends could be greater than or less than our prior estimates, in which case we would revise our claims estimates and record an adjustment to workers' compensation costs in the period such determination is made. If we were to experience any significant changes in actuarial assumptions, our loss development rates could increase (or decrease), which would result in an increase (or decrease) in workers' compensation costs and a resulting decrease (or increase) in net income reported in our Consolidated Statements of Operations.

The following table illustrates the sensitivity of changes in the loss development rate on our estimate of workers' compensation costs totaling $82.0 million in 2019:

| Change in Loss Development Rate | Change in Workers' Compensation Costs (in thousands) | | Change in Net Income (in thousands) | |
|---|---|---|---|---|
| (5.0)% | $ | (4,412) | $ | 3,517 |
| (2.5)% | | (2,206) | | 1,758 |
| 2.5% | | 2,206 | | (1,758) |
| 5.0% | | 4,412 | | (3,517) |

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

At the beginning of each policy period, the workers' compensation insurance carrier establishes monthly funding requirements comprised of premium costs and funds to be set aside for payment of future claims ("claim funds"). The level of claim funds is primarily based upon anticipated WSEE payroll levels and expected workers' compensation loss rates, as determined by the insurance carrier. Monies funded into the program for incurred claims expected to be paid within one year are recorded as restricted cash, a short-term asset, while the remainder of claim funds are included in deposits, a long-term asset in our Consolidated Balance Sheets. In 2019, we received $18.8 million for the return of excess claim funds related to the workers' compensation program, which decreased deposits. As of December 31, 2019, we had restricted cash of $49.3 million and deposits of $175.9 million. We have estimated and accrued $242.9 million in incurred workers' compensation claim costs as of December 31, 2019. Our estimate of incurred claim costs expected to be paid within one year are recorded as accrued workers' compensation costs and is included in short-term liabilities, while our estimate of incurred claim costs expected to be paid beyond one year is included in long-term liabilities in our Consolidated Balance Sheets.

• *Contingent liabilities* – We accrue and disclose contingent liabilities in our Consolidated Financial Statements in accordance with ASC 450-10, *Contingencies*. GAAP requires accrual of contingent liabilities that are considered probable to occur and that can be reasonably estimated. For contingent liabilities that are considered reasonably possible to occur, financial statement disclosure is required, including the range of possible loss if it can be reasonably determined. From time to time, we disclose in our financial statements issues that we believe are reasonably possible to occur, although we cannot determine the range of possible loss in all cases. As issues develop, we evaluate the probability of future loss and the potential range of such losses. If such evaluation were to determine that a loss was probable and the loss could be reasonably estimated, we would be required to accrue our estimated loss, which would reduce net income in the period that such determination was made.

• *Allowance for doubtful accounts* – We maintain an allowance for doubtful accounts for estimated losses resulting from the inability of our clients to pay their comprehensive service fees. We believe that the success of our business is heavily dependent on our ability to collect these comprehensive service fees for several reasons, including:

  • the fact that we are at risk for the payment of our direct costs and WSEE payroll costs regardless of whether our clients pay their comprehensive service fees

  • the large volume and dollar amount of transactions we process

  • the periodic and recurring nature of payroll, upon which the comprehensive service fees are based

To mitigate this risk, we have established very tight credit policies. We generally require our PEO HR Outsourcing solutions clients to pay their comprehensive service fees no later than one day prior to the applicable payroll date. In addition, we generally maintain the right to terminate the CSA and associated WSEEs or to require prepayment, letters of credit or other collateral if a client's financial position deteriorates or if the client does not pay the comprehensive service fee. As a result of these efforts, losses related to client nonpayment have historically been low as a percentage of revenues. However, if our clients' financial conditions were to deteriorate rapidly, resulting in nonpayment, our accounts receivable balances could grow and we could be required to provide for additional allowances, which would decrease net income in the period that such determination was made.

### New Accounting Pronouncements

We believe that we have implemented the accounting pronouncements with a material impact on our financial statements and do not believe there are any new or pending pronouncements that will materially impact our financial position or results of operations. Please read Note 1 "Accounting Policies," to the Consolidated Financial Statements for additional information.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### Results of Operations

The following table summarized our key financial and statistical information related to our results of operations:

| (in thousands, except per share and statistical data) | Year Ended December 31, 2019 | | Year Ended December 31, 2018 | | Year Ended December 31, 2017 | | % Change 2019 v 2018 | % Change 2018 v 2017 |
|---|---|---|---|---|---|---|---|---|
| **Financial data:** | | | | | | | | |
| Revenues[1] | $ | 4,314,804 | $ | 3,828,549 | $ | 3,300,223 | 12.7 % | 16.0 % |
| Gross profit | | 732,934 | | 681,909 | | 572,731 | 7.5 % | 19.1 % |
| Operating expenses | | 546,301 | | 502,873 | | 442,790 | 8.6 % | 13.6 % |
| Operating income | | 186,633 | | 179,036 | | 129,941 | 4.2 % | 37.8 % |
| Other income (expense) | | 3,010 | | 3,324 | | 200 | (9.4)% | — |
| Net income | | 151,099 | | 135,413 | | 84,402 | 11.6 % | 60.4 % |
| Diluted EPS | | 3.70 | | 3.22 | | 2.01 [2] | 14.9 % | 60.2 % |
| **Non-GAAP financial measures [3]:** | | | | | | | | |
| Adjusted net income | $ | 169,449 | $ | 157,536 | $ | 103,005 | 7.6 % | 52.9 % |
| Adjusted EBITDA | | 250,006 | | 239,601 | | 177,681 | 4.3 % | 34.8 % |
| Adjusted EPS | | 4.15 | | 3.75 | | 2.45 [2] | 10.7 % | 53.1 % |
| **Average WSEEs paid** | | 235,547 | | 209,123 | | 182,696 | 12.6 % | 14.5 % |
| **Statistical data** *(per WSEE per month)*: | | | | | | | | |
| Revenues[4] | $ | 1,527 | $ | 1,526 | $ | 1,505 | 0.1 % | 1.4 % |
| Gross profit | | 259 | | 272 | | 261 | (4.8)% | 4.2 % |
| Operating expenses | | 193 | | 201 | | 202 | (4.0)% | (0.5)% |
| Operating income | | 66 | | 71 | | 59 | (7.0)% | 20.3 % |
| Net income | | 53 | | 54 | | 38 | (1.9)% | 42.1 % |
| Adjusted EBITDA[3] | | 88 | | 95 | | 81 | (7.4)% | 17.3 % |

_____

[1]Revenues are comprised of gross billings less WSEE payroll costs as follows:

| (in thousands) | Year ended December 31, 2019 | | 2018 | | 2017 |
|---|---|---|---|---|---|
| Gross billings | $ | 27,212,010 | $ 23,830,731 | $ | 20,173,812 |
| Less: WSEE payroll cost | | 22,897,206 | 20,002,182 | | 16,873,589 |
| **Revenues** | $ | **4,314,804** | $ **3,828,549** | $ | **3,300,223** |

[2]   Adjusted to reflect the two-for-one split of our common stock effected on December 18, 2017 in the form of a stock dividend.

[3]   Please read "—Non-GAAP Financial Measures" for a reconciliation of the non-GAAP financial measures to their most directly comparable financial measures calculated and presented in accordance with GAAP.

[4]Revenues per WSEE per month are comprised of gross billings per WSEE per month less WSEE payroll costs per WSEE per month as follows:

| (per WSEE per month) | Year Ended December 31, 2019 | | 2018 | | 2017 |
|---|---|---|---|---|---|
| Gross billings | $ | 9,627 | $ 9,496 | $ | 9,202 |
| Less: WSEE payroll cost | | 8,100 | 7,970 | | 7,697 |
| **Revenues** | $ | **1,527** | $ **1,526** | $ | **1,505** |

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### *Key Operating Metrics*

We monitor certain key metrics to measure our performance, including:

- WSEEs

- Adjusted EBITDA

- Adjusted EPS

Our growth in the number of WSEEs paid is affected by three primary sources: new client sales, client retention and the net change in existing clients through WSEE new hires and terminations.

- During 2019, the number of WSEEs paid from new client sales decreased over 2018. In addition, the net change in existing clients and client retention also decreased compared to 2018.

- During 2018, the number of WSEEs paid from new client sales increased over 2017. In addition, the net change in existing clients and client retention improved compared to 2017.



### *Revenues*

### *2019 Compared to 2018*

Our revenues for 2019 were $4.3 billion, an increase of 12.7%, primarily due to the following:

- Average WSEEs paid increased 12.6%

- Revenues per WSEE per month increased 0.1%, or $1

### *2018 Compared to 2017*

Our revenues for 2018 were $3.8 billion, an increase of 16.0%, primarily due to the following:

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

- Average WSEEs paid increased 14.5%

- Revenues per WSEE per month increased 1.4%, or $21

We provide our PEO HR Outsourcing solutions to small and medium-sized businesses in strategically selected markets throughout the United States. PEO HR Outsourcing solutions revenue distribution by region follows:

**PEO HR Outsourcing Solutions Revenue by Region**
*(in thousands)*



The percentage of total PEO HR Outsourcing solutions revenues in our significant markets include the following:

**Significant Markets**



### Gross Profit

In determining the pricing of the markup component of our gross billings, we take into consideration our estimates of the costs directly associated with our WSEEs, including payroll taxes, benefits and workers' compensation costs, plus an acceptable gross profit margin. As a result, our gross profit per WSEE and our operating results are significantly impacted by our ability to accurately estimate, control and manage our direct costs relative to the revenues derived from the markup component of our gross billings.

Our gross billings charged to our PEO HR Outsourcing solutions clients are subject to pricing arrangements that are typically renewed annually. We use gross profit per WSEE per month as our principal measurement of relative performance at the gross profit level.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS



### *2019 Compared to 2018*

Our pricing objectives attempt to achieve a level of revenue per WSEE that matches or exceeds changes in primary direct costs and operating expenses. The net decrease in costs between 2019 and 2018 attributable to changes in cost estimates for benefits and workers' compensation totaled $9.3 million as discussed below. The primary direct cost components changed as follows:

*Benefits costs*

- The cost of group health insurance and related employee benefits increased $12 per WSEE per month, or 4.0%, on a per covered employee basis due primarily to an increase in the number of large individual healthcare claimants in 2019.

- The percentage of WSEEs covered under our health insurance plan was 66.5% in 2019 and 68.0% in 2018.

- Reported results include changes in estimated claims run-off related to prior periods and an increase in costs of $2.3 million, or $1 per WSEE per month, in 2019 compared to a decrease in costs of $1.3 million, or $1 per WSEE per month, in 2018.

Please read "—Critical Accounting Policies and Estimates—Benefits Costs" for a discussion of our accounting for health insurance costs.

*Workers' compensation costs*

Our continued discipline around our client selection, safety and claims management contributed to the reduction in our cost per WSEE and, as a result, has allowed for claims within our policy periods to be closed out at amounts below our original costs estimates.

- Workers' compensation costs decreased 4.7%, or $5 per WSEE per month, in 2019 compared to 2018.

- As a percentage of non-bonus payroll cost, workers' compensation costs in 2019 were 0.41% compared to 0.49% in 2018.

- As a result of closing out claims incurred in prior periods at lower than expected costs, we recorded a reduction in workers' compensation costs of $31.7 million, or 0.16% of non-bonus payroll costs, in 2019 compared to a reduction of $18.8 million, or 0.11% of non-bonus payroll costs, in 2018. The 2019 period costs include the impact of a 1.9%

---

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

discount rate used to accrue workers' compensation loss claims, compared to a 2.6% discount rate used in the 2018 period.

Please read "—Critical Accounting Policies and Estimates—Workers' Compensation Costs" for a discussion of our accounting for workers' compensation costs.

*Payroll tax costs*

- Payroll taxes increased 14.2%, or $8 per WSEE per month, due primarily to a 14.5% increase in payroll costs partially offset by lower unemployment tax rates in 2019.

- Payroll taxes as a percentage of payroll cost were 6.7% in both 2019 and 2018.

### 2018 Compared to 2017

The net decrease in costs between 2018 and 2017 due to changes in cost estimates for benefits and workers compensation totaled $5.0 million as discussed below. The primary direct cost components changed as follows:

*Benefits costs*

- The cost of group health insurance and related employee benefits increased $6 per WSEE per month, or 2.2%, on a per covered employee basis.

- The percentage of WSEEs covered under our health insurance plan was 68.0% in 2018 and 68.8% in 2017.

- Reported results include changes in estimated claims run-off related to prior periods and was a decrease in costs of $1.3 million, or $1 per WSEE per month, in 2018 compared to an increase in costs of $1.2 million, or $1 per WSEE per month, in 2017.

Please read "—Critical Accounting Policies and Estimates—Benefits Costs" for a discussion of our accounting for health insurance costs.

*Workers' compensation costs*

Our continued discipline around our client selection, safety and claims management contributed to the decrease in our cost per WSEE and, as a result, has allowed for claims within our policy periods to be closed out at amounts below our original costs estimates.

- Workers' compensation costs increased 6.2%, but decreased $3 on a per WSEE per month basis, in 2018 compared to 2017.

- As a percentage of non-bonus payroll cost, workers' compensation costs in 2018 were 0.49% compared to 0.54% in 2017.

- As a result of closing out claims incurred in prior periods at lower than expected costs, we recorded a reduction in workers' compensation costs of $18.8 million, or 0.11% of non-bonus payroll costs, in 2018 compared to a reduction of $16.3 million, or 0.11% of non-bonus payroll costs, in 2017. The 2018 period costs include the impact of a 2.6% discount rate used to accrue workers' compensation loss claims, compared to a 1.6% discount rate used in the 2017 period.

Please read "—Critical Accounting Policies and Estimates—Workers' Compensation Costs" for a discussion of our accounting for workers' compensation costs.

*Payroll tax costs*

- Payroll taxes increased 15.8%, or $6 per WSEE per month, due primarily to an 18.5% increase in payroll costs partially offset by lower unemployment tax rates in 2018.

- Payroll taxes as a percentage of payroll cost were 6.7% in 2018 compared to 6.9% in 2017.

---

**45**

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*Operating Expenses*

*2019 Compared to 2018*

The following table presents certain information related to our operating expenses:

| (in thousands, except per WSEE) | Year Ended December 31, | | | | | |
| | $ | | | WSEE | | |
| | 2019 | 2018 | % Change | 2019 | 2018 | % Change |
|---|---|---|---|---|---|---|
| Salaries | $ 317,124 | $ 301,027 | 5.3% | $ 112 | $ 120 | (6.7)% |
| Stock-based compensation | 23,993 | 20,425 | 17.5% | 8 | 8 | — |
| Commissions | 31,420 | 28,957 | 8.5% | 11 | 12 | (8.3)% |
| Advertising | 21,603 | 18,554 | 16.4% | 8 | 7 | 14.3 % |
| General and administrative | 123,438 | 111,068 | 11.1% | 44 | 45 | (2.2)% |
| Depreciation and amortization | 28,723 | 22,842 | 25.7% | 10 | 9 | 11.1 % |
| **Total operating expenses** | **$ 546,301** | **$ 502,873** | **8.6%** | **$ 193** | **$ 201** | **(4.0)%** |

Operating expenses for 2019 increased 8.6% to $546.3 million compared to $502.9 million in 2018. Operating expenses per WSEE per month for 2019 decreased 4.0% to $193 compared to $201 in 2018.

- Salaries of corporate and sales staff increased 5.3% to $317.1 million, but decreased $8 on a per WSEE per month basis, compared to 2018. The increase was primarily due to an 11.4% increase in headcount, including a 12.8% increase in total BPAs in 2019, partially offset by the non-recurrence of a $9.3 million one-time tax reform bonus paid in the first quarter of 2018 and lower incentive compensation expense during 2019.

- Stock-based compensation increased 17.5% to $24.0 million, but remained flat on a per WSEE per month basis, compared to 2018. This increase was primarily due to the acceleration of restricted stock awards and associated expense into the fourth quarter of 2017 that were originally scheduled to vest in the first quarter of 2018. Please read Note 1 "Accounting Policies" and Note 9 "Incentive Plans," to the Consolidated Financial Statements for additional information.

- Commissions expense increased 8.5% to $31.4 million, but decreased $1 on a per WSEE per month basis, compared to 2018. Commissions are primarily due to commissions associated with the growth in our PEO HR Outsourcing solutions, including an increase in the amount of sales channel referral fees paid during 2019.

- Advertising expense increased 16.4% to $21.6 million, or $1 per WSEE per month, compared to 2018. The increase was primarily due to an increase in advertising and business promotions.

- General and administrative expenses increased 11.1% to $123.4 million, but decreased $1 on a per WSEE per month basis, compared to 2018. The increase was primarily due to increased travel and training expenses associated with the increase in BPAs and technology licensing and maintenance costs.

- Depreciation and amortization expense increased 25.7% to $28.7 million, or $1 per WSEE per month, compared to 2018. The increase was primarily due to increased capital expenditures related to software development costs and sales office expansions.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### *2018 Compared to 2017*

The following table presents certain information related to our operating expenses:

| | | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|---|
| | | $ | | | WSEE | | |
| (in thousands, except per WSEE) | | 2018 | 2017 | % Change | 2018 | 2017 | % Change |
| Salaries | $ | 301,027 $ | 259,531 | 16.0 % $ | 120 $ | 118 | 1.7 % |
| Stock-based compensation | | 20,425 | 24,345 | (16.1)% | 8 | 11 | (27.3)% |
| Commissions | | 28,957 | 22,773 | 27.2 % | 12 | 10 | 20.0 % |
| Advertising | | 18,554 | 16,686 | 11.2 % | 7 | 8 | (12.5)% |
| General and administrative | | 111,068 | 101,273 | 9.7 % | 45 | 46 | (2.2)% |
| Depreciation and amortization | | 22,842 | 18,182 | 25.6 % | 9 | 9 | — |
| **Total operating expenses** | $ | **502,873** $ | **442,790** | **13.6 %** $ | **201** $ | **202** | **(0.5)%** |

Operating expenses for 2018 increased 13.6% to $502.9 million compared to $442.8 million in 2017. Operating expenses per WSEE per month for 2018 decreased 0.5% to $201 compared to $202 in 2017.

- Salaries of corporate and sales staff  increased 16.0% to $301.0 million, or $2 per WSEE per month, compared to  2017. The increase was primarily due to a $9.3 million charge related to a one-time tax reform bonus paid to corporate employees, a 10.7% increase in headcount, including a 16.2% increase in BPAs in 2018, and additional incentive compensation expense as a result of stronger operating results.

- Stock-based compensation decreased 16.1% to $20.4 million, or $3 per WSEE per month, compared to  2017. This decrease was primarily due to the acceleration of restricted stock awards and associated expense into the fourth quarter of 2017 that were originally scheduled to vest in the first quarter of 2018. Please read Note 1 "Accounting Policies" and Note 9 "Incentive Plans," to the Consolidated Financial Statements for additional information.

- Commissions expense increased 27.2% to $29.0 million, or $2 per WSEE per month, compared to  2017. Commissions are primarily due to commissions associated with the growth in our PEO HR Outsourcing solutions including an increase in the amount of sales channel referral fees paid in 2018.

- Advertising expense increased 11.2% to $18.6 million, but decreased $1 on a per WSEE per month basis, compared to  2017. The increase was due to additional spending on sponsorships, promotional items and billboard advertising.

- General and administrative expenses increased  9.7% to $111.1 million, but decreased  $1 on a per WSEE per month basis, compared to 2017. The increase was due to increased travel and training expenses associated with the increase in BPAs, professional services, technology costs, rent and office expenses, partially offset by the non-recurrence of charitable contributions made in 2017 related to Hurricane Harvey relief efforts.

- Depreciation and amortization expense  increased 25.6% to $22.8 million, but remained flat on a per WSEE per month basis, compared to 2017. The increase was primarily due to increased capital expenditures related to software development costs.

### *Other Income (Expense)*

Other income (expense), net was income of $3.0 million in 2019, $3.3 million in 2018 and $0.2 million in 2017. In 2019, higher interest income earnings on our investments was offset by higher interest expense on our outstanding debt. The 2018 increase in other income was primarily due to interest income earned on our investments. Please read Note 2 to the Consolidated Financial Statements, "Cash, Cash Equivalents and Marketable Securities," for additional information.

### *Income Tax Expense*

Our effective income tax rate was  20.3% in 2019, 25.7% in 2018 and 35.1% in 2017.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

During 2019, we incurred federal and state income tax expense of $38.5 million on pre-tax income of $189.6 million. Our provision for income taxes differed from the U.S. statutory rate of 21% primarily due to state income taxes and non-deductible expenses, offset by a $14.6 million tax benefit associated with equity compensation.

During 2018, we incurred federal and state income tax expense of $46.9 million on pre-tax income of $182.4 million. Our provision for income taxes differed from the U.S. statutory rate of 21% primarily due to state income taxes and non-deductible expenses, offset by a $3.9 million tax benefit associated with equity compensation.

During 2017, we incurred federal and state income tax expense of $45.7 million on pre-tax income of $130.1 million. Our provision for income taxes differed from the U.S. statutory rate of 35% primarily due to state income taxes and non-deductible expenses, including a non-cash tax charge of $2.5 million related to the enactment of the 2017 Tax Reform Act offset by $6.8 million of tax benefits associated with equity compensation.

Please read Note 1 "Accounting Policies" and Note 7 "Income Taxes," to the Consolidated Financial Statements for additional information.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### Non-GAAP Financial Measures

Non-GAAP financial measures are not prepared in accordance with GAAP and may be different from non-GAAP financial measures used by other companies. Non-GAAP financial measures should not be considered as a substitute for, or superior to, measures of financial performance prepared in accordance with GAAP. Investors are encouraged to review the reconciliation of the non-GAAP financial measures used to their most directly comparable GAAP financial measures as provided in the tables below.

| Non-GAAP Measure | Definition | Benefit of Non-GAAP Measure |
|---|---|---|
| Non-bonus payroll cost | Non-bonus payroll cost is a non-GAAP financial measure that excludes the impact of bonus payrolls paid to our WSEEs.<br><br>Bonus payroll cost varies from period to period, but has no direct impact to our ultimate workers' compensation costs under the current program. | Our management refers to non-bonus payroll cost in analyzing, reporting and forecasting our workers' compensation costs.<br><br>We include these non-GAAP financial measures because we believe they are useful to investors in allowing for greater transparency related to the costs incurred under our current workers' compensation program. |
| Adjusted cash, cash equivalents and marketable securities | Excludes funds associated with:<br>• federal and state income tax withholdings,<br>• employment taxes,<br>• other payroll deductions, and<br>• client prepayments. | |
| Adjusted operating expense | Represents operating expenses excluding the impact of the following:<br>• costs associated with a one-time tax reform bonus paid to corporate employees, and<br>• charitable donations to Hurricane Harvey relief efforts. | |
| EBITDA | Represents net income computed in accordance with GAAP, plus:<br>• interest expense,<br>• income tax expense, and<br>• depreciation and amortization expense. | We believe that the exclusion of the identified items helps us reflect the fundamentals of our underlying business model and analyze results against our expectations, against prior periods, and to plan for future periods by focusing on our underlying operations. We believe that the adjusted results provide relevant and useful information for investors because they allow investors to view performance in a manner similar to the method used by management and improves their ability to understand and assess our operating performance. Adjusted EBITDA is used by our lenders to assess our leverage and ability to make interest payments. |
| Adjusted EBITDA | Represents EBITDA plus:<br>• non-cash stock based compensation,<br>• costs associated with a one-time tax reform bonus paid to corporate employees, and<br>• charitable donations to Hurricane Harvey relief efforts. | |
| Adjusted net income | Represents net income computed in accordance with GAAP, excluding:<br>• non-cash stock based compensation,<br>• costs associated with a one-time tax reform bonus paid to corporate employees, and<br>• charitable donations to Hurricane Harvey relief efforts. | |
| Adjusted EPS | Represents diluted net income per share computed in accordance with GAAP, excluding:<br>• non-cash stock based compensation,<br>• costs associated with a one-time tax reform bonus paid to corporate employees, and<br>• charitable donations to Hurricane Harvey relief efforts. | |

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

Following is a reconciliation of payroll cost (GAAP) to non-bonus payroll costs (non-GAAP):

| | Year Ended December 31, | | | | | |
| | 2019 | | 2018 | | 2017 | |
| (in thousands, except per WSEE per month) | $ | WSEE | $ | WSEE | $ | WSEE |
|---|---|---|---|---|---|---|
| **Payroll cost** | $ 22,897,206 | $ 8,100 | $ 20,002,182 | $ 7,970 | $ 16,873,589 | $ 7,697 |
| Less: Bonus payroll cost | 2,880,680 | 1,019 | 2,498,875 | 996 | 1,959,053 | 894 |
| **Non-bonus payroll cost** | $ 20,016,526 | $ 7,081 | $ 17,503,307 | $ 6,974 | $ 14,914,536 | $ 6,803 |
| **% Change year over year** | 14.4% | 1.5% | 17.4% | 2.5% | 11.8% | 1.5% |

Following is a reconciliation of EBITDA (GAAP) and adjusted EBITDA (non-GAAP):

| | Year Ended December 31, | | | | | | | | | |
| | 2019 | | 2018 | | 2017 | | 2016 | | 2015 | |
| (in thousands, except per WSEE per month) | $ | WSEE | $ | WSEE | $ | WSEE | $ | WSEE | $ | WSEE |
|---|---|---|---|---|---|---|---|---|---|---|
| **Net income** | $ 151,099 | $ 53 | $ 135,413 | $ 54 | $ 84,402 | $ 38 | $ 65,991 | $ 33 | $ 39,390 | $ 23 |
| Income tax expense | 38,544 | 14 | 46,947 | 19 | 45,739 | 21 | 39,186 | 19 | 26,229 | 14 |
| Interest expense | 7,647 | 3 | 4,668 | 2 | 3,213 | 1 | 2,396 | 1 | 459 | — |
| Depreciation and amortization | 28,723 | 10 | 22,842 | 9 | 18,182 | 9 | 16,644 | 9 | 18,565 | 11 |
| **EBITDA** | 226,013 | 80 | 209,870 | 84 | 151,536 | 69 | 124,217 | 62 | 84,643 | 48 |
| Impairment charges and other | — | — | — | — | — | — | — | — | 10,480 | 6 |
| Stock-based compensation | 23,993 | 8 | 20,425 | 8 | 24,345 | 11 | 16,643 | 8 | 13,345 | 8 |
| One-time tax reform bonus | — | — | 9,306 | 3 | — | — | — | — | — | — |
| Charitable donations to Hurricane Harvey relief efforts | — | — | — | — | 2,000 | 1 | — | — | — | — |
| Other | — | — | — | — | (200) | — | — | — | — | — |
| Stockholder advisory expenses | — | — | — | — | — | — | 323 | 1 | 1,546 | 1 |
| **Adjusted EBITDA** | $ 250,006 | $ 88 | $ 239,601 | $ 95 | $ 177,681 | $ 81 | $ 141,183 | $ 71 | $ 110,014 | $ 63 |
| **% Change year over year** | 4.3% | (7.4)% | 34.8% | 17.3% | 25.9% | 14.1% | 28.3% | 12.7% | 30.8% | 16.7% |

Following is a reconciliation of cash, cash equivalents and marketable securities (GAAP) to adjusted cash, cash equivalents and marketable securities (non-GAAP) to adjusted cash, cash equivalents and marketable securities (non-GAAP):

| | December 31, | |
| (in thousands) | 2019 | 2018 |
|---|---|---|
| **Cash, cash equivalents and marketable securities** | $ 402,070 | $ 387,554 |
| Less: | | |
| Amounts payable for withheld federal and state income taxes, employment taxes and other payroll deductions | 234,553 | 224,487 |
| Client prepayments | 59,612 | 34,177 |
| **Adjusted cash, cash equivalents and marketable securities** | $ 107,905 | $ 128,890 |

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

Following is a reconciliation of operating expenses (GAAP) to adjusted operating expenses (non-GAAP):

| | Year Ended December 31, | | | | | | | |
| | 2019 | | 2018 | | 2017 | |
| (in thousands, except per WSEE per month) | $ | WSEE | $ | WSEE | $ | WSEE |
|---|---|---|---|---|---|---|
| **Operating expenses** | $ 546,301 | $ 193 | $ 502,873 | $ 201 | $ 442,790 | $ 202 |
| Less: | | | | | | |
| One-time tax reform bonus | — | — | 9,306 | 4 | — | — |
| Charitable donations to Hurricane Harvey relief efforts | — | — | — | — | 2,000 | 1 |
| **Adjusted operating expenses** | $ 546,301 | $ 193 | $ 493,567 | $ 197 | $ 440,790 | $ 201 |
| **% Change year over year** | 10.7% | (2.0)% | 12.0% | (2.0)% | 14.5% | 4.1% |

Following is a reconciliation of net income (GAAP) to adjusted net income (non-GAAP):

| | Year Ended December 31, | | | | |
| (in thousands) | 2019 | 2018 | 2017 | 2016 | 2015 |
|---|---|---|---|---|---|
| **Net income** | $ 151,099 | $ 135,413 | $ 84,402 | $ 65,991 | $ 39,390 |
| Non-GAAP adjustments: | | | | | |
| Impairment charges and other [1] | — | — | — | — | 10,480 |
| Stock-based compensation | 23,993 | 20,425 | 24,345 | 16,643 | 13,345 |
| One-time tax reform bonus | — | 9,306 | — | — | — |
| Charitable donations to Hurricane Harvey relief efforts | — | — | 2,000 | — | — |
| Other | — | — | (200) | — | — |
| Stockholder advisory expenses | — | — | — | 323 | 1,546 |
| **Total non-GAAP adjustments** | 23,993 | 29,731 | 26,145 | 16,966 | 25,371 |
| Tax effect of non-GAAP adjustments | (5,643) | (7,608) | (9,354) | (6,239) | (10,242) |
| Enactment of the 2017 Tax Reform Act | — | — | 2,481 | — | — |
| Disaster relief tax credit | — | — | (669) | — | — |
| **Adjusted net income** | $ 169,449 | $ 157,536 | $ 103,005 | $ 76,718 | $ 54,519 |
| **% Change year over year** | 7.6% | 52.9% | 34.3% | 40.7% | 48.4% |

_____

[1]   Includes impairment and other charges of $10.5 million related to the sale of two aircraft in 2015.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

Following is a reconciliation of diluted EPS (GAAP) to adjusted EPS (non-GAAP) [1]:

| (amounts per share) | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 |
| **Diluted EPS** | $ 3.70 | $ 3.22 | $ 2.01 | $ 1.54 | $ 0.79 |
| Non-GAAP adjustments: | | | | | |
| Impairment charges and other | — | — | — | — | 0.21 |
| Stock-based compensation | 0.59 | 0.49 | 0.58 | 0.39 | 0.27 |
| One-time tax reform bonus | — | 0.22 | — | — | — |
| Charitable donations to Hurricane Harvey relief efforts | — | — | 0.05 | — | — |
| Other | — | — | (0.01) | — | — |
| Stockholder advisory expenses | — | — | — | 0.01 | 0.03 |
| **Total non-GAAP adjustments** | **0.59** | **0.71** | **0.62** | **0.40** | **0.51** |
| Tax effect of non-GAAP adjustments | (0.14) | (0.18) | (0.22) | (0.15) | (0.20) |
| Enactment of the 2017 Tax Reform Act | — | — | 0.06 | — | — |
| Disaster relief tax credit | — | — | (0.02) | — | — |
| **Adjusted EPS** | $ **4.15** | $ **3.75** | $ **2.45** | $ **1.79** | $ **1.10** |
| **% Change year over year** | **10.7%** | **53.1%** | **36.9%** | **62.7%** | **52.8%** |

[1]    Per share amounts for the years 2017, 2016 and 2015 have been adjusted to reflect the two-for-one split of our common stock effected on December 18, 2017 as a stock dividend.

## Liquidity and Capital Resources

We periodically evaluate our liquidity requirements, capital needs and availability of resources in view of, among other things, our expansion plans, stock repurchases, potential acquisitions, debt service requirements and other operating cash needs. To meet short-term liquidity requirements, which are primarily the payment of direct costs and operating expenses, we rely primarily on cash from operations. Longer-term projects, large stock repurchases or significant acquisitions may be financed with debt or equity. We may seek to raise additional capital or take other steps to increase or manage our liquidity and capital resources. We had $402.1 million in cash, cash equivalents and marketable securities at December 31, 2019, of which approximately $234.6 million was payable in early January 2020 for withheld federal and state income taxes, employment taxes and other payroll deductions, and $59.6 million were client prepayments that were payable in January 2020. In 2019 and 2018, we received $18.8 million and $19.4 million, respectively, for the return of excess claim funds related to the workers' compensation program, which resulted in an increase in working capital. At December 31, 2019, we had working capital of $105.7 million compared to $94.2 million at December 31, 2018. The increase in working capital reflects, in part, cash flow from operations and borrowings under our facility, offset by share repurchases, dividends and capital expenditures. We currently believe that our cash on hand, marketable securities, cash flows from operations and availability under our credit facility will be adequate to meet our liquidity requirements for 2020. We intend to rely on these same sources, as well as public and private debt or equity financing, to meet our longer-term liquidity and capital needs.

We have a credit facility with a syndicate of financial institutions. During 2019, we borrowed $125.0 million under the credit facility, which was used for general corporate purposes. In September 2019, the credit facility was increased from $350 million to $500 million. The credit facility, which may be increased to $550 million based on the terms and subject to the conditions set forth in the agreement related to the facility, is available for working capital and general corporate purposes, including acquisitions. At December 31, 2019, we had outstanding letters of credit and borrowings totaling $270.4 million under the credit facility. Please read Note 6 to the Consolidated Financial Statements, "Long-Term Debt," for additional information.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### Cash Flows from Operating Activities

Our net cash flows from operating activities in 2019 were $205.2 million. Our primary source of cash from operations is the comprehensive service fee and payroll funding we collect from our PEO HR Outsourcing solutions clients. Cash and cash equivalents, and thus our reported cash flows from operating activities, are significantly impacted by various external and internal factors, which are reflected in part by the changes in our balance sheet accounts. These include the following:

- *Timing of client payments / payroll taxes* – We typically collect our comprehensive service fee, along with the client's payroll funding, from clients at least one day prior to the payment of WSEE payrolls and associated payroll taxes. Therefore, the last business day of a reporting period has a substantial impact on our reporting of operating cash flows. For example, many WSEEs are paid on Fridays and at month-end; therefore, operating cash flows decrease in the reporting periods that end on a Friday. In the year ended December 31, 2019, the last business day of the reporting period ended on a Tuesday, client prepayments were $59.6 million and amounts payable for withheld federal and state income taxes, employment taxes and other payroll deductions was $234.6 million. In the period ended December 31, 2018, which ended on a Monday, client prepayments were $34.2 million and amounts payable for withheld federal and state income taxes, employment taxes and other payroll deductions was $224.5 million.

- *Medical plan funding* – Our health care contract with United establishes participant cash funding rates 90 days in advance of the beginning of a reporting quarter. Therefore, changes in the participation level of the United plan have a direct impact on our operating cash flows. In addition, changes to the funding rates, which are determined solely by United based primarily upon recent claim history and anticipated cost trends, also have a significant impact on our operating cash flows. As of December 31, 2019, Plan Costs were less than the net premiums paid and owed to United by $2.6 million, which is $6.4 million less than our agreed-upon $9.0 million surplus maintenance level. The $6.4 million difference is therefore reflected as a current liability and $9.0 million is reflected as a long-term asset on our Consolidated Balance Sheets at December 31, 2019. In addition, the premiums owed to United at December 31, 2019, were $9.3 million, which is included in accrued health insurance costs, a current liability, on our Consolidated Balance Sheets.

- *Operating results* – Our net income has a significant impact on our operating cash flows. Our net income increased 11.6% to $151.1 million in 2019 from $135.4 million in 2018. Please read "Results of Operations."

### Cash Flows from Investing Activities

Our net cash flows used in investing activities were $29.7 million during 2019, primarily due to $56.3 million in property and equipment purchases offset by $26.6 million in redemptions of marketable securities, net of purchases.

### Cash Flows from Financing Activities

Our net cash flows used in financing activities were $118.4 million during 2019. We repurchased $203.0 million in stock and paid $48.6 million in dividends, offset by borrowings of $125.0 million under our Facility. Please read Note 6 to the Consolidated Financial Statements, "Long-Term Debt," for additional information.

# MANAGEMENT'S DISCUSSION AND ANALYSIS OF
# FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### Contractual Obligations and Commercial Commitments

The following table summarizes our contractual obligations and commercial commitments as of December 31, 2019, and the effect they are expected to have on our liquidity and capital resources:

| (in thousands) | Total | 2020 | 2021-2022 | 2023-2024 | Thereafter |
|---|---|---|---|---|---|
| Non-cancelable operating leases | $ 100,402 | $ 18,786 | $ 34,854 | $ 25,810 | $ 20,952 |
| Purchase obligations[1] | 109,951 | 79,562 [2] | 25,228 | 4,483 | 678 |
| Long-term debt | 269,400 | — | — | 269,400 | — |
| Other long-term liabilities: | | | | | |
| Accrued workers' compensation claim costs[3] | 242,904 | 49,295 | 56,078 | 41,814 | 95,717 |
| **Total contractual cash obligations** | **$ 722,657** | **$ 147,643** | **$ 116,160** | **$ 341,507** | **$ 117,347** |

[1]    The table includes purchase obligations associated with non-cancelable contracts individually greater than $100,000 and one year.

[2]    Includes $56.5 million related to the construction of a new facility on our corporate campus. For more information please read Item 2. "Properties—Corporate Facilities."

[3]    Accrued workers' compensation claim costs include the short and long-term amounts. For more information, please read, "—Critical Accounting Policies and Estimates—Workers' Compensation Costs."

### Seasonality, Inflation and Quarterly Fluctuations

Our quarterly earnings are impacted by the seasonal nature of our medical claims costs and payroll taxes. Typically, medical claims costs tend to increase throughout the year with the fourth quarter being the period with the highest costs, which has a negative impact on our fourth quarter earnings. This trend is primarily the result of many WSEEs' medical plan deductibles being fully met by the fourth quarter, which increases our liability with respect to those claims. We have also experienced variability on a quarterly basis in medical claims costs based on the unpredictable nature of large claims. Payroll taxes and associated billings are computed based on an employee's annual taxable wage base. The annual payroll tax wage bases are frequently met in the first two quarters of each year depending on the employee's compensation levels. As a result, the gross profit contribution from payroll taxes is typically higher in the first two quarters and declines in the latter half of each year. These historical trends may change and other seasonal trends may develop in the future. For further information related to our health insurance costs, please read "—Critical Accounting Policies and Estimates—Benefits Costs."

We believe the effects of inflation have not had a significant impact on our results of operations or financial condition.

**QUANTITIVE AND QUALITATIVE DISCLOSURES**

## Item 7A.  Quantitative and Qualitative Disclosures About Market Risk.

We are primarily exposed to market risks from fluctuations in interest rates and the effects of those fluctuations on the market values of our cash equivalent short-term investments and our available-for-sale marketable securities. In addition, borrowings under our credit facility bear interest at a variable market rate. As of December 31, 2019, we had outstanding letters of credit and borrowings totaling  $270.4 million under the credit facility. Please read Note 6 to the Consolidated Financial Statements, "Long-Term Debt," for additional information. Our cash equivalent short-term investments consist primarily of overnight investments, which are not significantly exposed to interest rate risk, except to the extent that changes in interest rates will ultimately affect the amount of interest income earned on these investments. Our available-for-sale marketable securities are subject to interest rate risk because these securities generally include a fixed interest rate. As a result, the market values of these securities are affected by changes in prevailing interest rates.

We attempt to limit our exposure to interest rate risk primarily through diversification and low investment turnover. Our investment policy is designed to maximize after-tax interest income while preserving our principal investment. As a result, our marketable securities consist of tax-exempt short and intermediate-term debt securities, which are primarily pre-refunded municipal bonds that are secured by escrow funds containing U.S. Government Securities.

## Item 8.  Financial Statements and Supplementary Data.

The information required by this Item 8 is contained in a separate section of this Annual Report. See "Index to Consolidated Financial Statements."

## DISCLOSURE CONTROLS AND PROCEDURES

### Item 9.  Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.

None.

### Item 9A.  Controls and Procedures.

#### *Evaluation of Disclosure Controls and Procedures*

In accordance with Exchange Act Rules 13a-15 and 15a-15, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of December 31, 2019.

#### *Design and Evaluation of Internal Control over Financial Reporting*

Pursuant to Section 404 of the Sarbanes-Oxley Act of 2002, we included a report of management's assessment of the design and effectiveness of our internal controls as part of this Annual Report on Form 10-K for the fiscal year ended December 31, 2019. Ernst & Young LLP, our independent registered public accounting firm, also audited our internal control over financial reporting. Management's report and the independent registered public accounting firm's audit report are included in our 2019 Consolidated Financial Statements under the captions entitled "Management's Report on Internal Control" and "Report of Independent Registered Public Accounting Firm," and are incorporated herein by reference.

There has been no change in our internal controls over financial reporting that occurred during the three months ended   December 31, 2019, that has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting.

### Item 9B.  Other Information.

On February 10, 2020, we entered into a letter agreement with United pursuant to which our financial responsibility to United under our existing Minimum Premium Financial Agreement is limited to the first $1 million of combined medical and pharmacy claims paid per claimant in 2020 and, at our option, in subsequent calendar years.

## MANAGEMENT AND CERTAIN SECURITY HOLDERS

### PART III

### Item 10.  Directors, Executive Officers and Corporate Governance.

Some of the information required by this item is incorporated by reference to the information set forth under the captions "Election of Directors" and "Delinquent Section 16(a) Reports" in our definitive Proxy Statement to be filed with the Securities and Exchange Commission pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this report (the "Insperity Proxy Statement").

#### *Code of Business Conduct and Ethics*

Our Board adopted our Code of Business Conduct and Ethics (the "Code of Ethics"), which meets the requirements of Rule 303A.10 of the New York Stock Exchange Listed Company Manual and Item 406 of Regulation S-K. You can access our Code of Ethics on the Corporate Governance page of our website at insperity.com. Changes in and waivers to the Code of Ethics for our directors, executive officers and certain senior financial officers will be posted on our Internet website within five business days and maintained for at least 12 months.

### Item 11.  Executive Compensation.

The information required by this item is incorporated by reference to the information set forth under the captions "Director Compensation" and "Executive Compensation" in the Insperity Proxy Statement.

### Item 12.  Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.

The information required by this item is incorporated by reference to the information set forth under the caption "Security Ownership of Certain Beneficial Owners and Management" in the Insperity Proxy Statement.

### Item 13.  Certain Relationships and Related Transactions, and Director Independence.

The information required by this item is incorporated by reference to the information set forth under the caption "Certain Relationships and Related Transactions" in the Insperity Proxy Statement.

### Item 14.  Principal Accounting Fees and Services.

The information required by this item is incorporated by reference to the information set forth under the caption "Ratification and Appointment of Independent Public Accountants – Fees of Ernst & Young LLP" and "—Finance, Risk Management and Audit Committee Pre-Approval Policy for Audit and Non-Audit Services" in the Insperity Proxy Statement.

## EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

## PART IV

### Item 15.  Exhibits, Financial Statement Schedules.

(a)    1.    Financial Statements of the Company

The Consolidated Financial Statements listed by the Registrant on the accompanying Index to Consolidated Financial Statements are filed as part of this Annual Report.

(a)    2.    Financial Statement Schedules

The required information is included in the Consolidated Financial Statements or Notes thereto.

(a)    3.    List of Exhibits

| Exhibit No. | | Exhibit |
|---|---|---|
| 3.1 | | Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on May 29, 2018). |
| 3.2 | | Amended and Restated Bylaws of Insperity, Inc. dated February 17, 2014 (incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on February 18, 2014). |
| 4.1 | | Specimen Common Stock Certificate (incorporated by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form S-1 (No. 33-96952)). |
| 4.2 | * | Description of Registrant's Common Stock. |
| 10.1 | † | Insperity, Inc. 2001 Incentive Plan, as amended and restated (incorporated by reference to Appendix A to the Registrant's definitive proxy statement on Schedule 14A filed on March 18, 2009 (No. 1-13998)). |
| 10.2 | † | Form of Director Stock Option Agreement (Annual Grant) (incorporated by reference to Exhibit 10.11 to the Registrant's Form 10-K for the year ended December 31, 2004). |
| 10.3 | † | Form of Restricted Stock Agreement (incorporated by reference to Exhibit 10.1 to the Registrant's Form 10-Q for the quarter ended September 30, 2012). |
| 10.4 | † | Form of Director Stock Option Agreement (incorporated by reference to Exhibit 10.2 to the Registrant's Form 10-Q for the quarter ended September 30, 2012). |
| 10.5 | † | Form of Director Restricted Stock Award Agreement (incorporated by reference to Exhibit 10.3 to the Registrant's Form 10-Q for the quarter ended September 30, 2012). |
| 10.6 | † | Form of Employee Restricted Stock Award Agreement (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed on February 22, 2013). |
| 10.7 | † | Form of New Hire Employee Restricted Stock Award Agreement (incorporated by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed on February 22, 2013). |
| 10.8 | † | Form of Named Executive Officer Restricted Stock Award Agreement (incorporated by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed on February 22, 2013). |
| 10.9 | † | Form of Director Restricted Stock Award Agreement (incorporated by reference to Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed on February 22, 2013). |
| 10.10 | † | Form of Employee Award Notice and Agreement (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed on April 2, 2015). |
| 10.11 | † | Form of Executive Officer Restricted Stock Award Agreement for awards granted on or after March 29, 2016 (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed on April 1, 2016). |
| 10.12 | † | Form of Employee Award Notice and Agreement under LTIP for awards granted on or after March 29, 2016 (incorporated by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed on April 1, 2016). |
| 10.13 | † | Form of Restricted Stock Award Agreement for awards granted to certain senior personnel on or after March 29, 2016 (incorporated by reference to Exhibit 10.5 to the Registrant's Form 10-Q for the quarter ended March 31, 2016). |
| 10.14 | † | Form of Restricted Stock Award Agreement for awards granted to other employees on or after March 29, 2016 (incorporated by reference to Exhibit 10.6 to the Registrant's Form 10-Q for the quarter ended March 31, 2016). |

## EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

| Exhibit No. | | Exhibit |
|---|---|---|
| 10.15 | † | Form of Restricted Stock Award Agreement for awards granted to executive officers on or after November 10, 2017 (incorporated by reference to Exhibit 10.1 to the Registrant's Form 10-Q for the quarter ended September 30, 2017). |
| 10.16 | † | Form of Restricted Stock Award Agreement for awards granted to certain senior personnel on or after November 10, 2017 (incorporated by reference to Exhibit 10.2 to the Registrant's Form 10-Q for the quarter ended September 30, 2017). |
| 10.17 | † | Form of Restricted Stock Award Agreement for awards granted to other employees on or after November 10, 2017 (incorporated by reference to Exhibit 10.3 to the Registrant's Form 10-Q for the quarter ended September 30, 2017). |
| 10.18 | *† | Form of Restricted Stock Unit Agreement for awards granted to executive officers on or after December 30, 2019. |
| 10.19 | *† | Form of Restricted Stock Unit Agreement for awards granted to certain senior personnel on or after December 30, 2019. |
| 10.20 | *† | Form of Restricted Stock Unit Agreement for awards granted to other employees on or after December 30, 2019. |
| 10.21 | † | Form of Employee Award Notice and Agreement under LTIP granted on or after November 10, 2017 (incorporated by reference to Exhibit 10.4 to the Registrant's Form 10-Q for the quarter ended September 30, 2017). |
| 10.22 | *† | Form of Employee Award Notice and Agreement under LTIP granted on or after December 30, 2019. |
| 10.23 | † | Directors Compensation Plan (incorporated by reference to Exhibit 10.4 to the Registrant's Form 10-Q for the quarter ended September 30, 2012). |
| 10.24 | † | Amendment to the Directors Compensation Plan (incorporated by reference to Exhibit 10.6 to the Registrant's Current Report on Form 8-K filed on February 22, 2013). |
| 10.25 | † | First Amendment and Appendix A to Directors Compensation Plan (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed on February 25, 2015). |
| 10.26 | † | Board of Directors Compensation Arrangements (incorporated by reference to the Registrant's Current Report on Form 8-K dated February 7, 2005). |
| 10.27 | † | Directors Compensation Plan (as amended and restated April 1, 2017) (incorporated by reference to Exhibit 10.2 to the Registrant's Form 10-Q for the quarter ended June 30, 2017). |
| 10.28 | | Insperity, Inc. 2008 Employee Stock Purchase Plan (incorporated by reference to Exhibit 10.1 to the Registrant's Registration Statement on Form S-8 (No. 333-151275)). |
| 10.29 | | Insperity, Inc. 2012 Incentive Plan (incorporated by reference to the Registrant's definitive proxy statement on Schedule 14A filed on March 29, 2012 (No. 1-13998)). |
| 10.30 | | First Amendment to the Insperity, Inc. 2012 Incentive Plan (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on February 22, 2013). |
| 10.31 | | Second Amendment to Insperity, Inc. 2012 Incentive Plan (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on February 25, 2015). |
| 10.32 | | Third Amendment to Insperity, Inc. 2012 Incentive Plan (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on April 1, 2016). |
| 10.33 | | Insperity, Inc. 2012 Incentive Plan, as amended and restated (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on June 21, 2017). |
| 10.34 | * | First Amendment to the Insperity Inc. 2012 Incentive Plan, as amended and restated. |
| 10.35 | | Insperity, Inc. Long-Term Incentive Program (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on April 2, 2015). |
| 10.36 | † | Insperity, Inc. Executive Severance Plan (incorporated by reference to Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed on January 3, 2020). |
| 10.37 | † | Form of Participant Agreement under the Insperity, Inc. Executive Severance Plan (incorporated by reference to Exhibit 99.2 to the Registrant's Current Report on Form 8-K filed on January 3, 2020). |
| 10.38 | (+) | Minimum Premium Financial Agreement, amended and restated effective January 1, 2005, by and between Insperity Holdings, Inc. (fka Administaff of Texas, Inc.) and United Healthcare Insurance Company (incorporated by reference to Exhibit 10.1 to the Registrant's Form 10-Q for the quarter ended June 30, 2005). |

## EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

| Exhibit No. | | Exhibit |
|---|---|---|
| 10.39 | (+) | Minimum Premium Administrative Services Agreement, amended and restated effective January 1, 2005, by and between Insperity Holdings, Inc. (fka Administaff of Texas, Inc.) and United Healthcare Insurance Company (incorporated by reference to Exhibit 10.2 to the Registrant's Form 10-Q for the quarter ended June 30, 2005). |
| 10.40 | (+) | Amendment to Minimum Premium Financial Agreement, as amended and restated effective January 1, 2005, by and between Insperity Holdings, Inc., and UnitedHealthcare Insurance Company (incorporated by reference to Exhibit 10.2 to the Registrant's Form 10-Q for the quarter ended June 30, 2007). |
| 10.41 | (+) | Amendment to Minimum Premium Administrative Services Agreement, as amended and restated effective January 1, 2005, by and between Insperity Holdings, Inc., and UnitedHealthcare Insurance Company (incorporated by reference to Exhibit 10.3 to the Registrant's Form 10-Q for the quarter ended June 30, 2007). |
| 10.42 | (+) | Amendment to Minimum Premium Financial Agreement, as amended effective January 1, 2009, by and between Insperity Holdings, Inc. (fka Administaff of Texas, Inc.) and United Healthcare Insurance Company (incorporated by reference to Exhibit 10.1 to the Registrant's Form 10-Q for the quarter ended March 31, 2013). |
| 10.43 | (+) | Amendment to Minimum Premium Financial Agreement, as amended effective January 1, 2013, by and between Insperity Holdings, Inc. and United Healthcare Insurance Company (incorporated by reference to Exhibit 10.2 to the Registrant's Form 10-Q for the quarter ended September 30, 2015). |
| 10.44 | (+) | Amendment to Minimum Premium Administrative Services Agreement, as amended effective January 1, 2008, by and between Insperity Holdings, Inc. (fka Administaff of Texas, Inc.) and UnitedHealthcare Insurance Company (incorporated by reference to Exhibit 10.2 to the Registrant's Form 10-Q for the quarter ended March 31, 2013). |
| 10.45 | (+) | Amendment to Minimum Premium Administrative Services Agreement, as amended effective January 1, 2013, by and between Insperity Holdings, Inc. and UnitedHealthcare Insurance Company, effective as of January 1, 2015 (incorporated by reference to Exhibit 10.3 to the Registrant's Form 10-Q for the quarter ended September 30, 2015). |
| 10.46 | (+) | Amendment to Minimum Premium Financial Agreement, as amended effective January 1, 2011, by and between Insperity Holdings, Inc. (fka Administaff of Texas, Inc.) and UnitedHealthcare Insurance Company, effective as of January 1, 2013 (incorporated by reference to Exhibit 10.2 to the Registrant's Form 10-Q for the quarter ended September 30, 2014). |
| 10.47 | (+) | Amendment to Minimum Premium Administrative Services Agreement, as amended effective January 1, 2011, by and between Insperity Holdings, Inc. (fka Administaff of Texas, Inc.) and UnitedHealthcare Insurance Company, effective as of January 1, 2013 (incorporated by reference to Exhibit 10.3 to the Registrant's Form 10-Q for the quarter ended September 30, 2014). |
| 10.48 | (+) | Amendment to the Minimum Premium Financial Agreement, as amended effective January 1, 2015, by and between Insperity Holdings, Inc. and UnitedHealthcare Insurance Company, effective as of January 1, 2016 (incorporated by reference to Exhibit 10.2 to the Registrant's Form 10-Q for the quarter ended June 30, 2016). |
| 10.49 | (+) | Amendment to the Minimum Premium Administrative Services Agreement, as amended effective January 1, 2015, by and between Insperity Holdings, Inc. and UnitedHealthcare Insurance Company, effective as of January 1, 2016 (incorporated by reference to Exhibit 10.3 to the Registrant's Form 10-Q for the quarter ended June 30, 2016). |
| 10.50 | (+) | Amendment to the Minimum Premium Financial Agreement, as amended effective January 1, 2016, by and between Insperity Holdings, Inc. and UnitedHealthcare Insurance Company, effective as of January 1, 2017 (incorporated by reference to Exhibit 10.39 to the Registrant's Form 10-K for the year ended December 31, 2016). |
| 10.51 | (+) | Letter of Agreement dated May 3, 2018 by and between Insperity Holdings, Inc. and UnitedHealthcare Insurance Company (incorporated by reference to Exhibit 10.1 to the Registrant's Form 10-Q for the quarter ended June 30, 2018). |
| 10.52 | (+) | Amendment to Minimum Premium Administrative Services Agreement (as previously amended effective January 1, 2016) by and between Insperity Holdings, Inc., and United Healthcare Insurance Company entered into as of January 1, 2019 (incorporated by reference to Exhibit 10.2 to the Registrant's Form 10-Q for the quarter ended March 31, 2019). |
| 10.53 | (+) | Amendment to Minimum Premium Financial Agreement (as previously amended effective January 1, 2017) by and between Insperity Holdings, Inc., and United Healthcare Insurance Company entered into as of January 1, 2019 (incorporated by reference to Exhibit 10.3 to the Registrant's Form 10-Q for the quarter ended March 31, 2019). |

## EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

| Exhibit No. | | Exhibit |
|---|---|---|
| 10.54 | | Amended and Restated Credit Agreement dated February 6, 2018 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on February 12, 2018). |
| 10.55 | | First Amendment to Amended and Restated Credit Agreement dated September 13, 2019 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on September 17, 2019). |
| 10.56 | | Standard Form of Agreement Between Owner and Contractor dated February 8, 2019 between Insperity Service, L.P. and David E. Harvey Builders, Inc. (incorporated by reference to Exhibit 10.1 to the Registrant's Form 10-Q for the quarter ended March 31, 2019). |
| 21.1 | * | Subsidiaries of Insperity, Inc. |
| 23.1 | * | Consent of Independent Registered Public Accounting Firm. |
| 24.1 | * | Powers of Attorney. |
| 31.1 | * | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | * | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | ** | Certification of Chief Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | ** | Certification of Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS | * | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | * | XBRL Taxonomy Schema Document. |
| 101.CAL | * | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF | * | XBRL Extension Definition Linkbase Document. |
| 101.LAB | * | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | | XBRL Taxonomy Extension Presentation Linkbase Document. |
| 104 | | Cover Page Interactive Data File (embedded with the Inline XBRL document). |

|   |   |
|---|---|
| * | Filed herewith. |
| ** | Furnished with this report. |
| † | Management contract or compensatory plan or arrangement required to be filed as an exhibit to this Form 10-K. |
| (+) | Certain portions of the exhibit have been omitted pursuant to an order granting confidential treatment or Rule 601(b)(10) of Regulation S-K. The omitted information is (i) not material and (ii) would likely cause competitive hard to the Company if publicly disclosed. |

## ITEM 16.  FORM 10-K SUMMARY.

None.

**61**

**SIGNATURES**

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Insperity, Inc. has duly caused this report to be signed in its behalf by the undersigned, thereunto duly authorized, on February 11, 2020.

INSPERITY, INC.

By: _____
        */s/ Douglas S. Sharp*
        Douglas S. Sharp
        Senior Vice President of Finance
        Chief Financial Officer and Treasurer

**62**

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons on behalf of Insperity, Inc. in the capacities indicated on February 11, 2020:

| Signature | Title |
|---|---|
| /s/ Paul J. Sarvadi<br>Paul J. Sarvadi | Chairman of the Board, Chief Executive Officer<br>and Director<br>(Principal Executive Officer) |
| /s/ Douglas S. Sharp<br>Douglas S. Sharp | Senior Vice President of Finance<br>Chief Financial Officer and Treasurer<br>(Principal Financial Officer) |
| *<br>Timothy Clifford | Director |
| *<br>Carol R. Kaufman | Director |
| *<br>John L. Lumelleau | Director |
| *<br>Ellen H. Masterson | Director |
| *<br>Randall Mehl | Director |
| *<br>John Morphy | Director |
| *<br>Latha Ramchand | Director |
| *<br>Richard G. Rawson | Director |
| *<br>Austin P. Young | Director |

*By: /s/ Daniel D. Herink
Daniel D. Herink, attorney-in-fact

---

## CONSOLIDATED FINANCIAL STATEMENTS

### INSPERITY, INC.

### INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Management's Report on Internal Control | F-5 |
| Report of Independent Registered Public Accounting Firm on Internal Control over Financial Reporting | F-6 |
| Consolidated Balance Sheets | F-7 |
| Consolidated Statements of Operations | F-8 |
| Consolidated Statements of Comprehensive Income | F-9 |
| Consolidated Statements of Stockholders' Equity | F-10 |
| Consolidated Statements of Cash Flows | F-11 |
| Notes to Consolidated Financial Statements | F-13 |

## CONSOLIDATED FINANCIAL STATEMENTS

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Stockholders and the Board of Directors of Insperity, Inc.

#### Opinion on the Financial Statements

We have audited the accompanying consolidated balance sheets of Insperity, Inc. (the Company) as of December 31,  2019 and 2018, and the related consolidated statements of operations, comprehensive income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2019, and the related notes (collectively referred to as the " consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated February 11, 2020 expressed an unqualified opinion thereon.

#### Adoption of ASU No. 2016-02

As discussed in Note 1 to the consolidated financial statements, effective January 1, 2019 the Company changed its method of accounting for leases due to the modified retrospective adoption of ASU No. 2016-02, *Leases (Topic 842).*

#### Basis for Opinion

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

#### Critical Audit Matters

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

## CONSOLIDATED FINANCIAL STATEMENTS

*Estimation of the Cost of Incurred Health Insurance Claims*

*Description of the Matter*

As discussed in Note 1 of the consolidated financial statements under "Health Insurance Costs", the Company provides the majority of its health insurance coverage to its worksite employees through a fully insured health insurance policy with UnitedHealthcare ("United"). While the policy with United is a fully-insured plan, as a result of certain contractual terms, the Company accounts for this plan using a partially self-funded insurance accounting model. Accordingly, the Company records the cost of the United plan, including an estimate of the incurred claims, taxes and administrative fees as benefits expense, which is a component of direct costs. The estimated incurred claims under the Company's United insurance policy are based upon: (i) the level of claims processed during each quarter; (ii) estimated completion rates based upon recent claim development patterns under the plan; and (iii) the number of participants in the plan, including both active and COBRA enrollees.

Auditing management's estimation of the cost of incurred health insurance claims was subjective and judgmental due to the significant estimation required in determining the medical and pharmacy completion rates. Estimating actual claims incurred is subjective due to the large number of plan participants and the possibility that the number, magnitude, nature, and the timing of processing of current period claims may not be comparable to historical results experienced by the Company.

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the estimation process, including, among others, controls over the completeness and accuracy of the data used to estimate the cost of incurred health insurance claims and the review and approval processes that management has in place for the assumptions applied and the calculation of the cost of incurred health insurance claims.

With the support of our actuarial specialists, we performed an independent assessment of the estimated cost of incurred health insurance claims. Our audit procedures included, among others, assessing (i) the Company's health insurance cost estimation methodologies, (ii) significant assumptions used to develop the medical and pharmacy completion rates, which includes the incurred but not reported component, (iii) the accuracy and completeness of the claims processed and the number of plan participants used in the Company's computation, as well as (iv) the historical accuracy of management's estimates of the cost of incurred health insurance claims. Our testing of the medical and pharmacy completion rate assumptions included comparing the completion rate assumptions used by management to the completion rates experienced in historical periods and assessing whether contrary evidence exists with respect to the completion rate assumptions utilized by the Company to estimate the cost of incurred health insurance claims. We compared the Company's estimate to a range developed by our actuarial specialists based on independently selected assumptions and historical data.

## CONSOLIDATED FINANCIAL STATEMENTS

*Estimation of the Cost of Incurred Workers' Compensation Claims and Related Liability*

*Description of the Matter*

As discussed in Note 1 of the consolidated financial statements under "Workers' Compensation Costs", the Company provides workers' compensation insurance, including ongoing health care and indemnity coverage, to its worksite employees whereby claims are paid over numerous years following the date of injury. Under the Company's insurance program, the Company has financial responsibility for a significant portion of the workers' compensation claims. Accordingly, the accrual related to incurred costs includes estimates that take into account the ongoing development of claims and therefore requires a significant level of judgment. The estimated accrued claims are based on (i) the loss development rate which is primarily based upon the nature of worksite employees' job responsibilities, the location of worksite employees, the historical frequency and severity of workers' compensation claims, (ii) an estimate of future cost trends, and (iii) discount rates which correspond to the weighted average estimated claim payout period.

Auditing management's estimation of the cost of incurred workers' compensation claims was subjective due to the significant estimation required in determining the loss development rate and future cost trends. These assumptions have a significant effect on the valuation of the liability.

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the estimation process, including, among others, controls over the completeness and accuracy of data used to estimate the cost of incurred workers' compensation claims and the review and approval processes that management has in place for the assumptions applied and the calculation of the cost of incurred workers' compensation claims.

With the support of our actuarial specialists, we performed an independent assessment of the estimated cost of workers' compensation claims incurred and the related liability. Our audit procedures included, among others, assessing (i) the Company's workers' compensation reserve methodologies, (ii) significant assumptions used to develop the loss development rate, as well as (iii) the historical accuracy of management's estimates of the cost of incurred workers' compensation claims. Our audit procedures included testing the completeness and accuracy of the underlying claims and payroll data provided to management's third-party actuaries and reviewing the Company's insurance contracts to assess the Company's self-insured retentions, deductibles, and coverage limits. Furthermore, we involved our actuarial specialists to assist in our evaluation of the methodologies utilized by management's third-party actuaries in developing the reserves recorded by the Company. We compared the Company's reserved amount to a range developed by our actuarial specialists based on historical loss data and independently selected assumptions.

*/s/ Ernst & Young LLP*

We have served as the Company's auditor since 1991.

Houston, Texas

February 11, 2020

**CONSOLIDATED FINANCIAL STATEMENTS**

### MANAGEMENT'S REPORT ON INTERNAL CONTROL

The Company has assessed the effectiveness of its internal control over financial reporting as of   December 31, 2019, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") (2013 framework). The Company's management is responsible for establishing and maintaining adequate internal controls over financial reporting. The effectiveness of the Company's internal control over financial reporting as of December 31, 2019 has been audited by the Company's independent registered public accounting firm, as stated in their report that is included herein.

Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Internal control over financial reporting includes those policies and procedures that: (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements. Because of the inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

The Company's assessment of the effectiveness of its internal control over financial reporting included testing and evaluating the design and operating effectiveness of its internal controls. In management's opinion, the Company has maintained effective internal control over financial reporting as of December 31, 2019, based on criteria established in the COSO 2013 framework .

| | |
|---|---|
| */s/ Paul J. Sarvadi* | */s/ Douglas S. Sharp* |
| Paul J. Sarvadi | Douglas S. Sharp |
| Chairman of the Board and | Senior Vice President of Finance |
| Chief Executive Officer | Chief Financial Officer and Treasurer |

**CONSOLIDATED FINANCIAL STATEMENTS**

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Stockholders and the Board of Directors of Insperity, Inc.

#### Opinion on Internal Control over Financial Reporting

We have audited Insperity, Inc.'s internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Insperity, Inc. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of Insperity, Inc. as of December 31, 2019 and 2018, the related consolidated statements of operations, comprehensive income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2019, and the related notes and our report dated February 11, 2020 expressed an unqualified opinion thereon.

#### Basis for Opinion

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

#### Definition and Limitations of Internal Control Over Financial Reporting

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Houston, Texas
February 11, 2020

**CONSOLIDATED FINANCIAL STATEMENTS**

## INSPERITY, INC. — CONSOLIDATED BALANCE SHEETS

| (in thousands, except per share amounts) | | December 31, 2019 | December 31, 2018 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | $ | 367,342 $ | 326,773 |
| Restricted cash | | 49,295 | 42,227 |
| Marketable securities | | 34,728 | 60,781 |
| Accounts receivable, net | | 465,779 | 400,623 |
| Prepaid insurance | | 10,418 | 8,411 |
| Other current assets | | 43,493 | 27,721 |
| Income taxes receivable | | 3,691 | — |
| **Total current assets** | | **974,746** | **866,536** |
| Property and equipment, net | | 147,706 | 117,213 |
| Right-of-use leased assets | | 56,886 | — |
| Deposits and prepaid health insurance | | 193,013 | 181,674 |
| Goodwill and other intangible assets, net | | 12,714 | 12,726 |
| Deferred income taxes, net | | 3,956 | 8,816 |
| Other assets | | 5,975 | 4,851 |
| **Total assets** | $ | **1,394,996** $ | **1,191,816** |
| | | | |
| **Liabilities and stockholders' equity** | | | |
| Accounts payable | $ | 4,565 $ | 10,622 |
| Payroll taxes and other payroll deductions payable | | 277,248 | 261,166 |
| Accrued worksite employee payroll cost | | 401,859 | 329,979 |
| Accrued health insurance costs | | 21,180 | 35,153 |
| Accrued workers' compensation costs | | 52,868 | 45,818 |
| Accrued corporate payroll and commissions | | 52,612 | 60,704 |
| Other accrued liabilities | | 58,713 | 28,890 |
| **Total current liabilities** | | **869,045** | **772,332** |
| Accrued workers' compensation costs | | 193,609 | 187,412 |
| Long-term debt | | 269,400 | 144,400 |
| Operating lease liabilities, net of current | | 58,863 | — |
| Other accrued liabilities, net of current | | — | 9,996 |
| **Total noncurrent liabilities** | | **521,872** | **341,808** |
| Commitments and contingencies | | | |
| Stockholders' equity: | | | |
| Preferred stock ($0.01 per share par value; 20,000 shares authorized; no shares issued and outstanding) | | — | — |
| Common stock ($0.01 per share par value; 120,000 shares authorized; 55,489 shares issued and outstanding) | | 555 | 555 |
| Additional paid-in capital | | 48,141 | 36,752 |
| Treasury stock, at cost (16,117 and 14,555 shares held in treasury) | | (544,102) | (357,569) |
| Accumulated other comprehensive income, net of tax | | 12 | (9) |
| Retained earnings | | 499,473 | 397,947 |
| **Total stockholders' equity** | | **4,079** | **77,676** |
| **Total liabilities and stockholders' equity** | $ | **1,394,996** $ | **1,191,816** |

See accompanying notes.

## CONSOLIDATED FINANCIAL STATEMENTS

### INSPERITY, INC. — CONSOLIDATED STATEMENTS OF OPERATIONS

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| (in thousands, except per share amounts) | | 2019 | 2018 | 2017 |
| **Revenues**[1] | $ | **4,314,804** $ | **3,828,549** $ | **3,300,223** |
| Payroll taxes, benefits and workers' compensation costs | | 3,581,870 | 3,146,640 | 2,727,492 |
| **Gross profit** | | **732,934** | **681,909** | **572,731** |
| Salaries, wages and payroll taxes | | 317,124 | 301,027 | 259,531 |
| Stock-based compensation | | 23,993 | 20,425 | 24,345 |
| Commissions | | 31,420 | 28,957 | 22,773 |
| Advertising | | 21,603 | 18,554 | 16,686 |
| General and administrative expenses | | 123,438 | 111,068 | 101,273 |
| Depreciation and amortization | | 28,723 | 22,842 | 18,182 |
| **Total operating expenses** | | **546,301** | **502,873** | **442,790** |
| **Operating income** | | **186,633** | **179,036** | **129,941** |
| Other income (expense): | | | | |
| Interest income | | 10,657 | 7,992 | 3,413 |
| Interest expense | | (7,647) | (4,668) | (3,213) |
| **Income before income tax expense** | | **189,643** | **182,360** | **130,141** |
| Income tax expense | | 38,544 | 46,947 | 45,739 |
| **Net income** | $ | **151,099** $ | **135,413** $ | **84,402** |
| Less distributed and undistributed earnings allocated to participating securities | | (1,759) | (1,875) | (1,517) |
| **Net income allocated to common shares** | $ | **149,340** $ | **133,538** $ | **82,885** |
| | | | | |
| **Net income per share of common stock** | | | | |
| Basic | $ | 3.72 $ | 3.24 $ | 2.02 |
| Diluted | $ | 3.70 $ | 3.22 $ | 2.01 |

———————————————————
[1]   Revenues are comprised of gross billings less worksite employee ("WSEE") payroll costs as follows:

| | | Year ended December 31, | | |
|---|---|---|---|---|
| (in thousands) | | 2019 | 2018 | 2017 |
| Gross billings | $ | 27,212,010 $ | 23,830,731 $ | 20,173,812 |
| Less: WSEE payroll cost | | 22,897,206 | 20,002,182 | 16,873,589 |
| **Revenues** | $ | **4,314,804** $ | **3,828,549** $ | **3,300,223** |

See accompanying notes.

**CONSOLIDATED FINANCIAL STATEMENTS**

### INSPERITY, INC. — CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| (in thousands) | | 2019 | 2018 | 2017 |
| Net income | $ | 151,099 | $ 135,413 | $ 84,402 |
| Other comprehensive loss: | | | | |
|   Unrealized gain (loss) on available-for-sale securities, net of tax | | 21 | (4) | (2) |
| **Comprehensive income** | $ | **151,120** | $ **135,409** | $ **84,400** |

See accompanying notes.

**CONSOLIDATED FINANCIAL STATEMENTS**

## INSPERITY, INC. — CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

| (in thousands) | Common Stock Issued Shares | Amount | Additional Paid In Capital | Treasury Stock | Accumulated Other Comprehensive Income (Loss) | Retained Earnings | Total |
|---|---|---|---|---|---|---|---|
| Balance at December 31, 2016 | 55,489 | $ 555 | $ 8,962 | $ (227,152) | $ (3) | $ 278,163 | $ 60,525 |
| Purchase of treasury stock, at cost | — | — | — | (38,735) | — | — | (38,735) |
| Stock-based compensation expense | — | — | 15,508 | 8,837 | — | — | 24,345 |
| Other | — | — | 867 | 687 | — | — | 1,554 |
| Dividends paid | — | — | — | — | — | (65,768) | (65,768) |
| Unrealized loss on marketable securities, net of tax | — | — | — | — | (2) | — | (2) |
| Net income | — | — | — | — | — | 84,402 | 84,402 |
| Balance at December 31, 2017 | 55,489 | $ 555 | $ 25,337 | $ (256,363) | $ (5) | $ 296,797 | $ 66,321 |
| Purchase of treasury stock, at cost | — | — | — | (113,327) | — | — | (113,327) |
| Issuance of long-term incentive awards and dividend equivalents | — | — | (5,764) | 6,619 | — | (855) | — |
| Stock-based compensation expense | — | — | 15,460 | 4,965 | — | — | 20,425 |
| Other | — | — | 1,719 | 537 | — | — | 2,256 |
| Dividends paid | — | — | — | — | — | (33,408) | (33,408) |
| Unrealized loss on marketable securities, net of tax | — | — | — | — | (4) | — | (4) |
| Net income | — | — | — | — | — | 135,413 | 135,413 |
| Balance at December 31, 2018 | 55,489 | $ 555 | $ 36,752 | $ (357,569) | $ (9) | $ 397,947 | $ 77,676 |
| Purchase of treasury stock, at cost | — | — | — | (203,043) | — | — | (203,043) |
| Issuance of long-term incentive awards and dividend equivalents | — | — | (7,695) | 8,646 | — | (951) | — |
| Stock-based compensation expense | — | — | 16,899 | 7,094 | — | — | 23,993 |
| Other | — | — | 2,185 | 770 | — | — | 2,955 |
| Dividends paid | — | — | — | — | — | (48,622) | (48,622) |
| Unrealized gain on marketable securities, net of tax | — | — | — | — | 21 | — | 21 |
| Net income | — | — | — | — | — | 151,099 | 151,099 |
| Balance at December 31, 2019 | 55,489 | $ 555 | $ 48,141 | $ (544,102) | $ 12 | $ 499,473 | $ 4,079 |

See accompanying notes.

**F-10**

**CONSOLIDATED FINANCIAL STATEMENTS**

## INSPERITY, INC. — CONSOLIDATED STATEMENTS OF CASH FLOWS

| (in thousands) | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| **Cash flows from operating activities** | | | |
| Net income | $ 151,099 | $ 135,413 | $ 84,402 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 28,723 | 22,842 | 18,182 |
| Amortization of marketable securities | (486) | 137 | 80 |
| Stock-based compensation | 23,993 | 20,425 | 24,345 |
| Deferred income taxes | 4,860 | (4,533) | 9,742 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | (65,156) | (66,642) | (63,697) |
| Prepaid insurance | (2,007) | 2,371 | 4,259 |
| Other current assets | (15,772) | (730) | (7,465) |
| Other assets | (3,023) | (2,005) | (2,496) |
| Accounts payable | (6,057) | 4,175 | 2,258 |
| Payroll taxes and other payroll deductions payable | 16,082 | (42,081) | 55,481 |
| Accrued worksite employee payroll expense | 71,880 | 62,577 | 52,188 |
| Accrued health insurance costs | (13,973) | 9,078 | (285) |
| Accrued workers' compensation costs | 13,247 | 23,763 | 23,945 |
| Accrued corporate payroll, commissions and other accrued liabilities | 6,359 | 8,941 | 17,138 |
| Income taxes payable/receivable | (4,616) | 10,749 | (4,875) |
| **Total adjustments** | **54,054** | **49,067** | **128,800** |
| **Net cash provided by operating activities** | **205,153** | **184,480** | **213,202** |
| | | | |
| **Cash flows from investing activities** | | | |
| Marketable securities: | | | |
| Purchases | (110,131) | (87,887) | (1,752) |
| Proceeds from maturities | 108,380 | 12,625 | 1,561 |
| Proceeds from dispositions | 28,313 | 16,299 | — |
| Property and equipment: | | | |
| Purchases | (56,307) | (35,328) | (33,337) |
| Proceeds from dispositions | 21 | 151 | 278 |
| **Net cash used in investing activities** | **(29,724)** | **(94,140)** | **(33,250)** |
| | | | |
| **Cash flows from financing activities** | | | |
| Purchase of treasury stock | $ (203,043) | $ (113,327) | $ (38,735) |
| Dividends paid | (48,622) | (33,408) | (65,768) |
| Borrowings under long-term debt agreement | 125,000 | 40,000 | — |
| Other | 8,312 | 2,257 | 1,554 |
| **Net cash used in financing activities** | **(118,353)** | **(104,478)** | **(102,949)** |
| **Net increase (decrease) in cash and cash equivalents** | **57,076** | **(14,138)** | **77,003** |
| Cash, cash equivalents and restricted cash at beginning of year | 535,474 | 549,612 | 472,609 |
| **Cash, cash equivalents and restricted cash at end of year** | **$ 592,550** | **$ 535,474** | **$ 549,612** |

**CONSOLIDATED FINANCIAL STATEMENTS**

## INSPERITY, INC. — CONSOLIDATED STATEMENTS OF CASH FLOWS (Continued)

|  | | Year ended December 31, | |
| --- | ---: | ---: | ---: |
| *(in thousands)* | **2019** | **2018** | **2017** |
| **Supplemental schedule of cash, cash equivalents and restricted cash** | | | |
| Cash and cash equivalents | $ 326,773 | $ 354,260 | $ 286,034 |
| Restricted cash | 42,227 | 41,137 | 42,637 |
| Deposits - workers' compensation | 166,474 | 154,215 | 143,938 |
| **Cash, cash equivalents and restricted cash beginning of year** | **$ 535,474** | **$ 549,612** | **$ 472,609** |
| | | | |
| **Supplemental schedule of cash, cash equivalents and restricted cash** | | | |
| Cash and cash equivalents | $ 367,342 | $ 326,773 | $ 354,260 |
| Restricted cash | 49,295 | 42,227 | 41,137 |
| Deposits - workers' compensation | 175,913 | 166,474 | 154,215 |
| **Cash, cash equivalents and restricted cash end of year** | **$ 592,550** | **$ 535,474** | **$ 549,612** |
| | | | |
| **Supplemental disclosures of cash flow information** | | | |
| Income taxes, net | $ 38,299 | $ 40,730 | $ 40,872 |
| Cash paid for interest | $ 7,421 | $ 4,006 | $ 3,257 |
| ROU assets obtained in exchange for lease obligations | $ 24,474 | $ — | $ — |

See accompanying notes.

## Notes to the Consolidated Financial Statements

### 1.    Accounting Policies

#### Description of Business

Insperity, Inc. ("Insperity" or "we", "our", and "us") provides an array of human resources ("HR") and business solutions designed to help improve business performance. Since our formation in 1986, we have evolved from being solely a professional employer organization ("PEO"), an industry we pioneered, to our current position as a comprehensive business performance solutions provider. We were organized as a corporation in 1986 and have provided PEO services since inception.

Our most comprehensive HR services offerings are provided through our Workforce Optimization ® and Workforce Synchronization™ solutions (together, our "PEO HR Outsourcing solutions"), which encompass a broad range of human resources functions, including payroll and employment administration, employee benefits, workers' compensation, government compliance, performance management and training and development services, along with our cloud-based human capital management platform, Insperity Premier™.

In addition to our PEO HR Outsourcing solutions, we offer a comprehensive traditional payroll and human capital management solution, known as Workforce Acceleration. We also offer a number of other business performance solutions, including Time and Attendance, Performance Management, Organizational Planning, Recruiting Services, Employment Screening, Expense Management Services, Retirement Services and Insurance Services, many of which are offered as a cloud-based software solution. These other products or services are offered separately or with our other solutions.

We provide our PEO HR Outsourcing solutions by entering into a co-employment relationship with our clients, under which Insperity and its clients each take responsibility for certain portions of the employer-employee relationship. Insperity and its clients designate each party's responsibilities through its Client Service Agreement ("CSA"), under which Insperity becomes an employer of the employees who work at the client's location ("WSEE") for most administrative and regulatory purposes.

As a co-employer of its WSEEs, we assume many of the rights and obligations associated with being an employer. We enter into an employment agreement with each WSEE, thereby maintaining a variety of employer rights, including the right to hire or terminate employees, the right to evaluate employee qualifications or performance, and the right to establish employee compensation levels. Typically, Insperity only exercises these rights in consultation with its clients or when necessary to ensure regulatory compliance. The responsibilities associated with our role as employer include the following obligations with regard to our WSEEs: (1) to compensate its WSEEs through wages and salaries; (2) to pay the employer portion of payroll-related taxes; (3) to withhold and remit (where applicable) the employee portion of payroll-related taxes; (4) to provide employee benefit programs; and (5) to provide workers' compensation insurance coverage.

In addition to our assumption of employer status for our WSEEs, our PEO HR Outsourcing solutions also include other human resources functions for our clients to support the effective and efficient use of personnel in their business operations. To provide these functions, we maintain a significant staff of professionals trained in a wide variety of human resources functions, including employee training, employee recruiting, employee performance management, employee compensation and employer liability management. These professionals interact and consult with clients on a daily basis to help identify each client's service requirements and to ensure that we are providing appropriate and timely personnel management services.

#### Revenue and Direct Cost Recognition

On January 1, 2018, we adopted Accounting Standards Update ("ASU") No. 2014-09, *Revenue from Contracts with Customers (Topic 606),* using the modified retrospective approach. Under this method, the guidance is applied only to the most current period presented in the financial statements. ASU No. 2014-09 outlines a single comprehensive revenue recognition model for revenue arising from contracts with customers and superseded most of the previous revenue recognition guidance, including industry-specific guidance. Under ASU No. 2014-09, an entity recognizes revenue for the transfer of promised goods or services to customers in an amount that reflects the consideration for which the entity expects to be entitled in exchange for those goods or services. Our revenue recognition policies remained substantially unchanged as a result of the adoption of ASU No. 2014-09 and we did not have any significant changes in our business processes or systems.

## Notes to the Consolidated Financial Statements

We enter into contracts with our customers for human resources services based on a stated rate and price in the contract. Our contracts generally have a term of 12 months, but are cancellable at any time by either party with 30-days' notice. Our performance obligations are satisfied as services are rendered each month. The term between invoicing and when our performance obligations are satisfied is not significant. Payment terms are typically due concurrently with the invoicing of our PEO services. We do not have significant financing components or significant payment terms.

Our revenue is generally recognized ratably over the payroll period as WSEEs perform their service at the client worksite. Customers are invoiced concurrently with each periodic payroll of its WSEEs. Revenues that have been recognized but not invoiced represent unbilled accounts receivable included in accounts receivable, net on our Consolidated Balance Sheets.

Pursuant to the "practical expedients" provided under ASU No 2014-09, we expense sales commissions when incurred because the terms of our contracts are cancellable by either party with a 30-day notice. These costs are recorded in commissions in our Consolidated Statements of Operations.

Our revenue for our PEO HR Outsourcing solutions by geographic region and for our other products and services offerings are as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| (in thousands) | 2019 | 2018 | 2017 |
| Northeast | $ 1,135,771 | $ 996,541 | $ 854,629 |
| Southeast | 499,201 | 447,584 | 379,874 |
| Central | 743,514 | 637,779 | 543,486 |
| Southwest | 1,001,845 | 895,243 | 767,207 |
| West | 880,434 | 797,942 | 702,619 |
| | 4,260,765 | 3,775,089 | 3,247,815 |
| Other revenue | 54,039 | 53,460 | 52,408 |
| **Total revenue** | **$ 4,314,804** | **$ 3,828,549** | **$ 3,300,223** |

Our PEO HR Outsourcing solutions revenues are primarily derived from our gross billings, which are based on (1) the payroll cost of its WSEEs; and (2) a markup computed as a percentage of the payroll cost. The gross billings are invoiced concurrently with each periodic payroll of its WSEEs. Revenues, which exclude the payroll cost component of gross billings and therefore consist solely of markup, are recognized ratably over the payroll period as WSEEs perform their service at the client worksite.

In determining the pricing of the markup component of our gross billings, we take into consideration our estimates of the costs directly associated with our WSEEs, including payroll taxes, benefits and workers' compensation costs, plus an acceptable gross profit margin. As a result, our operating results are significantly impacted by our ability to accurately estimate, control and manage our direct costs relative to the revenues derived from the markup component of our gross billings.

Consistent with our revenue recognition policy, our direct costs do not include the payroll cost of our WSEEs. Our direct costs associated with our revenue generating activities are primarily comprised of all other costs related to our WSEEs, such as the employer portion of payroll-related taxes, employee benefit plan premiums and workers' compensation insurance costs.

### Segment Reporting

We operate one reportable segment under Accounting Standards Codification ("ASC") 280, *Segment Reporting*.

### Principles of Consolidation

The Consolidated Financial Statements include the accounts of Insperity, Inc. and its wholly owned subsidiaries. Intercompany accounts and transactions have been eliminated in consolidation.

## Notes to the Consolidated Financial Statements

### Use of Estimates

The preparation of financial statements in conformity with United States Generally Accepted Accounting Principles requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from those estimates.

### Concentrations of Credit Risk

Financial instruments that could potentially subject us to concentration of credit risk include accounts receivable and marketable securities.

### Cash, Cash Equivalents and Marketable Securities

We invest our excess cash in federal government and municipal-based money market funds and debt instruments of U.S. municipalities. All highly liquid investments with stated maturities of three months or less from date of purchase are classified as cash equivalents. Liquid investments with stated maturities of greater than three months are classified as marketable securities in current assets.

We account for marketable securities in accordance with ASC 320, *Investments – Debt and Equity Securities*. We determine the appropriate classification of all marketable securities as held-to-maturity, available-for-sale or trading at the time of purchase, and re-evaluate such classification as of each balance sheet date. At December 31, 2019 and 2018, all of our investments in marketable securities were classified as available-for-sale, and as a result, were reported at fair value. Unrealized gains and losses are reported as a component of accumulated other comprehensive income (loss) in stockholders' equity. The amortized cost of debt securities is adjusted for amortization of premiums and accretion of discounts from the date of purchase to maturity. Such amortization is included in interest income as an addition to or deduction from the coupon interest earned on the investments. We use the specific identification method of determining the cost basis in computing realized gains and losses on the sale of our available-for-sale securities. Realized gains and losses are included in other income.

### Property and Equipment

Property and equipment are recorded at cost and are depreciated over the estimated useful lives of the related assets using the straight-line method.

Property and equipment, net consisted of the following:

| (in thousands) | | December 31, 2019 | | December 31, 2018 |
|---|---|---|---|---|
| Land | $ | 6,215 | $ | 6,215 |
| Buildings and improvements | | 119,635 | | 112,308 |
| Computer hardware and software | | 123,232 | | 115,259 |
| Software development costs | | 85,252 | | 71,332 |
| Furniture, fixtures and other | | 48,082 | | 45,694 |
| Construction in progress | | 20,885 | | — |
| | | 403,301 | | 350,808 |
| Accumulated depreciation and amortization | | (255,595) | | (233,595) |
| **Total property and equipment, net** | $ | **147,706** | $ | **117,213** |

F-15

## Notes to the Consolidated Financial Statements

The estimated useful lives of property and equipment for purposes of computing depreciation are as follows:

|  | Useful Life |
|---|---|
| Buildings and improvements | 5 — 30 years |
| Computer hardware and software | 2 — 5 years |
| Software development costs | 3 — 3 years |
| Furniture, fixtures and other | 5 — 7 years |

Software development costs relate primarily to software code development, systems integration and testing of our proprietary professional employer information systems and are accounted for in accordance with ASC 350-40, *Internal Use Software*. Capitalized software development costs are amortized using the straight-line method over the estimated useful lives of the software, generally three years. We recognized $7.8 million, $6.0 million and $4.1 million in amortization of capitalized computer software costs in 2019, 2018 and 2017, respectively. Unamortized software development costs were $25.8 million and $19.6 million in 2019 and 2018, respectively.

We periodically evaluate our long-lived assets for impairment in accordance with ASC 360-10, *Property, Plant, and Equipment.* ASC 360-10 requires that an impairment loss be recognized for assets to be disposed of or held-for-use when the carrying amount of an asset is deemed to not be recoverable. If events or circumstances were to indicate that any of our long-lived assets might be impaired, we would assess recoverability based on the estimated undiscounted future cash flows to be generated from the applicable asset. In addition, we may record an impairment loss to the extent that the carrying value of the asset exceeded the fair value of the asset. Fair value is generally determined using an estimate of discounted future net cash flows from operating activities or upon disposal of the asset.

### *Leases*

In February 2016, the Financial Accounting Standards Board ("FASB") issued ASU No. 2016-02, *Leases (Topic 842)*, which requires lessees to recognize a right-of-use ("ROU") asset and a lease liability for all leases with terms greater than 12 months and also requires disclosures by lessees and lessors about the amount, timing and uncertainty of cash flows arising from leases. Subsequent to the issuance of Topic 842, the FASB clarified the guidance through several ASUs; hereinafter, the collection of lease guidance is referred to as "ASC 842."

On January 1, 2019, we adopted ASC 842 using the modified retrospective transition method. Results for the reporting period beginning January 1, 2019 are presented under ASC 842, while prior period amounts were not adjusted and continue to be reported in accordance with our historical accounting under ASC 840, *Leases.* Upon adoption of ASC 842, we increased our total assets and liabilities due to the recording of operating lease ROU assets and operating lease liabilities of approximately $50.8 million and $63.7 million, respectively, as of January 1, 2019. These increases did not have a material impact on our results of operations or cash flows.

For all leases that commenced before the effective date of ASC 842, we elected to apply the permitted "practical expedients" to not reassess the following: (1) whether any expired or existing contracts contain leases; (2) the lease classification for any expired or existing leases; and (3) initial direct costs for any existing leases.

We determine if an arrangement is a lease at inception of a contract. ROU assets represent our right to use an underlying asset for the lease term and lease liabilities represent our obligation to make lease payments arising from the lease. ROU assets and lease liabilities are recognized at the lease commencement date based on the present value of lease payments over the lease term. As most of our leases do not provide an implicit interest rate, we use our incremental borrowing rate based on the information available at commencement date in determining the present value of lease payments. The lease terms used to calculate the ROU asset and related lease liability include options to extend or terminate the lease when it is reasonably certain that we will exercise that option. Lease expense for operating leases is recognized on a straight-line basis over the lease term as an operating expense. We have lease agreements which require payments for lease and non-lease components and have elected to account for these as a single lease component related to our other operating facilities. Please read Note 11, "Leases," for additional information.

### *Goodwill and Other Intangible Assets*

Our goodwill is not amortized, but is tested for impairment on an annual basis or when there is an indication that there has been a potential decline in the fair value of a reporting unit. Annually, we perform a qualitative analysis to determine if it is

## Notes to the Consolidated Financial Statements

more likely than not that the fair value has declined below its carrying value. This analysis considers various qualitative factors. Due to the nature of our business, all of our goodwill is associated with one reporting unit. We perform our annual impairment testing during the fourth quarter. Based on the results of our analysis, no impairment loss was recognized in 2019, 2018 or 2017.

At December 31, 2019 and 2018, we had an aggregate carrying amount of goodwill acquired of $21.2 million, which has been reduced by cumulative impairment charges of $8.5 million. Accordingly, our goodwill balance at December 31, 2019 and 2018 was $12.7 million.

### *Health Insurance Costs*

We provide group health insurance coverage to our WSEEs in our PEO HR Outsourcing solutions through a national network of carriers, including UnitedHealthcare ("United"), UnitedHealthcare of California, Kaiser Permanente, Blue Shield of California, HMSA BlueCross BlueShield of Hawaii and Tufts, all of which provide fully insured policies or service contracts.

The policy with United provides approximately 87% of our health insurance coverage. While the policy with United is a fully-insured plan, as a result of certain contractual terms, we have accounted for this plan since its inception using a partially self-funded insurance accounting model. Accordingly, we record the cost of the United plan, including an estimate of the incurred claims, taxes and administrative fees (collectively the "Plan Costs") as benefits expense, which is a component of direct costs, in our Consolidated Statements of Operations. The estimated incurred claims are based upon: (1) the level of claims processed during each quarter; (2) estimated completion rates based upon recent claim development patterns under the plan; and (3) the number of participants in the plan, including both active and COBRA enrollees. Each reporting period, changes in the estimated ultimate costs resulting from claim trends, plan design and migration, participant demographics and other factors are incorporated into the benefits costs, which requires a significant level of judgment.

Additionally, since the plan's inception, under the terms of the contract, United establishes cash funding rates 90 days in advance of the beginning of a reporting quarter. If the Plan Costs for a reporting quarter are greater than the premiums paid and owed to United, a deficit in the plan would be incurred and a liability for the excess costs would be accrued in our Consolidated Balance Sheets. On the other hand, if the Plan Costs for the reporting quarter are less than the premiums paid and owed to United, a surplus in the plan would be incurred and we would record an asset for the excess premiums in our Consolidated Balance Sheets. The terms of the arrangement require us to maintain an accumulated cash surplus in the plan of $9.0 million, which is reported as long-term prepaid insurance. In addition, United requires a deposit equal to approximately one day of claims funding activity, which was $6.5 million as of December 31, 2019, and is reported as a long-term asset. As of December 31, 2019, Plan Costs were less than the net premiums paid and owed to United by $2.6 million. As this amount is less than the agreed-upon $9.0 million surplus maintenance level, the $6.4 million difference is also included in accrued health insurance costs, a current liability, in our Consolidated Balance Sheets. The premiums, including the additional quarterly premiums, owed to United at December 31, 2019, were $9.3 million, which is included in accrued health insurance costs, a current liability in our Consolidated Balance Sheets. Our benefits costs incurred included an increase of $2.3 million in 2019, a reduction of $1.3 million in 2018 and an increase of $1.2 million in 2017 for changes in estimated run-off related to prior periods.

### *Workers' Compensation Costs*

Our workers' compensation coverage for our WSEEs in our PEO HR Outsourcing solutions has been provided through an arrangement with the Chubb Group of Insurance Companies or its predecessors (the "Chubb Program") since 2007. The Chubb Program is fully insured in that Chubb has the responsibility to pay all claims incurred under the policy regardless of whether we satisfy our responsibilities. Under the Chubb Program, for claims incurred on or before September 30, 2019, we have financial responsibility to Chubb for the first $1 million layer of claims per occurrence and, for claims over $1 million, up to a maximum aggregate amount of $6 million per policy year for claims that exceed $1 million. Chubb bears the financial responsibility for all claims in excess of these levels. Effective for claims incurred on or after October 1, 2019 we have financial responsibility to Chubb for the first $1.5 million layer of claims per occurrence and, for claims over $1.5 million, up to a maximum aggregate amount of $6 million per policy year for claims that exceed $1.5 million.

Because we bear the financial responsibility for claims up to the levels noted above, such claims, which are the primary component of our workers' compensation costs, are recorded in the period incurred. Workers' compensation insurance includes ongoing health care and indemnity coverage whereby claims are paid over numerous years following the date of

## Notes to the Consolidated Financial Statements

injury. Accordingly, the accrual of related incurred costs in each reporting period includes estimates, which take into account the ongoing development of claims and therefore requires a significant level of judgment.

We utilize a third-party actuary to estimate our loss development rate, which is primarily based upon the nature of WSEEs' job responsibilities, the location of WSEEs, the historical frequency and severity of workers' compensation claims, and an estimate of future cost trends. Each reporting period, changes in the actuarial assumptions resulting from changes in actual claims experience and other trends are incorporated into our workers' compensation claims cost estimates. During the years ended December 31, 2019, 2018 and 2017, we reduced accrued workers' compensation costs by $31.7 million, $18.8 million and $16.3 million, respectively, for changes in estimated losses related to prior reporting periods. Workers' compensation cost estimates are discounted to present value at a rate based upon the U.S. Treasury rates that correspond with the weighted average estimated claim payout period (the average discount rate was 1.9% in 2019 and 2.6% in 2018) are accreted over the estimated claim payment period and included as a component of direct costs in our Consolidated Statements of Operations.

The following table provides the activity and balances related to incurred but not paid workers' compensation claims:

| | | Year Ended December 31, | |
|---|---|---|---|
| (in thousands) | | 2019 | 2018 |
| Beginning balance | $ | 229,639 $ | 207,630 |
| Accrued claims | | 63,538 | 72,066 |
| Present value discount | | (4,629) | (7,829) |
| Paid claims | | (45,644) | (42,228) |
| **Ending balance** | **$** | **242,904 $** | **229,639** |
| | | | |
| Current portion of accrued claims | $ | 49,295 $ | 42,227 |
| Long-term portion of accrued claims | | 193,609 | 187,412 |
| **Total accrued claims** | **$** | **242,904 $** | **229,639** |

The current portion of accrued workers' compensation costs on the Consolidated Balance Sheets at December 31, 2019 and 2018 includes $3.6 million and $3.6 million, respectively, of workers' compensation administrative fees.

The undiscounted accrued workers' compensation costs were $262.9 million as of December 31, 2019 and $247.4 million as of December 31, 2018.

At the beginning of each policy period, the workers' compensation insurance carrier establishes monthly funding requirements comprised of premium costs and funds to be set aside for payment of future claims ("claim funds"). The level of claim funds is primarily based upon anticipated WSEE payroll levels and expected workers' compensation loss rates, as determined by the insurance carrier. Monies funded into the program for incurred claims expected to be paid within one year are recorded as restricted cash, a short-term asset, while the remainder of claim funds are included in deposits, a long-term asset in our Consolidated Balance Sheets. In 2019, we received $18.8 million for the return of excess claim funds related to the workers' compensation program, which decreased deposits. As of December 31, 2019, we had restricted cash of $49.3 million and deposits of $175.9 million.

Our estimate of incurred claim costs expected to be paid within one year is included in short-term liabilities, while our estimate of incurred claim costs expected to be paid beyond one year is included in noncurrent liabilities on our Consolidated Balance Sheets.

### Stock-Based Compensation

At December 31, 2019, we have one stock-based employee compensation plan under which we may issue awards. We account for this plan under the recognition and measurement principles of ASC 718, *Compensation – Stock Compensation*, which requires all share-based payments to employees, including grants of employee stock options, to be recognized in the income statement based on their fair values.

## Notes to the Consolidated Financial Statements

We generally make annual grants of restricted and unrestricted stock under our stock-based incentive compensation plan to our non-employee directors, officers and other management. Restricted stock grants to officers and other management generally vest over a period of three years from the date of grant. Shares of restricted stock are valued based on the fair value on date of grant and the associated expense, net of estimated forfeitures, is recognized over the vesting period. Stock grants issued to non-employee directors are 100% vested on the grant date.

Our Insperity Long-Term Incentive Program (the "LTIP") provides for performance based long-term compensation awards in the form of performance units to certain employees based on the achievement of pre-established performance goals. Each performance unit represents the right to receive one common share at a future date based on our performance against certain targets. Performance units have a vesting schedule of three years. Commencing in 2016, a portion of the LTIP grant to employees was considered a market-based performance award that cliff vests at the end of three years assuming continued employment and achievement of market-based performance goals. The fair value of each performance unit is the market price of our common stock on the date of grant. The fair value of each market-based performance unit was determined through use of the Monte Carlo simulation method. The compensation expense for such awards is recognized on a straight line basis over the vesting term. Over the performance period the number of shares expected to be issued is adjusted upward or downward based on the probability of achievement of the performance target.

### Company-Sponsored 401(k) Retirement Plans

Under our 401(k) retirement plan for corporate employees (the "Corporate Plan"), we matched 100% of eligible corporate employees' contributions, up to 6% of the employees' eligible compensation in 2019, 2018 and 2017. Matching contributions under the Corporate Plan are immediately vested. During 2019, 2018 and 2017, we made matching contributions on behalf of corporate employees to the Corporate Plan of $11.4 million, $10.3 million and $8.7 million, respectively, and is included in salaries, wages and payroll taxes in our Consolidated Statements of Operations.

Under our separate 401(k) retirement plan for WSEEs (the "Worksite Employee Plan"), the match percentage for WSEEs ranges from 0% to 6%, as determined by each client company. Matching contributions under the Worksite Employee Plan are immediately vested. During 2019, 2018 and 2017, we made matching contributions on behalf of WSEEs to the Worksite Employee Plan of $198.2 million, $165.5 million and $129.0 million, respectively.

### Advertising

We expense all advertising costs as incurred.

### Income Taxes

We use the liability method in accounting for income taxes. Under this method, deferred tax assets and liabilities are determined based on differences between financial reporting and income tax carrying amounts of assets and liabilities and are measured using the enacted tax rates and laws in effect when the differences are expected to reverse. On December 22, 2017, the Tax Cuts and Jobs Act (the "2017 Tax Reform Act") was signed into law. The 2017 Tax Reform Act significantly changes U.S. corporate income tax laws by, among other things, reducing the U.S. corporate income tax rate to 21% beginning in 2018. Please read Note 7, "Income Taxes," for additional information.

### Reclassifications

Certain immaterial prior year amounts have been reclassified to conform to the 2019 presentation.

### New Accounting Pronouncements

In June 2016, the FASB issued ASU 2016-13, *Financial Instruments - Credit Losses.* The new standard defines a current expected credit loss model which requires us to measure all expected credit loss for financial instruments held at the reporting date based on historical experience, current conditions and reasonable forecasts. This replaced the existing incurred loss model and is applicable to the measurement of credit losses on financial assets, including trade receivables. The guidance is effective for interim periods and fiscal years beginning after December 15, 2019. We do not expect the new standard to have a material impact on our consolidated financial statements.

In August 2018, the FASB issued ASU 2018-15, *Intangibles-Goodwill and Other-Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract.* The new standard requires a customer in a cloud computing arrangement that is a service contract to follow the

## Notes to the Consolidated Financial Statements

internal-use software guidance in ASC 350-40 to determine which implementation costs to capitalize as assets. The guidance is effective for fiscal years beginning after December 15, 2019. We do not expect the new standard to have a material  impact on our consolidated financial statements.

### 2.    Cash, Cash Equivalents and Marketable Securities

The following table summarizes our investments in cash equivalents and marketable securities held by investment managers and overnight investments:

| | December 31, | | | | | |
| | **2019** | | | **2018** | | |
| (in thousands) | **Cash & Cash Equivalents** | **Marketable Securities** | **Total** | **Cash & Cash Equivalents** | **Marketable Securities** | **Total** |
|---|---|---|---|---|---|---|
| Overnight holdings | $    349,857 $ | — $ | 349,857 | $    311,158 $ | — $ | 311,158 |
| Investments holdings | 13,218 | 34,728 | 47,946 | 16,711 | 60,781 | 77,492 |
| Cash in demand accounts | 36,521 | — | 36,521 | 33,207 | — | 33,207 |
| Outstanding checks | (32,254) | — | (32,254) | (34,303) | — | (34,303) |
| **Total** | $    **367,342** $ | **34,728** $ | **402,070** | $    **326,773** $ | **60,781** $ | **387,554** |

Our cash and overnight holdings fluctuate based on the timing of the client's payroll processing cycle. Included in the cash balance as of   December 31, 2019 and December 31, 2018, are $234.6 million and $224.5 million, respectively, in withholdings associated with federal and state income taxes, employment taxes and other payroll deductions, as well as $59.6 million and $34.2 million, respectively, in client prepayments.

### 3.    Fair Value Measurements

We account for our financial assets in accordance with ASC 820,  *Fair Value Measurement*. This standard defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. The fair value measurement disclosures are grouped into three levels based on valuation factors:

- Level 1 - quoted prices in active markets using identical assets

- Level 2 - significant other observable inputs, such as quoted prices for similar assets or liabilities, quoted prices in markets that are not active, or other observable inputs

- Level 3 - significant unobservable inputs

#### *Fair Value of Instruments Measured and Recognized at Fair Value*

The following tables summarize the levels of fair value measurements of our financial assets:

| | December 31, 2019 | | | December 31, 2018 | | |
| (in thousands) | **Total** | **Level 1** | **Level 2** | **Total** | **Level 1** | **Level 2** |
|---|---|---|---|---|---|---|
| Money market funds | $    363,075 $ | 363,075 $ | — | $    325,819 $ | 325,819 $ | — |
| U.S. Treasury bills | 34,728 | 34,728 | — | 52,197 | 52,197 | — |
| Municipal bonds | — | — | — | 10,634 | — | 10,634 |
| **Total** | $    **397,803** $ | **397,803** $ | **—** | $    **388,650** $ | **378,016** $ | **10,634** |

The municipal bond securities valued as Level 2 investments are primarily pre-refunded municipal bonds that are secured by escrow funds containing U.S. Government securities. Our valuation techniques used to measure fair value for these securities during the period consisted primarily of third-party pricing services that utilized actual market data such as trades

## Notes to the Consolidated Financial Statements

of comparable bond issues, broker/dealer quotations for the same or similar investments in active markets and other observable inputs.

The following is a summary of our available-for-sale marketable securities:

| (in thousands) | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
|---|---|---|---|---|
| **December 31, 2019** | | | | |
| U.S. Treasury bills | $ 34,716 | $ 13 | $ (1) | $ 34,728 |
| **December 31, 2018** | | | | |
| U.S. Treasury bills | $ 50,150 | $ — | $ (3) | $ 50,147 |
| Municipal bonds | 10,640 | 1 | (7) | 10,634 |

As of December 31, 2019, the contractual maturities of all marketable securities in our portfolio were less than one year.

### Fair Value of Other Financial Instruments

The carrying amounts of cash, cash equivalents, restricted cash, accounts receivable and accounts payable approximate their fair values due to the short-term maturities of these instruments.

At December 31, 2019, the carrying value of our borrowings under our revolving credit facility approximates fair value and was classified as Level 2 in the fair value hierarchy. Please read Note 6, "Long-Term Debt," for additional information.

### 4.    Accounts Receivable

Accounts receivable, net consisted of the following:

| (in thousands) | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Trade, net | $ 12,731 | $ 10,015 |
| Unbilled | 448,088 | 385,567 |
| Other | 4,960 | 5,041 |
| **Accounts receivable, net** | **$ 465,779** | **$ 400,623** |

Our accounts receivable is primarily composed of trade receivables and unbilled receivables. Our trade receivables, which represent outstanding gross billings to clients, are reported net of allowance for doubtful accounts of $0.9 million and $1.0 million as of December 31, 2019 and 2018, respectively. We establish an allowance for doubtful accounts based on management's assessment of the collectability of specific accounts and by making a general provision for other potentially uncollectible amounts.

We make an accrual at the end of each accounting period for our obligations associated with the earned but unpaid wages of our WSEEs and for the accrued gross billings associated with such wages. These accruals are included in accrued WSEE payroll cost and unbilled accounts receivable; however, these amounts are presented net in the Consolidated Statements of Operations. We generally require clients to pay invoices for service fees no later than one day prior to the applicable payroll date. As such, we generally do not require collateral.  Client prepayments directly attributable to unbilled accounts receivable have been netted against such receivables as the gross billings have been earned and the payroll cost has been incurred, thus we have the legal right of offset for these amounts. Unbilled accounts receivable consisted of the following:

## Notes to the Consolidated Financial Statements

| | | December 31, | | |
|---|---|---|---|---|
| *(in thousands)* | | 2019 | | 2018 |
| Accrued worksite employee payroll cost | $ | 401,859 | $ | 329,979 |
| Unbilled revenues | | 105,841 | | 89,765 |
| Customer prepayments | | (59,612) | | (34,177) |
| **Unbilled accounts receivable** | **$** | **448,088** | **$** | **385,567** |

### 5. Deposits and prepaid health insurance

Deposits and prepaid health insurance consisted of the following:

| | | December 31, | | |
|---|---|---|---|---|
| *(in thousands)* | | 2019 | | 2018 |
| Prepaid health insurance | $ | 9,000 | $ | 9,000 |
| Deposits – health insurance | | 8,100 | | 6,200 |
| Deposits – workers' compensation | | 175,913 | | 166,474 |
| **Deposits and prepaid health insurance** | **$** | **193,013** | **$** | **181,674** |

The contractual arrangement with United for health insurance coverage requires us to maintain an accumulated cash surplus in the plan of $9.0 million, which is reported as long-term prepaid health insurance. Please read Note 1, "Accounting Policies," for a discussion of our accounting policies for health insurance costs and workers' compensation costs.

### 6. Long-Term Debt

We have a revolving credit facility which is available for working capital and general corporate purposes, including acquisitions, stock repurchases and issuances of letters of credit. In September 2019, the revolving credit facility was increased from $350 million to $500 million (the "Facility"). Borrowings may be increased to $550 million based on the terms and subject to the conditions set forth in the agreement relating to the Facility (the "Credit Agreement"). Our obligations under the Facility are secured by 65% of the stock of our captive insurance subsidiary and are guaranteed by all of our domestic subsidiaries. In addition, as of December 31, 2019, we had an outstanding $1.0 million letter of credit issued under the Facility. As of December 31, 2019, our outstanding balance on the Facility was $269.4 million.

The Facility matures on September 13, 2024. Borrowings under the Facility bear interest at an alternate base rate or LIBOR, at our option, plus an applicable margin. Depending on our leverage ratio, the applicable margin varies (1) in the case of LIBOR loans, from 1.50% to 2.25% and (2) in the case of alternate base rate loans, from 0.00% to 0.50%. The alternate base rate is the highest of (1) the prime rate most recently published in The Wall Street Journal, (2) the federal funds rate plus 0.50% and (3) the 30-day LIBOR rate plus 2.00%. We also pay an unused commitment fee on the average daily unused portion of the Facility at a rate of 0.25%. The average interest rate during 2019 was 3.8%. Interest expense and unused commitment fees are recorded in other income (expense). Upon the discontinuation of LIBOR, the Facility provides that we and the agent will negotiate in good faith to amend the agreement to address such discontinuation and to place the parties in substantially the same economic position.

The Facility contains both affirmative and negative covenants that we believe are customary for arrangements of this nature. Covenants include, but are not limited to, limitations on our ability to incur additional indebtedness, sell material assets, retire, redeem or otherwise reacquire our capital stock, acquire the capital stock or assets of another business, make investments and pay dividends. In addition, the Credit Agreement requires us to comply with financial covenants limiting our total funded debt, minimum interest coverage ratio and maximum leverage ratio. We were in compliance with all financial covenants under the Credit Agreement at December 31, 2019.

## Notes to the Consolidated Financial Statements

### 7.    Income Taxes

Deferred taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities used for financial reporting purposes and the amounts used for income tax purposes.

Significant components of the net deferred tax assets as reflected on the Consolidated Balance Sheets are as follows:

| | | December 31, | |
|---|---|---|---|
| (in thousands) | | 2019 | 2018 |
| **Deferred tax liabilities** | | | |
| Prepaid assets | $ | (4,252) $ | (3,306) |
| Depreciation | | (4,564) | (3,918) |
| Software development costs | | (6,475) | (4,950) |
| Tenant improvements | | (3,209) | — |
| Right-of-use leased assets | | (15,949) | — |
| Intangibles | | (955) | (474) |
| **Total deferred tax liabilities** | | **(35,404)** | **(12,648)** |
| **Deferred tax assets** | | | |
| Accrued incentive compensation | | 5,946 | 8,612 |
| Net operating loss carryforward | | 632 | 709 |
| Workers' compensation accruals | | 5,404 | 4,739 |
| Accrued rent | | 1,223 | 918 |
| Stock-based compensation | | 6,712 | 6,183 |
| Operating lease liabilities | | 19,158 | — |
| Minority investment impairment | | 673 | 676 |
| Other | | 287 | 305 |
| **Total deferred tax assets** | | **40,035** | **22,142** |
| Valuation allowance | | (675) | (678) |
| **Total net deferred tax assets** | | **39,360** | **21,464** |
| **Net deferred tax assets** | $ | **3,956** $ | **8,816** |

The components of income tax expense are as follows:

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| (in thousands) | | 2019 | 2018 | 2017 |
| **Current income tax expense** | | | | |
| Federal | $ | 27,385 $ | 40,347 $ | 30,009 |
| State | | 6,299 | 11,133 | 5,988 |
| **Total current income tax expense** | | **33,684** | **51,480** | **35,997** |
| **Deferred income tax (benefit) expense** | | | | |
| Federal | | 4,016 | (3,398) | 9,549 |
| State | | 844 | (1,135) | 193 |
| **Total deferred income tax (benefit) expense** | | **4,860** | **(4,533)** | **9,742** |
| **Total income tax expense** | $ | **38,544** $ | **46,947** $ | **45,739** |

F-23

## Notes to the Consolidated Financial Statements

In 2016, we prospectively adopted ASU No. 2016-09, *Compensation-Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting.* We recognized an income tax benefit of $14.6 million in 2019, $3.9 million in 2018 and $6.8 million in 2017 related to excess tax benefits from the vesting of long-term incentive awards and restricted stock awards.

The reconciliation of income tax expense computed at U.S. federal statutory tax rates to the reported income tax expense from continuing operations is as follows:

| | | Year Ended December 31, | | |
| --- | --- | --- | --- | --- |
| (in thousands) | | 2019 | 2018 | 2017 |
| Expected income tax expense at 21%, 21% and 35%, respectively | $ | 39,825 $ | 38,296 $ | 45,549 |
| State income taxes, net of federal benefit | | 5,821 | 7,660 | 4,085 |
| Nondeductible expenses | | 5,959 | 4,831 | 2,649 |
| Section 199 benefits | | — | — | (875) |
| Equity compensation | | (12,120) | (2,737) | (6,218) |
| Research and development credit | | (1,069) | (856) | (634) |
| Disaster employee retention credit | | — | — | (669) |
| Enactment of the 2017 Tax Reform Act | | — | — | 2,559 |
| Other, net | | 128 | (247) | (707) |
| **Reported total income tax expense** | $ | **38,544** $ | **46,947** $ | **45,739** |

At December 31, 2019, we have net operating loss carryforwards totaling $2.5 million that expire from 2023 to 2030 related to an acquisition that occurred in 2010.

We recognize interest and penalties related to uncertain tax positions in income tax expense. As of December 31, 2019, 2018 and 2017, we made no provisions for interest or penalties related to uncertain tax positions. The tax years 2016 through 2018 remain open to examination by the Internal Revenue Service of the United States. The tax years 2015 through 2018 remain open to examination by various state tax authorities.

### 8.    Stockholders' Equity

#### *Two-for-One Stock Split*

On December 18, 2017, we effected a two-for-one stock split in the form of a 100% stock dividend. Share and per share amounts for 2017 presented in these financial statements have been retroactively restated to reflect this change in our capital structure.

#### *Repurchase Program*

Our Board of Directors (the "Board") has authorized a program to repurchase shares of our outstanding common stock ("Repurchase Program"). The purchases are to be made from time to time in the open market or directly from stockholders at prevailing market prices based on market conditions or other factors. We repurchased 1,897,322 shares under the Repurchase Program during 2019. In addition, 227,208 shares were withheld during 2019 to satisfy minimum tax withholding obligations for the vesting of long-term incentive and restricted stock awards, which are not subject to the Repurchase Program. In 2019, the Board authorized an increase of 700,000 shares that may be repurchased under the Repurchase Program. During 2018, we repurchased 1,066,409 shares under the Repurchase Program and 132,021 shares were withheld to satisfy minimum tax withholding obligations for the vesting of long-term incentive and restricted stock awards. At December 31, 2019, we were authorized to repurchase an additional 413,833 shares under the Repurchase Program. Shares repurchased under the Repurchase Program are recorded in treasury.

## Notes to the Consolidated Financial Statements

### Dividends

The Board declared quarterly dividends as follows:

| (amounts per share) | 2019 | 2018 |
|---|---|---|
| First quarter | $ 0.30 | $ 0.20 |
| Second quarter | 0.30 | 0.20 |
| Third quarter | 0.30 | 0.20 |
| Fourth quarter | 0.30 | 0.20 |

During 2019 and 2018, we paid a total of $48.6 million and $33.4 million, respectively, in dividends.

### Preferred Stock

At December 31, 2019, 20 million shares of preferred stock were authorized.

### 9.    Incentive Plans

The Insperity, Inc. 2001 Incentive Plan, as amended, and the 2012 Incentive Plan, as amended, (collectively, the "Incentive Plans") provide for options and other stock-based awards that have been and may be granted to eligible employees and non-employee directors of Insperity or its subsidiaries. The 2012 Incentive Plan is currently the only plan under which new stock-based awards may be granted. The Incentive Plans are administered by the Compensation Committee of the Board (the "Committee"). The Committee has the power to determine which eligible employees will receive awards, the timing and manner of the grant of such awards, the exercise price of stock options (which may not be less than market value on the date of grant), the number of shares and all of the terms of the awards. The Board may at any time amend or terminate the Incentive Plans. However, no amendment that would impair the rights of any participant, with respect to outstanding grants, can be made without the participant's prior consent. Stockholder approval of amendments to the Incentive Plans is necessary only when required by applicable law or stock exchange rules. At December 31, 2019, 2,615,253 shares of common stock were available for future grants under the 2012 Incentive Plan. The 2001 Incentive Plan only has outstanding nonqualified stock options. The 2012 Incentive Plan permits stock options, including nonqualified stock options and options intended to qualify as "incentive stock options" within the meaning of Section 422 of the Internal Revenue Code, stock awards, phantom stock awards, stock appreciation rights, performance units, and other stock-based awards and cash awards, all of which may or may not be subject to the achievement of one or more performance objectives. The purpose of the Incentive Plan generally is to retain and attract persons of training, experience and ability to serve as employees of Insperity and its subsidiaries and to serve as non-employee directors of Insperity, to encourage the sense of proprietorship of such persons and to stimulate the active interest of such persons in the development and financial success of Insperity and its subsidiaries.

We also maintain the Insperity, Inc. LTIP under the 2012 Incentive Plan. The LTIP provides for performance-based long-term compensation awards in the form of performance units to certain employees based on the achievement of pre-established performance goals. We granted performance units under the LTIP to our named executive officers and certain other officers in 2017, 2018 and 2019.

We recognized $24.0 million, $20.4 million and $24.3 million of compensation expense associated with the restricted stock and the LTIP awards in 2019, 2018 and 2017, respectively. Included in 2017, is $2.3 million of stock-based compensation associated with the acceleration of restricted stock awards from the first quarter of 2018 to December 2017 in order to maximize our tax deduction, which would have been limited under the 2017 Tax Reform Act. We recognized $4.9 million, $5.3 million and $8.5 million of tax benefits associated with stock-based compensation in 2019, 2018 and 2017, respectively.

## Notes to the Consolidated Financial Statements

*Restricted Stock Awards*

Restricted common shares, under equity plan accounting, are generally measured at fair value on the date of grant based on the number of shares granted, estimated forfeitures and the quoted price of the common stock. Such value is recognized as compensation expense over the corresponding vesting period, three years to five years for our shares currently outstanding. The total fair value of shares vested during the years ended December 31, 2019, 2018, and 2017 was $39.7 million, $1.2 million and $46.0 million, respectively. The weighted average grant date fair value of restricted stock awards granted during the years ended December 31, 2019, 2018 and 2017 was $124.04, $65.98 and $42.15, respectively. As of December 31, 2019, unrecognized compensation expense associated with the unvested shares outstanding was  $23.9 million and is expected to be recognized over a weighted average period of 22 months.

The following is a summary of restricted stock award activity for  2019:

|  | Shares (in thousands) | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Non-vested - December 31, 2018 | 582 | $ | 49.48 |
| Granted | 200 | | 124.04 |
| Vested | (320) | | 43.75 |
| Canceled | (19) | | 77.83 |
| **Non-vested - December 31, 2019** | **443** | **$** | **86.10** |

*Long-Term Incentive Program Awards*

Each performance unit represents the right to receive common shares at a future date based on our performance against specified targets. The ultimate number of shares issued and the related compensation cost recognized is based on a comparison of the final performance metrics to the specified targets, which can range from 0% to 200% of the targeted amounts. A performance unit may be comprised of either a performance based award or a market-based award. For performance based awards, performance units have a vesting schedule of three years and compensation expense is recognized based on the number of common shares expected to be issued and the market price per common share on the date of grant. Over the performance period, the number of shares expected to be issued is adjusted upward or downward based upon the probability of achievement of the performance targets. For market-based awards, performance units vest at the end of a three-year period assuming continued employment and achievement of market-based performance goals. The fair value of market-based performance awards was determined through the use of the Monte Carlo simulation method. The compensation expense for the LTIP awards is recognized on a straight-line basis over the vesting terms.

The following is a summary of LTIP award activity, at 100% of targeted amount, for  2019:

|  | Number of Performance Units (in thousands) | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Unvested at December 31, 2018 | 426 | $ | 46.35 |
| Granted | 59 | | 139.71 |
| Vested | (207) | | 29.57 |
| Canceled | (6) | | 61.47 |
| **Unvested at December 31, 2019** | **272** | **$** | **79.95** |

The determination of achievement results and corresponding vesting of the  2016 LTIP awards occurred in February  2019 resulting in the recipients receiving approximately 352,000 shares of common stock with a fair value  $45.1 million. As of  December 31, 2019, we estimate that approximately 211,000, 130,000 and 21,000 shares will vest with  $0.3 million, $3.2 million and $1.9 million in unamortized compensation expense related to the 2017, 2018 and 2019 LTIP grants, respectively.

**F-26**

## Notes to the Consolidated Financial Statements

### Employee Stock Purchase Plan

Our employee stock purchase plan (the "ESPP") enables employees to purchase shares of Insperity stock at a 5% discount. The ESPP is a non-compensatory plan under generally accepted accounting principles of stock-based compensation. As a result, no compensation expense is recognized in conjunction with this plan. Approximately 29,000, 30,000 and 38,000 shares were issued from treasury under the ESPP during fiscal years 2019, 2018 and 2017, respectively.

### 10.   Net Income Per Share

We utilize the two-class method to compute net income per share. The two-class method allocates a portion of net income to participating securities, which includes unvested awards of share-based payments with non-forfeitable rights to receive dividends. Net income allocated to unvested share-based payments is excluded from net income allocated to common shares. Any undistributed losses resulting from dividends exceeding net income are not allocated to participating securities. Basic net income per share is computed by dividing net income allocated to common shares by the weighted average number of common shares outstanding during the period. Diluted net income per share is computed by dividing net income allocated to common shares by the weighted average number of common shares outstanding during the period, plus the dilutive effect of outstanding stock options.

The following table summarizes the net income allocated to common shares and the basic and diluted shares used in the net income per share computations:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| (in thousands) | 2019 | 2018 | 2017 |
| Net income | $ 151,099 | $ 135,413 | $ 84,402 |
| Less distributed and undistributed earnings allocated to participating securities | (1,759) | (1,875) | (1,517) |
| **Net income allocated to common shares** | **$ 149,340** | **$ 133,538** | **$ 82,885** |
| | | | |
| Weighted average common shares outstanding | 40,186 | 41,217 | 41,067 |
| Incremental shares from assumed LTIP awards and conversions of common stock options | 166 | 289 | 204 |
| **Adjusted weighted average common shares outstanding** | **40,352** | **41,506** | **41,271** |
| | | | |
| Potentially dilutive securities not included in weighted average share calculation due to anti-dilutive effect | — | — | — |

### 11.   Leases

In 2019, we adopted ASU No. 2016-02, *Leases* (Topic 842). We have operating leases for office space, other operating facilities, vehicles and office equipment. Our fixed operating lease costs for 2019, 2018 and 2017 were $15.9 million, $15.4 million and $15.4 million, respectively, and are included in general and administrative expenses on our Consolidated Statements of Operations. During 2019, cash paid for amounts included in the measurement of operating lease liabilities was $17.1 million.

## Notes to the Consolidated Financial Statements

The following table presents the lease balances within our Consolidated Balance Sheets, weighted average lease term and weighted average discount rates related to our operating leases:

| (dollars in thousands) | Classification in Consolidated Balance Sheets | | December 31, 2019 |
|---|---|---|---|
| Operating lease ROU assets | Right-of-use leased assets | $ | 56,886 |
| Lease liabilities: | | | |
| Current operating lease liabilities | Other accrued liabilities | $ | 15,143 |
| Long-term operating lease liabilities | Operating lease liabilities, net of current | | 58,863 |
| **Total operating lease liabilities** | | $ | **74,006** |
| Less: | | | |
| Landlord funded tenant improvements | | $ | 12,397 |
| Deferred rent | | | 4,723 |
| **Operating lease ROU assets** | | $ | **56,886** |
| | | | |
| Weighted average remaining lease term (years) | | | 6 |
| Weighted average discount rate | | | 4.5% |

The following presents the maturity of our operating leases liabilities as of December 31, 2019:

| (in thousands) | | Operating Leases |
|---|---|---|
| 2020 | $ | 18,087 |
| 2021 | | 15,611 |
| 2022 | | 14,206 |
| 2023 | | 11,682 |
| 2024 | | 8,952 |
| Thereafter | | 15,758 |
| **Total remaining obligation** | | **84,296** |
| Less imputed interest | | 10,290 |
| **Present value of lease liabilities** | $ | **74,006** |

As of December 31, 2019, we have additional operating leases that have not yet commenced of $16.1 million with lease terms ranging from 4 years to 8 years.

## 12.  Commitments and Contingencies

We enter into fixed purchase and service obligations in the ordinary course of business. These arrangements primarily consist of, advertising commitments and service contracts. At December 31, 2019, future purchase and service obligations greater than $100,000 and one year were as follows (in thousands):

| | | |
|---|---|---|
| 2020 | $ | 79,562 [1] |
| 2021 | | 16,994 |
| 2022 | | 8,234 |
| 2023 | | 3,188 |
| 2024 | | 1,295 |
| Thereafter | | 678 |
| **Total obligations** | $ | **109,951** |

[1]  Includes $56.5 million related to the construction of a new facility on our corporate campus.

## Notes to the Consolidated Financial Statements

### Worksite Employee 401(k) Retirement Plan Class Action Litigation

In December 2015, a class action lawsuit was filed against us and a third-party who served as the discretionary trustee of the Insperity 401(k) retirement plan that is available to eligible worksite employees (the "Plan") in the United States District Court for the Northern District of Georgia, Atlanta Division, on behalf of Plan participants. The suit generally alleges the third-party discretionary trustee of the Plan and Insperity breached their fiduciary duties to plan participants by selecting an Insperity subsidiary to serve as the recordkeeper for the Plan, by causing participants in the Plan to pay excessive recordkeeping fees to the Insperity subsidiary, by failing to monitor other fiduciaries, and by making imprudent investment choices. The court certified a class defined as "all participants and beneficiaries of the Insperity 401(k) Plan from December 22, 2009 through September 30, 2017." The court dismissed the breach of fiduciary duty claims relating to the selection of an Insperity subsidiary to serve as the recordkeeper of the Plan. On March 28, 2019, the court partially granted Insperity's motion for summary judgment, resulting in the dismissal of the claims concerning allegations of excessive recordkeeping fees. The court has denied plaintiffs' request for a jury trial and has set a bench trial for March 2, 2020. With respect to plaintiffs' remaining claims, plaintiffs allege damages up to $146.0 million against all defendants. We believe we have meritorious defenses, and we intend to vigorously defend this litigation. As a result of uncertainty regarding the outcome of this matter, no provision has been made in the accompanying Consolidated Financial Statements.

### Other Litigation

We are a defendant in various other lawsuits and claims arising in the normal course of business. Management believes it has valid defenses in these cases and is defending them vigorously. While the results of litigation cannot be predicted with certainty, management believes the final outcome of such litigation will not have a material adverse effect on our financial position or results of operations.

### 13. Quarterly Financial Data (Unaudited)

| | Quarter Ended | | | |
|---|---|---|---|---|
| (in thousands, except per share amounts) | March 31 | June 30 | Sept. 30 | Dec. 31 |
| **2019** | | | | |
| Revenues | $ 1,153,010 | $ 1,043,316 | $ 1,043,388 | $ 1,075,090 |
| Gross profit | 226,717 | 173,735 | 170,546 | 161,936 |
| Operating income | 85,461 | 38,720 | 34,733 | 27,719 |
| Net income | 76,289 | 28,556 | 25,859 | 20,395 |
| Basic net income per share | 1.86 | 0.69 | 0.64 | 0.51 |
| Diluted net income per share | 1.85 | 0.69 | 0.63 | 0.51 |
| **2018** | | | | |
| Revenues | $ 1,014,372 | $ 922,295 | $ 925,126 | $ 966,756 |
| Gross profit | 199,720 | 154,544 | 166,054 | 161,591 |
| Operating income | 64,703 | 33,581 | 48,133 | 32,619 |
| Net income | 49,991 | 24,560 | 36,207 | 24,655 |
| Basic net income per share | 1.20 | 0.59 | 0.86 | 0.59 |
| Diluted net income per share | 1.18 | 0.58 | 0.86 | 0.59 |

**Exhibit 4.2**

**DESCRIPTION OF REGISTRANT'S SECURITIES
REGISTERED PURSUANT TO SECTION 12 OF THE
SECURITIES EXCHANGE ACT OF 1934**

**DESCRIPTION OF COMMON STOCK**

The following description of the common stock, par value $0.01 per share, of Insperity, Inc. is based upon Insperity's amended and restated certificate of incorporation ("Certificate of Incorporation"), Insperity's amended and restated bylaws ("Bylaws"), and applicable provisions of law. We have summarized certain portions of the Certificate of Incorporation and Bylaws below. The summary is not complete and is subject to, and is qualified in its entirety by express reference to, the provisions of the Certificate of Incorporation and Bylaws, each of which is filed as an exhibit to the Annual Report on Form 10-K of which this Exhibit 4.2 is a part.

**Authorized Capital Stock**

Under the Certificate of Incorporation, Insperity may issue an aggregate of 120,000,000 shares of common stock, par value $0.01 per share, and an aggregate of 20,000,000 shares of preferred stock, par value $0.01 per share.

**Common Stock**

*Common Stock Outstanding.* The outstanding shares of Insperity's common stock are duly authorized, validly issued, fully paid and nonassessable. The principal United States market for our common stock is the New York Stock Exchange, where it is traded under the symbol "NSP."

*Voting Rights.* Each holder of shares of Insperity's common stock is entitled to one vote for each share held on all matters voted upon by our stockholders, including the election of directors. Stockholders are not entitled to cumulative voting rights. Except as otherwise provided by law, the Certificate of Incorporation, or the Bylaws, the holders of a majority of Insperity's stock issued and outstanding and entitled to vote at a meeting, present in person or represented by proxy, without regard to class or series, constitutes a quorum at all meetings of the stockholders for the transaction of business. Unless otherwise provided by applicable law, the rules or regulations of any applicable stock exchange, the Certificate of Incorporation, or the Bylaws, if a quorum is present, action on a matter presented to stockholders (other than the election of directors) shall be approved if the votes cast in favor of the matter exceed the votes cast opposing the matter. In any uncontested elections of directors (i.e. an election in which the number of candidates for election as directors does not exceed the number of directors to be elected), a director nominee for our Board of Directors will be elected by the affirmative vote of a majority of the votes cast in a meeting in which a quorum is determined to exist. In a contested election, a plurality voting standard will apply to director elections. Directors are elected until the expiration of the term for which they are elected and until their respective successors are duly elected and qualified. For purposes of this paragraph, a majority of votes cast means that the number of shares voted "for" a director's election exceeds the number of shares voted "against" such director's election. "Votes cast" excludes abstentions with respect to that director's election.

*Dividend Rights.* Subject to the rights of the holders of any outstanding shares of preferred stock, holders of Insperity's common stock are entitled to receive dividends when, as and if declared by the Board of Directors out of funds legally available therefor.

*Rights upon Liquidation.* In the event of our voluntary or involuntary liquidation, dissolution or winding up, after the payment or provision for payment of our debts and other liabilities and the preferential amounts to which holders of our preferred stock are entitled (if any shares of preferred stock are then outstanding), the holders of our common stock are entitled to share ratably in our remaining assets.

**Exhibit 4.2**

*Rights and Preferences*. Holders of common stock have no preemptive, conversion, subscription or other rights, and there are no redemption or sinking fund provisions applicable to our common stock. The rights, preferences and privileges of the holders of common stock are subject to and may be adversely affected by the rights of the holders of shares of any series of preferred stock that we may designate in the future.

*Transfer Agent and Registrar*. The transfer agent and registrar for our common stock is Computershare Trust Company, N.A. The transfer agent and registrar's address is 250 Royall Street, Canton, Massachusetts 02021.

**Anti-Takeover Provisions of Delaware Law**

*Delaware Anti-Takeover Statute.* We are subject to Section 203 of the General Corporation Law of the State of Delaware ("Section 203"). In general, Section 203 prohibits a publicly held Delaware corporation from engaging in various "business combination" transactions with an "interested stockholder" for a period of three years after the date of the transaction in which the person became an interested stockholder, unless:

- prior to that date, the board of directors of the corporation approved either the business combination or the transaction that resulted in the stockholder becoming an interested stockholder;

- upon consummation of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced (excluding certain shares described in Section 203); or

- on or subsequent to that date, the business combination is approved by the board of directors of the corporation and authorized at an annual or special meeting of stockholders by the affirmative vote of at least two-thirds of the outstanding voting stock that is not owned by the "interested stockholder."

A "business combination" is defined to include mergers, asset sales, and other transactions resulting in financial benefit to a stockholder. In general, an "interested stockholder" is a person who, together with affiliates and associates, owns (or within three years, did own) 15% or more of a corporation's voting stock. The statute could prohibit or delay mergers or other takeover or change in control attempts with respect to the Company's common stock and, accordingly, may discourage attempts to acquire us even though such a transaction may offer the Company's stockholders the opportunity to sell their stock at a price above the prevailing market price.

**Anti-Takeover Provisions of Insperity's Certificate of Incorporation and Bylaws**

*Available but Unissued Preferred Stock.* Under the Certificate of Incorporation, without further stockholder action, our Board of Directors is authorized, subject to any limitations prescribed by the law of the State of Delaware, to provide for the issuance of shares of preferred stock in one or more series, to establish from time to time the number of shares to be included in each such series, to fix the designation, powers, preferences and rights of the shares of each such series and any qualifications, limitations or restrictions thereof, and to increase or decrease the number of shares of any such series. The ability to authorize undesignated preferred stock will make it possible for our Board of Directors to issue preferred stock with voting or other rights or preferences that could impede the success of any attempt to change control of Insperity. These and other provisions may have the effect of deterring hostile takeovers or delaying changes in control or management of Insperity.

*Classification of the Board of Directors; Election and Removal of Directors; Filing Vacancies* Our Board of Directors is divided into three classes. Each class of directors consists, as nearly as possible, of one-third of the total number of directors constituting the entire Board of Directors. Our Board of Directors may consist of not less than three nor more than 15 members.

Directors may be removed only for cause and then only upon the affirmative vote of the holders of a majority of the shares entitled to vote at an election of directors. Any vacancy on our Board of Directors, including a vacancy

**Exhibit 4.2**

resulting from an increase in the size of our Board of Directors, may be filled by a majority vote of the directors then in office, even if less than a quorum, or by the sole remaining director.

*Amendment of the Certificate of Incorporation and the Bylaws.* The Certificate of Incorporation requires the affirmative vote of 66-2/3 percent of the total voting power of all shares of Insperity's stock entitled to vote in the election of directors in order to amend, alter or repeal certain provisions of the Certificate of Incorporation, including those relating to:

- the maximum number of directors of our Board of Directors,

- the classes of our Board of Directors,

- the right of our Board of Directors to amend the Bylaws,

- the minimum voting requirement for stockholders to amend the Bylaws,

- the limitation on stockholders to act by written consent,

- the authority of our Board of Directors to create and issue rights to purchase Insperity stock,

- limitations on liability of directors as allowed under the General Corporation Law of Delaware.

The Bylaws provide that the stockholders may not repeal or change any of the provisions of the Bylaws unless such repeal or change is approved by the affirmative vote of the holders of not less than 80% of the total voting power of all shares of Insperity stock entitled to vote in the election of directors.

*No Stockholder Action by Written Consent.* The Certificate of Incorporation and Bylaws do not provide for the right of stockholders to act by written consent without a meeting.

*Advance Notice for Stockholder Proposals.* The Bylaws sets forth advance notice procedures with respect to stockholder proposals and the nomination of candidates for election as directors, other than nominations made by or at the direction of the Board of Directors or a committee of the Board of Directors.

*Special Meetings.* The Certificate of Incorporation and Bylaws vest the power to call special meetings of stockholders in the Board of Directors or stockholders holding shares representing not less than 25% of the outstanding votes entitled to vote at the meeting.

**Exhibit 10.18**

**INSPERITY, INC. 2012 INCENTIVE PLAN**
**(as Amended and Restated Effective June 16, 2017)**

**RESTRICTED STOCK UNIT AGREEMENT**

This Restricted Stock Unit Agreement (this "*Agreement*") is between Insperity, Inc. (the "*Company*") and _____ (the "*Grantee*"), an employee of the Company or one of its Subsidiaries, regarding an award (this "*Award*") of restricted stock units, each representing one share of Common Stock (as defined in the Insperity, Inc. 2012 Incentive Plan, as amended and restated effective June 16, 2017 (the "*Plan*"), such units comprising this Award referred to herein as "*Restricted Stock Units*") awarded to the Grantee on _____ (the "*Award Date*"), such number of Restricted Stock Units subject to adjustment as provided in the Plan, and further subject to the following terms and conditions:

1.   **Relationship to Plan.** This Award is subject to all of the terms, conditions and provisions of, and administrative interpretations under, the Plan, if any, which have been adopted by the Committee thereunder. Any question of interpretation arising under this Agreement shall be determined by the Committee and its determinations shall be final and conclusive upon all parties in interest. Except as defined herein, capitalized terms shall have the same meanings ascribed to them under the Plan.

2.   **Vesting Schedule.**

(a)   Subject to Sections 2(b), 2(c), 2(d) and 3 below, _____ (\_\_\_\_) of the Restricted Stock Units granted under this Award shall become vested on each annual anniversary of the Award Date (each a " *Vesting Date*"), subject to the Grantee's continuous Employment from the Award Date until (and as of) each Vesting Date.

(b)   Unvested Restricted Stock Units subject to this Award shall not partially or fully vest or otherwise accelerate vesting solely as the result of a Change in Control.

(c)   All unvested Restricted Stock Units subject to this Award shall vest, irrespective of the limitations set forth in subparagraph (a) above, provided that the Grantee has been in continuous Employment since the Award Date, upon the occurrence of:

(i)   a Qualifying Termination;

(ii)   a Non-Assumption; or

(iii)   the Grantee's termination of Employment by reason of death or Disability.

Officer RSU Award_ Dec 2019

(d)    If the Grantee's Employment terminates due to the Grantee's Retirement, the Grantee will continue to vest in the remaining unvested Restricted Stock Units, if any, on the applicable annual Vesting Date in accordance with Section 2(a) or accelerated vesting under Section 2(c)(ii) and (iii) as if the Grantee had remained in continuous Employment through the applicable annual Vesting Date or vesting event, respectively.

(e)    For purposes of this Agreement:

(i)    "*Cause*" shall be determined solely by the Compensation Committee and means a termination of Grantee's Employment for:

   a.    Gross negligence or willful misconduct in the performance of the Grantee's duties;

   b.    Conviction or plea of *nolo contendre* for a felony or any crime involving moral turpitude; or

   c.    Committing an act of fraud or deceit intended to result in personal and unauthorized enrichment of Grantee at the Company's expense.

(ii)    "*Disability*" means that the Grantee has a disability such that he has been determined to be eligible for benefits under a long-term disability plan sponsored by the Company or a Subsidiary or, if the Grantee is not covered by such a plan, a physical or mental impairment (a) which causes a Grantee to be unable to perform the normal duties for an employer as determined by the Committee in its sole discretion; and (b) which is expected either to result in death (or blindness) or to last for a continuous period of at least twelve (12) months. The Committee may require that the Grantee be examined by a physician or physicians selected by the Committee.

(iii)    "*Employment*" means employment with the Company, a successor following a Change in Control or a Subsidiary other than a Subsidiary that is a licensed professional employer organization.

(iv)    A "*Non-Assumption*" shall be deemed to occur on the date of the consummation of an event that constitutes a Change in Control as defined solely under the definition of Change in Control in section 2 of the Plan, where in connection with such Change in Control, the successor entity, or a parent of the successor entity, has not agreed to assume, replace or substitute this Award with another award of equivalent or greater value, and on substantially similar or more favorable terms.

(v)    "*Qualifying Termination*" means a termination of the Grantee's Employment within eighteen (18) months following a Change in Control for one of the following reasons:

    a.  A termination initiated by the Grantee due to items (1) through (4) below referred to herein as "*Good Reason*" that the Grantee has not consented to in writing:

        (1)    A material diminution in the Grantee's title, position, authority, duties or responsibilities from those applicable to Grantee preceding the Change in Control;

        (2)    A change in the geographic location at which Grantee must perform services, which shall mean requiring Grantee to be permanently based more than 50 miles from the Grantee's principal Company location;

        (3)    A material diminution in Grantee's base salary other than as part of an across-the-board reduction applicable to all the Company's executives of less than ten (10) percent; or

        (4)    A material diminution in Grantee's bonus opportunity, incentive compensation or perquisites, if inconsistent with other executives with similar levels of authority, duties or responsibilities; or

    b.  An involuntary termination by the Company or Subsidiary other than for Cause.

For purposes of this Agreement, the Grantee's termination of Employment will be considered to be a Qualifying Termination for Good Reason if the Grantee has provided written notice to the Company of the condition the Grantee claims constitutes Good Reason within ninety (90) days of the initial existence of such condition, the condition specified in the notice remains uncorrected for thirty (30) days after receipt of the notice by the Company, and the Grantee actually terminates Employment after the thirty (30) day correction period and before the expiration of the time limit required of a Qualifying Termination.

(vi)    "*Retirement*" means the Grantee's voluntary termination of Employment other than for Good Reason (and other than an involuntary termination by the Company for Cause) satisfying all of the following conditions:

3    Officer RSU Award_ Dec 2019

a. the Grantee submits a voluntary request for retirement that is accepted by the Company or Subsidiary;

b. the Grantee's Employment terminates on or after the date that the Grantee has attained sixty-two (62) years of age and has at least fifteen (15) years of continuous Employment as of the termination date;

c. the Grantee's Employment terminates on or after the date that is six (6) months after the Grant Date; and

d. the Grantee executes an effective Waiver and Release Agreement. In order for a Waiver and Release Agreement to be effective for purposes of Retirement, the Waiver and Release Agreement must be:

(1)   Executed and returned to the Company after termination of the Grantee's Employment,

(2)    Unrevoked by the Grantee during the seven (7) day period following the date of execution, and

(3)   Effective and irrevocable no later than the thirtieth (30th) day after the date of a Grantee's termination of Employment.

(vii)   "*Waiver and Release Agreement*" means the legal document in a form approved by the Company, in which a Grantee, in exchange for the benefits specified in Section 2(d), releases the Company and other related parties, from liability and damages arising from or in connection with the Grantee's termination of Employment with the Company or its Subsidiaries.

4    Officer RSU Award_ Dec 2019

3 .    **Forfeiture of Award.** Except as provided in another written agreement between the Grantee and the Company, if the Grantee's Employment terminates other than by reason of death, Disability, Retirement or Qualifying Termination pursuant to the provisions of Section 2, all unvested Restricted Stock Units as of the Employment termination date shall be forfeited. Except in the case of a Qualifying Termination, the Company has sole discretionary authority to determine when a Grantee's Employment terminates for all purposes under this Agreement and the Plan. If a Grantee's Employment terminates due to Retirement, all unvested Restricted Stock Units as of the Grantee's termination date shall expire on the date that is thirty (30) days after the Grantee's termination of Employment unless the Grantee has delivered a timely, effective and irrevocable Waiver and Release Agreement on or before such thirtieth (30th) day.

4 .    **Dividend Equivalents; No Shareholder Rights.** During the period of time between the Award Date and the earlier of the settlement date or forfeiture date of the Restricted Stock Units, the Restricted Stock Units shall be evidenced by book entry registration. With respect to each Restricted Stock Unit that becomes vested, at the same time such Award is settled pursuant to Section 5, the Grantee is entitled to receive a stock dividend equivalent payment equal to all dividends and other distributions made with respect to a share of Common Stock during the period between the Award Date and the Vesting Date. The Grantee shall have no rights of a shareholder with respect to Restricted Stock Units until and unless shares of Common Stock are transferred to the Grantee.

5.    **Settlement and Delivery of Shares.** The Grantee will receive one share of Common Stock with respect to each Restricted Stock Unit that becomes vested as of a Vesting Date, which shall be delivered to the Grantee as soon as administratively practicable, but not later than thirty (30) days following the date the Restricted Stock Unit becomes vested. The Company shall not be obligated to deliver any shares of Common Stock if counsel to the Company determines that such sale or delivery would violate any applicable law or any rule or regulation of any governmental authority or any rule or regulation of, or agreement of the Company with, any national securities exchange or inter-dealer quotation system upon which the Common Stock is listed or quoted. In no event shall the Company be obligated to take any affirmative action in order to cause the delivery of shares of Common Stock to comply with any such law, rule, regulation or agreement.

6.    **Notices and Disclosure.** Unless the Company notifies the Grantee in writing of a different procedure, any notice or other communication to the Company with respect to this Award shall be in writing and shall be delivered:

(a)    by registered or certified United States mail, postage prepaid, to Insperity, Inc., Attn: General Counsel, 19001 Crescent Springs Drive, Kingwood, Texas 77339;

(b)    by hand delivery or otherwise to Insperity, Inc., Attn:  General Counsel, 19001 Crescent Springs Drive, Kingwood, Texas 77339; or

(c)    by email to the Company's General Counsel or his delegate.

Notwithstanding the foregoing, in the event that the address of the Company is changed, notices shall instead be made pursuant to the foregoing provisions at the Company's then current address.

Any notices provided for in this Agreement or in the Plan shall be given in writing and shall be deemed effectively delivered or given upon receipt or, in the case of notices delivered by the Company to the Grantee, five days (5) after deposit in the United States mail, postage prepaid, addressed to the Grantee at the address specified at the end of this Agreement or at such other address as the Grantee hereafter designates by written notice to the Company.

The foregoing notwithstanding, the Grantee agrees that the Company may deliver by email all documents relating to the Plan or this Award (including, without limitation, prospectuses required by the Securities and Exchange Commission) and all other documents that the Company is required to deliver to its security holders (including, without limitation, annual reports and proxy statements). The Grantee also agrees that the Company may deliver these documents by posting them on a web site maintained by the Company or by a third party under contract with the Company. If the Company posts these documents on a web site, such posting is deemed to notify the Grantee.

7. **No Transfer or Assignment of Award.**  Except as otherwise permitted by the Committee, the Grantee's rights under the Plan and this Agreement are personal; no assignment or transfer of the Grantee's rights under and interest in this Award may be made by the Grantee other than by will or by the laws of descent and distribution or by a qualified domestic relations order, and this Award is payable during his lifetime only to the Grantee, or in the case of a Grantee who is mentally incapacitated, this Award shall be payable to his guardian or legal representative.

8. **Payment of Par Value.** In the event that the Company does not settle the Award from the Company's treasury shares or in consideration of the Grantee's past service, the Company's obligation to deliver the shares of Common Stock to Grantee upon the vesting of Restricted Stock Units shall be subject to the payment in full of the requisite par value per share of the shares of Common Stock prior to such issuance (collectively, the "***Par Value***"). The Grantee approves and authorizes the Company to deduct the Par Value of the shares of Common Stock from the Grantee's payroll from the Company or its affiliates. If the Company is unable to or otherwise does not make such payroll deduction, Grantee acknowledges and agrees that he shall be responsible for the payment of any and all federal, state and local taxes on such income if the Company pays the Par Value on behalf of Grantee.

9. **Withholding.** The Company's obligation to deliver shares of Common Stock to the Grantee upon the vesting of Restricted Stock Units shall be subject to the satisfaction of all applicable federal, state and local income and employment tax withholding requirements (the "***Required Withholding***"). The Company shall withhold from the Common Stock that would otherwise have been delivered to the Grantee the number of shares necessary to satisfy the Grantee's Required Withholding, and deliver the remaining whole shares of Common Stock to the Grantee, unless the Grantee has made arrangements with the Company for the Grantee to deliver to the Company cash, a check or other available funds for the full amount of the Required Withholding

by 5:00 p.m. Central Standard Time on the date the Restricted Stock Units become vested. The amount of the Required Withholding and the number of shares of Common Stock to be withheld by the Company, if applicable, to satisfy the Grantee's Required Withholding, shall be based on the Fair Market Value of the shares of Common Stock on the date prior to the applicable date of vesting and shall be limited to the withholding amount calculated using the minimum statutory withholding rates or; in accordance with any policy adopted by the Company, such other applicable withholding rates not in excess of the maximum statutory rates in effect for the applicable jurisdiction.

10.    **Successors and Assigns.** This Agreement shall bind and inure to the benefit of and be enforceable by the Grantee, the Company and their respective permitted successors and assigns (including personal representatives, heirs and legatees), except that the Grantee may not assign any rights or obligations under this Agreement except to the extent and in the manner expressly permitted herein.

11.    **Right to Employment or Service.** The granting of this Award shall not impose upon the Company any obligation to maintain Grantee as an Employee and shall not diminish the power of the Company to terminate Grantee's Employment at any time. The Company and its Subsidiaries reserve the right to terminate a Grantee's Employment at any time, with or without cause.

12.    **Severability.** If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable for any reason, such invalidity, illegality, or unenforceability shall not affect any of the other terms, provisions, covenants, or conditions of this Agreement, each of which shall be binding and enforceable.

13.    **Governing Law.** This Agreement, to the extent not otherwise governed by mandatory provisions of the Code or the securities laws of the United States, shall be governed by, construed, and enforced in accordance with the laws of the State of Texas.

14.    **Section 409A.** It is the intent of the Company and the Grantee that this Award comply with or be exempt from the requirements of Section 409A and the provisions of this Agreement will be administered, interpreted and construed accordingly. To the extent this Award constitutes "deferred compensation" under Section 409A, (a) the time of settlement of this Award specified in Section 5 is a specified time within the meaning of Treasury Regulation § 1.409A-3(i)(1) and (b) if the Grantee is a "specified employee" within the meaning of Section 409A on the date of his or her "separation from service" within the meaning of Section 409A, any payments of deferred compensation hereunder shall be made on the first to occur of (x) the date that is six (6) months after the date of the Grantee's separation from service, (y) the date of the Grantee's death, or (z) such other date as complies with the requirements of Section 409A.

15.    **Recoupment Policy and Clawback Provision.** Any amounts granted or paid under this Agreement may be subject to the Insperity, Inc. Incentive Compensation Recoupment

Policy or other applicable recoupment or clawback policy of the Company in effect from time to time.

16.     **Entire Agreement; Binding Effect.** This Agreement shall cover all shares of Common Stock acquired by the Grantee pursuant to this Agreement, including any community and/or separate property interest owned by the Grantee's spouse in said shares. All terms, conditions and limitations on transferability imposed under this Agreement upon shares acquired by the Grantee shall apply to any interest of the Grantee's spouse in such shares. This Agreement and the Plan constitute the entire understanding between the parties regarding this Award, and supersedes any and all prior written or oral agreements between the parties with respect to the subject matter hereof. There are no representations, agreements, arrangements, or understanding, either written or oral, between or among the parties with respect to the subject matter hereof which are not set forth in this Agreement. This Agreement is binding upon the Grantee's heirs, executors and personal representatives with respect to all provisions hereof. Except as set forth herein, this Agreement cannot be modified, altered or amended, to the detriment of the Grantee, except by an agreement, in writing, signed by both a duly authorized executive officer of the Company and the Grantee.

**INSPERITY, INC.**

By:__

Name:__

Title:__

8     Officer RSU Award_ Dec 2019

**ACKNOWLEDGEMENT AND ACCEPTANCE BY THE GRANTEE**

I, _____, the undersigned Grantee, hereby acknowledge that I have received a copy of the Insperity, Inc. 2012 Incentive Plan, as amended and restated effective June 16, 2017 (the "***Plan***"), and that I will consult with and rely upon only my own tax, legal and financial advisors regarding the consequences and risks of the Award. I hereby agree to and accept the foregoing Restricted Stock Unit Agreement, subject to the terms and provisions of the Plan and administrative interpretations thereof referred to above.

**GRANTEE:**

Date:___   ___

9    Officer RSU Award_ Dec 2019

**Exhibit 10.19**

**INSPERITY, INC. 2012 INCENTIVE PLAN**
**(as Amended and Restated Effective June 16, 2017)**

**RESTRICTED STOCK UNIT AGREEMENT**

This Restricted Stock Unit Agreement (this "***Agreement***") is between Insperity, Inc. (the "***Company***") and _____ (the "***Grantee***"), an employee of the Company or one of its Subsidiaries, regarding an award (this "***Award***") of restricted stock units, each representing one share of Common Stock (as defined in the Insperity, Inc. 2012 Incentive Plan, as amended and restated effective June 16, 2017 (the "***Plan***"), such units comprising this Award referred to herein as "***Restricted Stock Units***") awarded to the Grantee on _____ (the "***Award Date***"), such number of Restricted Stock Units subject to adjustment as provided in the Plan, and further subject to the following terms and conditions:

1.    **Relationship to Plan.** This Award is subject to all of the terms, conditions and provisions of, and administrative interpretations under, the Plan, if any, which have been adopted by the Committee thereunder.  Any question of interpretation arising under this Agreement shall be determined by the Committee and its determinations shall be final and conclusive upon all parties in interest. Except as defined herein, capitalized terms shall have the same meanings ascribed to them under the Plan.

2.    **Vesting Schedule.**

(a)    Subject to Sections 2(b), 2(c), 2(d) and 3 below, _____ (____) of the Restricted Stock Units granted under this Award shall become vested on each annual anniversary of the Award Date (each a " ***Vesting Date***"), subject to the Grantee's continuous Employment from the Award Date until (and as of) each Vesting Date.

(b)    Unvested Restricted Stock Units subject to this Award shall not partially or fully vest or otherwise accelerate vesting solely as the result of a Change in Control.

(c)    All unvested Restricted Stock Units subject to this Award shall vest, irrespective of the limitations set forth in subparagraph (a) above, provided that the Grantee has been in continuous Employment since the Award Date, upon the occurrence of:

(i)    a Qualifying Termination;

(ii)    a Non-Assumption; or

(iii)    the Grantee's termination of Employment by reason of death or Disability.

(d)    If the Grantee's Employment terminates due to the Grantee's Retirement, the Grantee will continue to vest in the remaining unvested Restricted Stock Units, if any, on the applicable annual Vesting Date in accordance with Section 2(a) or accelerated vesting under Section 2(c)(ii) and (iii) as if the Grantee had remained in continuous Employment through the applicable annual Vesting Date or vesting event, respectively.

(e)    For purposes of this Agreement:

(i)    "***Cause***" shall be determined solely by the Compensation Committee and means a termination of Grantee's Employment for:

a.    Gross negligence or willful misconduct in the performance of the Grantee's duties;

b.    Conviction or plea of *nolo contendre* for a felony or any crime involving moral turpitude; or

c.    Committing an act of fraud or deceit intended to result in personal and unauthorized enrichment of Grantee at the Company's expense.

(ii)    "***Disability***" means that the Grantee has a disability such that he has been determined to be eligible for benefits under a long-term disability plan sponsored by the Company or a Subsidiary or, if the Grantee is not covered by such a plan, a physical or mental impairment (a) which causes a Grantee to be unable to perform the normal duties for an employer as determined by the Committee in its sole discretion; and (b) which is expected either to result in death (or blindness) or to last for a continuous period of at least twelve (12) months. The Committee may require that the Grantee be examined by a physician or physicians selected by the Committee.

(iii)    "*Employment*" means employment with the Company, a successor following a Change in Control or a Subsidiary other than a Subsidiary that is a licensed professional employer organization.

(iv)    A "*Non-Assumption*" shall be deemed to occur on the date of the consummation of an event that constitutes a Change in Control as defined solely under the definition of Change in Control in section 2 of the Plan, where in connection with such Change in Control, the successor entity, or a parent of the successor entity, has not agreed to assume, replace or substitute this Award with another award of equivalent or greater value, and on substantially similar or more favorable terms.

(v)    "*Qualifying Termination*" means a termination of the Grantee's Employment within twelve (12) months following a Change in Control for one of the following reasons:

a.    A termination initiated by the Grantee due to items (1) through (3) below referred to herein as "**Good Reason**" that the Grantee has not consented to in writing:

(1)    A change in the geographic location at which Grantee must perform services, which shall mean requiring Grantee to be permanently based more than 50 miles from the Grantee's principal Company location;

(2)    A material diminution in Grantee's base salary other than as part of an across-the-board reduction applicable to employees at the same salary grade or level of less than ten (10) percent; or

(3)    A material diminution in Grantee's bonus opportunity, incentive compensation or perquisites, if inconsistent with other employees at Grantee's salary grade or level.

b.    An involuntary termination by the Company or Subsidiary other than for Cause.

For purposes of this Agreement, the Grantee's termination of Employment will be considered to be a Qualifying Termination for Good Reason if the Grantee has provided written notice to the Company of the condition the Grantee claims constitutes Good Reason within ninety (90) days of the initial existence of such condition, the condition specified in the notice remains uncorrected for thirty (30) days after receipt of the notice by the Company, and the Grantee actually terminates Employment after the thirty (30) day correction period and before the expiration of the time limit required of a Qualifying Termination.

(vi)    "*Retirement*" means the Grantee's voluntary termination of Employment other than for Good Reason (and other than an involuntary termination by the Company for Cause) satisfying all of the following conditions:

a.    the Grantee submits a voluntary request for retirement that is accepted by the Company or Subsidiary;

b.    the Grantee's Employment terminates on or after the date that the Grantee has attained sixty-two (62) years of age and has at least fifteen (15) years of continuous Employment as of the termination date;

c.    the Grantee's Employment terminates on or after the date that is six (6) months after the Grant Date; and

d.    the Grantee executes an effective Waiver and Release Agreement. In order for a Waiver and Release Agreement to be effective for purposes of Retirement, the Waiver and Release Agreement must be:

(1)    Executed and returned to the Company after termination of the Grantee's Employment,

(2)    Unrevoked by the Grantee during the seven (7) day period following the date of execution, and

(3)    Effective and irrevocable no later than the thirtieth (30th) day after the date of a Grantee's termination of Employment.

(vii)    "*Waiver and Release Agreement*" means the legal document in a form approved by the Company, in which a Grantee, in exchange for the benefits specified in Section 2(d), releases the Company and other related

parties, from liability and damages arising from or in connection with the Grantee's termination of Employment with the Company or its Subsidiaries.

3.    **Forfeiture of Award.** Except as provided in another written agreement between the Grantee and the Company, if the Grantee's Employment terminates other than by reason of death, Disability, Retirement or Qualifying Termination pursuant to the provisions of Section 2, all unvested Restricted Stock Units as of the Employment termination date shall be forfeited. Except in the case of a Qualifying Termination, the Company has sole discretionary authority to determine when a Grantee's Employment terminates for all purposes under this Agreement and the Plan. If a Grantee's Employment terminates due to Retirement, all unvested Restricted Stock Units as of the Grantee's termination date shall expire on the date that is thirty (30) days after the Grantee's termination of Employment unless the Grantee has delivered a timely, effective and irrevocable Waiver and Release Agreement on or before such thirtieth (30th) day.

4.    **Dividend Equivalents; No Shareholder Rights.** During the period of time between the Award Date and the earlier of the settlement date or forfeiture date of the Restricted Stock Units, the Restricted Stock Units shall be evidenced by book entry registration. With respect to each Restricted Stock Unit that becomes vested, at the same time such Award is settled pursuant to Section 5, the Grantee is entitled to receive a stock dividend equivalent payment equal to all dividends and other distributions made with respect to a share of Common Stock during the period between the Award Date and the Vesting Date.  The Grantee shall have no rights of a shareholder with respect to Restricted Stock Units until and unless shares of Common Stock are transferred to the Grantee.

5.    **Settlement and Delivery of Shares.** The Grantee will receive one share of Common Stock with respect to each Restricted Stock Unit that becomes vested as of a Vesting Date, which shall be delivered to the Grantee as soon as administratively practicable, but not later than thirty (30) days following the date the Restricted Stock Unit becomes vested. The Company shall not be obligated to deliver any shares of Common Stock if counsel to the Company determines that such sale or delivery would violate any applicable law or any rule or regulation of any governmental authority or any rule or regulation of, or agreement of the Company with, any national securities exchange or inter-dealer quotation system upon which the Common Stock is listed or quoted. In no event shall the Company be obligated to take any affirmative action in order to cause the delivery of shares of Common Stock to comply with any such law, rule, regulation or agreement.

6.    **Notices and Disclosure.** Unless the Company notifies the Grantee in writing of a different procedure, any notice or other communication to the Company with respect to this Award shall be in writing and shall be delivered:

(a)    by registered or certified United States mail, postage prepaid, to Insperity, Inc., Attn: General Counsel, 19001 Crescent Springs Drive, Kingwood, Texas 77339;

(b)    by hand delivery or otherwise to Insperity, Inc., Attn:  General Counsel, 19001 Crescent Springs Drive, Kingwood, Texas 77339; or

(c)    by email to the Company's General Counsel or his delegate.

Notwithstanding the foregoing, in the event that the address of the Company is changed, notices shall instead be made pursuant to the foregoing provisions at the Company's then current address.

Any notices provided for in this Agreement or in the Plan shall be given in writing and shall be deemed effectively delivered or given upon receipt or, in the case of notices delivered by the Company to the Grantee, five days (5) after deposit in the United States mail, postage prepaid, addressed to the Grantee at the address specified at the end of this Agreement or at such other address as the Grantee hereafter designates by written notice to the Company.

The foregoing notwithstanding, the Grantee agrees that the Company may deliver by email all documents relating to the Plan or this Award (including, without limitation, prospectuses required by the Securities and Exchange Commission) and all other documents that the Company is required to deliver to its security holders (including, without limitation, annual reports and proxy statements). The Grantee also agrees that the Company may deliver these documents by posting them on a web site maintained by the Company or by a third party under contract with the Company. If the Company posts these documents on a web site, such posting is deemed to notify the Grantee.

7.    **No Transfer or Assignment of Award.**  Except as otherwise permitted by the Committee, the Grantee's rights under the Plan and this Agreement are personal; no assignment or transfer of the Grantee's rights under and interest in this Award may be made by the Grantee other than by will or by the laws of descent and distribution or by a qualified domestic relations order, and this Award is payable during his lifetime only to the Grantee, or in the case of a Grantee who is mentally incapacitated, this Award shall be payable to his guardian or legal representative.

8．**Payment of Par Value.** In the event that the Company does not settle the Award from the Company's treasury shares or in consideration of the Grantee's past service, the Company's obligation to deliver the shares of Common Stock to Grantee upon the vesting of Restricted Stock Units shall be subject to the payment in full of the requisite par value per share of the shares of Common Stock prior to such issuance (collectively, the "***Par Value***"). The Grantee approves and authorizes the Company to deduct the Par Value of the shares of Common Stock from the Grantee's payroll from the Company or its affiliates. If the Company is unable to or otherwise does not make such payroll deduction, Grantee acknowledges and agrees that he shall be responsible for the payment of any and all federal, state and local taxes on such income if the Company pays the Par Value on behalf of Grantee.

9．**Withholding.** The Company's obligation to deliver shares of Common Stock to the Grantee upon the vesting of Restricted Stock Units shall be subject to the satisfaction of all applicable federal, state and local income and employment tax withholding requirements (the "***Required Withholding***"). The Company shall withhold from the Common Stock that would otherwise have been delivered to the Grantee the number of shares necessary to satisfy the Grantee's Required Withholding, and deliver the remaining whole shares of Common Stock to the Grantee, unless the Grantee has made arrangements with the Company for the Grantee to deliver to the Company cash, a check or other available funds for the full amount of the Required Withholding by 5:00 p.m. Central Standard Time on the date the Restricted Stock Units become vested. The amount of the Required Withholding and the number of shares of Common Stock to be withheld by the Company, if applicable, to satisfy the Grantee's Required Withholding, shall be based on the Fair Market Value of the shares of Common Stock on the date prior to the applicable date of vesting and shall be limited to the withholding amount calculated using the minimum statutory withholding rates or; in accordance with any policy adopted by the Company, such other applicable withholding rates not in excess of the maximum statutory rates in effect for the applicable jurisdiction.

10．**Successors and Assigns.** This Agreement shall bind and inure to the benefit of and be enforceable by the Grantee, the Company and their respective permitted successors and assigns (including personal representatives, heirs and legatees), except that the Grantee may not assign any rights or obligations under this Agreement except to the extent and in the manner expressly permitted herein.

11．**Right to Employment or Service.** The granting of this Award shall not impose upon the Company any obligation to maintain any Participant as an Employee and shall not diminish the power of the Company to terminate any Participant's Employment at any time. The Company and its Subsidiaries reserve the right to terminate a Grantee's Employment at any time, with or without cause.

12．**Severability.** If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable for any reason, such invalidity, illegality, or unenforceability shall not affect any of the other terms, provisions, covenants, or conditions of this Agreement, each of which shall be binding and enforceable.

13．**Governing Law.** This Agreement, to the extent not otherwise governed by mandatory provisions of the Code or the securities laws of the United States, shall be governed by, construed, and enforced in accordance with the laws of the State of Texas.

14．**Section 409A.** It is the intent of the Company and the Grantee that this Award comply with or be exempt from the requirements of Section 409A and the provisions of this Agreement will be administered, interpreted and construed accordingly. To the extent this Award constitutes "deferred compensation" under Section 409A, (a) the time of settlement of this Award specified in Section 5 is a specified time within the meaning of Treasury Regulation § 1.409A-3(i)(1) and (b) if the Grantee is a "specified employee" within the meaning of Section 409A on the date of his or her "separation from service" within the meaning of Section 409A, any payments of deferred compensation hereunder shall be made on the first to occur of (x) the date that is six (6) months after the date of the Grantee's separation from service, (y) the date of the Grantee's death, or (z) such other date as complies with the requirements of Section 409A.

15．**Recoupment Policy and Clawback Provision.** Any amounts granted or paid under this Agreement may be subject to the Insperity, Inc. Incentive Compensation Recoupment Policy or other applicable recoupment or clawback policy of the Company in effect from time to time.

16．**Restrictive Covenants**. Grantee's right to receive settlement of the Restricted Stock Units shall be further conditioned upon his or her compliance with the provisions of this Section 16. In the event Grantee fails to comply with any of the provisions of this Section 16, Grantee shall repay to the Company any prior settlement of Restricted Stock Units subject to this Agreement and will forfeit any unvested Restricted Stock Units covered by this Agreement. For purposes of this Section 16, the term "Company" means the Company and its Subsidiaries.

(a)    Definitions. As used in this Section 16, the following terms shall have the following meanings:

(1)    "***Non-Solicit Period***" means the period during which Grantee is employed by the Company and

extending until twelve (12) months following Grantee's termination of Employment.

(2)    "*Proprietary Information*" includes all confidential or proprietary scientific or technical information, data, formulas and related concepts, business plans (both current and under development), client lists, promotion and marketing programs, trade secrets, or any other confidential or proprietary business information relating to the business of the Company, whether in written or electronic form of writings, correspondence, notes, drafts, records, maps, invoices, technical and business logs, policies, computer programs, disks or otherwise. Proprietary Information does not include information that is or becomes publicly known through lawful means.

( b )    Confidential Treatment. Grantee acknowledges and agrees that he or she has acquired, and will in the future acquire as a result of his or her Employment or otherwise, Proprietary Information of the Company which is of a confidential or trade secret nature, and all of which has a great value to the Company and is a substantial basis and foundation upon which the Company's business is predicated. Accordingly, other than in the legitimate performance of Grantee's job duties, Grantee agrees:

(1)    to regard and preserve as confidential at all times all Proprietary Information;

(2)    to refrain from publishing or disclosing any part of the Proprietary Information and from using, copying or duplicating it in any way by any means whatsoever; and

(3)    not to use on Grantee's own behalf or on behalf of any third party or to disclose the Proprietary Information to any person or entity without the prior written consent of the Company.

( c )    Property of the Company. Grantee acknowledges that all Proprietary Information and other property of the Company which Grantee accumulates during Grantee's Employment are the exclusive property of the Company. Upon the termination of Grantee's Employment, or at any time upon the Company's request, Grantee shall surrender and deliver to the Company (and not keep, recreate or furnish to any third party) any and all work papers, reports, manuals, documents and the like (including all originals and copies thereof) in Grantee's possession which contain Proprietary Information relating to the business, prospects or plans of the Company. Further, Grantee agrees to search for and delete all Company information, including Proprietary Information, from his or her computer, smartphone, tablet, or any other personal electronic storage devices, other than payroll information or other financial information that Grantee may need for his or her tax filings, and, upon request, certify to the Company that Grantee has completed this search and deletion process.

(d)    Cooperation. Grantee agrees that, following any termination of his or her Employment, Grantee will not disclose or cause to be disclosed any Proprietary Information, unless (in any such case) required by court order. Pursuant to the Defend Trade Secrets Act of 2016, Grantee shall not be held criminally or civilly liable under any Federal or state trade secret law for the disclosure of any Proprietary Information that (i) is made (A) in confidence to a Federal, state or local government official, either directly or indirectly, or to an attorney and (B) solely for the purpose of reporting or investigating a suspected violation of law or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. The Company may seek the assistance, cooperation or testimony of Grantee following any such termination in connection with any investigation, litigation or proceeding arising out of matters within the knowledge of Grantee and related to his or her Employment, and in such instance, Grantee shall provide such assistance, cooperation or testimony and the Company shall pay Grantee's reasonable costs and expenses in connection therewith.

(e)    Non-Solicitation.

(1)    Grantee and the Company agree to the non-solicitation provisions of this Section 16(e): (i) in consideration for the Proprietary Information provided by the Company to Grantee; and (ii) to protect the Proprietary Information of the Company disclosed or entrusted to Grantee by the Company or created or developed by Grantee for the Company, the business goodwill of the Company developed through the efforts of Grantee and the business opportunities disclosed or entrusted to Grantee by the Company.

(2)    Grantee expressly covenants and agrees that, during the Non-Solicit Period, Grantee will not: (i) engage or employ, or solicit or contact with a view to the engagement or employment of, any person who is an officer or employee of the Company; or (ii) canvass, solicit, approach or entice away or cause to be canvassed, solicited, approached or enticed away from the Company any person who or which is or was a customer of the Company, during the prior two years of Grantee's Employment, and either (x) about which Grantee received Proprietary Information or (y) with which Grantee had contact or dealings on behalf of the Company.

(3)    Grantee expressly recognizes that he or she is a key employee and an important member of management who will be provided with access to Proprietary Information and trade secrets as part of Grantee's Employment and that the restrictive covenants set forth in this Section 16 are reasonable and

necessary in light of Grantee's position and access to the Proprietary Information.

( f )    Relief. Grantee and the Company agree and acknowledge that the limitations as to time and scope of activity to be restrained as set forth in this Section 16 are reasonable and do not impose any greater restraint than is necessary to protect the legitimate business interests of the Company. Grantee and the Company also acknowledge that money damages would not be sufficient remedy for any breach of this Section 16 by Grantee, and the Company shall be entitled to enforce the provisions of this Section 16 by terminating any unvested Restricted Stock Units, taking action to recoup the value of any Restricted Stock Units already settled and paid to Grantee, and to specific performance and injunctive relief as remedies for such breach or any threatened breach. Such remedies shall not be deemed the exclusive remedies for a breach of this Section 16 but shall be in addition to all remedies available at law or in equity, including the recovery of damages from Grantee and Grantee's agents. However, if it is determined that Grantee has not committed a breach of this Section 16, then the Company shall resume vesting of the Restricted Stock Units due under this Agreement and pay to Grantee all Restricted Stock Units that would have vested but had been suspended pending such determination.

( g )    Reformation. The Company and Grantee agree that the foregoing restrictions are reasonable under the circumstances and that any breach of the covenants contained in this Section 16 would cause irreparable injury to the Company. Grantee expressly represents that enforcement of the restrictive covenants set forth in this Section 16 will not impose an undue hardship upon Grantee or any person or entity affiliated with Grantee. Further, Grantee acknowledges that Grantee's skills are such that Grantee can be gainfully employed and that the restrictive covenants will not prevent Grantee from earning a living. Nevertheless, if any of the aforesaid restrictions are found by a court of competent jurisdiction to be unreasonable, or overly broad as to time, or otherwise unenforceable, the parties intend for the restrictions herein set forth to be modified by the court making such determination so as to be reasonable and enforceable and, as so modified, to be fully enforced.

(h)    Protected Disclosures. Notwithstanding any provision to the contrary in this Agreement, nothing in this Agreement prohibits Grantee from reporting possible violations of law or regulation to any governmental agency or entity, including the U.S. Department of Justice, the U.S. Securities and Exchange Commission, the U.S. Congress, and any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation. Nothing in this Agreement limits Grantee's ability to communicate with any government agencies or otherwise participate in any investigation or proceeding that may be conducted by any government agency, including providing documents or other information, without notice to the Company. Additionally, Grantee and the Company acknowledge and agree that Grantee does not need the prior authorization of the Company to make any such reports or disclosures and Grantee is not required to notify the Company or any of its affiliates that Grantee has made such reports or disclosures.

(i)    Survivability. The provisions of this Section 16 shall survive any termination of the Agreement and settlement of Restricted Stock Units, and shall remain applicable to Grantee.

17.    **Entire Agreement; Binding Effect.** This Agreement shall cover all shares of Common Stock acquired by the Grantee pursuant to this Agreement, including any community and/or separate property interest owned by the Grantee's spouse in said shares. All terms, conditions and limitations on transferability imposed under this Agreement upon shares acquired by the Grantee shall apply to any interest of the Grantee's spouse in such shares. This Agreement and the Plan constitute the entire understanding between the parties regarding this Award, and supersedes any and all prior written or oral agreements between the parties with respect to the subject matter hereof. There are no representations, agreements, arrangements, or understanding, either written or oral, between or among the parties with respect to the subject matter hereof which

are not set forth in this Agreement. This Agreement is binding upon the Grantee's heirs, executors and personal representatives with respect to all provisions hereof. Except as set forth herein, this Agreement cannot be modified, altered or amended, to the detriment of the Grantee, except by an agreement, in writing, signed by both a duly authorized executive officer of the Company and the Grantee.

**INSPERITY, INC.**

Award Date: _____    By:_____
    Name: Paul J. Sarvadi

Title: Chairman of the Board and<br>Chief Executive Officer

**ACKNOWLEDGEMENT AND ACCEPTANCE BY THE GRANTEE**

I, _____, the undersigned Grantee, hereby acknowledge that I have received a copy of the

Insperity, Inc. 2012 Incentive Plan, as amended and restated effective June 16, 2017 (the "*Plan*") and that I will consult with and rely upon only my own tax, legal and financial advisors regarding the consequences and risks of the Award. I hereby agree to and accept the foregoing Restricted Stock Unit Agreement, subject to the terms and provisions of the Plan and administrative interpretations thereof referred to above.

**GRANTEE:**

Date:____  ____

L1819_RSU Award_ Dec 2019

**Exhibit 10.20**

**INSPERITY, INC. 2012 INCENTIVE PLAN**
**(as Amended and Restated Effective June 16, 2017)**

**RESTRICTED STOCK UNIT AGREEMENT**

This Restricted Stock Unit Agreement (this "***Agreement***") is between Insperity, Inc. (the "***Company***") and _____ (the "***Grantee***"), an employee of the Company or one of its Subsidiaries, regarding an award (this "***Award***") of restricted stock units, each representing one share of Common Stock (as defined in the Insperity, Inc. 2012 Incentive Plan, as amended and restated effective June 16, 2017 (the "***Plan***"), such units comprising this Award referred to herein as "***Restricted Stock Units***") awarded to the Grantee on _____ (the "***Award Date***"), such number of Restricted Stock Units subject to adjustment as provided in the Plan, and further subject to the following terms and conditions:

1.   **Relationship to Plan.** This Award is subject to all of the terms, conditions and provisions of, and administrative interpretations under, the Plan, if any, which have been adopted by the Committee thereunder. Any question of interpretation arising under this Agreement shall be determined by the Committee and its determinations shall be final and conclusive upon all parties in interest. Except as defined herein, capitalized terms shall have the same meanings ascribed to them under the Plan.

2.   **Vesting Schedule.**

(a)   Subject to Sections 2(b), 2(c), 2(d) and 3 below, _____ (____) of the Restricted Stock Units granted under this Award shall become vested on each annual anniversary of the Award Date (each a " ***Vesting Date***"), subject to the Grantee's continuous Employment from the Award Date until (and as of) each Vesting Date.

(b)   Unvested Restricted Stock Units subject to this Award shall not partially or fully vest or otherwise accelerate vesting solely as the result of a Change in Control.

(c)   All unvested Restricted Stock Units subject to this Award shall vest, irrespective of the limitations set forth in subparagraph (a) above, provided that the Grantee has been in continuous Employment since the Award Date, upon the occurrence of:

(i)   an Involuntary Termination following a Change in Control;

(ii)   a Non-Assumption; or

(iii)   the Grantee's termination of Employment by reason of death or Disability.

(d)    If the Grantee's Employment terminates due to the Grantee's Retirement, the Grantee will continue to vest in the remaining unvested Restricted Stock Units, if any, on the applicable annual Vesting Date in accordance with Section 2(a) or accelerated vesting under Section 2(c)(ii) and (iii) as if the Grantee had remained in continuous Employment through the applicable annual Vesting Date or vesting event, respectively.

(e)    For purposes of this Agreement:

(i)    "*Cause*" shall be determined by the Company's Senior Vice President Corporate Human Resources (or successor position) or other individual or individuals as delegated by the Company's Chief Executive Officer and means a termination of Grantee's Employment for failure to satisfactorily perform the duties, responsibilities or functions assigned or delegated to Grantee.

(ii)    "*Disability*" means that the Grantee has a disability such that he has been determined to be eligible for benefits under a long-term disability plan sponsored by the Company or a Subsidiary or, if the Grantee is not covered by such a plan, a physical or mental impairment (a) which causes a Grantee to be unable to perform the normal duties for an employer as determined by the Committee in its sole discretion; and (b) which is expected either to result in death (or blindness) or to last for a continuous period of at least twelve (12) months. The Committee may require that the Grantee be examined by a physician or physicians selected by the Committee.

(iii)    "*Employment*" means employment with the Company, a successor following a Change in Control or a Subsidiary other than a Subsidiary that is a licensed professional employer organization.

(iv)    "*Involuntary Termination*" means an involuntary termination of Grantee's Employment, other than for Cause, that occurs on or within twelve (12) months following the date of a Change in Control.

(v)    A "*Non-Assumption*" shall be deemed to occur on the date of the consummation of an event that constitutes a Change in Control as defined solely under the definition of Change in Control in section 2 of the Plan, where in connection with such Change in Control, the successor entity, or a parent of the successor entity, has not agreed to assume, replace or substitute this Award with another award of equivalent or greater value, and on substantially similar or more favorable terms.

(vi)    "*Retirement*" means the Grantee's voluntary termination of Employment (and other than an Involuntary Termination or termination for Cause by the Company) satisfying all of the following conditions:

Employee RSU Award_ Dec 2019

2

a.  the Grantee submits a voluntary request for retirement that is accepted by the Company or Subsidiary;

b.  the Grantee's Employment terminates on or after the date that the Grantee has attained sixty-two (62) years of age and has at least fifteen (15) years of continuous Employment as of the termination date;

c.  the Grantee's Employment terminates on or after the date that is six (6) months after the Grant Date; and

d.  the Grantee executes an effective Waiver and Release Agreement. In order for a Waiver and Release Agreement to be effective for purposes of Retirement, the Waiver and Release Agreement must be:

(1)  Executed and returned to the Company after termination of the Grantee's Employment,

(2)   Unrevoked by the Grantee during the seven (7) day period following the date of execution, and

(3)  Effective and irrevocable no later than the thirtieth (30th) day after the date of a Grantee's termination of Employment.

(vii)  "**_Waiver and Release Agreement_**" means the legal document in a form approved by the Company, in which a Grantee, in exchange for the benefits specified in Section 2(d), releases the Company and other related parties, from liability and damages arising from or in connection with the Grantee's termination of Employment with the Company or its Subsidiaries.

Employee RSU Award_ Dec 2019

3

3.    **Forfeiture of Award.** Except as provided in another written agreement between the Grantee and the Company, if the Grantee's Employment terminates other than by reason of death, Disability, Retirement or Involuntary Termination following a Change in Control, all unvested Restricted Stock Units as of the Employment termination date shall be forfeited. The Company has sole discretionary authority to determine when a Grantee's Employment terminates for all purposes under this Agreement and the Plan. If a Grantee's Employment terminates due to Retirement, all unvested Restricted Stock Units as of the Grantee's termination date shall expire on the date that is thirty (30) days after the Grantee's termination of Employment unless the Grantee has delivered a timely, effective and irrevocable Waiver and Release Agreement on or before such thirtieth (30th) day.

4.    **Dividend Equivalents; No Shareholder Rights.** During the period of time between the Award Date and the earlier of the settlement date or forfeiture date of the Restricted Stock Units, the Restricted Stock Units shall be evidenced by book entry registration. With respect to each Restricted Stock Unit that becomes vested, at the same time such Award is settled pursuant to Section 5, the Grantee is entitled to receive a stock dividend equivalent payment equal to all dividends and other distributions made with respect to a share of Common Stock during the period between the Award Date and the Vesting Date. The Grantee shall have no rights of a shareholder with respect to Restricted Stock Units until and unless shares of Common Stock are transferred to the Grantee.

5.    **Settlement and Delivery of Shares.** The Grantee will receive one share of Common Stock with respect to each Restricted Stock Unit that becomes vested as of a Vesting Date, which shall be delivered to the Grantee as soon as administratively practicable, but not later than thirty (30) days following the date the Restricted Stock Unit becomes vested. The Company shall not be obligated to deliver any shares of Common Stock if counsel to the Company determines that such sale or delivery would violate any applicable law or any rule or regulation of any governmental authority or any rule or regulation of, or agreement of the Company with, any national securities exchange or inter-dealer quotation system upon which the Common Stock is listed or quoted. In no event shall the Company be obligated to take any affirmative action in order to cause the delivery of shares of Common Stock to comply with any such law, rule, regulation or agreement.

6.    **Notices and Disclosure.** Unless the Company notifies the Grantee in writing of a different procedure, any notice or other communication to the Company with respect to this Award shall be in writing and shall be delivered:

(a)    by registered or certified United States mail, postage prepaid, to Insperity, Inc., Attn: General Counsel, 19001 Crescent Springs Drive, Kingwood, Texas 77339;

(b)    by hand delivery or otherwise to Insperity, Inc., Attn: General Counsel, 19001 Crescent Springs Drive, Kingwood, Texas 77339; or

(c)    by email to the Company's General Counsel or his delegate.

Employee RSU Award_ Dec 2019

4

Notwithstanding the foregoing, in the event that the address of the Company is changed, notices shall instead be made pursuant to the foregoing provisions at the Company's then current address.

Any notices provided for in this Agreement or in the Plan shall be given in writing and shall be deemed effectively delivered or given upon receipt or, in the case of notices delivered by the Company to the Grantee, five days (5) after deposit in the United States mail, postage prepaid, addressed to the Grantee at the address specified at the end of this Agreement or at such other address as the Grantee hereafter designates by written notice to the Company.

The foregoing notwithstanding, the Grantee agrees that the Company may deliver by email all documents relating to the Plan or this Award (including, without limitation, prospectuses required by the Securities and Exchange Commission) and all other documents that the Company is required to deliver to its security holders (including, without limitation, annual reports and proxy statements). The Grantee also agrees that the Company may deliver these documents by posting them on a web site maintained by the Company or by a third party under contract with the Company. If the Company posts these documents on a web site, such posting is deemed to notify the Grantee.

7.    **No Transfer or Assignment of Award.**  Except as otherwise permitted by the Committee, the Grantee's rights under the Plan and this Agreement are personal; no assignment or transfer of the Grantee's rights under and interest in this Award may be made by the Grantee other than by will or by the laws of descent and distribution or by a qualified domestic relations order, and this Award is payable during his lifetime only to the Grantee, or in the case of a Grantee who is mentally incapacitated, this Award shall be payable to his guardian or legal representative.

8.    **Payment of Par Value.** In the event that the Company does not settle the Award from the Company's treasury shares or in consideration of the Grantee's past service, the Company's obligation to deliver the shares of Common Stock to Grantee upon the vesting of Restricted Stock Units shall be subject to the payment in full of the requisite par value per share of the shares of Common Stock prior to such issuance (collectively, the "***Par Value***"). The Grantee approves and authorizes the Company to deduct the Par Value of the shares of Common Stock from the Grantee's payroll from the Company or its affiliates. If the Company is unable to or otherwise does not make such payroll deduction, Grantee acknowledges and agrees that he shall be responsible for the payment of any and all federal, state and local taxes on such income if the Company pays the Par Value on behalf of Grantee.

9.    **Withholding.** The Company's obligation to deliver shares of Common Stock to the Grantee upon the vesting of Restricted Stock Units shall be subject to the satisfaction of all applicable federal, state and local income and employment tax withholding requirements (the "***Required Withholding***"). The Company shall withhold from the Common Stock that would otherwise have been delivered to the Grantee the number of shares necessary to satisfy the Grantee's Required Withholding, and deliver the remaining whole shares of Common Stock to the Grantee, unless the Grantee has made arrangements with the Company for the Grantee to deliver to the Company cash, a check or other available funds for the full amount of the Required Withholding

by 5:00 p.m. Central Standard Time on the date the Restricted Stock Units become vested. The amount of the Required Withholding and the number of shares of Common Stock to be withheld by the Company, if applicable, to satisfy the Grantee's Required Withholding, shall be based on the Fair Market Value of the shares of Common Stock on the date prior to the applicable date of vesting and shall be limited to the withholding amount calculated using the minimum statutory withholding rates or; in accordance with any policy adopted by the Company, such other applicable withholding rates not in excess of the maximum statutory rates in effect for the applicable jurisdiction.

10.    **Successors and Assigns.** This Agreement shall bind and inure to the benefit of and be enforceable by the Grantee, the Company and their respective permitted successors and assigns (including personal representatives, heirs and legatees), except that the Grantee may not assign any rights or obligations under this Agreement except to the extent and in the manner expressly permitted herein.

11.    **Right to Employment or Service.** The granting of this Award shall not impose upon the Company any obligation to maintain any Participant as an Employee and shall not diminish the power of the Company to terminate any Participant's Employment at any time. The Company and its Subsidiaries reserve the right to terminate a Grantee's Employment at any time, with or without cause.

12.    **Severability.** If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable for any reason, such invalidity, illegality, or unenforceability shall not affect any of the other terms, provisions, covenants, or conditions of this Agreement, each of which shall be binding and enforceable.

13.    **Governing Law.** This Agreement, to the extent not otherwise governed by mandatory provisions of the Code or the securities laws of the United States, shall be governed by, construed, and enforced in accordance with the laws of the State of Texas.

14.    **Section 409A.** It is the intent of the Company and the Grantee that this Award comply with or be exempt from the requirements of Section 409A and the provisions of this Agreement will be administered, interpreted and construed accordingly. To the extent this Award constitutes "deferred compensation" under Section 409A, (a) the time of settlement of this Award specified in Section 5 is a specified time within the meaning of Treasury Regulation § 1.409A-3(i)(1) and (b) if the Grantee is a "specified employee" within the meaning of Section 409A on the date of his or her "separation from service" within the meaning of Section 409A, any payments of deferred compensation hereunder shall be made on the first to occur of (x) the date that is six (6) months after the date of the Grantee's separation from service, (y) the date of the Grantee's death, or (z) such other date as complies with the requirements of Section 409A.

15.    **Recoupment Policy and Clawback Provision.** Any amounts granted or paid under this Agreement may be subject to the Insperity, Inc. Incentive Compensation Recoupment

Policy or other applicable recoupment or clawback policy of the Company in effect from time to time.

16.    **Restrictive Covenants**. Grantee's right to receive settlement of the Restricted Stock Units shall be further conditioned upon his or her compliance with the provisions of this Section 16. In the event Grantee fails to comply with any of the provisions of this Section 16, Grantee shall repay to the Company any prior settlement of Restricted Stock Units subject to this Agreement and will forfeit any unvested Restricted Stock Units covered by this Agreement. For purposes of this Section 16, the term "Company" means the Company and its Subsidiaries.

(a)    Definitions. As used in this Section 16, the following terms shall have the following meanings:

(1)    "***Non-Solicit Period***" means the period during which Grantee is employed by the Company and extending until twelve (12) months following Grantee's termination of Employment.

(2)    "***Proprietary Information***" includes all confidential or proprietary scientific or technical information, data, formulas and related concepts, business plans (both current and under development), client lists, promotion and marketing programs, trade secrets, or any other confidential or proprietary business information relating to the business of the Company, whether in written or electronic form of writings, correspondence, notes, drafts, records, maps, invoices, technical and business logs, policies, computer programs, disks or otherwise. Proprietary Information does not include information that is or becomes publicly known through lawful means.

(b)    Confidential Treatment. Grantee acknowledges and agrees that he or she has acquired, and will in the future acquire as a result of his or her Employment or otherwise, Proprietary Information of the Company which is of a confidential or trade secret nature, and all of which has a great value to the Company and is a substantial basis and foundation upon which the Company's business is predicated. Accordingly, other than in the legitimate performance of Grantee's job duties, Grantee agrees:

(1)    to regard and preserve as confidential at all times all Proprietary Information;

(2)    to refrain from publishing or disclosing any part of the Proprietary Information and from using, copying or duplicating it in any way by any means whatsoever; and

(3)    not to use on Grantee's own behalf or on behalf of any third party or to disclose the Proprietary Information to any person or entity without the prior written consent of the Company.

Employee RSU Award_ Dec 2019

7

(c)    Property of the Company. Grantee acknowledges that all Proprietary Information and other property of the Company which Grantee accumulates during Grantee's Employment are the exclusive property of the Company. Upon the termination of Grantee's Employment, or at any time upon the Company's request, Grantee shall surrender and deliver to the Company (and not keep, recreate or furnish to any third party) any and all work papers, reports, manuals, documents and the like (including all originals and copies thereof) in Grantee's possession which contain Proprietary Information relating to the business, prospects or plans of the Company. Further, Grantee agrees to search for and delete all Company information, including Proprietary Information, from his or her computer, smartphone, tablet, or any other personal electronic storage devices, other than payroll information or other financial information that Grantee may need for his or her tax filings, and, upon request, certify to the Company that Grantee has completed this search and deletion process.

(d)    Cooperation. Grantee agrees that, following any termination of his or her Employment, Grantee will not disclose or cause to be disclosed any Proprietary Information, unless (in any such case) required by court order. Pursuant to the Defend Trade Secrets Act of 2016, Grantee shall not be held criminally or civilly liable under any Federal or state trade secret law for the disclosure of any Proprietary Information that (i) is made (A) in confidence to a Federal, state or local government official, either directly or indirectly, or to an attorney and (B) solely for the purpose of reporting or investigating a suspected violation of law or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. The Company may seek the assistance, cooperation or testimony of Grantee following any such termination in connection with any investigation, litigation or proceeding arising out of matters within the knowledge of Grantee and related to his or her Employment, and in such instance, Grantee shall provide such assistance, cooperation or testimony and the Company shall pay Grantee's reasonable costs and expenses in connection therewith.

(e)    Non-Solicitation.

(1)    Grantee and the Company agree to the non-solicitation provisions of this Section 16(e): (i) in consideration for the Proprietary Information provided by the Company to Grantee; and (ii) to protect the Proprietary Information of the Company disclosed or entrusted to Grantee by the Company or created or developed by Grantee for the Company, the business goodwill of the Company developed through the efforts of Grantee and the business opportunities disclosed or entrusted to Grantee by the Company.

(2)    Grantee expressly covenants and agrees that, during the Non-Solicit Period, Grantee will not: (i) engage or employ, or solicit or contact with a view to the engagement or employment of, any person who is an officer or employee of the Company; or (ii) canvass, solicit, approach or entice away

Employee RSU Award_ Dec 2019

8

or cause to be canvassed, solicited, approached or enticed away from the Company any person who or which is or was a customer of the Company, during the prior two years of Grantee's Employment, and either (x) about which Grantee received Proprietary Information or (y) with which Grantee had contact or dealings on behalf of the Company.

(3)    Grantee expressly recognizes that he or she is a key employee and an important member of management who will be provided with access to Proprietary Information and trade secrets as part of Grantee's Employment and that the restrictive covenants set forth in this Section 16 are reasonable and necessary in light of Grantee's position and access to the Proprietary Information.

( f )    Relief. Grantee and the Company agree and acknowledge that the limitations as to time and scope of activity to be restrained as set forth in this Section 16 are reasonable and do not impose any greater restraint than is necessary to protect the legitimate business interests of the Company. Grantee and the Company also acknowledge that money damages would not be sufficient remedy for any breach of this Section 16 by Grantee, and the Company shall be entitled to enforce the provisions of this Section 16 by terminating any unvested Restricted Stock Units, taking action to recoup the value of any Restricted Stock Units already settled and paid to Grantee, and to specific performance and injunctive relief as remedies for such breach or any threatened breach. Such remedies shall not be deemed the exclusive remedies for a breach of this Section 16 but shall be in addition to all remedies available at law or in equity, including the recovery of damages from Grantee and Grantee's agents.  However, if it is determined that Grantee has not committed a breach of this Section 16, then the Company shall resume vesting of the Restricted Stock Units due under this Agreement and pay to Grantee all Restricted Stock Units that would have vested but had been suspended pending such determination.

( g )    Reformation. The Company and Grantee agree that the foregoing restrictions are reasonable under the circumstances and that any breach of the covenants contained in this Section 16 would cause irreparable injury to the Company. Grantee expressly represents that enforcement of the restrictive covenants set forth in this Section 16 will not impose an undue hardship upon Grantee or any person or entity affiliated with Grantee. Further, Grantee acknowledges that Grantee's skills are such that Grantee can be gainfully employed and that the restrictive covenants will not prevent Grantee from earning a living. Nevertheless, if any of the aforesaid restrictions are found by a court of competent jurisdiction to be unreasonable, or overly broad as to time, or otherwise unenforceable, the parties intend for the restrictions herein set forth to be modified by the court making such determination so as to be reasonable and enforceable and, as so modified, to be fully enforced.

(h)   Protected Disclosures. Notwithstanding any provision to the contrary in this Agreement, nothing in this Agreement prohibits Grantee from reporting possible violations of law or regulation to any governmental agency or entity, including the U.S. Department of Justice, the U.S. Securities and Exchange Commission, the U.S. Congress, and any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation. Nothing in this Agreement limits Grantee's ability to communicate with any government agencies or otherwise participate in any investigation or proceeding that may be conducted by any government agency, including providing documents or other information, without notice to the Company. Additionally, Grantee and the Company acknowledge and agree that Grantee does not need the prior authorization of the Company to make any such reports or disclosures and Grantee is not required to notify the Company or any of its affiliates that Grantee has made such reports or disclosures.

(i)   Survivability. The provisions of this Section 16 shall survive any termination of the Agreement and settlement of Restricted Stock Units, and shall remain applicable to Grantee.

17.   **Entire Agreement; Binding Effect.** This Agreement shall cover all shares of Common Stock acquired by the Grantee pursuant to this Agreement, including any community and/or separate property interest owned by the Grantee's spouse in said shares. All terms, conditions and limitations on transferability imposed under this Agreement upon shares acquired by the Grantee shall apply to any interest of the Grantee's spouse in such shares. This Agreement and the Plan constitute the entire understanding between the parties regarding this Award, and supersedes any and all prior written or oral agreements between the parties with respect to the subject matter hereof. There are no representations, agreements, arrangements, or understanding, either written or oral, between or among the parties with respect to the subject matter hereof which are not set forth in this Agreement. This Agreement is binding upon the Grantee's heirs, executors and personal representatives with respect to all provisions hereof. Except as set forth herein, this Agreement cannot be modified, altered or amended, to the detriment of the Grantee, except by an agreement, in writing, signed by both a duly authorized executive officer of the Company and the Grantee.

**INSPERITY, INC.**

Award Date: _____     By:_____
     Name: Paul J. Sarvadi

Title: Chairman of the Board and
Chief Executive Officer

**ACKNOWLEDGEMENT AND ACCEPTANCE BY THE GRANTEE**

I, _____, the undersigned Grantee, hereby acknowledge that I have received a copy of the Insperity, Inc. 2012 Incentive Plan, as amended and restated effective June 16, 2017 (the "Plan") and that I will consult with and rely upon only my own tax, legal and financial advisors regarding the consequences and risks of the Award. I hereby agree to and accept the foregoing Restricted Stock Unit Agreement, subject to the terms and provisions of the Plan and administrative interpretations thereof referred to above.

**GRANTEE:**

Date:___   ___

Employee RSU Award_ Dec 2019

11

**Exhibit 10.22**

**AWARD NOTICE AND AGREEMENT**
**(For Phantom Stock Awarded Under Long-Term Incentive Program)**

This Award Notice and Agreement (this "*Agreement*") is between Insperity, Inc. (the "*Company*") and _____ (the "*Grantee*"), an employee of the Company or one of its Subsidiaries, regarding an award (this "*Award*") of _____ shares (the "*Target Amount*") of Phantom Stock (as defined in the Insperity, Inc. Long-Term Incentive Program ("*LTIP*") adopted under the Insperity, Inc. 2012 Incentive Plan, as amended and restated effective June 16, 2017 (the "*2012 Incentive Plan*")), awarded to the Grantee on _____ (the "*Grant Date*"), subject to the following terms and conditions:

1 .    **Relationship to LTIP.** This Award is granted under the 2012 Incentive Plan pursuant to an award under the LTIP and is subject to all of the terms, conditions and provisions of, and administrative interpretations under, the 2012 Incentive Plan and the LTIP, if any, which have been adopted by the Committee thereunder. Any question of interpretation arising under this Agreement shall be determined by the Committee and its determinations shall be final and conclusive upon all parties in interest. Except as defined herein, capitalized terms shall have the same meanings ascribed to them under the LTIP, however, in the absence thereof, capitalized terms herein shall have the same meanings ascribed to them under the 2012 Incentive Plan.

2.    **Performance Determination; Vesting; Change in Control.**

( a )    *Performance Determination.* The Grantee's Final Award, if any, shall be equal to the number of shares of Phantom Stock resulting from the Committee's determination of the achievement of the Performance Goal(s) over the Performance Period(s) specified on *Schedule A* attached hereto.

(b)    *Vesting.* Subject to Sections 2(c), 3 and 4 below, the Grantee shall become vested in the Grantee's Final Award upon the final Valuation Date of the last Performance Period applicable to this Award (the "*Final Valuation Date*"), provided that the Grantee has been in continuous Employment since the Grant Date through the Final Valuation Date.

( c )    *Change in Control.* The Award granted under this Agreement will not partially or fully vest or otherwise accelerate vesting solely as the result of a Change in Control. Upon a Change in Control after the Grant Date and prior to the Final Valuation Date, the Final Award shall be determined by the Committee based on (i) actual performance results for any Performance Period that was completed on or prior to the date of the Change in Control and (ii) the greater of Target Level or actual performance (if measurable) for the Performance Period during which the Change in Control occurs and any Performance Period that was scheduled to begin after the date of the Change in Control (collectively, the "*Change in Control Value*"). Any Final Award determined pursuant to this Section 2(c) shall be paid at the time indicated in Section 5 and the Grantee shall become vested in the Change in Control Value only if continuously employed through the date indicated in Section 5, except in the event of a Qualifying Termination. However, in the event of a Change in Control as defined solely under subsection (c) of the definition of Change in Control under section 2 of the Plan (a "Subsection (c) Change in Control"), if the successor entity, or a parent of the successor entity, has not agreed to assume, replace or substitute this Award with another award of equivalent or greater value, and on substantially similar or more favorable terms, then the Grantee shall vest in the Final Award as of the Subsection (c) Change in Control and the Change in Control Value shall be paid within seventy-five (75) days of the Subsection (c) Change in Control.

3.    **Qualifying Termination; Death; Disability; Retirement.**

(a)    *Qualifying Termination.* Notwithstanding Section 2(b) above, if the Grantee remains in continuous Employment from the Grant Date through the date of the Grantee's Qualifying Termination that occurs prior to vesting under Section 2(c), then, upon the date of the Grantee's Qualifying Termination, the Grantee shall vest in a Final Award equal to the Change in Control Value. Any Final Award determined pursuant to this Section 3(a) shall be payable to the Grantee no later than seventy-five (75) days after the date of the Grantee's Qualifying Termination, subject to delay pursuant to Article X.F of the LTIP, if applicable.

(b)    *Good Reason.* Notwithstanding the definition in the LTIP program document, for purposes of this Agreement, Good Reason means a Grantee terminates his or her Employment due to one of the following actions by his or her Employer (without written consent of the Grantee): (i) a material diminution in the Grantee's title, position, authority, duties or responsibilities from those applicable to Grantee preceding a Change in Control; (ii) a change in the geographic location at which the Grantee must perform services, which shall mean requiring the Grantee to be permanently based more than fifty (50) miles from the Grantee's principal Employer location; (iii) a material diminution in the Grantee's Base Salary other than as part of an across-the-board reduction application to all Company's executives of less than 10%; or (iv) a material diminution in the Grantee's bonus opportunity, incentive compensation or perquisites, if inconsistent with other executives of the Company with similar levels of authority, duties or responsibilities.

(c)    *Death or Disability*. Notwithstanding Section 2 above, if the Grantee remains in continuous Employment from the Grant Date through the date of the Grantee's death or Disability that occurs prior to the Final Valuation Date, then the Grantee shall be entitled to a Final Award based on actual achievement of the Performance Goal(s) during the Performance Period(s) pro-rated by a fraction, the numerator of which shall be the total number of days of the Grantee's Employment from the Grant Date through the date of the Grantee's death or Disability, as applicable, and the denominator of which shall be the total number of days encompassing the first day of the first Performance Period and the last day of the last Performance Period applicable to the Award (if multiple Performance Periods). In the event of a Change in Control, if the Grantee remains in continuous Employment from the Grant Date through the Grantee's death or Disability occurring after a Change in Control, the Grantee shall be entitled to a pro-rata portion, as calculated under this Section 3(c), of the Change in Control Value.

(d)    *Retirement*. Notwithstanding Section 2 above, if the Grantee remains in continuous Employment from the Grant Date through the date of the Grantee's Retirement that occurs prior to the Final Valuation Date, then the following shall apply:

(i)    With respect to any Performance Period which begins on or after the date of the Grantee's Retirement, the shares of Phantom Stock related to such Performance Period shall be forfeited;

(ii)    With respect to any Performance Period which ends prior to the date of the Grantee's Retirement, the shares of Phantom Stock related to such Performance Period shall be paid based upon actual achievement of the Performance Goal and settled in accordance with Section 5; and

(iii)    With respect to any other Performance Period that begins before or ends after the date of the Grantee's Retirement, the Grantee shall be entitled to shares of Phantom Stock based upon actual achievement of the Performance Goal during such Performance Period pro-rated by a fraction, the numerator of which shall be the total number of days of the Grantee's Employment from the first day of such Performance Period through the date of the Grantee's Retirement and the denominator of which shall be the total number of days encompassing the first day of such Performance Period and the last day of such Performance Period applicable to the Award, which shall be settled in accordance with Section 5.

(iv)    For purposes of this Award, "***Retirement***" means the Grantee's voluntary termination of Employment other than for Good Reason (and other than an involuntary termination by the Company for Cause), satisfying all of the following conditions:

a.    the Grantee submits a voluntary request for retirement that is accepted by the Company or Subsidiary;

b.    the Grantee's Employment terminates on or after the date that the Grantee has attained sixty-two (62) years of age and has at least fifteen (15) years of continuous Employment as of the termination date;

c.    the Grantee's Employment terminates on or after the date that is six (6) months after the Grant Date; and

d.    the Grantee executes an effective Waiver and Release Agreement. In order for a Waiver and Release Agreement to be effective for purposes of Retirement, the Waiver and Release Agreement must be:

(1)    Executed and returned to the Company after termination of the Grantee's Employment,

(2)    Unrevoked by the Grantee during the seven (7) day period following the date of execution, and

(3)    Effective and irrevocable no later than the thirtieth (30th) day after the date of a Grantee's termination of Employment.

(v)    For purposes of this Award, "**Waiver and Release Agreement**" means the legal document in a form approved by the Company, in which a Grantee, in exchange for the benefits provided under this Section 3(d), releases the Company and other related parties, from liability and damages arising from or in connection with the Grantee's termination of Employment with the Company or its Subsidiaries.

4 .    **Forfeiture of Award.** If the Grantee's Employment terminates other than by reason of death, Disability, Qualifying Termination or Retirement prior to the Final Valuation Date, this Award shall be forfeited as of the date of the Grantee's termination of Employment. Except in the case of a Qualifying Termination or a Retirement, the Company has sole discretionary authority to determine when a Grantee's Employment terminates for all purposes under this Agreement, the LTIP and the 2012 Incentive Plan. If a Grantee's Employment terminates due to Retirement, all unvested portions of this Award as of the Grantee's termination date shall expire on the date that is thirty (30) days after the Grantee's termination of Employment unless the Grantee

has delivered a timely, effective and irrevocable Waiver and Release Agreement on or before such thirtieth (30th) day.

5.  **Settlement of Final Award.**  Settlement of the Grantee's Final Award, if any, as determined pursuant to Section 2, Section 3(c) or Section 3(d) shall be made in the form of shares of Common Stock on the date that is seventy-five (75) days after the end of the last originally scheduled and untruncated Performance Period applicable to the Award.

6.  **No Voting Rights; Dividend Equivalents.**

(a)  The Grantee shall have no voting rights in connection with Phantom Stock.

(b)  If any dividends are paid with respect to the Common Stock between the Grant Date and the date of settlement of the Grantee's Final Award, the Grantee will be conditionally credited with Dividend Equivalents. Upon settlement of the Grantee's Final Award, the Grantee will receive additional shares of Common Stock determined by (i) multiplying the aggregate amount of Dividend Equivalents credited between the Grant Date and the date of settlement of the Grantee's Final Award for a share of Phantom Stock, by the total number of shares of Phantom Stock covered by the Grantee's Final Award and (ii) dividing such product by the Fair Market Value of the Common Stock on the trading day immediately preceding the date of settlement of the Final Award (rounded up to the next whole number of shares).

7.  **Limitation on Delivery of Shares.**  The Company shall not be obligated to deliver any shares of Common Stock if counsel to the Company determines that such sale or delivery would violate any applicable law or any rule or regulation of any governmental authority or any rule or regulation of, or agreement of the Company with, any national securities exchange or inter-dealer quotation system upon which the Common Stock is listed or quoted. In no event shall the Company be obligated to take any affirmative action in order to cause the delivery of shares of Common Stock to comply with any such law, rule, regulation or agreement.

8 .  **Assignment of Award.**  Except as otherwise permitted by the Committee, the Grantee's rights under the LTIP, 2012 Incentive Plan and this Agreement are personal; no assignment or transfer of the Grantee's rights under and interest in this Award may be made by the Grantee other than by will or by the laws of descent and distribution or by a qualified domestic relations order, and this Award is payable during his lifetime only to the Grantee, or in the case of a Grantee who is mentally incapacitated, this Award shall be payable to his guardian or legal representative.

9.  **Award is Unfunded.**  Nothing in this Agreement, the LTIP or the Plan shall require the Company to segregate or set aside any funds or other property for the purpose of paying any portion of an Award. No Participant, beneficiary or other person shall have any right, title or interest in any amount awarded under this Agreement, the LTIP or the Plan before the payment date for the Award, or in any property of the Company or a Subsidiary.

10.  **Withholding.**  The Company's obligation to deliver shares of Common Stock to the Grantee upon settlement of this Award shall be subject to the satisfaction of all applicable federal, state and local income and employment tax withholding requirements (the "***Required Withholding***"). The Company shall withhold from the Common Stock that would otherwise have been delivered to the Grantee the number of shares necessary to satisfy the Grantee's Required Withholding, and deliver the remaining whole shares of Common Stock to the Grantee, unless the Grantee has made arrangements with the Company for the Grantee to deliver to the Company cash, a check or other available funds for the full amount of the Required Withholding by 5:00 p.m. Central Standard Time on the date the shares of Common Stock become vested. The amount of the Required Withholding and the number of shares of Common Stock to be withheld by the Company, if applicable, to satisfy the Grantee's Required Withholding, shall be based on the Fair Market Value of the shares of Common Stock on the first trading date prior to the applicable settlement date and shall be limited to the withholding amount calculated using the minimum statutory withholding rates or; in accordance with any policy adopted by the Company, such other applicable withholding rates not in excess of the maximum statutory rates in effect for the applicable jurisdiction.

11 .  **Successors and Assigns.**  This Agreement shall bind and inure to the benefit of and be enforceable by the Grantee, the Company and their respective permitted successors and assigns (including personal representatives, heirs and legatees), except that the Grantee may not assign any rights or obligations under this Agreement except to the extent and in the manner expressly permitted herein.

12 .  **Right to Employment or Service.**  The granting of this Award shall not impose upon the Company any obligation to maintain any Participant as an Employee and shall not diminish the power of the Company to terminate any Participant's Employment at any time. The Company and its Subsidiaries reserve the right to terminate a Grantee's Employment at any time, with or without cause.

13 .  **Severability.**  If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable for any reason, such invalidity, illegality, or unenforceability shall not affect any

of the other terms, provisions, covenants, or conditions of this Agreement, each of which shall be binding and enforceable.

14.    **Governing Law.** This Agreement, to the extent not otherwise governed by mandatory provisions of the Code or the securities laws of the United States, shall be governed by, construed, and enforced in accordance with the laws of the State of Texas.

15.    **Code Section 409A.** It is the intent of the Company and the Grantee that this Award be exempt from or comply with the requirements of Code Section 409A and the provisions of this Agreement will be administered, interpreted and construed accordingly. For purposes of Code Section 409A, the time of settlement of this Award is either exempt from Code Section 409A, including, but not limited to, by compliance with the "short-term deferral exemption" as specified in section 1.409A-1(b)(4) of the Treasury Regulations or in compliance with Code Section 409A, including, but not limited to, being paid pursuant to a fixed schedule or specified date pursuant to section 1.409A-3(i)(1) of the Treasury Regulations.

16.    **Recoupment Policy and Clawback Provision.** Any amounts granted or paid under this Agreement are subject to the Insperity, Inc. Incentive Compensation Recoupment Policy or other applicable recoupment policy of the Company. In addition, this Agreement will be administered in compliance with Section 10D of the Securities Exchange Act of 1934 (the **"*Exchange Act*")**, and any applicable rules and regulations promulgated by the Securities and Exchange Commission or any national securities exchange on which the Common Stock may be traded, and any policy adopted by the Company from time to time to address the requirements of Section 10D of the Exchange Act, to the extent the Committee determines that such rules and regulations require application to this Agreement.

17.    **Entire Agreement; Binding Effect.** This Agreement shall cover all shares of Phantom Stock and Common Stock acquired by the Grantee pursuant to this Agreement, including any community and/or separate property interest owned by the Grantee's spouse in said shares. All terms, conditions and limitations on transferability imposed under this Agreement upon shares acquired by the Grantee shall apply to any interest of the Grantee's spouse in such shares. This Agreement, the LTIP and the 2012 Incentive Plan constitute the entire understanding between the parties regarding this Award, and supersede any and all prior written or oral agreements between the parties with respect to the subject matter hereof. There are no representations, agreements, arrangements, or understanding, either written or oral, between or among the parties with respect to the subject matter hereof which are not set forth in this Agreement, the LTIP or the 2012 Incentive Plan. This Agreement is binding upon the Grantee's heirs, executors and personal representatives with respect to all provisions hereof. Except as set forth herein, this Agreement cannot be modified, altered or amended, to the detriment of the Grantee, except by an agreement, in writing, signed by both a duly authorized executive officer of the Company and the Grantee.

**INSPERITY, INC.**

By:_____

Name: _____

Title: _____

**ACKNOWLEDGEMENT AND ACCEPTANCE BY THE GRANTEE**

I, _____, the undersigned Grantee, hereby acknowledge that I will consult with and rely upon only my own tax, legal and financial advisors regarding the consequences and risks of the Award. I hereby agree to and accept the foregoing Award Notice and Agreement, subject to the terms and provisions of this Agreement, the Long-Term Incentive Program, and the Insperity, Inc. 2012 Incentive Plan, as amended and restated effective June 16, 2017, and administrative interpretations thereof referred to above.

**GRANTEE:**

Date:__        _____

**ACKNOWLEDGEMENT AND ACCEPTANCE BY THE GRANTEE**

I, _____, the undersigned Grantee, hereby acknowledge that I will consult with and rely upon only my own tax, legal and financial advisors regarding the consequences and risks of the Award. I hereby agree to and accept the foregoing Award Notice and Agreement, subject to the terms and provisions of this Agreement, the Long-Term Incentive Program, and the Insperity, Inc. 2012 Incentive Plan, as amended and restated effective June 16, 2017, and administrative interpretations thereof referred to above.

**GRANTEE:**

Date:__        _____

**Exhibit 10.34**

**FIRST AMENDMENT TO THE**
**INSPERITY, INC. 2012 INCENTIVE PLAN**
(As Amended and Restated Effective June 16, 2017)

The Insperity, Inc. 2012 Incentive Plan, as amended and restated effective June 16, 2017 (the "Plan"), shall be, and hereby is, amended effective as of December 30, 2019, as follows:

**I.**

Section 7(i) is amended, in its entirety, to be and to read as follows:

"(i)  *Minimum Vesting for Certain Types of Employee Awards.*  Any Option, Phantom Stock Award, Restricted Stock, Stock Appreciation Right, or Stock Award, granted to an Employee, which is not a Performance Award, shall be granted with a minimum vesting period of one (1) year from the Grant Date, provided that:

　　　(i)　　The Committee may provide for earlier vesting for an Employee Award granted in conjunction with an Employee's date of hire or upon a termination of employment by reason of death, disability, retirement or Change of Control.

　　　(ii)　　The one (1) year minimum vesting period shall not apply to an Employee Award that is granted in lieu of salary or bonus."

**II.**

Except as modified herein, the Plan shall remain in full force and effect.

IN WITNESS WHEREOF, this Amendment to the Plan is adopted this 30th day of December, 2019.

INSPERITY, INC.

By:　 /s/ Daniel D. Herink
　　　　Daniel D. Herink
　　　　Senior Vice President of Legal,
　　　　General Counsel and Secretary

Exhibit 21.1

SUBSIDIARIES OF INSPERITY, INC.

- Insperity Holdings, Inc., a Delaware corporation and wholly owned subsidiary of Insperity, Inc.
- Insperity Enterprises, Inc., a Texas corporation and wholly owned subsidiary of Insperity Holdings, Inc.
- Administaff Partnerships Holding, Inc., a Delaware corporation and wholly owned subsidiary of Insperity Holdings, Inc.
- Insperity Captive Insurance Companies Limited, a Bermuda corporation and wholly owned subsidiary of Administaff Partnerships Holding, Inc.
- Insperity Business Services, L.P., a Delaware limited partnership, with Insperity Holdings, Inc. being a 1% general partner and Administaff Partnerships Holding, Inc. being a 99% limited partner.
- Insperity Retirement Services, L.P., a Delaware limited partnership, with Insperity Holdings, Inc. being a 1% general partner and Administaff Partnerships Holding, Inc. being a 99% limited partner.
- Insperity Services, L.P., a Delaware limited partnership, with Insperity Holdings, Inc. being a 1% general partner and Administaff Partnerships Holding, Inc. being a 99% limited partner.
- Administaff Partnerships Holding II, Inc., a Delaware corporation and wholly owned subsidiary of Insperity Services, L.P.
- Insperity GP, Inc., a Delaware corporation and wholly owned subsidiary of Insperity Services, L.P.
- Insperity Support Services, L.P., a Delaware limited partnership, with Insperity GP, Inc. being a 1% general partner and Administaff Partnerships Holding II, Inc. being a 99% limited partner.
- Administaff Companies, Inc., a Delaware corporation and wholly owned subsidiary of Insperity Holdings, Inc.
- Administaff Partnerships Holding III, Inc., a Delaware corporation and wholly owned subsidiary of Administaff Companies, Inc.
- Insperity PEO Services, L.P., a Delaware limited partnership, with Administaff Companies, Inc. being a 1% general partner and Administaff Partnerships Holding III, Inc. being a 99% limited partner.
- Insperity Insurance Services, L.L.C., a Delaware limited liability company and wholly owned subsidiary of Insperity PEO Services, L.P.
- Insperity Employment Screening, L.L.C, a Delaware limited liability company and wholly owned subsidiary of Insperity Holdings, Inc.
- Insperity Expense Management, Inc. a California corporation and wholly owned subsidiary of Insperity Holdings, Inc.
- Insperity Payroll Services, L.L.C., a Delaware limited liability company and wholly owned subsidiary of Insperity Business Services, L.P.

Exhibit 23.1

Consent of Independent Registered Public Accounting Firm

We consent to the incorporation by reference in the following Registration Statements:

(1) Registration Statements (Form S-8 Nos. 333-221310, 333-181569) pertaining to the Insperity, Inc. 2012 Incentive Plan,

(2) Registration Statements (Form S-8 No. 333-159007, 333-140602, 333-66344) pertaining to the Insperity, Inc. 2001 Incentive Plan,

(3) Registration Statement (Form S-8 No. 333-151275) pertaining to the Insperity, Inc. 2008 Employee Stock Purchase Plan,

(4) Registration Statement (Form S-8 No. 333-118790) pertaining to the Insperity, Inc. Directors Compensation Plan, and

(5) Registration Statements (Form S-8 Nos. 333-85151, 333-66342) pertaining to the Insperity, Inc. Non-Qualified Stock Option Plan;

of our reports dated February 11, 2020, with respect to the consolidated financial statements of Insperity, Inc. and the effectiveness of internal control over financial reporting of Insperity, Inc. included in this Annual Report (Form 10-K) of Insperity, Inc. for the year ended December 31, 2019.

/s/Ernst & Young LLP

Houston, Texas
February 11, 2020

**EXHIBIT 24.1**

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that the undersigned, in my capacity as a director of Insperity, Inc., a Delaware corporation (the "Company") appoints PAUL J. SARVADI, DOUGLAS S. SHARP and DANIEL D. HERINK and each of them, severally, as my true and lawful attorney or attorneys-in-fact and agent or agents, each of whom shall be authorized to act with or without the other, with full power of substitution and resubstitution, to execute, in my capacity as a director of the Company, and to file or cause to be filed, with the Securities and Exchange Commission, the Company's Annual Report on Form 10-K for the year ended December 31, 2019 and any and all amendments thereto as said attorneys or any of them shall deem necessary or incidental in connection therewith, and all materials required by the Securities Exchange Act of 1934, as amended, with full power and authority to each of said attorneys-in-fact and agents to do and perform in the name and on behalf of the undersigned, each and every act and thing whatsoever that is necessary, appropriate or advisable in connection with any or all the above-described matters and to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any of them or their substitutes, may lawfully do or cause to be done by virtue hereof.

| */s/ Tim Clifford* | *January 28, 2020* |
|---|---|
| Tim Clifford | Date |

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that the undersigned, in my capacity as a director of Insperity, Inc., a Delaware corporation (the "Company") appoints PAUL J. SARVADI, DOUGLAS S. SHARP and DANIEL D. HERINK and each of them, severally, as my true and lawful attorney or attorneys-in-fact and agent or agents, each of whom shall be authorized to act with or without the other, with full power of substitution and resubstitution, to execute, in my capacity as a director of the Company, and to file or cause to be filed, with the Securities and Exchange Commission, the Company's Annual Report on Form 10-K for the year ended December 31, 2019 and any and all amendments thereto as said attorneys or any of them shall deem necessary or incidental in connection therewith, and all materials required by the Securities Exchange Act of 1934, as amended, with full power and authority to each of said attorneys-in-fact and agents to do and perform in the name and on behalf of the undersigned, each and every act and thing whatsoever that is necessary, appropriate or advisable in connection with any or all the above-described matters and to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any of them or their substitutes, may lawfully do or cause to be done by virtue hereof.

| */s/ Carol Kaufman* | *January 29, 2020* |
|---|---|
| Carol Kaufman | Date |

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that the undersigned, in my capacity as a director of Insperity, Inc., a Delaware corporation (the "Company") appoints PAUL J. SARVADI, DOUGLAS S. SHARP and DANIEL D. HERINK and each of them, severally, as my true and lawful attorney or attorneys-in-fact and agent or agents, each of whom shall be authorized to act with or without the other, with full power of substitution and resubstitution, to execute, in my capacity as a director of the Company, and to file or cause to be filed, with the Securities and Exchange Commission, the Company's Annual Report on Form 10-K for the year ended December 31, 2019 and any and all amendments thereto as said attorneys or any of them shall deem necessary or incidental in connection therewith, and all materials required by the Securities Exchange Act of 1934, as amended, with full power and authority to each of said attorneys-in-fact and agents to do and perform in the name and on behalf of the undersigned, each and every act and thing whatsoever that is necessary, appropriate or advisable in connection with any or all the above-described matters and to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any of them or their substitutes, may lawfully do or cause to be done by virtue hereof.

| */s/ John Lumelleau* | *January 31, 2020* |
|---|---|
| John Lumelleau | Date |

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that the undersigned, in my capacity as a director of Insperity, Inc., a Delaware corporation (the "Company") appoints PAUL J. SARVADI, DOUGLAS S. SHARP and DANIEL D. HERINK and each of them, severally, as my true and lawful attorney or attorneys-in-fact and agent or agents, each of whom shall be authorized to act with or without the other, with full power of substitution and resubstitution, to execute, in my capacity as a director of the Company, and to file or cause to be filed, with the Securities and Exchange Commission, the Company's Annual Report on Form 10-K for the year ended December 31, 2019 and any and all amendments thereto as said attorneys or any of them shall deem necessary or incidental in connection therewith, and all materials required by the Securities Exchange Act of 1934, as amended, with full power and authority to each of said attorneys-in-fact and agents to do and perform in the name and on behalf of the undersigned, each and every act and thing whatsoever that is necessary, appropriate or advisable in connection with any or all the above-described matters and to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any of them or their substitutes, may lawfully do or cause to be done by virtue hereof.

| | |
|---|---|
| */s/ Ellen H. Masterson* | *January 29, 2020* |
| Ellen H. Masterson | Date |

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that the undersigned, in my capacity as a director of Insperity, Inc., a Delaware corporation (the "Company") appoints PAUL J. SARVADI, DOUGLAS S. SHARP and DANIEL D. HERINK and each of them, severally, as my true and lawful attorney or attorneys-in-fact and agent or agents, each of whom shall be authorized to act with or without the other, with full power of substitution and resubstitution, to execute, in my capacity as a director of the Company, and to file or cause to be filed, with the Securities and Exchange Commission, the Company's Annual Report on Form 10-K for the year ended December 31, 2019 and any and all amendments thereto as said attorneys or any of them shall deem necessary or incidental in connection therewith, and all materials required by the Securities Exchange Act of 1934, as amended, with full power and authority to each of said attorneys-in-fact and agents to do and perform in the name and on behalf of the undersigned, each and every act and thing whatsoever that is necessary, appropriate or advisable in connection with any or all the above-described matters and to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any of them or their substitutes, may lawfully do or cause to be done by virtue hereof.

| | |
|---|---|
| */s/ Randall A. Mehl* | *January 28, 2020* |
| Randall A. Mehl | Date |

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that the undersigned, in my capacity as a director of Insperity, Inc., a Delaware corporation (the "Company") appoints PAUL J. SARVADI, DOUGLAS S. SHARP and DANIEL D. HERINK and each of them, severally, as my true and lawful attorney or attorneys-in-fact and agent or agents, each of whom shall be authorized to act with or without the other, with full power of substitution and resubstitution, to execute, in my capacity as a director of the Company, and to file or cause to be filed, with the Securities and Exchange Commission, the Company's Annual Report on Form 10-K for the year ended December 31, 2019 and any and all amendments thereto as said attorneys or any of them shall deem necessary or incidental in connection therewith, and all materials required by the Securities Exchange Act of 1934, as amended, with full power and authority to each of said attorneys-in-fact and agents to do and perform in the name and on behalf of the undersigned, each and every act and thing whatsoever that is necessary, appropriate or advisable in connection with any or all the above-described matters and to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any of them or their substitutes, may lawfully do or cause to be done by virtue hereof.

| | |
|---|---|
| */s/ John Morphy* | *January 29, 2020* |
| John Morphy | Date |

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that the undersigned, in my capacity as a director of Insperity, Inc., a Delaware corporation (the "Company") appoints PAUL J. SARVADI, DOUGLAS S. SHARP and DANIEL D. HERINK and each of them, severally, as my true and lawful attorney or attorneys-in-fact and agent or agents, each of whom shall be authorized to act with or without the other, with full power of substitution and resubstitution, to execute, in my capacity as a director of the Company, and to file or cause to be filed, with the Securities and Exchange Commission, the Company's Annual Report on Form 10-K for the year ended December 31, 2019 and any and all amendments thereto as said attorneys or any of them shall deem necessary or incidental in connection therewith, and all materials required by the Securities Exchange Act of 1934, as amended, with full power and authority to each of said attorneys-in-fact and agents to do and perform in the name and on behalf of the undersigned, each and every act and thing whatsoever that is necessary, appropriate or advisable in connection with any or all the above-described matters and to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any of them or their substitutes, may lawfully do or cause to be done by virtue hereof.

| | |
|---|---|
| */s/ Latha Ramchand* | *January 29, 2020* |
| Latha Ramchand | Date |

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that the undersigned, in my capacity as a director of Insperity, Inc., a Delaware corporation (the "Company") appoints PAUL J. SARVADI, DOUGLAS S. SHARP and DANIEL D. HERINK and each of them, severally, as my true and lawful attorney or attorneys-in-fact and agent or agents, each of whom shall be authorized to act with or without the other, with full power of substitution and resubstitution, to execute, in my capacity as a director of the Company, and to file or cause to be filed, with the Securities and Exchange Commission, the Company's Annual Report on Form 10-K for the year ended December 31, 2019 and any and all amendments thereto as said attorneys or any of them shall deem necessary or incidental in connection therewith, and all materials required by the Securities Exchange Act of 1934, as amended, with full power and authority to each of said attorneys-in-fact and agents to do and perform in the name and on behalf of the undersigned, each and every act and thing whatsoever that is necessary, appropriate or advisable in connection with any or all the above-described matters and to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any of them or their substitutes, may lawfully do or cause to be done by virtue hereof.

| | |
|---|---|
| */s/ Richard G. Rawson* | *January 31, 2020* |
| Richard G. Rawson | Date |

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that the undersigned, in my capacity as a director of Insperity, Inc., a Delaware corporation (the "Company") appoints PAUL J. SARVADI, DOUGLAS S. SHARP and DANIEL D. HERINK and each of them, severally, as my true and lawful attorney or attorneys-in-fact and agent or agents, each of whom shall be authorized to act with or without the other, with full power of substitution and resubstitution, to execute, in my capacity as a director of the Company, and to file or cause to be filed, with the Securities and Exchange Commission, the Company's Annual Report on Form 10-K for the year ended December 31, 2019 and any and all amendments thereto as said attorneys or any of them shall deem necessary or incidental in connection therewith, and all materials required by the Securities Exchange Act of 1934, as amended, with full power and authority to each of said attorneys-in-fact and agents to do and perform in the name and on behalf of the undersigned, each and every act and thing whatsoever that is necessary, appropriate or advisable in connection with any or all the above-described matters and to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any of them or their substitutes, may lawfully do or cause to be done by virtue hereof.

| | |
|---|---|
| */s/ Austin P. Young* | *January 30, 2020* |
| Austin P. Young | Date |

**Exhibit 31.1**

## CERTIFICATION

I, Paul J. Sarvadi, certify that:

1.      I have reviewed this annual report on Form 10-K of Insperity, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    February 11, 2020

/s/ Paul J. Sarvadi
_____
Paul J. Sarvadi
Chairman of the Board and Chief Executive Officer

**Exhibit 31.2**

**CERTIFICATION**

I, Douglas S. Sharp, certify that:

1.      I have reviewed this annual report on Form 10-K of Insperity, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    February 11, 2020

/s/ Douglas S. Sharp

Douglas S. Sharp

Senior Vice President of Finance,

Chief Financial Officer and Treasurer

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO SECTION 906**
**OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Insperity, Inc. (the "Company") on Form 10-K for the period ending December 31, 2019, (the "Report"), as filed with the Securities and Exchange Commission on the date hereof, I, Paul J. Sarvadi, Chairman of the Board and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

1.      The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.      The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

*/s/ Paul J. Sarvadi*

Paul J. Sarvadi
Chairman of the Board and Chief Executive Officer
February 11, 2020

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO SECTION 906**
**OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Insperity, Inc. (the "Company") on Form 10-K for the period endingDecember 31, 2019, (the "Report"), as filed with the Securities and Exchange Commission on the date hereof, I, Douglas S. Sharp, Senior Vice President of Finance, Chief Financial Officer and Treasurer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

1.      The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.      The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

*/s/ Douglas S. Sharp*

Douglas S. Sharp

Senior Vice President of Finance,

Chief Financial Officer and Treasurer

February 11, 2020