UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | x | |
| BUILDING TRADES PENSION FUND OF WESTERN PENNSYLVANIA, Individually and on Behalf of All Others Similarly Situated, | : : : | Civil Action No. 1:20-cv-05635-NRB |
| | : | CLASS ACTION |
| Plaintiff, | : : | LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |
| vs. | : : | |
| INSPERITY, INC., PAUL J. SARVADI and DOUGLAS S. SHARP, | : : : | |
| Defendants. | : : | |
| | x | |

4846-9732-1710.v2

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ...............................................................................................1

II.  BACKGROUND AND STATEMENT OF FACTS ..........................................3

    A.   Insperity Sets – Then Increases – Aggressive 2019 Growth Forecast
        Purportedly Supported By All-Time High BPA Numbers ......................................4

    B.   Insperity Reveals Increased Medical Claims for 2Q19 but Falsely
        Reassures Investors that Medical Claims Will Normalize and Company
        Remains on Track .....................................................................................5

    C.   Insperity Reveals Its Second Consecutive Quarter of Increased Medical
        Claims; Admits It Never Had Ongoing Access to Medical Claims Data
        and Never Had Sufficient BPAs .............................................................6

    D.   The Full Truth Emerges: Insperity Admits that It Had Been Underpricing
        to Drive Growth and Would Require a Full-Year Reset................................7

III. ARGUMENT......................................................................................................7

    A.   Legal Standard ..................................................................................7

    B.   The Complaint Alleges Actionable False and Misleading Statements....................8

        1.   Defendants Misrepresented the Sufficiency Its of BPAs............................8

        2.   Defendants Misrepresented Their Ongoing Access to Medical
            Claims Data and Visibility into Current Claims .......................................10

        3.   Defendants Misrepresented the Company's Current Growth and
            Sales Progress .......................................................................13

        4.   Defendants Falsely Denied that the Company Suffered from a
            Cost/Price Mismatch.................................................................14

        5.   Defendants Misrepresented the Company's Purchase of Stop Loss
            Protection ............................................................................15

        6.   The Alleged Misrepresentations and Omissions Are Actionable..............16

    C.   The Complaint Adequately Alleges Materiality....................................................18

    D.   The Complaint Alleges a Strong Inference of Scienter .......................................19

4846-9732-1710.v2

**Page**

1.  Defendants' Admitted They Had Actual Knowledge of Facts Contradicting Their Public Statements .......................................................20

2.  Scienter Is Strongly Inferred Where Defendants Grossly Misrepresented the Truth ..............................................................................21

3.  Scienter Is Strongly Inferred from Defendants Detailed Discussions on the Matters Alleged to be False .......................................22

4.  Scienter Is Strongly Inferred by the Temporal Proximity of Defendants' False Statements and the Disclosure of the Truth .................22

5.  Defendants' "Competing Inferences" Are Baseless and Reinforce that Scienter Is Sufficiently Pled.................................................................23

IV.    CONCLUSION................................................................................................25

4846-9732-1710.v2

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)...........................................................................................8, 17

*AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec., LLC*,
2005 WL 2385854 (S.D.N.Y. Sept. 26, 2005)...................................................................25

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) ..............................................................................19

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
957 F. Supp. 2d 277 (S.D.N.Y. 2013)..................................................................................9

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020)................................................................................10

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020)................................................................................12

*Dobina v. Weatherford Int'l*,
909 F. Supp. 2d 228 (S.D.N.Y. 2012)................................................................................21

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
323 F. Supp. 3d 393 (S.D.N.Y. 2018)..................................................................................7

*Foman v. Davis*,
371 U.S. 178 (1962)...........................................................................................................25

*Freidus v. Barclays Bank PLC*,
734 F.3d 132 (2d Cir. 2013)..............................................................................................24

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010).....................................................................12, 13, 14

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)..............................................................................................18

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
422 F. Supp. 3d 821 (S.D.N.Y. 2019)................................................................................22

*Ill. State Bd. of Inv. v. Authentidate Holding Corp.*,
369 F. App'x 260 (2d Cir. 2010) .......................................................................................16

4846-9732-1710.v2

**Page**

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F.Supp.2d 474 (S.D.N.Y. 2004)..................................................................................22

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017)..................................................................................19

*In re Fannie Mae 2008 Sec. Litig.*,
891 F. Supp. 2d 458 (S.D.N.Y. 2012).................................................................................16

*In re GlenFed, Inc. Sec. Litig.*,
42 F.3d 1541 (9th Cir. 1994) .............................................................................................12

*In re Nielsen Holdings PLC Sec. Litig.*,
__ F. Supp. 3d __, 2021 WL 22722 (S.D.N.Y. Jan. 4, 2021)...................................................11

*In re Salix Pharms., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016).......................................................................16

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)...........................................................................................8, 20

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)......................................................................11

*In re STEC Inc. Sec. Litig.*,
2011 WL 2669217 (C.D. Cal. June 17, 2011) ......................................................................18

*In re Symbol Techs., Inc. Sec. Litig.*,
2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) ........................................................................23

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021)..............................................................................................12

*In re Vivendi. S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)....................................................................................16, 17, 19

*In re Vivendi Universal, S.A.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003).................................................................................25

*in Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) .............................................................................................12

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)..............................................................................................22

- iv -

4846-9732-1710.v2

**Page**

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ........................................................................................24

*Lasker v. New York State Elec. & Gas Corp.*,
  85 F.3d 55 (2d Cir. 1996) .............................................................................................19

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)....................................................................................19, 25

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ...............................................................................19, 20, 24

*Manavazian v. Atec Grp., Inc.*,
  160 F. Supp. 2d 468 (E.D.N.Y. 2001) ..........................................................................18

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014)....................................................................................10, 11

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013)...........................................................................................18

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)...........................................................................................21

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) .......................................................................................15

*Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
  432 F. Supp. 3d 131 (D. Conn. 2019)............................................................................15

*Plotkin v. IP Axess Inc.*,
  407 F.3d 690 (5th Cir. 2005) .........................................................................................16

*Plumbers & Pipefitters Loc. Union No. 630 Pension Annuity Tr. Fund v. Arbitron Inc.*,
  741 F. Supp. 2d 474 (S.D.N.Y. 2010)............................................................................18

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) .........................................................................................23

*Ret. Sys. of Gov't of the V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015).................................................................................. *passim*

*Ret. Sys. v. MF Glob., Ltd.*,
  620 F.3d 137 (2d Cir. 2010)...........................................................................................23

4846-9732-1710.v2

**Page**

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007)................................................................................3

*S.E.C. v. StratoComm Corp.*,
  2 F. Supp. 3d 240 (N.D.N.Y. 2014)...................................................................21

*Set Cap. LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021)...........................................................................19, 21

*Setzer v. Omega Healthcare Invs., Inc.*,
  968 F.3d 204 (2d Cir. 2020)..............................................................................21

*Va. Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991)........................................................................................12

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
  §78u-4(b)(1)................................................................................................8, 12

Federal Rules of Civil Procedure
  Rule 10b-5...................................................................................................7, 17
  Rule 12(b)(6)....................................................................................................7

## I.    INTRODUCTION

The Complaint sets forth in particularized detail a compelling claim of securities fraud against defendants Insperity, Inc. ("Insperity" or the "Company"), its CEO Paul J. Sarvadi ("Sarvadi") and its CFO Douglas S. Sharp ("Sharp").[1]  Over the course of the one-year Class Period, defendants made false statements and omitted material negative information concerning the most important aspects of the Company, including misrepresentations about:

- the Company's hiring and retention of critical sales people, Business Performance Advisors ("BPA"), which defendants described as its most important performance metric;

- the Company's ability to monitor the cost of its co-employees' medical claims, which defendants falsely claimed it could do on an ongoing basis; and

- the Company's ability to add and retain clients without resorting to underpricing its health insurance plan and leaving it exposed to significant financial risk.

The truth was revealed in a series of three consecutive quarterly earnings announcements each of which contained partial corrective disclosures but continued to conceal the Company's true financial condition.  First, in July 2019, the Company disclosed that it experienced increased medical claims, but falsely assured investors that the increased claims experience was an anomaly that would normalize.  BPA growth also missed expectations but defendants falsely assured investors that BPA growth was sufficient, sales were ahead of the prior year, and the Company was more efficient at making sales with fewer BPAs.  Still, the Company reduced its annual outlook.  The stock price declined 24% but remained inflated by defendants' ongoing misrepresentations.

---

[1]    "¶" and "¶¶" references are to the Corrected Amended Complaint for Violations of the Federal Securities Laws (ECF No. 37) (the "Complaint"); "Class Period" is between February 11, 2019 and February 11, 2020, inclusive. "Plaintiffs" refers to Lead Plaintiff Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association Trust and the additional named plaintiffs.  Citations and footnotes are omitted throughout and emphasis is added unless otherwise indicated.

4846-9732-1710.v2

Then, in November 2019, defendants reported that the Company missed every projected financial metric for 3Q19. Contradicting their prior statements, defendants disclosed that they had been behind on BPAs all year but hoped to offset poor BPA growth by outperforming with large sales. Insperity also reported that it had experienced a second straight quarter of increased medical claims, acknowledging, contrary to earlier assurances, that they never had access to current claims at any point during the quarter. Instead, only after a given quarter was over could Insperity see its claims data. Insperity's 3Q19 performance was so poor that defendants once again lowered their full year projections and stated that they had completely written off 4Q19. These disclosures caused the price to decline 34% but it remained inflated by defendants' false assurances that the critical annual sales and renewal campaign was currently strong and the Company's 2020 growth outlook was positive.

Finally, in February 2020, the full truth emerged: the Company missed its lowered 4Q19 guidance and defendants admitted that despite prior assurances, medical claims had and would continue at elevated levels. Worse yet, sales and renewals results were both disastrously low as a consequence of having to increase pricing. Defendants disclosed – contrary to prior denials – that the Company suffered from a cost/price mismatch as a consequence of underpricing its offerings to drive past growth. When Insperity raised prices to reflect its true risk, renewals and new sales plummeted. The benchmark of double digit WSEE (defined below) growth disappeared into a full-year reset and the stock price declined another 20%.

While defendants' motion to dismiss ("Motion") mischaracterizes the misrepresentations as primarily forward-looking, they cannot escape the material false statements and omissions of current or historical facts. Further, the Motion ignores that as the truth was divulged over six months, defendants repeatedly assured investors that negative developments related to BPAs and

- 2 -

medical claims either were planned or were anomalies that would not derail Insperity's financial position. While the Motion simply asserts that defendants lacked contemporaneous knowledge of the truth, it is presumed that defendants either knew the truth, or were reckless, when addressing issues of paramount importance to investors. Further, defendants' knowledge is confirmed by their own admissions which eviscerate the notion they were caught unaware, but instead reveals that they were peddling half-truths to conceal material problems.[2] At bottom, defendants' Motion misconstrues the facts, the law, and ignores the revelations that sent the stock plummeting, losing over half its value in three successive disclosures. The Court should deny the Motion.

## II.    BACKGROUND AND STATEMENT OF FACTS

Insperity is a professional employer organization that contracts with small and mid-sized businesses to effectively outsource their human resources requirements to the Company. Insperity becomes the co-employer of their clients' employees, referring to them as "worksite employees" ("WSEE"). Insperity's growth is driven by increasing WSEEs, either by adding new clients or when existing clients add new employees. ¶3. It typically takes 60 to 90 days from a new sale until when revenue is first generated. ¶6. Insperity does not provide sales guidance or sales results, but instead only does so for WSEEs and earnings (which accounts for the medical claims).[3] In October each year, Insperity begins its renewal cycle, where approximately half of its existing

---

[2]    The Court should disregard defendants' Appendix A (ECF No. 53-1) which contains additional argument not found in their Motion as a violation of this Court's Individual Practices, Rule 2, D, setting a 25 page limit on briefing. If the Court intends to rely on Appendix A, Plaintiffs request the opportunity to also provide a document rebutting defendants' appendix. Plaintiffs do not oppose the Court taking notice of documents filed with the SEC, transcripts or analyst reports but "'only to determine what the documents stated,'" and "'not to prove the truth of their contents.'" *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (emphasis omitted).

[3]    When WSEEs are reported annually, Insperity discloses what percentage of those WSEEs were from new sales, but does not report when those sales occurred.

4846-9732-1710.v2

clients are repriced for the upcoming year.  ¶4.  Likewise, most WSEEs from new client sales typically onboard in January, to coincide with the new calendar year.  *Id.*

Insperity offers its own healthcare insurance plan to approximately 70% of its clients.  ¶5. While the health insurance carrier (*e.g.*, UnitedHealth) initially pays medical claims made by WSEEs, Insperity is responsible for paying back the carrier.  *Id.*  If Insperity underprices its health insurance, any increase in actual medical claims cuts directly into its earnings and can lead to a cost/price mismatch, *i.e.*, medical costs exceed premiums paid by WSEEs.  Thus, Insperity has to assess each client before offering health insurance, and the experience and strength of its BPAs is critical to this process.  Defendants discussed at length their BPA numbers and told investors it was the "key metric" because more BPAs signaled more sales.  *See, e.g.*, ¶¶58, 61, 86.  In other words, BPA growth is a leading indicator for Insperity's growth.

### A.     Insperity Sets – Then Increases – Aggressive 2019 Growth Forecast Purportedly Supported By All-Time High BPA Numbers

At the start of the Class Period, on February 11, 2019, the Company announced its FY18 financial results and FY19 outlook.  ¶¶58-59.  Defendants falsely claimed that their BPA retention was at an all-time high and that their review of underlying medical claims, from the accounts just renewed and onboarded, confirmed they were currently positioned to continue their strong FY18 financial performance.  ¶¶60-61, 64.  The Company's SEC Form 10-K for FY18, filed the same day, stated it evaluated its medical claims experience on an ongoing basis.  ¶65.  The stock price increased nearly 20%.  ¶69.

On April 29, 2019, the Company announced financial results for 1Q19 and raised its FY19 projections, repeating that the results demonstrated the sustainability of its rapid growth.  ¶¶70, 72. The Company, however, actually missed consensus expectations for net revenue, and revenue growth declined in comparison to WSEE growth (a potential indicator of underpricing).  ¶74.

- 4 -

When asked about this, Sarvadi scoffed that the revenue observation was not meaningful and falsely stated that WSEEs were currently "at measure" with respect to their increased projections. *Id.* Although defendants had previously told investors that BPA growth would drive new sales, the Company *reduced* its BPA growth target for FY19 from 14% to 13%, but told investors they were exactly where they intended to be because success with larger mid-market businesses allowed the Company to grow WSEEs faster with fewer BPAs. ¶¶61, 73. While the Company was already one third of the way through 2Q19 (*i.e.*, April 1 to June 30, 2019) and already experiencing elevated medical claims, defendants stated, "where we look today," underlying medical claims were lower than their initial projections. ¶75.

**B.    Insperity Reveals Increased Medical Claims for 2Q19 but Falsely Reassures Investors that Medical Claims Will Normalize and Company Remains on Track**

On July 26, 2019, the Company reported 2Q19 results that missed WSEE growth guidance and disclosed an increase in large medical claims. ¶83. The Company reduced its annual WSEE guidance and reduced its top-end earnings outlook for the year. ¶84. However, defendants falsely assured investors that sales and client retention were progressing on plan and the Company remained on track to achieve its FY19 guidance. ¶86. Sarvadi falsely stated that there was no sales slowdown and the mid-market pipeline was the biggest the Company ever had and, in fact, the Company was above the prior year in sales. ¶89. Sharp falsely added that Insperity was still in a very favorable benefit/cost environment. ¶88. Defendants also asserted that the higher 2Q19 medical costs were a one-time anomaly and that large claims would normalize and the predictability of medical costs remained excellent on an annual basis. ¶87. In truth, the elevated medical claims that began in 2Q19 were continuing unabated through July 2019. ¶97. Based on

- 5 -

these disclosures Insperity's stock price declined more than 24% but continued to trade at artificially inflated prices due to defendants' ongoing misrepresentations.  ¶95.

C.    **Insperity Reveals Its Second Consecutive Quarter of Increased Medical Claims; Admits It Never Had Ongoing Access to Medical Claims Data and Never Had Sufficient BPAs**

On November 4, 2019, the Company announced disastrous 3Q19 financial results, missing every quarterly projected metric.  Defendants admitted that they failed to employ enough trained BPAs in the beginning of the year and were still struggling with hiring.  ¶101.  Sarvadi conceded that he had hoped that the mid-market would outperform to cover up this problem.  *Id.*

Defendants admitted that, despite prior assurances that medical claims were predictable and would normalize claims had continued at elevated levels in 3Q19 and defendants had no indication or warning system of what current underlying medical claims were currently.  ¶104. Insperity had to wait until after quarter-end to receive medical claims data, meaning any "ongoing" evaluation was only done four times a year.  *Id.*  The increased medical claims concerned investors that Insperity had driven growth by underpricing.  Defendants falsely pushed back saying there was no "cost price mismatch."  ¶106.  They assured investors that pricing had been strong all year, there was no connection with increased medical claims and pricing, and no need to raise prices. And, as for ongoing renewals, defendants claimed they were ahead for the year.  *Id.*  Insperity's stock price declined 34%, but remained artificially inflated by these ongoing misrepresentations. ¶110.

On November 26, 2019, with sales and renewals nearly complete for the year, Sarvadi and Sharp continued to insist the Company did not suffer from a cost/price mismatch.  Despite being mostly through another quarter of elevated medical claims, defendants continued to assure that

4846-9732-1710.v2

higher claims were an anomaly.  When asked if Insperity would get insurance to cover large claims, defendants stated that it would unnecessarily limit their growth and profitability.  ¶114.

### D.     The Full Truth Emerges: Insperity Admits that It Had Been Underpricing to Drive Growth and Would Require a Full-Year Reset

On February 11, 2020, investors would learn the extent of defendants' deceit.  Defendants revealed that their prior growth had come at the expense of a systemic cost/price mismatch.  And, since 3Q19 they had been raising prices, which caused existing clients to leave and new sales to decline.  ¶¶124-128, 134.  The growth outlook for 2020 would shrink to as low as 6% and double-digit growth would not return until 2021.  ¶¶126-127.  Medical claims continued at an elevated rate again in 4Q19.  ¶135.  Defendants admitted that their prior assurances that claims would decline were without basis, and elevated medical claims were expected to continue.  ¶130.  In addition, in a complete reversal from defendants' statements on November 26, 2019, the Company announced that it renegotiated its agreement with UnitedHealth to add a stop loss mechanism – the protection defendants previously dismissed as too expensive and limiting on growth and profitability.  ¶121.  The market reacted swiftly; Insperity's stock declined another 19%.  ¶149.

## III.   ARGUMENT

### A.     Legal Standard

"'To state a claim under Rule 10b-5 for misrepresentations, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury.'"  *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015).[4]  In assessing a Rule 12(b)(6) motion to dismiss, courts must

---

[4]   Defendants have only challenged falsity and scienter, and thus have waived all other arguments at this stage. *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 450 (S.D.N.Y. 2018).

4846-9732-1710.v2

"[a]ccept[] all of the allegations in the complaint as true and draw[] all reasonable inferences in favor of plaintiffs." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69 (2d Cir. 2001).  "[D]ismissal is proper 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Id.*

### B.   The Complaint Alleges Actionable False and Misleading Statements

The Complaint "specif[ies] each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . all facts on which that belief is formed."  15 U.S.C. §78u-4(b)(1); *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173 (2d Cir. 2020).

#### 1.   Defendants Misrepresented the Sufficiency Its of BPAs

Defendants described its BPA numbers as the "key metric" to focus on as more BPAs lead to more sales.  *See, e.g.*, ¶¶58, 61, 86; *see also* Def. Ex. 6 at 26 ("our model is really based on that number of BPAs").[5]  On February 11, 2019, intent on showing continued growth, defendants falsely touted that they saw "step-up improvement in retaining our BPAs," which had been a chronic weak point, and asserted that retention was the highest in the Company's history.  ¶61. Just one quarter later, on April 29, 2019, the Company reduced its BPA growth projections from 14% to 13%, but assured investors that their current position was "basically where we intend to be" and that they were driving more sales with fewer BPAs.  ¶¶61, 73.  Then, on July 29, 2019, with BPAs having grown only 11% in 2Q19, defendants falsely insisted that their BPA numbers were "right where we want to be" and that their sales results (though undisclosed) "demonstrates our success in hiring and training new [BPAs]."  ¶¶86, 90.  An analyst asked if they were having

---

[5]   All "MTD" references are to the Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Corrected Amended Complaint (ECF No. 53). "Def. Ex. _" references are to the Declaration of Amy Pharr Hefley in Support of Defendants' Motion to Dismiss, and exhibits thereto (ECF No. 54).

4846-9732-1710.v2

any issue hiring BPAs, to which Sarvadi responded falsely that Insperity was "capable of growing that base of [BPAs] at the target[] levels."  ¶90.

The truth, as admitted on November 4, 2019, was that the Company never had enough BPAs:  "[t]he primary cause leading to fewer paid worksite employees . . . is *we simply had too few trained BPAs early this year*."  ¶101.  In direct contradiction to his prior assurances, Sarvadi revealed that the Company had "*a lower-trained BPA count early in the year*" and was *still "focused on turning that around*."  *Id.*; ¶¶73, 90.  Indeed, he acknowledged that he "was too optimistic in expecting mid-market sales to offset a lower growth rate in BPAs."  ¶101.  On November 26, 2019, Sarvadi added that – at the same time he was touting historic retention rates – BPAs were at the "*lowest point*" because poorly performing BPAs were fired after the renewal cycle.[6]  Def. Ex. 6 at 24.  Nothing more is required to plead falsity.  *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 301 n.6 (S.D.N.Y. 2013) ("a material misstatement of fact is alleged by pointing to the true fact about the world that contradicts the misstatement").[7]

Defendants argue that Sarvadi's November 4, 2019 statements are not admissions but a "retrospective analysis."  MTD at 24.  But they sidestep that Sarvadi admits that from the beginning, the Company lacked BPAs and sought to cover up this deficiency with overly rosy expectations for mid-market sales.  ¶101.  Defendants also ignore that Sarvadi admitted they were still working to turn around the BPA numbers all the way though to November – despite repeated

---

[6]  Plaintiffs were unable to obtain the transcript of defendants' November 26, 2019 conference with SunTrust Robinson Humphrey until it was filed in connection with the Motion.  Def. Ex. 6.  However, the transcript (as opposed to the analyst report summary in the Complaint) only further supports Plaintiffs' allegations.

[7]  In a final rounding trick, Insperity's February 11, 2020, press release stated it grew WSEFs by 13% and BPA's by 12% giving the appearance both that they had exceeded WSEEs guidance of 12.7% and had grown sales faster than BPAs.  ¶119.  Both were untrue: its 2019 Form 10-K revealed that WSEEs grew at 12.6% while BPAs grew at 12.8%, further undermining defendants' claims that they were able to grow sales faster with fewer BPAs.  ¶137.

4846-9732-1710.v2

assurances in April and July that the Company was where it intended to be.  ¶¶73, 90, 101; *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 404-09 (S.D.N.Y. 2020) (touting sustainability of sales while cutting experienced staff was misleading).

### 2.    Defendants Misrepresented Their Ongoing Access to Medical Claims Data and Visibility into Current Claims

Defendants misrepresented their access to medical claims data and their knowledge of medical claims activity.  On February 11, 2019, the Company's FY18 annual report stated that "*[o]n an ongoing basis* we evaluate . . . [the Company's] insurance claims experience." ¶65.  That same day Sarvadi stated that as of the first week of February, after all repriced and newly onboarded clients went through one payroll, defendants analyzed the "full picture" of "all the elements of our direct costs, including benefits."  ¶64.  Sarvadi confirmed that this analysis was "with underlying claims in there," and purportedly based on this bottom-up analysis, defendants falsely claimed that they were in excellent shape.[8]  ¶¶63-64.  In truth, defendants had zero visibility to into the current quarter – let alone future – claims.

By 2Q19 Insperity started to experience a material increase in large medical claims.  Nonetheless, on April 29, 2019 (*i.e.*, one third of the way through the quarter), Sharp asserted that "where we look *today*" the medical claims costs were coming in "towards the low end" of 2% to 3%. ¶75.  Insperity also issued a false and misleading risk warning in its Form 10-Q that "*[i]f* we experience an increase in the number or severity of claims, our health insurance costs *could* increase."  ¶76; *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) ("'Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.'").

---

[8]    These statements cannot refer to underlying medical claims as of December 31, 2018 because the significance of this statement is that Insperity can see its pricing and costs, the "full picture," after it reprices in January.  ¶¶4, 64.

On July 26, 2019, the Company revealed the first in a series of material increases in medical claims.  But based on its misleading statements of ongoing evaluation and current visibility of medical claims data, defendants falsely stated that 2Q19 was an anomaly and "the predictability of the cost of our health plan is excellent on an annual basis" and "large claims [would] normalize and . . . remain relatively low for the remainder of 2019."  ¶¶87-88.  At the time of these statements large medical claims continued unabated through July 2019, *i.e.*, the first month of 3Q19.

Then, on November 4, 2019, after disclosing a second consecutive quarter of increased medical costs, defendants admitted the truth.  During any given quarter, Insperity had "[no] indication" of what the underlying medical claims were because the Company does not receive data from the carrier until after the quarter is over.  ¶104.  A shocked analyst asked whether there was "an earlier warning system"; Sarvadi said there was not but they were working to "get better insight."  *Id.*; *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *13 (S.D.N.Y. Nov. 26, 2018) (analyst reaction can create inference that defendants' statements were misleading).  These admissions contradict defendants' prior statements of "ongoing" evaluation of claims and knowledge of benefits costs "where we look today."  ¶¶65, 75; *In re Nielsen Holdings PLC Sec. Litig.*, __ F. Supp. 3d __, 2021 WL 22722, at *12 (S.D.N.Y. Jan. 4, 2021) (assurances that the company "had access to all of the data it needed" when later admission showed that they did not, was materially misleading).

On February 11, 2020, Insperity disclosed a third consecutive quarter of elevated medical claims, and that claims increased by $200 million for the full year.  ¶135.  When pressed, Sarvadi admitted that defendants' prior assumptions that claims would snap back in line had "no basis."  ¶130.  Indeed, defendants' prior statements that medical claims would normalize were always false and misleading because Insperity never had a basis to make these comforting predictions.  ¶¶87-

4846-9732-1710.v2

88; *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) ("The house was **always** defective because it was **always** built on landfill.") (emphasis in original), *superseded by statute on other grounds*, Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4(b)(1), *as recognized in Ronconi v. Larkin*, 253 F.3d 423, 429 n.6 (9th Cir. 2001).

Defendants do not dispute that they lacked current medical claims data (MTD at 16) but argue that a patchwork of disclosures informed investors that "'ongoing'" really meant "'quarterly.'" MTD at 7-8. This argument, however, asks the Court to improperly reject the plain meaning of "ongoing." *Ongoing*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/ongoing (last visited June 10, 2021) (Ongoing: "being actually in process; continuing; [or] continuously moving forward"); *see In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 168 (2d Cir. 2021) ("defining 'pushback,' using the most straightforward option: common dictionary usage"); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 130 (S.D.N.Y. 2020) (that investors should be aware of words with special meanings "exemplifies a gross misunderstanding of the [PSLRA]"). The context of the misrepresentations also supports its falsity, as the other items similarly referenced, such as "bad debts" or "contingent liabilities," are evaluated on an ongoing basis, not quarterly. Def. Ex. 1 at 37;[9] *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010) (citing *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991)) ("The purpose of the disclosure requirements is 'to inform, not to challenge the reader's critical wits.'").

---

[9]  Analysis of defendants' patchwork of phrases makes clear that Insperity did not disclose, much less explain, that its evaluations were only done quarterly. MTD at 7-8. For example, the first phrase defendants point to – "level of claims processed during the quarter" – is argued to be a forward-looking estimate, but the Company states that this is an input into its "benefits expense," *i.e.*, a current reported estimate. And, defendants misleadingly argue that this is an "incurred but not reported claim" but this phrase is pulled from another paragraph. Def. Ex. 1 at 37. Indeed, the sentence for this second phrase was subsequently changed to discuss "claim development patterns" as opposed to "claims activity" once defendants admitted they did not have medical claims until the end of the quarter. *Compare id. with* Def. Ex. 11 at 38.

- 12 -

### 3.    Defendants Misrepresented the Company's Current Growth and Sales Progress

On April, 29, 2019, Insperity misleadingly stated that their "mid-market sales success" was allowing them to grow WSEEs faster.  ¶73.  Defendants raised WSEE projections and claimed that they were "at measure" with these raised targets.  ¶74.  On July 29, 2019, despite missing its raised WSEE targets and having higher than expected medical claims, defendants falsely assured that everything was progressing as planned and earnings were on track for the year.  ¶86.  Insperity's WSEE targets still indicated that they were expecting acceleration in new WSEEs for the rest of the year.  ¶90.  When questioned on this, Sarvadi responded that acceleration in WSEEs was part of the Company's "normal sales plan in terms of the sales per salesperson per month, number of BPAs and how that rolls in over the balance of the year."  *Id.*  Defendants reinforced this by claiming: "[n]ew sales were 101% of forecast over the first half of the year" and the Company had "the biggest pipeline we've had, and *we are above last year in sales for the year*."[10]  ¶¶86, 89.

On November 4, 2019, Insperity reported 3Q19 results that missed every financial projection.  In trying to explain away their prior bullish statements, defendants admitted that their April and July statements about mid-market sales success were false.  ¶¶73-74, 85, 86, 89.  While the Company had "*nearly* the same number of accounts sold" in 2019, "the biggest difference from [2018] in mid-market sales [was] the *lower average size of accounts sold*."  ¶102; *Blanford*, 794 F.3d at 306 (statements about high demand were misleading).  In other words, defendants touted the *number* of sales while omitting their *smaller size*.  Sarvadi also admitted that the touted pipeline was actually for the next year and, in fact, sales were not currently accelerating.  ¶¶101-

---

[10]    Defendants were falsely assuring investors that sales already made would become earnings in the second half of 2019, which was believable because sales are not reported and it takes 60-90 days for a new sale to materialize as revenue.  ¶6.

4846-9732-1710.v2

102; *Freudenberg*, 712 F. Supp. 2d at 184 (defendant created a false impression about its state of growth in response to questions from analysts).  After the renewal period, Insperity would reveal that new sales did not even make up for canceled renewals by departing clients.  ¶123.

### 4.     Defendants Falsely Denied that the Company Suffered from a Cost/Price Mismatch

Insperity concealed its cost/price mismatch throughout the Class Period.  By November 4, 2019, after the second consecutive quarter of increased medical claims, investors were very concerned that Insperity underpriced its insurance plan, but Sarvadi emphatically and falsely stated that pricing was "strong throughout the year," there was "no connection" between increased claims and pricing, and "we don't have . . . a cost price mismatch."  ¶106.  In support of these misrepresentations, defendants claimed that clients were renewing; the ongoing renewal cycle was "actually a little ahead." *Id.*  On November 26, 2019, defendants ***denied*** that "the company was forced to reprice and saw heightened churn as a result."  ¶115.[11]

Then, on February 11, 2020, defendants shocked the market, missing even its lowered projections and reporting extremely negative results from its renewal cycle.  ¶¶118-119, 123. Defendants indirectly admitted Insperity had a cost/price mismatch: First, medical claims eroding its pricing margin was a systemic issue, "from different participants as opposed to ongoing claims from the same group of participants in prior periods," meaning they had grown across the board by underpricing their medical plan.  ¶128.  Second, Insperity had been raising prices in the second half of 2019, to "improve[]" and "enhance overall pricing."  ¶¶122, 125.  Third, contradicting that they were "a little ahead" on renewals, existing clients were leaving and new sales cratered as a

---

[11]   "[E]ach of the Individual Defendants is liable for the others' statements made at conference calls in which they participated." *Freudenberg*, 712 F. Supp. 2d at 195 (citing cases).

4846-9732-1710.v2

result of raising prices. ¶¶106, 123 (primary reason for terminations was "cost or value"). In other words, a cost/price mismatch.

The consequence to growth of this cost/price mismatch was devastating. The Company stated that "an ***interruption in growth and profitability unfortunately resets the starting point*** . . . we're expecting 6% to 8% unit growth for [2020]." ¶127. Thus, defendants were never "well positioned to continue our strong financial performance" or "demonstrate sustainability of [the Company's] rapid growth" because its growth was built on underpricing its healthcare plan. ¶¶60, 72. Sarvadi admitted the Company had to go back to the fundamentals and "lay the groundwork" because it could not "return to double-digit growth [until] 2021." ¶126; *Blanford*, 794 F.3d at 306 (finding that "fourth quarter revenue gap is indicative of a 'false growth story'"); *Ont. Tchrs.' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 163 (D. Conn. 2019) ("comments on its revenue in which it neglected to include pricing as a factor, or expressly denied it as a factor, were misleading").

### 5.    Defendants Misrepresented the Company's Purchase of Stop Loss Protection

On November 26, 2019, defendants continued to falsely downplay the ongoing increase in medical claims cost, and misled investors by stating that the Company did not need to reduce its medical claims exposure with stop loss protections. When asked if the Company could mitigate medical claims through "layers of insurance . . . stop-loss insurance or some other mechanism", defendants misleadingly stated that limits "on claim liability is possible, but unlikely to be doable in such a way that would make economic sense for NSP."[12] ¶114. But defendants would reveal

---

[12]    "[W]hen statements in analysts' reports clearly originated from the defendants, and do not represent a third party's projection, interpretation, or impression, the statements may be held to be actionable." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004).

4846-9732-1710.v2

that a stop loss protection was implemented for the beginning of 2020, only five weeks later.  The temporal proximity of defendants' statement and the contrary truth is sufficient to allege that defendants misled investors as to the need for stop loss protection despite its expense.  *Plotkin v. IP Axess Inc*., 407 F.3d 690, 698 (5th Cir. 2005) (subsequent "matters" can be "so temporally connected" that they "shed light" on the falsity of earlier statements).

### 6.    The Alleged Misrepresentations and Omissions Are Actionable

Defendants argue that certain statements are not actionable as forward-looking statements protected by the PSLRA's safe harbor, but the safe harbor "does not apply to any 'allegedly false statement [that] has both a forward-looking aspect and an aspect that encompasses a representation of present fact.'"[13]  MTD at 11; *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016).  The Motion discusses two alleged false statements: First, defendants April 29, 2019 statement that "we're basically where we intend to be [with respect to BPAs]" is a false statement of current condition.  ¶73.  As to the remainder of the response to the analyst, that defendants were "expecting around 13% increase [in trained BPAs] year-over-year," defendants' statement omitted Insperity's current and ongoing inability to hire and retain sufficient BPAs and the fact that the Company was not achieving the claimed greater efficiency with fewer BPAs.  *Id.*  Second, and similarly, the statement "[o]ur earnings outlook for 2019 is in line with our previous forecast as we come off a strong performance in the first half of the year" is a misrepresentation of current and historical fact as Insperity was in a far worse position in April 2019, due to omitted current

---

[13]    Defendants claim that their purported cautionary language is meaningful. MTD at 12. But "'[t]o be "meaningful," a "cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil.'"'" *In re Fannie Mae 2008 Sec. Litig*., 891 F. Supp. 2d 458, 476-77 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 16 (2d Cir. 2013); *see also*, *In re Vivendi. S.A. Sec. Litig*., 838 F.3d 223, 247 (2d Cir. 2016) ("'defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information'"). In addition, the statements were made on conference calls and not "accompanied" by the filed documents defendants cite. *See Ill. State Bd. of Inv. v. Authentidate Holding Corp*., 369 F. App'x 260, 264 & n.3 (2d Cir. 2010).

- 16 -

facts, including a lack of BPAs, an ongoing rise in large medical claims, and a cost/price mismatch. ¶85; *Vivendi*, 838 F.3d at 246 ("Although some aspects of this statement could conceivably be characterized as forward-looking, there is nothing prospective about the representation that Vivendi entered 2001 with a 'very strong balance sheet . . . .'").

Defendants' effort to escape liability by claiming their misrepresentations are protected opinion statements fair no better. Many of the alleged false and misleading statements are simply not opinions. *See, e.g.*, ¶65 ("On an ongoing basis, we evaluate these [liability and expense] estimates . . ."), ¶89 ("we are above last year in sales for the year"), ¶106 ("And we don't have . . . a cost price mismatch"). Even if the Court were to construe other statements as opinions, defendants' ignore the "embedded factual statements that can be proven false" and the omissions of "critical context, implied facts that can be proven false." *Abramson*, 965 F.3d at 175-76. For example, the purported opinion that defendants saw "improvement" in retaining BPAs (¶61) includes the embedded fact that those BPAs were sufficient, when actually Insperity had too few BPAs and was at its lowest point in the year. ¶101; Def. Ex. 6 at 24; *Abramson*, 965 F.3d at 175-176. ("'I believe that x is so because y has occurred'" can be proven false under Rule 10b-5 "[i]f y has in fact not occurred"). Likewise, what constituted the purported "advantage" when defendants discussed having no stop-loss implied that Insperity was both "growing faster" and "being more profitable" (¶114), but both implied facts were false because business was slowing and defendants were raising prices to become profitable. ¶123; Def. Ex. 6 at 5.

Apparently recognizing that the omission of access to timely medical claims data was misleading, but defendants attempt to argue that this omission was a permissible judgement call because it was just "'some fact cutting the other way.'" MTD at 15. This is absurd. The underlying claims data is the very basis for defendants' purported ongoing evaluation and claimed

- 17 -

visibility during the year.  *See, e.g.*, ¶¶65, 75, 87.  Alternatively, the Motion suggests, Insperity "conveyed" that it lacked this information because of various hedges and disclaimers.  MTD at 16. But this type of truth-on-the-market defense is fact-specific and not appropriate at the pleading stage.  *Plumbers & Pipefitters Loc. Union No. 630 Pension Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 485-86 (S.D.N.Y. 2010) (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000)).  In addition, to credit such an argument would improperly draw an inference in defendants' favor, which directly contradicts defendants' own assurances that "the predictability of the cost of our health plan is excellent on an annual basis" and is rebutted by the analysts' shock that there was not "an earlier wanting system" in place when the truth was disclosed.  ¶¶87, 104; *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011) (analyst statements support the false impression that Plaintiffs allege Defendants' statements conveyed").

## C. The Complaint Adequately Alleges Materiality

"'[M]isstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"  *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp.*, *PLC*, 709 F.3d 109, 126 (2d Cir. 2013).  The Complaint sufficiently alleges the materiality of the false and misleading statements and omissions as they concern Insperity's most critical operations, including its BPAs (Insperity's most important metric), its access to ongoing medical claims data (blamed for three consecutive quarters of earnings misses) and pricing (impacting sales, renewals and stability of growth).  Notably, each time the truth about these operations was revealed, Insperity's stock price dramatically declined – 24%, 34%, 20% – further supporting the materiality of the misrepresentations.  ¶¶95, 110, 133; *see Manavazian v. Atec Grp., Inc.*, 160 F. Supp. 2d 468, 483 (E.D.N.Y. 2001) (dramatic change in stock price supports the materiality of the announcement).

4846-9732-1710.v2

Defendants claim certain misrepresentations intended to comfort investors are mere puffery. MTD at 16-18. But these statements are "not so general that a reasonable investor could not have relied upon them." *Vivendi*, 838 F.3d at 245. For example, statements about "our success in hiring" are specifically tied to metrics, like 101% in new sales and 11% increase in BPAs. ¶86; *Carlton v. Cannon*, 184 F. Supp. 3d 428, 494 (S.D. Tex. 2016) (statements "tethered" to "current facts" are not puffery). Statements that the Company was in "excellent shape for the starting point for 2019," for example, are "statements that discuss the very specific benefits" of being able to see the full picture of the repriced accounts after the renewal cycle. ¶64; *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 249 n.14 (5th Cir. 2009). Statements about stability of the Company's growth were repeated to ease investor concerns about pricing and sales. *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (statements "'made repeatedly in an effort to reassure the investing public' about matters particularly important to the company and investors" are material). The cases cited by defendants are inapt. *See, e.g.*, *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (addressing whether "commitment to create earnings opportunities" could be taken as "insuring that dividend rates would remain constant."); MTD at 17-18.

### D. The Complaint Alleges a Strong Inference of Scienter

"'[A] complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud.'" *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021). "In determining the adequacy of Plaintiffs' fraud pleadings under these various requirements, [the Court should] view the alleged facts in their totality, not in isolation." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015). "A complaint

- 19 -

4846-9732-1710.v2

will survive 'if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference . . . .'" *Blanford*, 794 F.3d at 306.

### 1.    Defendants' Admitted They Had Actual Knowledge of Facts Contradicting Their Public Statements

"Where the complaint alleges that defendants knew facts . . . contradicting their public statements, recklessness is adequately pled . . . ." *Scholastic*, 252 F.3d at 76.  Here, defendant Sarvadi admitted that from the beginning of the Class Period, he knew Insperity had "too few trained BPAs," and that BPAs were at their "*lowest point*" early in the year, but concealed this information and spent 11 months trying to "turn . . . around" these numbers.  ¶101 ("I was too optimistic in expecting mid-market sales to offset a lower growth rate in BPAs"); Def. Ex. 6 at 24. These admissions show that defendants knew of, and concealed, material facts that undermined their statements that they were having "improvement in retaining our BPAs" (¶61) or that BPA numbers were right where they wanted to be, as claimed on April 29, and July 29, 2019.  ¶¶73, 90. In addition, while defendants claimed the Company was being more efficient with fewer BPAs (¶¶62, 73, 86, 90), they knew that the lower numbers was due to their inability to hire BPAs.  ¶101.

Similarly, while defendants' told investors that they had access to ongoing medical claims data and visibility into medical claims activity occurring during the quarters, they later admitted knowing that, in fact, they had no current medical claims data until after each quarter ended and during the quarter there wasn't an[y] indication," no "earlier warning system" of what the claims were.  ¶¶63, 65, 75, 88, 104-105.  There is no dispute that defendants knew they lacked medical claims data, indeed, the Motion (wrongly) argues that defendants disclosed as much.  MTD at 16. This is sufficient for scienter.  *Lormand*, 565 F.3d at 254 ("admissions by the individual defendants . . . directly and cogently tend to prove their state-of-mind at the time of their misleading statements and omissions").

- 20 -

### 2.    Scienter Is Strongly Inferred Where Defendants Grossly Misrepresented the Truth

In addition to the admissions showing defendants' knowledge of contradictory facts, the "stark" "discrepancies between the admissions" and prior representations support an inference that defendants were, at minimum, reckless as to the truth. *Dobina v. Weatherford Int'l*, 909 F. Supp. 2d 228, 246 (S.D.N.Y. 2012)); *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 215 (2d Cir. 2020) ("choosing to disclose incomplete and misleading information" raises a strong inference that defendants acted recklessly); *S.E.C. v. StratoComm Corp.*, 2 F. Supp. 3d 240, 259 (N.D.N.Y. 2014) ("'[R]epresenting information as true while knowing it is not, recklessly misstating information, or asserting an opinion on grounds so flimsy as to belie any genuine belief in its truth, are all circumstances sufficient to support a conclusion of scienter.'"), *aff'd sub nom. Sec. & Exch. Comm'n v. StratoComm Corp.*, 652 F. App'x 35 (2d Cir. 2016).

Defendants made statements to investors that were directly contrary to the truth. For example, as the Company missed BPA growth estimates, defendants repeatedly told investors they were exactly where they intended to be, only to later admit they never had enough BPAs and had been struggling to address this issue all year. ¶¶73, 86, 90, 101. *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (egregious refusal to see the obvious, or to investigate the doubtful, may give rise to an inference of recklessness). With respect to sales, defendants stated they were above the prior year, saw no sign of a slowdown, and were progressing on plan. ¶¶85-86, 89-90. All the while, clients were leaving and new sales were not being made because they were raising prices. ¶¶122-125, 128, 134. Finally, at the same time defendants were denying the existence of a cost/price mismatch, they were raising prices due to increased medical claims and losing business, which would result in a year-long reset of the Company's growth. ¶¶105-106; *Set Cap.*, 996 F.3d

at 78-79 (statements minimizing hedging strategies and actions responding to volatility supported evidence of conscious misbehavior or recklessness).

### 3.     Scienter Is Strongly Inferred from Defendants Detailed Discussions on the Matters Alleged to be False

Sarvadi and Sharp both made detailed and specific statements to investors, over multiple quarters, indicative of their awareness of (or recklessness toward) the contradictory facts alleged. *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 489 (S.D.N.Y. 2004) (when speaking on facts of critical importance "it is reasonable to conclude that the speaker had intimate knowledge of those facts or should have known of them"); *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 850 (S.D.N.Y. 2019) (defendant "'must have educated himself' . . . presumably by reviewing data given to him . . . and 'by performing his own due diligence'"). For example, defendants gave a variety of explanations as to why investors should not be alarmed when BPA growth came in below expectations in 1Q19 and 2Q19. ¶¶86, 89-90. These specific statements are more than sufficient to infer that defendants knew, but failed to disclose, that they did not have sufficient BPAs. ¶86. Likewise, defendants repeatedly claimed that sales were above the prior years' level but concealed that the sales were to smaller clients – a material fact defendants either knew or recklessly disregarded. ¶¶89, 102.

### 4.     Scienter Is Strongly Inferred by the Temporal Proximity of Defendants' False Statements and the Disclosure of the Truth

The proximity of when defendants made certain misrepresentations to the subsequent disclosure of the truth is indicative of scienter, in particular those statements made during 4Q19 with just a few weeks left in the year. *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 271 (3d Cir. 2009) ("Just as the magnitude of the alleged discounting and margin contraction strengthens the inference of scienter, so does the temporal proximity of McGuire's March denials

- 22 -

4846-9732-1710.v2

to the end of the quarter."); *Reese v. Malone*, 747 F.3d 557, 574-75 (9th Cir. 2014) (contradictory disclosures separated by three to six months bolster the inference of scienter), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).  For example, on November 4, 2019, defendants assured investors in support of their pricing that they were "actually a little ahead" on client renewals.  ¶106.  Then, on November 26, 2019, with just five weeks left in the year, defendants denied that they were "forced to reprice and saw heightened churn," and stated that double-digit growth was still achievable.  ¶115.  Defendants also stated that insurance mechanisms were not economical and minimized the risk of the medical claims issue.  In truth, Insperity reported a ***net loss of clients*** at year-end and double digit growth was ***gone until 2021***.  ¶¶123, 126.  And, defendants completely reversed their position and added a stop loss feature as of the start of January 2020.  ¶¶114, 121; *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 143 n.13 (2d Cir. 2010) ("Depending on the problem, its existence in February 2008 may support an inference that it was present six months earlier.").  The proximity of these divergent statements supports an inference of scienter.

### 5.   Defendants' "Competing Inferences" Are Baseless and Reinforce that Scienter Is Sufficiently Pled

Defendants' arguments do not give rise to an inference of non-fraudulent intent, let alone one which is ***more*** cogent than Plaintiffs' allegations.  *Blanford*, 794 F.3d at 306 (Complaint must be "at least" as compelling as opposing inferences); *In re Symbol Techs., Inc. Sec. Litig.*, 2013 WL 6330665, at *10 & n.3 (E.D.N.Y. Dec. 5, 2013) (complaint sustained as "Defendants do not identify any . . . more compelling, competing inference").  Defendants argue "'fraud by hindsight,'" saying the Complaint merely alleges that "optimistic projections did not come to

- 23 -

pass." MTD at 24-25.[14] However, this argument cannot be reconciled with the facts alleged including, defendants' admissions that "directly and cogently tend to prove their state-of-mind at the time of their misleading statements and omissions." *Lormand*, 565 F.3d at 254; MTD at 24-25. For example, Sarvadi's BPA admission, directly points to knowledge that defendants knew they had too few BPAs at the beginning of the Class Period. ¶101. On November 26, 2019 Sarvadi admitted that "***at that point*** . . . I thought the midmarket could make up for ***that difference*** as the year progressed." Def. Ex. 6 at 24. And no argument can be made that Company's failure to disclose its lack of timely access to medical data was somehow related a projection that did not come to pass – it was the actual state of affairs at all relevant times.

Defendants' argument that Plaintiffs are required to plead "contemporaneous data" to show knowledge completely misses the point. MTD at 21. For example, with respect to medical claims data, there was no access to current data when defendants' claimed there was. ¶104. The admission that defendants only receive underlying claims data four times a year is enough at this stage. *Blanford*, 794 F.3d at 306 ("pleading standard does not involve applying the more probing test used at the summary judgment or judgment as a matter of law stage"). And, as to pricing, defendants' own brief asserts that defendants were increasing prices, which is a significant factual concession.[15] MTD at 9-10. This goes further than the contemporaneous data they demand, it is acknowledging contemporaneous actions to correct a known (but concealed) material problem.

---

[14] Defendants also contend that Insperity's repurchases raises a "nonculpable inference that Defendants believed their guidance." MTD at 19. This *ipse dixit* is a version of a fact that defendants are not entitled to raise. *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 999 (9th Cir. 2018) (Defendants cannot "present their own version of the facts at the pleading stage."). Repurchases inflate price: they are often used as a market signal that a company's stock price is likely to increase, to inflate financial metrics denominated by the number of shares outstanding or to attempt to halt a declining stock price. These known tactics help, not hurt, Plaintiffs.

[15] Defendants' argument that they raised prices is a significant factual concession. However, whether that information was actually disclosed to investors on November 4, 2019 is a factual dispute to be resolved later. MTD at 9-10; *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 135 (2d Cir. 2013) (facts are to be construed for the Plaintiffs). Indeed, the statements defendants point to are not disclosures but obfuscating responses by Sarvadi creating the

- 24 -

Lastly, defendants' contend that subsequent events cannot raise an inference of scienter but this proposition is roundly rejected. *See In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 181 (S.D.N.Y. 2003) (citing three Second Circuit opinions) (post period news articles can show scienter during the class period, and accepting defendants' fraud-by-hindsight argument would "reward them for their successful concealment of their wrongdoing"); *see also AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec., LLC*, 2005 WL 2385854, at *7, *12 (S.D.N.Y. Sept. 26, 2005) (pleading "April 2001" report by third party "resolved" fraud-by-hindsight argument raised by defendants for 1998 statements).[16]

## IV.    CONCLUSION

For the foregoing reasons, plaintiff respectfully respects that the Court deny defendants' Motion.  In the event that the Court does not deny the Motion, Plaintiffs requests leave to amend to address any deficiencies that the Court might identify.  *Loreley*, 797 F.3d at 190; *Foman v. Davis*, 371 U.S. 178, 182 (1962).

DATED:  June 10, 2021                    Respectfully submitted,

                                         ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                         SHAWN A. WILLIAMS
                                         DANIEL J. PFEFFERBAUM


                                         s/ Daniel J. Pfefferbaum
                                         DANIEL J. PFEFFERBAUM

---

impression that medical claims were not impacting pricing.  But Sarvadi clearly refutes the very inference defendants seek to draw: any increase in pricing was normal and "not so much related to the large claims."  Def. Ex. 4 at 13.

16    With respect to plaintiff's claim under §20(a) of the 1934 Act, defendants have not contested control, only a lack of a primary violation.  MTD at 25.  As argued herein, because plaintiffs have met their burden of pleading primary violations of §10(b) the Complaint adequately pleads a §20(a) claim.  *See* ¶¶53-57.

4846-9732-1710.v2

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
dpfefferbaum@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
PATTON L. JOHNSON
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
pjohnson@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

VANOVERBEKE, MICHAUD & TIMMONY,
P.C.
THOMAS C. MICHAUD
AARON L. CASTLE
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com
acastle@vmtlaw.com

- 26 -

4846-9732-1710.v2

WATKINS, PAWLICK, CALATI & PRIFTI, PC
DEREK L. WATKINS
1423 E. Twelve Mile Road
Madison Heights, MI  48071
Telephone:  248/658-0797
248/658-0801 (fax)
dwatkins@wpcplaw.com

*Additional Counsel for Lead Plaintiff*

- 27 -

4846-9732-1710.v2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on June 10, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

<div style="margin-left: 50%;">

s/ Daniel J. Pfefferbaum
DANIEL J. PFEFFERBAUM

ROBBINS GELLER RUDMAN
    & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail:  dpfefferbaum@rgrdlaw.com

</div>

4846-9732-1710.v2

**Mailing Information for a Case 1:20-cv-05635-NRB Building Trades Pension Fund of Western Pennsylvania v. Insperity, Inc. et al**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Elizabeth Pennington Furlow**
  elizabeth.furlow@bakerbotts.com

- **Amy P. Hefley**
  amy.hefley@bakerbotts.com,amy-hefley-7007@ecf.pacerpro.com

- **Patton Johnson**
  pjohnson@rgrdlaw.com

- **Brian C. Kerr**
  brian.kerr@bakerbotts.com,john.mitchell@bakerbotts.com,brian-kerr-3602@ecf.pacerpro.com

- **Anthony Joseph Lucisano**
  anthony.lucisano@bakerbotts.com

- **Charles Frank Mace**
  frank.mace@bakerbotts.com

- **Francis Paul McConville**
  fmcconville@labaton.com,HChang@labaton.com,lpina@labaton.com,drogers@labaton.com,9849246420@filings.docketbird.com,electroniccasefiling@labaton.com

- **Daniel J. Pfefferbaum**
  dpfefferbaum@rgrdlaw.com,dpfefferbaumRGRD@ecf.courtdrive.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@ecf.courtdrive.com

- **David D. Sterling**
  david.sterling@bakerbotts.com,john.mitchell@bakerbotts.com,leslie.buenzow@bakerbotts.com,leigh-ann-bunker-8737@ecf.pacerpro.com,leigh.ann.bunker@bakerbotts.com,leslie-buenzow-9672@ecf.pacerpro.com

- **Shawn Anthony Williams**
  swilliams@rgrdlaw.com,aelishb@rgrdlaw.com,ShawnW@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,sbloyd@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)