UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
BUILDING TRADES PENSION FUND OF WESTERN
PENNSYLVANIA, Individually and on Behalf
of All Others Similarly Situated,
              Plaintiff,

        - against -

INSPERITY, INC., PAUL J. SARVARDI, and
DOUGLAS S. SHARP,

              Defendants.
----------------------------------------X

**MEMORANDUM AND ORDER**
20 Civ. 5635 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Lead Plaintiff Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association Trust (hereinafter, "Oakland County Employees' Retirement System," "lead plaintiff," or "plaintiff") brings this class action lawsuit on behalf of all persons or entities who purchased common stock of Insperity, Inc. ("Insperity" or the "Company") between February 11, 2019 and February 11, 2020.  Plaintiff alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against Insperity, its Chief Executive Officer ("CEO"), President, and Chairman, Paul J. Sarvadi, and its Chief Financial Officer ("CFO"), Treasurer, and Senior Vice President of Finance, Douglas S. Sharp.  Before the Court is defendants' motion to dismiss the Corrected Amended Complaint ("CAC"), ECF No. 37, for failure to state a claim

pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the following reasons, defendants' motion is granted.

## I. **Background**[1]

### A. **Insperity**

Insperity is a Delaware corporation headquartered in Kingwood, Texas.  CAC ¶ 49.  The Company trades on the New York Stock Exchange under the ticker symbol "NSP."  Id.  Insperity describes itself as a professional employer organization providing an array of human resources ("HR") and business solutions to small and medium-sized business clients.  Id. ¶ 2.  Insperity provides these services by entering into a Client Services Agreement ("CSA") with its clients, pursuant to which Insperity and its client act as co-employers of the employees who work at the client's worksite (the "worksite employees" or "WSEEs").  Id. ¶ 3.  Under this model, Insperity charges its business clients a comprehensive service fee that includes WSEE payroll, and Insperity retains any profit after payroll and related benefits are deducted.  Id.  Insperity has five sales offices in the state of New York and approximately ten

---

[1]     The following facts are principally drawn from the operative complaint, ECF No. 37.  For the purposes of the Court's ruling on the instant motion, the Court draws all reasonable inferences in plaintiff's favor.  See Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012).  Where noted, certain statements are taken from earnings calls and SEC filings, which the Court takes judicial notice of "only to determine what the documents stated, and not to prove the truth of their contents." Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp., 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018) (citation and internal quotation marks omitted), aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United Techs. Corp., 779 F. App'x 69 (2d Cir. 2019).

percent of its approximately 221,000 co-employed WSEEs are within the state of New York.  Id. ¶ 49.

One of the principal services Insperity provides is health care benefits to WSEEs.  The majority of Insperity's group health insurance coverage is provided through its contract with UnitedHealthcare.  Id. ¶ 5.  Insperity is "the policyholder responsible for premiums associated with these group insurance policies." Id.  While UnitedHealthcare "initially pays healthcare claims made by WSEEs, Insperity is actually responsible for paying back the carrier for all healthcare benefits delivered."  Id. Insperity's comprehensive service fee "includes a pricing component associated with its healthcare benefit costs."  Id. Insperity's profits are therefore determined in part by the number of WSEEs Insperity employs, along with the costs of the benefits provided to those workers.

In order to generate business, Insperity employs sales representatives referred to as Business Performance Advisors ("BPAs"), who are paid on commission.  Id. ¶ 6.  Insperity's sales process typically takes approximately 90 days for clients with fewer than 150 employees and 180 days for larger clients.  Id.  A sale does not produce revenue until after the WSEEs are enrolled and paid by Insperity, which usually takes another 60 to 90 days. Id.  Insperity's clients generally agree to one- or two-year contracts, which are typically renewed annually.  Id. ¶ 4.  Almost

half of Insperity's pricing agreements begin in January, after existing clients receive new pricing during the prior October. Id.

### B. The Individual Defendants

Defendants Paul J. Sarvadi and Douglas S. Sharp (together, the "individual defendants") are officers of Insperity. Sarvadi has been the CEO and Chairman of the Board of Directors since 1989. Id. ¶ 50. Sharp has been the CFO, Treasurer, and Senior Vice President of Finance at Insperity since 2008. Id. ¶ 51. The individual defendants participated in earnings conference calls throughout the period at issue in this case, are quoted in press releases, and signed Insperity's Form 10-K filed with the SEC on February 11, 2019. Id. ¶¶ 50-51. Sharp also signed Insperity's Forms 10-Q and 8-K filed with the SEC on April 29, June 29, and November 4, 2019. Id. ¶ 51. Between February 11, 2019 and February 11, 2020, Sarvadi sold 89,800 shares of Insperity common stock for proceeds of nearly $10.73 million. Id. ¶ 50. During the same period, Sharp sold "more than 16,427 shares of Insperity common stock" for proceeds of approximately $2.07 million. Id. ¶ 51.

### C. Alleged Misstatements

Lead plaintiff purchased Insperity stock between February 11, 2019 and February 11, 2020. Id. ¶ 46. Plaintiff challenges statements that Insperity, Sarvadi, and Sharp made on earnings calls and in press releases during that period. Broadly, these

4

statements fall into five categories: (1) statements regarding whether Insperity employed sufficient BPAs to meet its growth targets, (2) statements regarding Insperity's insight into health care claims data; (3) statements regarding Insperity's sales and growth; (4) statements regarding whether there was a mismatch between Insperity's costs and pricing; and (5) statements regarding Insperity's purchase of stop-loss protection.

### 1.  **Fiscal Year 2018 Results and First Quarter Projections**

On February 11, 2019, Insperity announced its financial results for Fiscal Year 2018 ("FY18") and its Fiscal Year 2019 ("FY19") guidance.  Id. ¶ 58.

In a press release published that day, Insperity noted that adjusted earnings per share ("EPS") increased 57% and adjusted EBITDA increased 35%.  Id. ¶ 59.  The press release stated that Insperity's growth was primarily the result of "an increase in WSEEs paid from new sales on a 16% increase in the average number of trained BPAs."  Id. ¶ 58.  Insperity further predicted year-over-year growth in the following categories:  WSEEs (14-16%); adjusted EPS (17-25%); and adjusted EBITDA (12-19%).  Id. ¶ 59.  The press release also stated that Insperity was "starting 2019 with 15% worksite employee growth and [is] well positioned to continue our strong financial performance."  Id. ¶ 60.

That same day, defendants Sarvadi and Sharp hosted an earnings call with analysts.  Id. ¶ 61.  One of the issues discussed on the

call was Insperity's BPA retention rates.  Id.  Sarvadi stated
that "[w]e've seen what I'd call a kind of step-up improvement in
retaining our BPAs for a long time.  First 30 years in business
. . . we were north of [a] 30% [turnover rate] . . . And [now]
we're more in the 26%, 27% [range]."  Id.; ECF No. 54-3 at 13.
Sarvadi also stated that that Insperity was "always conservative
in our routine budget process . . . So when you put the entire
picture together, our starting point in paid worksite employees
supports our expectation for 14% to 16% unit growth for 2019."
CAC ¶ 62.  He continued that "[w]e expect continuing strong sales
and retention, our controllable factors, and we have incorporated
a slightly lower contribution from new hires and layoffs just to
be conservative."  Id.  Sarvadi further informed investors that
Insperity's WSEE "forecast is based upon our successful year-end
transition of new and renewing accounts, 15% growth in the average
number of trained Business Performance Advisors while maintaining
recent sales efficiency levels, and continued success in our mid-
market client segment."  Id.

Defendants also discussed their predictions for the costs of
medical claims on the call.  Id. ¶ 63.  Sarvadi disclosed that the
fourth quarter medical claims in 2018 were higher than Insperity
expected.  Id.  Sarvadi also stated that Insperity "would expect"
health care costs per employee "to be down a little bit because it
was so exaggerated last year."  Id.  He continued to say that,

after a 2% growth in health benefits costs in 2018, Insperity was "kind of looking at - again, being conservative at the beginning of the year around 3%," telling investors to "look at a range of 2.5% to 3.5% . . . ." Id.

Insperity also issued its Form 10-K for FY18 on February 11, 2019. Id. ¶ 65. The 10-K stated that, "[o]n an ongoing basis, we evaluate these [liability and expenses] estimates, including those related to health and workers' compensation insurance claims experience . . . ." Id.

Following Insperity's disclosures, the company's stock price increased 19%. Id. ¶ 69. Analysts, including Roth Capital Partners and SunTrust Robinson Humphrey, Inc. ("SunTrust Robinson Humphrey"), also issued positive reports regarding Insperity. Id. ¶¶ 67-68.

## 2. **Insperity Releases its First Quarter Financial Results**

On April 29, 2019, Insperity announced its financial results for the first quarter ("Q1") of FY19. Id. ¶ 70. Insperity beat its quarterly financial guidance for EPS and paid WSEEs, but did not meet "consensus expectations" for net revenue. Id. The Company also reduced its estimated rate of BPA growth. Id. Insperity increased its year-over-year growth predictions for adjusted EPS (from 17%-25% to 21%-28%) and adjusted EBITDA (from 12%-19% to 15%-21%). Id. ¶ 71.

Defendants Sarvadi and Sharp participated in an earnings call on April 29, 2019 to discuss Insperity's Q1 results.  <u>Id</u>. ¶ 73. On the call, Sarvadi stated that Insperity was targeting an average increase in trained BPAs of 13% for the full year and that "[t]he size and maturity of our sales organizations, combined with our mid-market sales success, is now allowing us to grow the number of worksite employees at a faster rate than the growth rate of the number of BPAs . . . ."  <u>Id</u>. ¶ 73. Sarvadi also said that Insperity was "at measure" to meet its WSEE targets.  <u>Id</u>. ¶ 74.  Sharp also discussed Insperity's benefit cost trend, and specifically said, "[b]ut when we look over the course of the year, we're still looking at a benefit cost trend . . . where we look today" in terms of cost of health care benefits claims was "on the low end" of Insperity's 2% to 3% range.  <u>Id</u>. ¶ 75.

Insperity contemporaneously filed its Form 10-Q on April 29, 2019, which included potential risks facing the company.  <u>Id</u>. ¶ 76.  Among those risks was that, if Insperity were to "experience an increase in the number or severity of claims, [its] health insurance costs could increase."  <u>Id</u>.  Following Insperity's discussion of its Q1 results, Insperity's stock price declined 5%, from $118.95 on April 28, 2019 to $112.96 on April 29, 2019.  <u>Id</u>. ¶ 78.  Subsequently, several analysts, including Roth Capital Partners, SunTrust Robinson Humphrey, and Zacks issued analyst reports regarding Insperity's first quarter results.  <u>Id</u>.

Insperity's stock price rose to $119.56 on April 30, 2019.  Id. ¶ 82.

### 3. **Insperity's Second Quarter Results**

Insperity released its second quarter results on July 29, 2019.  In a press release issued on July 29, 2019, Insperity announced that the Company had met its quarterly EPS guidance, missed its quarterly guidance for WSEE growth, and reported a significant increase in benefit costs attributable to large medical claims.  Id. ¶ 83.  The Company also announced that "[n]et gains in our client base were lower than expected, particularly during the last month of the quarter, due primarily to less hiring of full-time and seasonal employees."  Id.  Insperity modified its target for WSEE growth from 14%-16% to 13.5%-14.5%; its target for EPS growth from 21%-28% to 22%-26%; and its adjusted EBITDA from 15%-21% to 16%-19%.  Id. ¶ 84.

On the same day, Insperity also held an earnings call with investors.  On the earnings call, Sarvadi stated that "[n]ew sales were 101% of forecast over the first half of the year as sales efficiency stayed the same despite an 11% increase in the average number of Business Performance Advisors.  This demonstrates our success in hiring and training new Business Performance Advisors, which is the key driver for future growth."  Id. ¶ 86.  Sarvadi also noted that Insperity ended the second quarter with a 13% increase year-over-year in trained BPAs.  Id.  Sharp noted that

"the predictability of the cost of our health care plan is excellent on an annual basis . . . We've analyzed our underlying plan trends . . . Based on that analysis, we expect large claims to normalize and overall benefit cost to remain relatively low[.]" Id. ¶ 87. Sharp stated that he expected a cost benefit trend of "only 2% to 2.5%." Id. In response to questions from analysts regarding Insperity's anticipated sales, Sarvadi replied that, "[w]e've got the biggest pipeline we've had, and we are above last year in sales for the year." Id. ¶ 89. Sarvadi also said that Insperity was "capable" of growing its base of Business Performance Advisors at the targeted levels, and that Insperity was "at about 13% at the end of the quarter . . . and we'll continue to ramp that up to around 14% over the balance of the year, and that's right where we want to be going into 2020." Id. ¶ 90.

Following Insperity's call, analysts again issued reports on the second quarter earnings. Id. ¶¶ 91-93. SunTrust Robinson Humphrey noted in its report that it was unlikely that "a surge in large claims can occur" in "multiple consecutive quarters." Id. ¶ 93. After Insperity's second quarter disclosures, Insperity's stock price declined more than 24%. Id. ¶ 23.

### 4. **Insperity's Third Quarter Results**

On November 4, 2019, Insperity announced its third quarter results. It reported EPS of $0.75, missing its third quarter guidance by up to 28%; EBITDA of $51 million, missing its guidance

by as much as 26%; and 240,939 average WSEEs paid, missing its guidance by as much as 3,161 WSEEs.  Id. ¶ 24.  Insperity also adjusted its targets downward as follows:

| FY19 Guidance (date issued) | Feb. 11, 2019 | Apr. 29, 2019 | Jul. 29, 2019 | Nov. 4, 2019 |
|---|---|---|---|---|
| Avg. WSEEs paid growth | 14%-16% | 14%-16% | 13.5%-14.5% | 12.7%-13.0% |
| Adjusted EPS growth | 17%-25% | 21%-28% | 22%-26% | 9%-12% |
| Adjusted EBITDA growth | 12%-19% | 15%-21% | 15%-19% | 3%-6% |

Id. ¶ 27; ¶ 84.  On an earnings call on November 4, 2019, Sarvardi stated that Insperity's failure to meet expectations was "driven primarily by a second consecutive quarter with elevated large claims in our medical plan and to a small degree by lower growth than expected in paid worksite employees."  Id. ¶ 100.  He further told investors that "[t]he primary cause leading to fewer paid worksite employees from sales in Q3 is we simply had too few trained BPAs early this year and did not offset that with mid-market sales."  Id. ¶ 101.  He continued that, "in retrospect, I believe I was too optimistic in expecting mid-market sales to offset a lower growth rate in BPAs at this stage."  Id.  Sarvadi explained that Insperity "had nearly the same number of accounts sold year-to-date in our mid-market segment . . . However, the biggest difference from last year in mid-market sales is the lower average size of the accounts sold."  Id. ¶ 102.

Sarvadi also informed investors that Insperity was not assuming a further reduction in large claims for the remainder of 2019. Id. ¶ 29. In response to an analyst's questions about when Insperity discovered that health care costs were elevated and the possibility of more frequent updates on health care claims data, Sharp responded that the company received claims data from UnitedHealthcare quarterly and that Insperity meets with UnitedHealthcare monthly. Id. ¶ 104.

Sarvadi also stated that although costs had increased, "[p]ricing has been strong throughout the year and has even come in ahead of our expectations as the year went along." Id. ¶ 106. He stated that higher benefits did not "call for any change in pricing" because "our normal pricing strategy would actually have us pricing at a higher number . . . and we don't have . . . a cost price mismatch, we don't have to go back and hurry up and increase prices on consumers." Id. He also stated that "a little over 40% of our book of business renews in this January to February time period. And those – we're well into renewing those accounts already and – or actually, a little ahead on that." Id. Insperity's stock price dropped from a close of $107.67 per share on November 1, 2019 to a close of $71.38 per share on November 4, 2019 (the next trading day). Id. ¶ 110.

Following the call, analysts again issued reports making recommendations regarding Insperity. Id. ¶ 112-13. On November

26, 2019, SunTrust Robinson Humphrey published an analyst report stating that Insperity imposing a limit "on claim liability is possible, but unlikely to be doable in such a way that would make economic sense."  Id. ¶¶ 113-14.

### 5.  **Insperity Announces its Fourth Quarter and FY19 Results**

Insperity's results in the fourth quarter were largely in line with its predictions.  On February 11, 2020, Insperity issued a press release in which it reported adjusted EPS of $4.15 per share (annual growth of 10.67%); annual growth of EBITDA of 4.3%; and 235,547 average WSEEs (annual growth of 12.6%).  Id. ¶ 119.

In the release, the Company also announced a new stop-loss mechanism that provided that Insperity would not have "financial responsibility for any amount of a participant's annual claim costs that exceed $1 million."  Id. ¶ 121.  The release also stated that "[h]igher benefit costs were partially offset by continued improvements in pricing."  Id. ¶ 122.  Insperity acknowledged that the number of large claims remained elevated and that this claim activity resulted in a 4% benefit cost trend in 2019, as compared to the 2%-3% trend forecast at the outset of the year.  Id. ¶ 128. Further, Insperity stated it had a 12% growth in BPAs and a 13% growth in WSEEs.  Id. ¶ 137.  In its FY19 10-K, filed the next day on February 12, 2020, Insperity reported a 12.6% increase in WSEEs and a 12.8% increase in BPAs in 2019.  Id.

In its Form 8-K, filed that same day, Insperity disclosed that it had repurchased approximately 2,125,000 shares of common stock at a cost of $203 million, including 643,000 shares purchased during the fourth quarter at a cost of $49.4 million.  ECF No. 54-10 at 6-7.

Insperity also held an earnings call on February 11, 2020. CAC ¶ 123.  On that call, Sarvadi stated that Insperity did not anticipate reaching double-digit growth until 2021.  Id. ¶ 126. Sarvadi also announced on the call that Insperity would assume for budgeting purposes that the elevated number of large claims would continue, because "we felt like though it was important for us for budgeting purposes to not assume that [a reduction] was just going to keep happening with no basis for it. So instead, we've assumed kind of in our worst case that the number of these claims goes up with our unit growth . . . ."  Id. ¶ 130.  Sarvadi also reported that client attrition was 7.3%, above the 5.5% of January 2019. Id. ¶ 123.

Again, SunTrust Robinson Humphrey released a report regarding the earnings call.  Id. ¶ 132.  Insperity's stock price declined 19.58%, from a close of $89.08 per share on February 11, 2020 to a close of $71.64 per share on February 12, 2020.  Id. ¶ 133.

### D. Procedural History

Building Trades Pension Fund of Western Pennsylvania commenced this action on July 21, 2020.  ECF No. 1.[2]  On September 21, 2020, Wayne County Employees' Retirement System and Oklahoma Law Enforcement Retirement System filed a motion to be appointed lead plaintiffs.  ECF No. 9.  That same day, Oakland County Employees' Retirement System filed its own motion to be appointed lead plaintiff.  ECF No. 14.  On October 5, 2020, Wayne County Employees' Retirement System and Oklahoma Law Enforcement Retirement System submitted a motion of non-opposition to Oakland County Employees' Retirement System's request to be appointed lead plaintiff, noting that they did not possess the largest financial interest in the relief sought by the class.  ECF No. 24.  On October 23, 2020, this Court granted Oakland County Employees' Retirement System's motion and appointed it lead plaintiff.  ECF No. 27.  Oakland County Employees' Retirement System filed the CAC on December 24, 2020.  ECF No. 37.  On April 26, 2021, defendants filed the instant motion to dismiss and memorandum of law in support thereof (the "Motion" or "Mot.").  ECF No. 52-53.  On June 10, 2021, Oakland County Employees' Retirement System filed its opposition brief ("Opp.").  ECF No. 56.  Defendants filed their reply on July 12, 2021.  ECF No. 57.

---

[2]     Building Trades Pension Fund of Western Pennsylvania did not file a motion to be appointed lead plaintiff.

## II.  <u>Legal Standard</u>

### A.  Federal Rule of Civil Procedure 12(b)(6)

On a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor. <u>City of Providence v. BATS Glob. Mkts., Inc.</u>, 878 F.3d 36, 48 (2d Cir. 2017). However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, (2009), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," <u>Brown v. Daikin Am., Inc.</u>, 756 F.3d 219, 225 (2d Cir. 2014).  "Factual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).  Thus, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." <u>Id</u>.

### B.  Heightened Pleading Standard Under Section 10(b) of the Exchange Act and Rule 10b-5

A plaintiff pleading securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). <u>ATSI Comm., Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d

87, 99 (2d Cir. 2007); 15 U.S.C. § 78u-4(b).  Rule 9(b) requires plaintiffs asserting securities fraud claims to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004).  "The PSLRA expanded on the Rule 9(b) standard, requiring that securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 108 (2d Cir. 2012) (internal quotation marks and alterations omitted).  The PSLRA further provides that, "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

## C. Elements of a Claim for Securities Fraud

In order to state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, plaintiffs must allege that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that

plaintiffs' reliance was the proximate cause of their injury."
Gamm v. Sanderson Farms, Inc., 944 F.3d 455, 463 (2d Cir. 2019).

Defendants challenge only the first two prongs of this test
in their motion to dismiss.

### 1. Misstatements or Omissions of Material Fact

Defendants dispute that they made misstatements or omissions
of material fact.  "To prevail on a § 10(b) claim, a plaintiff
must show that the defendant made a statement that was
misleading as to a material fact."  Matrixx Initiatives, Inc. v.
Siracusano, 563 U.S. 27, 38 (2011) (internal citation and quotation
marks omitted) (emphasis in original).  An omission is actionable
when disclosure is "necessary 'to make ... statements made, in the
light of the circumstances under which they were made, not
misleading.'"  Id. at 37 (quoting 17 C.F.R. § 240.10b–5(b)).

A statement or omission is materially misleading when there
is "a substantial likelihood that the disclosure of the omitted
fact would have been viewed by the reasonable investor as having
significantly altered the 'total mix' of information made
available" to the market.  Id. at 38.  The "materiality hurdle" is
therefore a "meaningful pleading obstacle."  In re ProShares Tr.
Sec. Litig. v. ProShares Tr., 728 F.3d 96, 102 (2d Cir. 2013).
Because materiality is a mixed question of law and fact, a claim
may not be dismissed "on the ground that the alleged misstatements
or omissions are not material unless they are so obviously

unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 235 (2d Cir. 2014) (citation omitted).

Certain categories of alleged misstatements are not actionable.

### (a)   Puffery

Challenged statements that are properly viewed as "expressions of puffery and corporate optimism do not give rise to securities violations." Rombach, 355 F.3d at 174. "[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000).

### (b)   Forward-Looking Statements

Similarly, a forward-looking statement is not actionable if it "is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." Slayton v. Am. Exp. Co., 604 F.3d 758, 766 (2d Cir. 2010) (emphasis in original). Under the PSLRA, a statement is forward-looking if it contains, inter alia, "a projection of revenues, income, [or] earnings," "plans and objectives of management for future operations," or "a statement of future

economic performance." 15 U.S.C. § 78u-5(i)(1). For cautionary language to qualify as "meaningful," it "must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements." Slayton, 604 F.3d at 771 (quoting H.R. Conf. Rep. 104-369, at 43 (1995)); see also In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 247 (2d Cir. 2016) ("To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information.") (citations and quotation marks omitted).

### (c)   Opinion Statements

Moreover, "subjective statements of opinion are generally not actionable as fraud." In re Sanofi Sec. Litig., 87 F.Supp.3d 510, 528 (S.D.N.Y. 2015), aff'd sub nom. Tongue v. Sanofi, 816 F.3d 199 (2d Cir. 2016). Opinion statements are protected unless (1) "the speaker did not hold the belief she professed," (2) "the supporting facts she supplied were untrue," or (3) "the speaker omits information whose omission makes the statement misleading to a reasonable investor." Tongue v. Sanofi, 816 F.3d 199, 210 (2d Cir. 2016) (citing Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 186, 193-94 (2015)). For an omission from an opinion to be actionable, "[t]he investor must identify particular (and material) facts going to the basis for

the issuer's opinion -- facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have -- whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." Omnicare, 575 U.S. at 194.   In other words, the opinion must "fairly align[ ] with the information in the issuer's possession at the time."   In re Sanofi, 87 F. Supp. 3d at 210 (quoting Omnicare, 575 U.S. at 189).   Establishing liability based on omissions from opinion statements "is no small task for an investor." Id. (quoting Omnicare, 575 U.S. at 194). "[A] statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'"   Id. (quoting Omnicare, 575 U.S. at 189).

### 2. **Scienter**

"In order to plead scienter adequately under the PSLRA, a plaintiff must plead with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."   ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009) (internal quotation marks omitted).   This "strong inference" must be more than "merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 314 (2007).

III. **Discussion**

  **A. Plaintiff Fails to Allege False or Misleading Statements**

In this section, we address each of the categories of statements that plaintiff relies on to claim securities fraud. After considering each category, we find that plaintiff's complaint fails because plaintiff has failed to allege any false or misleading statements.

  1. **Statements Regarding Insperity's BPAs**

We first address plaintiff's allegations that defendants made false or misleading statement regarding Insperity's BPAs. Plaintiff principally alleges that Insperity's ultimate failure to meet the growth targets set on April 29, 2019[3] renders defendants' statements in February, April, and July 2019 regarding the number of BPAs Insperity employed and Insperity's ability to meet its growth targets false or misleading. This allegation is insufficient to support a finding that defendants made a false or misleading statement.

To be clear, plaintiff does not allege that Insperity ever misreported the number of BPAs it employed or, for that matter, intentionally misreported any metric in the period from February

_____

[3]   In advancing its various arguments regarding Insperity's failure to meet growth targets, plaintiff makes repeated comparisons to April 29, 2019, the date on which defendants announced first quarter results, rather than using as the base point of comparison the projections for the year announced on February 11, 2019.  See CAC ¶¶ 37, 148.  The reason for this selection is clear: Insperity announced its highest growth targets on this day, thereby allowing plaintiff to create the greatest fall-off when making its comparisons.

11, 2019 to February 11, 2020.[4]  In fact, plaintiff alleges that
Insperity transparently adjusted its growth targets downward each
quarter it failed to hit its target metrics.  See, e.g., CAC ¶¶
98, 120 (summarizing changes in growth targets in 2019).  Moreover,
plaintiff ignores the bottom-line fact that Insperity met its
guidance on BPAs.  While plaintiff alleges that Insperity "**miss[ed]
every metric** of its original and upwardly revised guidance issued
on April 29, 2019," id. ¶ 37 (emphasis in original), Insperity met
its April 29, 2019 goal of 13% increased BPA growth.  Compare id.
¶ 73 (on April 29, 2019 Insperity was "targeting an average
increase in trained BPAs of 13% for the full year") with ¶ 137
(reporting BPAs increased 12.8% in 2019).  Likewise, plaintiff
ignores that Insperity ultimately met the fourth quarter guidance
it issued on November 4, 2019.  See id. ¶ 120 (demonstrating that
Insperity met it guidance in all categories but WSEE growth, which
Insperity missed by 0.1%).

---

[4]    Plaintiff alleges in a single sparse paragraph that defendants
misleadingly rounded the numbers of BPAs reported in its press release of
February 11, 2020 by rounding the percentage growth of BPAs down from 12.8% to
12%, and the number of WSEEs up from 12.6% to 13%. CAC ¶ 137.  However, this
statement was clarified the next day, on February 12, 2020, in Insperity's 10-
K, in which Insperity disclosed the actual percentages of BPAs and WSEEs to the
decimal points.  Id.  The fact that Insperity self-corrected its disclosure the
following day undercuts any suggestion that Insperity had the required intent
to mislead investors.  See infra Section III(B).  Moreover, the statement was
not material.  See Azrielli v. Cohen Law Offices, 21 F.3d 512, 518 (2d Cir.
1994) (holding a statement is material if "there is a substantial likelihood
that a reasonable person would consider [the allegedly misstated fact] important
in deciding whether to buy or sell" the securities at issue.)

As we discuss below, plaintiff's complaint fails to allege a false or misleading statement regarding Insperity's BPAs because plaintiff cannot manufacture a securities fraud claim out of statements which are uncontradicted, are protected forward-looking statements under the PSLRA, or constitute opinions.  Further, plaintiff cannot assert that defendants had a duty to disclose facts where no such duty exists and the facts in question were disclosed.

### (a)   Uncontradicted Statements

Somewhat curiously, plaintiff alleges that uncontradicted statements regarding Insperity's BPAs are false.  For example, plaintiff challenges Sarvadi's February 11, 2019 statement that Insperity saw a "step-up improvement in retaining our BPAs," id. ¶ 61, and Sarvadi's statement on the April 29, 2019 earnings call that "[t]he size and maturity of our sales organization . . . is now allowing us to grow the number of worksite employees at a faster rate than the growth rate of the number of BPAs," id. ¶ 73. In an effort to avoid the obvious conclusion that an uncontradicted statement cannot be misleading, plaintiff contends that Sarvadi admitted the falsity of these statements on the November 4, 2019 earnings call by saying, "[t]he primary cause leading to fewer paid worksite employees from sales in Q3 is we simply had too few trained BPAs early this year and did not offset that with midmarket sales" and "[i]n retrospect, I believe I was too optimistic in

expecting mid-market sales to offset a lower growth rate in BPAs at this stage." Id. ¶ 101. But neither November statement is inconsistent with the statements made in February and April because the "disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." In re Duane Reade Inc. Sec. Litig., No. 02 Civ. 6478 (NRB), 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003) (citation omitted), aff'd sub nom. Nadoff v. Duane Reade, Inc., 107 F. App'x 250 (2d Cir. 2004); see also Nadoff v. Duane Reade, Inc., 107 F. App'x 250, 252 (2d Cir. 2004) ("Accurate statements about past performance are self evidently not actionable under the securities laws[.]").

**(b)   Forward-Looking Statements**

Plaintiff also challenges Sarvadi's projections on the April 29, 2019 and July 29, 2019 earnings calls regarding Insperity's "targeted" or "expect[ed]" BPA growth in 2019, along with his assurances that Insperity was "on track" to meet those projections. See, e.g., CAC ¶¶ 73, 74, 86. These statements are protected as forward-looking statements under the PSLRA. See 15 U.S.C. § 78u-5(c); In re Fairway Grp. Holdings Corp. Sec. Litig., No. 14 Civ. 0950 (LAK)(AJP), 2015 WL 4931357, at *14 (S.D.N.Y. Aug. 19, 2015) (holding statements regarding expected expansion of Fairway stores were forward-looking), report and recommendation adopted, No. 14 Civ. 0950, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015).

Further, these statements are accompanied by meaningful cautionary language. For example, when asked on the July 29, 2019 earnings call if there were challenges with "talent acquisition on the BPA side," Sarvadi responded, "Yes. No question. I mean it is a tight labor market out there." ECF No. 54-9 at 9. Similarly, Insperity's April 29, 2019 and July 29, 2019 Forms 8-K listed "failure to manage growth of our operations and the effectiveness of our sales and marketing effort" among the risks Insperity faced that could cause results to differ from its predictions. ECF No. 54-7 at 7; ECF No. 54-8 at 7.[5]

In sum, none of the statements are actionable because they are forward-looking and accompanied by meaningful cautionary language.

### (c) Opinion Statements

In addition, many of the statements plaintiff challenges are also protected as opinion statements. Among those are Sarvadi's statements on the April 29, 2019 and July 29, 2019 earnings calls that Insperity was "on track" to meet its growth estimates, "where we intend to be" with regard to the number of BPAs retained, and "capable of growing that base of [BPAs] at the target[] levels,"

---

[5]    "[C]ourts in this Circuit routinely find that references to SEC filings that expound more fully on the risks suffice to adequately convey the risks." In re Dynagas LNG Partners LP Sec. Litig., 504 F. Supp. 3d 289, 319 (S.D.N.Y. 2020). Sharp noted on the April 29, 2019 and July 29, 2019 earnings calls that investors should refer to "the company's public filings, including the Form 8-K filed today" "[f]or a more detailed discussion of the risks and uncertainties that could cause actual results to differ materially from any forward-looking statements . . . ." ECF No. 58-1 at 4; ECF No. 54-9 at 4.

CAC ¶¶ 73,86,90.  None of the exceptions set out in <u>Omnicare</u> apply.
Therefore, these statements cannot be the predicate of a securities
fraud claim.

First, in the absence of any allegation that the speakers
did not hold the stated beliefs at the time the statements were
made, plaintiff's complaint rests on the inaccuracy of defendant's
predictions.  But "a sincere statement of pure opinion is not an
'untrue statement of material fact,'" regardless of "whether an
investor can ultimately prove the belief wrong."  <u>Omnicare</u>, 575
U.S. at 186.

Second, as just described, there is no allegation that the
defendants' statements of fact were untrue at the time that they
were made — only that they were overly optimistic.  But exuding
confidence while acknowledging risk does not constitute a
misstatement.  <u>Jones v. Perez</u>, 550 F. App'x 24, 26 (2d Cir. 2013)
(holding that "misguided optimism" is not a cause of action).
Moreover, defendants' statements were only predictions, not
guarantees.  <u>See</u> <u>In re HEXO Corp. Sec. Litig.</u>, 524 F. Supp. 3d
283, 309 (S.D.N.Y. 2021) (holding statements that defendant was
"confident" about reaching target and defendant corporation was
"on track" to do so were "not guarantees" and not actionable
statements).  As such, the statements are non-actionable opinion
statements.

### (d)   Duty to Disclose

Plaintiff's allegation that defendants were obligated to disclose that "the Company did not have, and was not hiring or retaining, a sufficient number of trained BPAs to make the sales required to support its WSEE and financial growth outlook for FY 19," CAC ¶ 66(a), also lacks a basis in law or fact.  Plaintiff's complaint acknowledges that, rather than withholding information, defendants provided investors with regular quarterly updates on the number of BPAs and level of sales, and adjusted their predictions downward where necessary.  See, e.g., id. ¶¶ 83–84, 86, 120.  Similarly, defendants also revised Insperity's growth targets each quarter.  Id. ¶¶ 27, 84, 120.  Indeed, the CAC notes that when these targets were adjusted downward, following Insperity's quarterly disclosures, Insperity's stock price dropped.  See id. ¶¶ 23, 32, 133.  This drop in the stock price indicates that Insperity's investors had received sufficient facts to evaluate the growth trends of Insperity.  See In re HEXO, 524 F. Supp 3d. at 310 (finding that drop in stock price after earnings call indicated that investors understood risks conveyed in call).

Moreover, plaintiff cannot assert that defendants were required to update their predictions before their quarterly disclosures.  Defendants had no duty to update investors outside of the affirmative disclosure requirements promulgated by the SEC "[e]ven though defendants may have learned . . . that that their

prior predictions would prove incorrect." In re Duane Reade, 2003 WL 22801416, at *7.   Even when "facts are material, a business need not disclose them immediately; rather, 'the timing of disclosure is a matter for the business judgment of the corporate officers entrusted with the management of the corporation within the affirmative disclosure requirements promulgated by the exchanges and by the SEC.'" Id. at *7, n. 15 (quoting SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 851, n. 12 (2d Cir. 1968)).   Here, defendants were forthcoming and timely disclosed their quarterly results and their success (or lack thereof) in hiring BPAs.   See e.g., CAC ¶¶ 27, 84, 86, 90.

Plaintiff has therefore not stated a claim that defendants made false or misleading statements regarding Insperity's BPAs.

### 2. **Statements Regarding the Visibility of Health Care Claims**

Plaintiff also claims that Insperity made false or misleading statements with regard to Insperity's access to current health insurance claims data from UnitedHealthcare.   See CAC ¶ 18(b). Plaintiff bases this allegation primarily on Insperity's statement in its February 11, 2019 10-K that, "[o]n an ongoing basis, we evaluate these [liability and expense] estimates, including those related to health and workers' compensation insurance claims experience . . . ."   CAC ¶ 65.   Plaintiff also relies on Sharp's statement on the April 29, 2019 earnings call, that "we're still

looking at a benefit cost trend . . . but where we look today [in terms of benefit cost] is more towards the low end of that." <u>Id</u>. ¶ 75.  In addition, plaintiff points to Sarvadi's statement on the July 29, 2019 earnings call that "the predictability of the cost of our health plan is excellent on an annual basis . . . We've analyzed our underlying plan trends . . . Based on that analysis, we expect large claims to normalize and overall benefit cost trend to remain relatively low for the remainder of 2019." <u>Id</u>. ¶ 87.

Plaintiff contends that these statements amount to an assertion that defendants have continuous access to health insurance claims data.  As such, plaintiff contends these statements are false or misleading because defendants in fact only met monthly with United Healthcare and only received medical claims activity data on a quarterly basis.  But evaluating claims on an "ongoing basis" is not inconsistent with the Company only receiving health care claims data via quarterly updates, along with its monthly meetings with UnitedHealthcare.  While plaintiff cites to the dictionary definition of "ongoing" to argue that defendants were promising "continuing" or "current" insights, Opp. at 12, it is not uncommon to use "ongoing" to mean "on a regular basis." Indeed, as defendants point out, the SEC speaks this way.  <u>See,</u> <u>e.g.,</u> U.S. Securities and Exchange Commission, <u>Form 10-K</u>, https://www.investor.gov/introduction-investing/investing-basics/glossary/form-10-k (explaining "[t]he federal securities

laws require publicly reporting companies to disclose information on an ongoing basis," including through "quarterly reports").

Moreover, even if there were some ambiguity, Insperity's FY18 10-K makes clear that Insperity's predictions are based on quarterly claims activity.  See ECF No. 54-1 at 37 ("The estimated incurred claims are based upon: (1) the level of claims processed during the quarter; (2) estimated completion rates based upon recent claim development patterns under the plan; and (3) the number of participants in the plan . . . .").  The 10-K continues to say that "[e]ach reporting period, changes in the estimated ultimate costs resulting from claim trends, plan design and migration, participant demographics and other factors are incorporated into the benefits costs," and clarifies that these changes are made based on the "reporting quarter."  Id.  In this context, there is no misleading statement.  See In re Skechers USA, Inc. Sec. Litig., 444 F. Supp. 3d 498, 516 (S.D.N.Y. 2020) ("The key question in considering the misleading nature of a statement is 'whether defendants' representations, taken together and in context, would have misle[d] a reasonable investor,' not whether it is susceptible to any interpretation that could generate misleading impressions when read in isolation.") (quoting McMahan & Co. v. Wherehouse Ent., Inc., 900 F.2d 576, 579 (2d Cir. 1990)).[6]

---

[6]     Plaintiff also points to a statement from an analyst who asked about an "earlier warning system," Opp. at 11, CAC ¶ 104.  While plaintiff describes this analyst as "shocked," Opp. at 11, there is no evidence in the record to

Plaintiff also states that Insperity asserted an ability to accurately foresee health care costs for the entire upcoming year. Plaintiff contends that defendants stated that "as of the first week of February 2019 . . . they had full visibility into the Company's pricing and annual healthcare benefit costs, indicating that the Company both had access to current claims data and could accurately forecast from such information[.]" CAC ¶ 64. Plaintiff makes that assertion based on a partial quotation - "[w]e are able to see the full picture of this change and we can confirm that we are in excellent shape for the starting point for 2019. This view into pricing includes all the elements of our direct costs, including benefits . . . " - which Sarvadi said on the February 11, 2019 earnings call. Id. ¶ 9. However, in full, Sarvadi said:

> Another important measure of a successful fall campaign for Insperity is the effect on pricing of the book of business, after accounting for the volume of new sales, client renewals and client terminations occurring at year end. We are able to see the full picture of this change each year in the first week of February, and we can confirm that we are in excellent shape for the starting point for 2019. This view into pricing includes all the elements of our direct costs, including benefits, payroll tax and workers compensation allocation in addition to HR service fees and other smaller items.

ECF No. 54-3 at 6. Plaintiff's reading of the statement is, to put it charitably, strained. In context, the statement that "[w]e

---

support that characterization. Nevertheless, even if the analyst had been "shocked," it would be insufficient to demonstrate that the challenged statements regarding Insperity's access to healthcare were false or misleading, especially in light of Insperity's clear statements.

are able to see the full picture of this change" is a present-
tense statement about the health of the company as of February
2019, not a predictive statement.  As a significant portion of
Insperity's book of business typically renews near the beginning
of the year, see CAC ¶ 106, it makes sense that Insperity assessed
its financial health at that time.  There is no specific statement
that Insperity could accurately foresee health care claims.
Moreover, any contention that a reasonable investor would think
that Insperity could accurately guarantee what claims would occur
for the upcoming year begs credulity.  Health care claims are, by
their nature, inherently unpredictable.  In context, plaintiff has
not pled any reason why this is false or misleading.

     In any event, Sarvadi's statement on the February 11, 2019
call that Insperity was in "excellent shape" at the beginning of
2019, id. ¶ 9, is puffery, and therefore not actionable.  See
Abengoa, 481 F. Supp. 3d at 211-12 (finding statements that company
had a "comfortable outlook for the future" and "excellent position"
were "expressions of corporate optimism and puffery too general to
cause a reasonable investor to rely upon them."); In re Duane Reade
Inc. Sec. Litig., 2003 WL 22801416, at *4 (holding that an
actionable statement "must be one of existing fact, and not merely
an expression of opinion, expectation or declaration of
intention") (citations omitted).  Likewise, Insperity's statement
in its February 11, 2019 press release that it was "well-positioned

to continue our strong financial performance," CAC ¶ 60, is also puffery.  As a result, these statements cannot be the basis for a securities fraud claim.

### 3.  <u>Statements Regarding Sales and Growth</u>

Plaintiff also contends that defendants made false statements regarding Insperity's sales in the first half of 2019. Specifically, plaintiff argues that Sarvadi's statements on the July 29, 2019 earnings call that "[n]ew sales were 101% of forecast over the first half of the year" and that Insperity was "above last year in sales for this year" are false or misleading.  CAC ¶¶ 86, 89.  Plaintiff bases this claim on Sarvadi's statement on the November 4, 2019 conference call that, "the biggest difference from last year in mid-market sales is the lower average size of accounts sold and the fact that we did not close a large enterprise account like we did last year."  <u>Id</u>. ¶ 102.  Plaintiff claims that in making the November 4, 2019 statement, Sarvadi acknowledged his July 29, 2019 statements as false.  <u>Id</u>.[7]  Again, there is no contradiction here.  As we have previously discussed, falsity requires more than plaintiff's say-so.  <u>See</u> <u>Abnegoa</u>, 481 F. Supp. 3d at 207 ("The Second Circuit has repeatedly indicated that

---

[7]     Plaintiff also argues that these statements demonstrate that Sarvadi's April 29, 2019 statement that "[t]he size and maturity of our sales organization, combined with our mid-market sales success is now allowing us to grow the number of worksite employees at a faster rate than the growth rate of the number of BPAs," CAC ¶ 73, was false.  We have addressed this argument *supra* at Section III (A)(1)(a).

plaintiffs cannot simply assert that a statement is false—'they must demonstrate with specificity why . . . that is so.'") (citation omitted).  There is no inconsistency in Insperity having strong sales in the first half of the year, such that it was ahead of the prior year, and then having a weaker second half of the year.

Moreover, plaintiff cannot argue that Insperity ought to have made more disclosures regarding the size of sales to prevent Sarvadi's July 29, 2019 statements from being false or misleading. Insperity was abundantly transparent in disclosing the impact of the "large enterprise account" referenced in the November 4, 2019 call.  In fact, Sarvadi referenced an exceptionally large sale in the middle of 2018 on the July 29, 2019 earnings call.  ECF No. 54-9 at 8 ("We did have a really large account last year that came on midyear. We didn't have a repeat of that yet this year, but there's a lot of things in the hopper.").  Therefore, these statements are neither false nor misleading.

Plaintiff also challenges Sarvadi's statement on the July 29, 2019 call that Insperity had the "biggest pipeline we've had." CAC ¶ 89.  Plaintiff does not provide any basis to demonstrate that this statement was actually false.  All that plaintiff alleges is that this "biggest pipeline" did not result in sales consistent with defendants' growth targets for 2019.  As we have previously stated, defendants' misguided optimism is not a sufficient basis

for a securities claim.  Moreover, this statement is forward-looking.  See, e.g., In re Fairway, 2015 WL 4931357, at *14 (holding statement that "we have never been in a better position from a real estate pipeline prospective" was forward-looking). Further, this statement was accompanied by cautionary language. ECF No. 54-7 at 7 (noting that forward-looking statements may prove to be in accurate because, inter alia, of a "failure to manage growth of our operations and the effectiveness of our sales and marketing effort").  In sum, plaintiff has failed to identify a misleading statement concerning Insperity's sales and growth.

### 4. Failure to Admit a "Cost/Price" Mismatch

Plaintiff next alleges that defendants should have admitted that Insperity had a "cost/price mismatch."  Plaintiff's theory is that throughout the period from February 11, 2019 to February 11, 2020, Insperity's plan was underpriced compared to the cost of the health care claims, which led Insperity to raise prices and lose clients.  Opp. at 14-15.

Plaintiff alleges that while Sarvadi on November 4, 2019 denied that there was a "cost/price mismatch" such that Insperity did not "have to go back and hurry up and increase prices on customers," CAC ¶ 106, defendants "indirectly admitted" the cost/price mismatch, rendering his denial false.  Opp. at 14. Plaintiff's argument for this indirect admission has three parts. First, plaintiff argues that defendants admitted that pricing was

36

a systemic issue with Insperity's health plan because, on the February 11, 2020 earnings call, Sharp stated that the increased medical claims were "from different participants as opposed to ongoing claims from the same group of participants in prior periods."  CAC ¶ 128, Opp. at 14.  Next, plaintiff argues that Insperity admitted it had been raising prices in the second half of 2019 in its February 11, 2020 press release.  CAC ¶¶ 122, 125; Opp. at 14.  Finally, plaintiff contends that Sarvadi's statement on the November 4, 2019 conference call that Insperity was "a little ahead" on renewals, CAC ¶ 106, is false because on the February 11, 2020 earnings call Sarvadi explained that ultimately some existing clients left and sales were down as a result of "cost or value considerations," id. ¶ 123; Opp. at 14-15.

Plaintiff's argument that these statements constitute an admission of a cost/price mismatch fails because it relies on selectively emphasizing certain of defendants' statements and ignoring others.  For example, plaintiff fails to mention that Sarvadi explained on the November 4, 2019 call that built-in pricing changes that were part of Insperity's existing strategy of assessing pricing on an ongoing basis.  See ECF No. 54-4 at 8 ("So on the pricing side, we have an ongoing process where we are pricing every new and renewing customer every month based on the most recent information that we have. So we've been continuing to move pricing up accordingly.").  Sarvadi explained that it was

precisely for this reason that there was no cost/price mismatch, because although there had been a 3.7% increased cost trend, "[o]ur normal pricing strategy would actually have us pricing at a higher number than that . . . and we don't have -- what -- a cost price mismatch, we don't have to go back and hurry up and increase prices on customers." Id. at 10.

Plaintiff also fails to account for the fact that defendants did react to higher costs throughout the year. Insperity revised its adjusted EPS and adjusted EBITDA targets down in its press releases issued on July 29, 2019 and November 4, 2019, taking into account the increased costs of the large health claims. See e.g., CAC ¶ 120 (summarizing Insperity's 2019 guidance). Sharp also announced on the November 4, 2019 earnings call that although Insperity did not believe that the claims data pointed to "an ongoing issue with the health plan," Insperity would "take a more conservative approach to estimating benefit costs for the fourth quarter by not assuming a further reduction in large claim levels for the remainder of 2019." ECF No. 54-4 at 7.

Moreover, plaintiff argues that defendants must have realized that higher costs were a systemic issue in advance of Sharp's statement on the February 11, 2020 call. But plaintiff does not explain why this is so. In fact, the historic record is to the contrary. On the November 4, 2019 call, Sharp stated that, "[t]wo consecutive quarters of large health care claim payments at these

elevated levels is a historical anomaly for us." Id. at 6.  He
noted that Insperity "historically had a strong track record in
predicting our total claim costs on an annual basis.  It appears
that 2019 will be an exception due to this recent spike in large
claims." Id.  Sharp further stated that the same evidence that
plaintiff contends shows a systemic issue - that Insperity's large
claims came from different groups of participants - "points to the
randomness of these 2 isolated events." Id. at 6-7.  Essentially,
plaintiff's claim is that Insperity and its officers should have
determined sooner that higher costs due to large claims would
continue.  But while defendants may have been mistaken about
whether large claims would continue, it is not a securities fraud
for defendants to have reasonably concluded that higher health
care costs were anomalous.  This is especially true given
defendants' prior history of reliably predicting plan costs, which
plaintiff does not contest.

Furthermore, plaintiff has not pled that the statement that
Insperity was "a little ahead" on renewals was false when made.
In context, defendant Sarvadi said, "Now the year-end, we have .
. . a little over 40% of our book of business renews in this
January to February time period. And those -- we're well into
renewing those accounts already and -- or actually a little ahead
on that. But those -- those -- the pricing on those accounts goes
out in October, typically . . . ." CAC ¶ 106.  There is no

inconsistency with Insperity being ahead on renewals in November 2019, but ultimately being behind on renewals by February 2020, particularly when the bulk of the renewals typically occur in January or February. Here again, plaintiff has failed to plead a false statement of fact or omission.

### 5. **Purchase of Stop-Loss Protection**

Finally, plaintiff contends that defendants made a false statement regarding Insperity's purchase of stop-loss protection. Plaintiff bases this claim on a statement SunTrust Robinson Humphrey - not defendants - made in an analyst report published on November 26, 2019, which followed the November 25, 2019 call. This report stated that Insperity imposing a limit "on claim liability is possible, but unlikely to be doable in such a way that would make economic sense [for Insperity]." CAC ¶ 114. Plaintiff contends this is a false statement because within a few weeks thereafter, in January 2020, Insperity purchased stop-loss protection. Id. ¶ 41.

Before assessing the falsity of the statement, it is necessary to determine if it is even attributable to the defendants. "Under the law of this circuit, plaintiffs may state a claim against corporate officials for false and misleading information disseminated through analysts' reports by alleging that the officials either: (1) intentionally foster[ed] a mistaken belief concerning a material fact that was incorporated into reports; or

40

(2) adopted or placed their imprimatur on the report." <u>Novak v.</u>
<u>Kasaks</u>, 216 F.3d 300, 314 (2d Cir. 2000) (citation and internal
quotation marks omitted).  Plaintiff fails to make either showing.
First, plaintiff does not show that defendants intentionally
fostered a mistaken belief concerning a material fact that was
incorporated into the report.  In fact, Sarvadi noted on the
November 25, 2019 call that stop-loss coverage, which, as Sarvadi
clarified on the call, is also known as a "pooling limit" was
"something we're looking at, it's something we're evaluating.
We'll make a determination as we go on to the next plan year of
whether or not we want to add a pooling limit." ECF No. 54-6 at
5.[8]  Sarvadi therefore did not intentionally foster a mistaken
belief concerning a material fact.  Further, plaintiff does not
allege that the defendants "adopted or placed their imprimatur on
the report." <u>Novak</u>, 216 F.3d at 314.  Thus, the statement is not
attributable to defendants, and plaintiff has failed to allege a
misstatement of a material fact.

In short, plaintiff has failed to plead that defendants made
false or misleading statements with regard to stop-loss
protection.

---

[8]    It appears that SunTrust Robinson Humphrey misreported Sarvadi's
statement and confused the stop-loss coverage with an "aggregate limit to
[Insperity's] spend", which Sarvadi said was "highly unlikely that it would be
doable at a level that would have made a difference in this scenario." <u>Id</u>.

**B.  Scienter**

Plaintiff's complaint does not survive the motion to dismiss for the separate and independent reason that plaintiff has failed to plead scienter.  "The requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  ECA, 553 F.3d at 198.  Plaintiff has failed to allege scienter under either theory.

**1.  Motive and Opportunity**

"In order to raise a strong inference of scienter through 'motive and opportunity' to defraud," plaintiff must allege that the defendants benefited "in some concrete and personal way from the purported fraud."  Id.  The only allegations plaintiff makes regarding motive or opportunity is that defendants Sarvadi and Sharp sold stock during the class period.  CAC ¶¶ 50-51.  However, to prevail on a motive or opportunity theory, plaintiff "must establish that the sales at issue were 'unusual' or suspicious."  In re Skechers USA, Inc. Sec. Litig., 444 F. Supp. 3d 498, 523 (S.D.N.Y. 2020); see also id. (holding that whether the trading activities at issue were "unusual" or "suspicious" turns on seven factors).  Plaintiff does not even endeavor to allege that the sales were unusual or suspicious or begin to address the factors.

Thus, plaintiff has failed to establish an inference of scienter under the motive and opportunity prong.

Moreover, the fact that Insperity repurchased over $200 million of stock during 2019, including almost $50 million of stock in the fourth quarter of 2019, ECF No. 54-10 at 6-7, undercuts any inference of scienter.  It would make no economic sense for Insperity to inflate its stock price, so that, in turn, it could buy its own stock back at a higher, inflated price in the fourth quarter of 2019.  See Turner v. MagicJack VocalTec, Ltd., No. 13 Civ. 0448 (RWS), 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014) ("[D]uring the Class Period, magicJack was engaged in a massive, $100 million stock buyback," so it was "unreasonable to assume that magicJack would artificially inflate its stock price when it was repurchasing a significant amount of its own shares on the open market."); Davidoff v. Farina, No. 04 Civ. 7617, 2005 WL 2030501 (NRB), at *11, n.19 (S.D.N.Y. Aug. 22, 2005) (finding no strong inference of scienter where "it would have made no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail.").  Plaintiff has therefore not shown motive or opportunity.

## 2. **Recklessness**

When a plaintiff cannot show motive or opportunity, a plaintiff can still establish a "strong inference of scienter under the strong circumstantial evidence prong, though the strength of

the circumstantial allegations must be correspondingly greater if there is no motive." ECA, 553 F.3d at 199 (citation and quotation marks omitted). To establish this inference, plaintiff must either allege that defendants "(1) benefit[]ed in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." Id. (internal quotation marks omitted). Taking each alternative seriatim, plaintiff does not make this showing.

First, as we have already discussed, supra, plaintiff has not shown that defendants benefited from the alleged fraud. Plaintiff's only allegations that relate to a potential benefit is that the individual defendants sold stock. While a sale of stock that has been artificially inflated could constitute a benefit under this prong, plaintiff's naked allegation that the individual defendants sold stock during the alleged class period is grossly insufficient to plead a benefit to support a claim of scienter.

Second, plaintiff does not make any specific allegation that any defendant engaged in deliberately illegal behavior.

Third, we have already examined in depth each of the statements plaintiff relies on in claiming that the individual defendants misrepresented the truth, see Section III(A), supra, and have not found any statement to be false or misleading.

44

Plaintiff's theory is the type of "fraud by hindsight" that has been routinely rejected. See, e.g., In re Duane Reade, 2003 WL 22801416, at *10 ("Plaintiffs' argument that because sales were down at the end of the first quarter, the impending final results for the second quarter must have been apparent throughout the quarter . . . mimics the typical type of 'fraud by hindsight' theory that courts have been unwilling to entertain."). Plaintiff does not point to any contradictory predictions, reports, or piece of information that defendants actually possessed that demonstrated their statements were false. Without these allegations, the "mere inconsistency between the challenged statements and after-the-fact results" "amounts to nothing more than a claim of 'fraud by hindsight,' which the Second Circuit has held insufficient to plead scienter." Skechers, 444 F. Supp. 3d at 528; see also In re HEXO, 524 F. Supp. 3d at 314 ("Given the nature of plaintiffs' theory of scienter, their abject failure to identify any reports or statements containing adverse facts to which defendants had access at the time the statements at issue were made is itself fatal to plaintiffs' Section 10(b) claims."). As such, plaintiff has failed to demonstrate scienter.

Finally, plaintiff does not allege that defendants failed to check information that they had a duty to monitor. Therefore,

plaintiff has failed to show an inference of scienter sufficient to survive a motion to dismiss.[9]

### C. § 20(a) Claim

In order to state a claim of control person liability under § 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 236 (2d Cir. 2014) (citation omitted).  As demonstrated in this opinion, plaintiff has failed to plead an underlying primary violation.  Therefore, the § 20(a) claim fails.

### IV.  Conclusion

For the reasons set forth above, defendants' motion to dismiss is granted and the complaint is dismissed with prejudice.  The Clerk of the Court is respectfully requested to close this case on the Court's docket.[10]

---

[9]     The parties do not distinguish between individual and corporate scienter in briefing.  However, plaintiff relies on the same fraud by hindsight theory with respect to both the individual defendants and the corporate defendant. For the same reasons that plaintiff does not show individual scienter, plaintiff also does not show corporate scienter.

[10]     Plaintiff requests, in a single sentence at the end of its brief, that it be given the opportunity to replead if the motion to dismiss is granted. However, plaintiff does not explain how it would amend its complaint, and as such, its request is insufficient.  See In re Ferrellgas Partners, L.P., Sec. Litig., No. 16 Civ. 7840 (RJS), 2018 WL 2081859, at *20 (S.D.N.Y. Mar. 30, 2018) ("[D]istrict courts may deny leave to amend when plaintiffs request such leave in a cursory sentence on the last page of an opposition to a motion to dismiss,

**SO ORDERED.**

Dated:      New York, New York
            March 15, 2022

_____
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

without any justification or an accompanying suggested amended pleading."), aff'd, 764 F. App'x 127 (2d Cir. 2019) (summary order).  Moreover, plaintiff has had the benefit of reviewing the initial complaint filed in this case, ECF No. 1, and filing a corrected amended complaint, ECF No. 37.  Plaintiff also had an opportunity to amend its complaint in light of defendants' proposed motion to dismiss, see ECF No. 40, and chose not to take that opportunity.  We therefore deny plaintiff's cursory request for leave to replead.  See Rosner v. Star Gas Partners, L.P., 344 F. App'x 642, 644 (2d Cir. 2009) (affirming District Court's decision to dismiss case with prejudice without leave to replead where plaintiff had prior opportunity to amend pleading).